No. 02-465C
(Judge Hewitt)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LA GLORIA OIL AND GAS COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT AND SUPPLEMENTAL APPENDIX

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

HOWARD M. KAUFER
Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

DONALD S. TRACY
Trial Attorney
Defense Supply Center
Richmond, VA

March 31, 2006

# TABLE OF CONTENTS


STATEMENT OF THE ISSUES .......... 1

STATEMENT OF THE CASE .......... 3

I. Nature Of The Case .......... 3

SUMMARY OF MATERIAL FACTS .......... 4

I. La Gloria's Contracts .......... 4

II. DESC's Small Business Set-Aside Program .......... 6

SUMMARY OF THE ARGUMENT .......... 7

ARGUMENT .......... 10

I. Standard of Review .......... 10

II. DESC's EPA Clauses Are Authorized by FAR 16.203-1 .......... 11

A. EPA Clauses Need Not Be Based Upon The Contractor's Own Prices .. 11

B. La Gloria's Fair Market Value Allegations Do Not State A Cause of Action .......... 16

C. La Gloria's FAR 15.802(b) Allegation Does Not State A Cause of Action .......... 17

D. Summary .......... 20

E. La Gloria Cannot Demonstrate Harm .......... 21

III. La Gloria's Alternative Illegality Theories In Counts II-VI Must Be Dismissed 22

A. Count II (Misrepresentation) .......... 22

B. Count III ("Breach of Contract") .......... 23

C. Count IV ("Implied-In-Fact Contract") .......... 24

D. Count V ("Failure of Consideration and Frustration of Purpose") .......... 24

E. Count VI (Mistake) .......... 25

1. Mutual Mistake ........ 26

2. Unilateral Mistake ........ 27

IV. Count VII (Takings Allegation) Fails To State A Claim ........ 29

V. La Gloria's Complaints Concerning DESC's Small Business Program Must Be Dismissed ........ 31

A. The Court Lacks Jurisdiction To Entertain The Fifth Amendment Complaint ........ 31

B. DESC's Small Business Does Not Constitute An Auction ........ 32

C. The Court Lacks Jurisdiction To Entertain The Complaint That DESC's Small Business Program Violates FAR 52.219-7, Which It Does Not .. 34

VI. Waiver and Estoppel Bar La Gloria's Claims ........ 35

CONCLUSION ........ 39

**INDEX TO THE SUPPLEMENTAL APPENDIX**

Declaration of John R. Walker ........ 1

DESC Clauses ........ 4

FAR Part 15, 15.610 Written or oral discussion ........ 8

52.219-7 Notice of Partial Small Business Set-Aside (Oct. 1995) ........ 10

Notice of Evaluation Preference for Small Disadvantaged Business Concerns (Jun. 1997) ....... 11

Notice of Partial Small Business Set-Aside With Preferential Consideration for Small Disadvantaged Business Concerns Clause (May 1995) ........ 14

DFSC Memo, re: Base Reference Date for EPA References Tied to Petroleum Marketing Monthly (PMM), dated January 6, 1986 ........ 18

Defense Logistics Agency Inter-Office Memorandum, dated December 2, 1987 Subject: Economic Price Adjustment in the Domestic Bulk Program ........ 20

Excerpt of Deposition of Lawrence Ervin, dated December 1, 2003 ........ 27

Request for Class Deviation and Permanent Coverage in DLAR, dated May 12, 1995 ............ 37

Comptroller General Opinion re: DFSC Small Business Set-Aside Procurements .................... 42

Excerpt from Platts web site ........................................................................................ 47

## TABLE OF AUTHORITIES

## CASES

All Phase Environmental, Inc.,
B-292-919.2, 2004 CPD ¶ 2004 WL 437450 ........................................................ 19

Am. Tel. & Tel. Co. v. United States,
177 F.3d 1368 (Fed. Cir.1999) ........................................................................ 19

Am. Tel. & Tel. Co. v. United States,
307 F.3d 1374 (Fed. Cir. 2002) .................................................................. passim

American Commerce National Bank v. United States,
38 Fed. Cl. 271 (1997) ................................................................................. 29

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ..................................................................................... 10

Atlas Corp. v. United States,
895 F.2d 745 (Fed. Cir. 1990) ........................................................................ 26

Barrett Refining v. United States,
242 F.3d. 1055 (2001) .................................................................................. 24

Bernaugh v. United States,
38 Fed. Cl. 538 (1997), aff'd., 168 F.3d 1319 (Fed. Cir. 1998) (table) ......................... 30

Brookhard v. Janis,
384 U.S. 1 (1966) ........................................................................................ 36

Calcasieu v. United States, 2003 WL 22049528 .......................................................... 37

CCD Distributors, Inc. v. U.S., 69 Fed. Cl. 277 (2006) ................................................ 16

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ..................................................................................... 10

Conley v. Gibson,
355 U.S. 41 (1957) .......... 11

DGS Contract Services, Inc. v. United States,
43 Fed. Cl. 227 (1999) .......... 33

Dairyland Power Cooperative v. United States,
16 F.3d 1197 (Fed. Cir. 1994) .......... 26

Dale Ingram, Inc. v. United States,
201 Ct. Cl. 56, 475 F.2d 1177 (1973) .......... 27

Durable Metals Prods., Inc. v. United States,
27 Fed. Cl. 472 aff'd, 11 F.3d 1071 (Fed. Cir. 1993) (table) .......... 20

Dynalectron Corp. v. United States,
4 Cl. Ct. 424 (1984), aff'd, 758 F.2d 665 (Fed. Cir. 1984) .......... 31

E. Walters & Co., Inc. v. United States,
217 Ct. Cl. 254, 576 F.2d 362 (1978) .......... passim

Eastport Steamship Corp. v. United States,
178 Ct. Cl. 599, 372 F.2d 1002 (1967) .......... 31

Everett Plywood Corp. v. United States,
227 Ct. Cl. 415, 651 F.2d 723 (1981) .......... 25

Far West Fed. Bank v. OTS,
119 F.3d 1358 (9th Cir. 1997) .......... 25

Florida Rock Indus. Inc. v. United States,
791 F.2d 893 (Fed. Cir. 1986) .......... 29

Fraass Surgical Mfg. Co., Inc. v. United States,
215 Ct. Cl. 820, 571 F.2d 34 (1978) .......... 28, 29

Freightliner Corp. v. Caldera,
225 F.3d 1361 (Fed. Cir. 2000) .......... 18

Glopak Corporation v. United States,
12 Cl. Ct. 96 (1987), aff'd., 851 F.2d 334 (1988) .......... 29

Gold Line Refining v. United States, 54 Fed. Cl. 285 (2002) .......... 37

Gould, Inc. v. United States,

935 F.2d 1271 (Fed. Cir. 1991) ........................................................................... 11

Gratz v. United States,
25 Cl. Ct. 411, aff'd, 985 F.2d 583 (Fed. Cir. 1992) .............................................. 30, 31

Hermes v. United States, 58 Fed. Cl. 3, 19 (2003)) ................................................................ 37

Hermes v. United States,
58 Fed. Cl. 409 (2003) ......................................................................................... passim

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2001) ........................................................................... 30

Hume v. United States,
21 Ct. Cl. 328 (1886), aff'd., 132 U.S. 406 (1889) ....................................................... 28

Inupiat Community of the Arctic Slope v. United States,
230 Ct. Cl.647, cert. denied, 459 U.S. 969 (1982) ....................................................... 32

J&E Salvage v. United States,
37 Fed. Cl. 256 (1997) ......................................................................................... 27, 28

John Massman Contracting Co., v. United States,
23 Cl. Ct. 24 (1991) ............................................................................................. 23

LaBarge Prods., Inc. v. West,
46 F.3d 1547 (Fed. Cir. 1995) ................................................................... 21, 22, 35

LaGloria v. United States, 56 Fed. Cl. 211 (2003) ................................................................ 37

Larson v. Domestic & Foreign Commerce Corp.,
337 U.S. 682 (1949) ............................................................................................. 30

LeBlanc v. United States,
50 F.3d 1025 (Fed. Cir. 1995) ............................................................................. 32

Liebherr Crane Corp. v. United States,
810 F.2d 1153 (Fed. Cir. 1987) ........................................................................... 28

Ling-Temco-Vought, Inc. v. United States,
201 Ct. Cl. 135 (1973) ......................................................................................... 38, 39

MAPCO Alaska Petroleum, Inc. v. United States,
27 Fed. Cl. 405 (1992) ......................................................................................... passim

Montana v. United States,
124 F.3d 1269 (Fed. Cir. 1999) ........ 10

Morrison-Knudsen Co. v. United States,
170 Ct. Cl. 712 (1965) ........ 23

Mullenberg v. United States,
857 F.2d 770 (Fed. Cir. 1988) ........ 32

Navajo v. United States, 58 Fed. Cl. 200, 213 (2003) ........ 37

Northern Helex Co. v. United States,
197 Ct. Cl. 118 (1972) ........ 38

Perpetual Financial Corp. v. United States,
61 Fed. Cl. 126 (2004) ........ 25

Reservation Ranch v. United States,
39 Fed. Cl. 696 (1997), aff'd, 217 F.3d 850 (Fed. Cir. 1999) (table) ........ 36

Rochman v. United States,
27 Fed. Cl. 162 (1992) ........ 11

Seaboard Lumber Co. v. United States,
903 F.2d 1560 (Fed. Cir. 1980) ........ 36

Seaboard Lumber v. United States,
308 F.3d 1283 (Fed. Cir. 2002) ........ 25

Sherwood v. Walker,
66 Mich. 568, 33 N.W. 919 (1887) ........ 26

Short Bros., PLC v. United States,
65 Fed. Cl. 695 (2005) ........ 18

Spalding & Sons, Inc. v. United States,
28 Fed. Cl. 242 (1993) ........ 25

Sun Oil Co. v. United States,
215 Ct. Cl. 716, 572 F.2d 786 (1978) ........ 30

Sunoco v. United States, 59 Fed. Cl. 390, 398 (2004) ........ 37

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987) ........ 10

Tabb Lakes, Ltd. v. United States,
10 F.3d 796 (Fed. Cir. 1993) .......................................................................... 29

Tesoro v. United States, 58 Fed. Cl. 65 (2003) .............................................................. 37

Tesoro et al. v. United States,
405 F. 3d 1339 (Fed. Cir. 2005) ................................................................ passim

Tony Downs Foods Co. v. United States,
209 Ct. Cl. 31, 530 F.2d 367 (1976) ................................................................ 28

Trauma Service Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) ...................................................................... 24

United States v. Connolly,
716 F.2d 882 (Fed. Cir. 1983), cert. denied, 104 S. Ct. 1414 (1984) ............................ 31

United States v. Hamilton Enterprises,
711 F.2d 1038 (Fed. Cir. 1983) ................................................................. 27, 28

United States v. Mitchell,
445 U.S. 535 (1980) ...................................................................................... 31

United States v. Sherwood,
312 U.S. 584 (1941) ...................................................................................... 31

United States v. Testan,
424 U.S. 392 (1976) ...................................................................................... 31

Whittaker Electronic Systems v. Dalton,
124 F.3d 1443 (Fed. Cir. 1997) ................................................................ 36, 37

**STATUTES**

10 U.S.C. § 2306(a) ........................................................................................ 20

10 U.S.C. § 2323 ............................................................................................. 6

15 U.S.C. § 644 ............................................................................................... 6

15 U.S.C. § 772 ............................................................................................... 5

28 U.S.C. § 1491 ............................................................................................ 31

41 U.S.C. § 423 .......... 33

FAR 15.402(a) .......... passim

FAR 15.610 .......... 32, 33

FAR 15.802(b) .......... passim

FAR 15.804-3 .......... 12, 13, 15

FAR 16.103(a) .......... 20

FAR 16.104 .......... 20

FAR 16.203-1 .......... passim

FAR 16.203-1(a) .......... 12

FAR 16.203-2 .......... 13

FAR 16.203-3 .......... 13, 14

FAR 16.203-4 .......... 12, 20

FAR 19.502-3(c) .......... 34

## MISCELLANEOUS

Formation of Government Contracts (3rd Ed. 1998) at 1279 ...................................................... 19

Restatement (Second) of Contracts § 151a ...................................................................... 28

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LA GLORIA OIL AND GAS COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-465C |
| v. | ) | (Judge Hewitt) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

The United States respectfully requests that the Court dismiss paragraphs 40 and 41 of the Amended Complaint ("Compl.") (small business complaints), pursuant to RCFC 12(b)(1), and the remainder of the complaint, pursuant to RCFC 56(b). In the alternative, defendant respectfully requests that the Court dismiss the remainder of the complaint pursuant to RCFC 12(b)(6). In support of this motion, we rely upon the Amended Complaint, the following brief, our proposed findings of uncontroverted fact ("PFF"), the exhibits filed with our motion for partial summary judgment ("Def. Exh."), and our supplemental appendix ("Supp. App.").

**STATEMENT OF THE ISSUES**

1. Whether the contracts at issue were illegal because their Economic Price Adjustment ("EPA") clauses were based upon "indexes rather than on Plaintiff's own established fuel prices," "were not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel," as alleged in Count I of the Amended Complaint.

2. Whether the allegation contained in Count II that the "PMM [Petroleum Marketing Monthly] indexes were not designed or intended to be used to set or adjust prices and which did not reflect at least the fair market value of military fuel" states a claim upon which

relief can be granted.

3. Whether the allegation contained in Count I that the EPA clauses violate the Federal Acquisition Regulation ("FAR") 15.402(a) states a claim upon which relief can be granted.

4. Whether, if the answers to Issues 2 and 3 are in the negative, Counts II-VI, which state alternative theories of relief based upon the same allegations concerning the PMM and are labeled as "Misrepresentation," "Breach of Contract," "Implied-In-Fact-Contract," "Failure of Consideration and Frustration of Purpose," and "Mistake," also should be dismissed for failing to state a claim upon which relief can be granted.

5. Whether the allegation contained in Count VII, that the contracts at issue effected a taking, states a claim upon which relief can be granted.

6. Whether this Court has jurisdiction to entertain the allegation contained in paragraph 46 that DESC violated "the equal protection component of the fifth amendment's due process clause by extending to minority-owned businesses bidding preferences."

7. Whether this Court has jurisdiction to entertain the allegation contained in paragraph 41 that DESC improperly solicited and awarded "portions of the procurements set aside for small businesses together with those for large businesses" and, if so, whether that is true.

8. Whether DESC used "prohibited auction techniques, whereby DESC awarded contracts to bidders that agreed to match other bidders' prices," as alleged in paragraph 40 of the complaint.

9. If the answers to any of the above are in the affirmative, whether La Gloria has

waived any applicable benefit, or is estopped from litigating their applicability.[1]

## STATEMENT OF THE CASE

I. Nature Of The Case

This case arises from six fuel supply contracts between La Gloria and the Defense Energy Support Center ("DESC"). Compl. ¶¶ 31.[2] La Gloria complains that the EPA clauses contained in DESC fuel contracts were illegal and pads these complaints with various common-law theories of relief and a takings theory of relief, premised upon the very same illegality. La Gloria also asserts that certain features of DESC's small business program also were illegal. Presuming it has thus destroyed the very contracts it made and performed, without complaint, the complaint concludes that La Gloria is "entitled to recover based on the fair market value of the fuel it delivered to DESC." Compl. ¶ 44.

In an earlier phase of this litigation, this case was stayed pending the outcome of an interlocutory appeal certified by this Court, and eventually resolved in Tesoro et al. v. United States, 405 F. 3d 1339 (Fed. Cir. 2005), *petition for reh'g. en banc denied*, No. 04-5064 (Fed. Cir. Aug. 22, 2005) ("Tesoro"). In Tesoro, the Federal Circuit held that DESC's PMM-based EPA clause was legal, and declined to reach the waiver issue. Following the decision in Tesoro, the Court permitted La Gloria to file its Amended Complaint, which includes what we consider

---

[1] In this case, the Court has held that a waiver would not bar La Gloria's FAR 16.203-1 illegality allegation. La Gloria v. United States, 56 Fed. Cl. 211 (2003). Accordingly, although we believe our position was correct, we do not address the applicability of waiver to that allegation here. The Court did not, however, address the effect of waiver upon La Gloria's small business program illegality and common law causes of action.

[2] Until 1998, DESC was called the Defense Fuel Supply Center ("DFSC"). We use the current name.

to be immaterial factual allegations concerning the PMM and to assert a cause of action pursuant to FAR 15.402(a) (contracting officer's duty to assure prices offered are fair and reasonable). See Compl. ¶ 38.

## SUMMARY OF MATERIAL FACTS

The evidence set forth in the accompanying proposed findings of uncontroverted fact is sufficient to establish the Government's right to dismissal of the complaint. Generally, the proposed findings describe the market-based nature of the EPA clauses at issue, DESC's long, controversy-free use of those clauses, La Gloria's failure to object to the use of, or application of, the clauses, until many years after performing the contracts, and La Gloria's long history and familiarity with these clauses. They also demonstrate that DESC's small business program is consistent with applicable laws and regulations.

### I. La Gloria's Contracts

La Gloria is a petroleum refiner operating in Texas. It also is an experienced Government contractor. Between 1993 and 1999, DESC paid La Gloria in excess of $137 million pursuant to the contracts at issue here, buying a total of more than 248 million gallons of jet fuel. PFF 4.

At issue are DESC-drafted price adjustment clauses. PFF 8-13.[3] These clauses adjusted the per-gallon "base price" offered by fuel suppliers. Id. Offerors also acknowledged a "reference price" for comparable petroleum products, which, since the early 1980s, has been

[3] DESC began using EPA clauses during the 1973 oil embargo. At that time, the agency allowed offerors to choose between basing price adjustments upon either published prices of refined products, or actual crude oil costs. DESC began using market-prices exclusively in the early 1980s, primarily because the prior practice made it difficult to compare offers for evaluation purposes. PFF 8.

taken from a number of widely-available petroleum price publications. PFF 9-11. After award, the base price per gallon was periodically adjusted up or down, by the exact number of fractions of a cent that the published reference price had risen or fallen since the last adjustment. PFF 9.

La Gloria's 1993 contract contained an EPA clause tied to monthly average sale prices of refined petroleum products, by region, as reported by the Petroleum Marketing Monthly. PFF 10. The PMM is published by the Department of Energy's Energy Information Administration, and reports transaction prices that refiners, including La Gloria, are required by law to submit monthly. PFF 11; 15 U.S.C. § 772.

Pursuant to the PMM-based EPA clause, suppliers' per-gallon prices were adjusted monthly. PFF 11. For example, for in 1993, La Gloria bid a base price of .566300 and .576300 cents per gallon for JP-8, tied to a PMM-based reference price, supplied by DESC, of .569500 cents per gallon for February, 1993. Def. Exh. 10 at 2, 7. Assuming hypothetically that, for the first month in which La Gloria delivered fuel, the reference price increased .10 cents, the contract price for that first month would have been the base price plus the same .10 cents per gallon.

In 1995, DESC adopted as its EPA escalator a widely-used industry publication, <u>Platts Oilgram Price Report</u> ("Platts"). PFF 13. Accordingly, La Gloria's 1995-1999 contracts used <u>Platts</u> as their price reference. <u>Id.</u> DESC did so because, despite substantial advantages offered by the PMM, including the fact that it was a report of <u>actual</u> sale prices, the report of those prices was not available until three months after the sales took place. PFF 12-13. The EPA clauses, however, required monthly payments and, therefore, price adjustments. To accommodate this gap between the payment date and the availability of the data necessary to calculate the economic price adjustment applicable to those payments, DESC made an estimated interim

payment and then reconciled that payment with the amount properly due when the applicable PMM sales data became available. PFF 13. Thus, La Gloria's suggestion that the change from PMM demonstrates that a PMM-based clause was illegal or not market-based is, simply, hyperbole. See, e.g., Compl. ¶¶ 14-19.

La Gloria never objected to the legality of any version of the EPA clause, or to any of the hundreds of price adjustments made pursuant to the clauses. PFF 28. Indeed, it was not until La Gloria submitted its first certified claim in 2001 – approximately eight years after the first contract was awarded, and nine years after MAPCO, 27 Fed. Cl. 405, was decided – that La Gloria alleged that the EPA clauses were illegal. Compl. ¶¶ 31; PFF 29.

## II. DESC's Small Business Set-Aside Program

In accordance with 15 U.S.C. § 644 and FAR Part 19, DESC's Bulk Fuels Program solicitations included partial small business set-asides. Beginning in 1988, pursuant to 10 U.S.C. § 2323, DESC solicitations also included an evaluation preference of up to 10 per cent for small disadvantaged business concerns. DESC solicitation clauses I237.05, Notice of Evaluation Preference for Small Disadvantaged Business Concerns, and I237.06, Notice of Partial Small Business Set-Aside with Preferential Consideration for Small Disadvantaged Business Concerns, set forth the operation of these programs. The clauses provided that awards will be made to those small disadvantaged concerns whose offered price does not exceed the highest price the Government would pay for the non-set-aside portion plus ten percent, as adjusted for transportation and other factors. Supp. App. 6 (subparagraph (c)).

DESC's domestic bulk fuels partial small-business set-aside program was described in the solicitation in DESC clauses I237.05 and I237.06 (DEVIATION). PFF 26. DESC also operated a small business set-aside program. Although small businesses could compete for non

set-aside amounts, DESC would award contracts to provide the set-aside amounts, the price for which was to be "negotiated by the Contracting Officer based upon prices the Government would otherwise pay under this solicitation had there been no set-aside for supply of the location at which the set-aside is placed, adjusted for transportation and other factors." Supp. App. 7 (subparagraph (d)). During the negotiations, the contracting officer did not provide small business concerns with either the identity or the prices of other offerors. Supp. App. 2 ¶ 5.

DESC's method of awarding partial set asides in its bulk fuels acquisitions differs from the standard FAR and DFARS procedures, in that DESC makes offers for the set aside quantities before award of the basic quantities. Supp. App. 2 ¶ 5; Supp. App. 5-7. The standard FAR and DFARS procedure is to offer set aside quantities after award of the basic quantities. Supp. App. 14-17. Where there is a set aside failure, the quantities are awarded to the low offeror for the basic quantity rather than being re-solicited as a new requirement. Id. This procedure avoids the delay that would take place in re-soliciting set aside failure quantities under the standard FAR and DFARS procedures. Id. DESC has used this method since the 1960's pursuant to authorized deviations. Id.; Supp. App. 42. The DESC procedure has been approved by the Government Accountability Office ("GAO"), formerly the General Accounting Office, on several occasions. Sup. App. 42.

## SUMMARY OF THE ARGUMENT

This case presents the incredible claim that an experienced Government supplier that performed at least six DESC contracts over seven years, without complaint, now is entitled to damages due to alleged defects in those contracts. Remarkably, La Gloria does not even allege that it misunderstood the clauses at issue, or that the clauses did not operate as their plain language suggests they would.

In Tesoro, 405 F.3d 1339, the Federal Circuit explicitly rejected La Gloria's stubborn contention that the clauses were illegal because they were based upon "indexes rather than on Plaintiff's own established fuel prices" (Compl. ¶ 36) and that DESC's PMM-based EPA clause is prohibited by the FAR. Tesoro also effectively disposed of La Gloria's miscellaneous complaints concerning the EPA clauses, found in Count I. In Tesoro, the court held that, in order to pass muster under FAR 16.203-1, EPA clauses may rely upon "industry-based prices," which "may be established by reference to either a catalog or market sources independent of the manufacturer or vendor." Id. at 1347. DESC's EPA clauses pass muster under Tesoro, because they are undeniably based upon "market sources independent of the manufacturer or vendor."

La Gloria contends that the EPA clauses are suspect because they were not "designed or intended" to set prices and did not "reflect at least the fair market value of military fuel." These allegations do not invoke any part of the legal test for EPA clauses and, therefore, fail to state a claim upon which relief may be granted. Indeed, even if the EPA clauses were shown to be inconsistent with the FAR, La Gloria never has demonstrated that they were administered or interpreted in a manner inconsistent with La Gloria's own understanding and expectations. In short, La Gloria cannot demonstrate an essential element of any request for equitable adjustment, harm.

La Gloria's parallel common law and takings allegations fare no better. The former, Counts II-VI, simply repackage La Gloria's illegality count as "Breach of Contract," "Implied-In-Fact-Contract," "Failure of Consideration and Frustration of Purpose," and "Mistake" counts. All are based upon the legally-unfounded premise that DESC owed a duty to La Gloria to utilize price references that were "designed or intended to be used to set or adjust prices," that the references "reflect at least the fair market value of military fuel," and that DESC pay "fair

market value." None is grounded in the language of La Gloria's actual contracts or the Federal Circuit's standard for assessing the legality of EPA clauses. All are thinly-disguised, back-door attempts to alter the legal standard for EPA clauses, established and applied in Tesoro. Accordingly, none of these states a cause of action upon which relief may be granted. To the extent they might, La Gloria simply cannot demonstrate the elements of proof necessary to sustain these traditional causes of action. The same is true of Count VII, which asserts that DESC's possession of the fuel purchased, *pursuant to the contracts at issue*, effected a taking. Count VII fails for the same reason as Counts II-VI. Moreover, it is well-established that, when the Government action at issue is subject to a contract claim, no Fifth Amendment takings may lie. Accordingly, Count VII, too, should be dismissed.

The complaint also quarrels with various aspects of DESC's small business program, without demonstrating what harm even a demonstrable violation might have had upon any of La Gloria's contracts. Specifically, the complaint alleges that: (1) DESC's small business set-aside program violates the FAR's anti-auction provisions; (2) that program violates the FAR's prohibition against "awarding portions of the procurements set aside for small business together with those for large businesses"; and (3) DESC's small disadvantaged business program violates the equal protection component of the Fifth Amendment. These counts offer little reason to keep this litigation afloat. First, La Gloria cannot demonstrate any link between these allegations and its contracts. Second, this Court has no jurisdiction to address an equal protection claim or the facial attack concerning the order of procurement award. Third, the programs were administered pursuant to applicable regulations.

Finally, if La Gloria's various allegations are not subject to dismissal for the reasons summarized above, we still are entitled to summary judgment, because, years ago, La Gloria

abandoned any rights the FAR, the Fifth Amendment, or small business regulations might have conferred. La Gloria also forfeited any right it might have had to test those rights in litigation when it waited as many as eight years to file the necessary claims. In a case involving similar circumstances, this Court already has held as much. Hermes II, 58 Fed. Cl. 409 (concerning the alleged FAR 16.203 violation). Although the Hermes Court did not explicitly address La Gloria's common law, takings and other auxiliary illegality causes of action, there is no principled basis for treating them differently.

## ARGUMENT

I. Standard of Review

Summary judgment is warranted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." RCFC 56(c); accord Montana v. United States, 124 F.3d 1269, 1273 (Fed. Cir. 1999). A factual issue is material if it could affect the outcome of the case in light of the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute exists only if a reasonable trier of fact could find for the nonmoving party. Id. The movant need not "produce evidence" of the absence of factual disputes; it need only "point[] out" that the record does not support the other party's case. Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1563 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

We have moved to dismiss some counts of the Amended Complaint pursuant to RCFC 12(b)(6), which permits the dismissal of an allegation that fails to state a claim upon which relief may be granted. Dismissal upon this ground is appropriate whenever "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

In making this determination, the Court must accept the factual allegations set forth in the complaint as true and "indulge in all reasonable inferences in favor of the nonmovant." Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991).[4]

II. DESC's EPA Clauses Are Authorized by FAR 16.203-1

In Count I, La Gloria presents several theories concerning the illegality of DESC's EPA clauses: (1) that the clauses were illegal because there were not based upon "Plaintiff's own established fuel prices" (Compl. ¶ 36); (2) that the clauses were illegal because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 37); and (3) that the contracts were awarded in violation of FAR § 15.802(b) (currently codified at FAR 15.402(a)) (contracting officer's duty to review offers for price reasonableness) (Compl. ¶ 38). As explained below, none of these allegations entitle La Gloria to readjust its contracts' prices, because, pursuant to the standards enunciated in Tesoro, the clauses are legal. In short, La Gloria's illegality allegations are based upon standards not found in the law and, therefore, fail to state a claim.

A. EPA Clauses Need Not Be Based Upon The Contractor's Own Prices

FAR 16.203-1 provides as follows:

> A fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies. Economic price adjustments are of three general types:
>
> (a) Adjustments based on established prices. These price adjustments are based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific

[4] However, "legal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." Rochman v. United States, 27 Fed. Cl. 162, 168 (1992)(quoting 2A Jeremy C. Moore, Moore's Federal Practice, ¶ 12.07 [2.-5] (2d ed. 1992)).

> items or the contract end items.
>
> (b) Adjustments based on actual costs of labor or material. These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.
>
> (c) Adjustments based on cost indexes of labor or material. These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

FAR Section 16.203-1(a) describes two types of "established" price adjustments -- those based upon "published" prices and those based upon "otherwise established" prices – but does not define those terms. However, FAR 16.203-4(a), and (b) ("Clauses"), which prescribe standardized clauses for "adjustments based on established prices," specifically refer to the use of established prices for supplies that have either established "catalog" or "market prices." Since January 1997, FAR 16.203-4 has not explicitly defined the terms "catalog" or "market prices."[5] However, its predecessor made clear that the terms referred to the definitions found in FAR 15.804-3. The predecessor stated that, before using a "published or otherwise established price" EPA clause, the contracting officer must determine that "the requirement is for . . . supplies that have an established catalog or market price <u>verified using the criteria in FAR 15.804-3</u>" (emphasis added). Section 15.804-3 (c), in turn, defined "established catalog prices" as "prices (including discount prices) recorded in a catalog, price list, schedule, or other verifiable and established record that (A) are regularly maintained by the manufacturer or vendor; and (B) are published or otherwise available for customer inspection." FAR 15.804-3(c)(1) (1995). It defined "established market prices" as "current prices that (i) are established

---

[5] This provision was deleted from the FAR effective January 2, 1997.

in the course of ordinary and usual trade between buyers and sellers free to bargain and (ii) can be substantiated by data from sources independent of the manufacturer or vendor." Id. § 15.804-3(c)(2) (emphasis added).

In Tesoro, the Federal Circuit, reviewing the PMM-based EPA clause at issue here, held that FAR 15.804-3 supplies the meaning for "established prices," which need not be, as La Gloria asserts here, still, the contractor's own prices:

> Although the term "established price" is not expressly defined in FAR § 16.203, the definition of the term in FAR § 15.804-3 is incorporated by reference. FAR § 15.804-3 defines "established prices" to include contractor-specific prices, namely "established catalog prices," and industry-based prices, namely "established market prices." As indicated by FAR § 16.203-2 and FAR § 15.804-3, the policy behind requiring use of "established prices" is to avoid contracts subject to the operational whims of individual contractors.

Tesoro, 405 F.3d at 1347 (emphasis added)..

Rejecting La Gloria's theory, the court held explicitly that the theory that "FAR 16.203-3 requires that adjustments be based only on changes in the prices charged by individual contractors eviscerates the regulatory meaning of the term 'established prices' and the policy reasons for using it." Id. Summarizing, the court explained that: "According to the interplay of all four sections of FAR § 16.203, a 'contractor's established price' may be established by reference to either a catalog or market sources independent of the manufacturer or vendor." Id. at 1347 (emphasis added)..

The court did not stop there, however. Rather, it explicitly considered whether DESC's PMM-based EPA clause was an "established prices" clause contemplated by FAR § 16.203-1 and held that it was – foreclosing consideration of the question anew. Indicating that it was indeed considering the legality of the PMM-based EPA clause, the court recited the PMM's

various features as well as the parties' contentions concerning the effect of those features upon the viability of the PMM-based EPA clause. The court's specific recitations concerning the PMM included the following.

- The court's statement of the certified question as "Did DESC establish the price of fuel in violation of law by employing economic price adjustment clauses indexed to PMM?" Tesoro, 405 F.3d at 1342 (emphasis added).

- "The reference prices to which the price adjustments were tied were drawn from market publications. Until June 23, 1994, DESC drew its EPA reference prices from the market publication known as the [PMM]." Id. at 1341.

- The court's observation that the PMM is published by DOE and reports "monthly average sales figures for specified fuels for five fuel regions known as Petroleum Administration for Defense Districts ('PADDS')." Id.

- "All refiners, including Tesoro and Hermes, are required by law to submit monthly sales data to the DOE, which then compiles the data to report the monthly average sales prices per PADD for various products." Id.

- The observation that the complaints in both suits claimed that "DESC's actions were per se illegal because the PMM-based EPA clause was inconsistent with the applicable section of the FAR." Id. at 1342 (emphasis added).

- The observation that the contractors argued that "DESC's use of an EPA clause tied particularly to the PMM does not comport with the express requirements of FAR § 16.203-3 . . . Relying on the language of MAPCO, Appellants claim that a PMM-based EPA clause fails to address either of the "mischiefs" specified in FAR § 16.203-3, because the PMM is an "amalgamation" of petroleum sales that does not reflect the product, the market, or the price for the military fuel Tesoro and Hermes supplied." Id. at 1348 (emphasis added).

- A review of the MAPCO analysis of the PMM itself, which was distinct from MAPCO's analysis of whether, in general, EPA clauses must be based upon the contractor's prices. See MAPCO, 27 Fed. Cl. at 410-11.

- The appellate court's review included MAPCO's dissection of the PMM, including the fact that it was an "amalgamation of the previous month's sales data" and, as such, did not comport with the dictionary definition of "established." The review also recited MAPCO's conclusion ("In sum, the index at issue is neither the contractor's, nor does it reflect an established price"), which underscored the fact that the appellate court and the MAPCO court considered the general question of whether an "established prices" EPA clause could be market

> based as well as whether DESC's PMM clause was an "established prices" clause. Id. at 1347 (emphasis added).

Following these recitations, the court concluded, in unmistakable language, that the PMM-based EPA clause was, indeed, a permissible EPA clause:

> Because we conclude that DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR, we do not reach the other issues raised in the certified questions . . . . Our holding that the use of the PMM-based EPA clause was authorized under the statute moots the issue of [waiver].
>
> * * *
>
> For the foregoing reasons, we hold that the Court of Federal Claims erred in holding that DESC's use of a PMM-based EPA clause was not authorized under the FAR.

Id. at 1348-49 (emphasis added).

The appellate court's conclusion is not surprising. The PMM is based upon sales data from a large number of refiners and sellers of petroleum products. It reports averages of the actual prices sellers have charged and buyers have paid for various petroleum products in different states and regions of the country. PFF 11. Because the prices are established in actual sales between a number of sellers and buyers, they clearly are "market prices," and satisfy the FAR 15.804-3 requirement that market prices be established in the course of ordinary business between "buyers and sellers free to bargain."

The Platts Oilgram Price Report, also is a market-based publication that is widely used to adjust prices. PFF 13, 22-23; Supp. App. 47. Indeed, La Gloria's own "fair market value" claim is based upon Platts. PFF 30. Accordingly, La Gloria's Platts-based EPA clauses easily pass muster under Tesoro's "market sources"/ "market-based" standard. La Gloria's complaint does not assert otherwise. Indeed, La Gloria's sole complaint concerning these publications is that: "[o]n information and belief, DESC also knew that some of the other indexes it used to set or

adjust prices were not appropriate for these purposes." Compl. ¶ 25. This allegation appears to be of the same character as La Gloria's alternative EPA clause illegality argument, i.e., that EPA clauses must meet a higher standard than that defined in Tesoro. We discuss that argument in the next section.

B. La Gloria's Fair Market Value Allegations Do Not State A Cause of Action

The above analysis establishes that DESC's EPA clauses pass muster under the Tesoro standard for EPA clauses and, therefore, are legal. However, La Gloria asserts that the clauses may not be considered legal, because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 37). But, we are aware of no legal basis for invalidating EPA clauses upon these grounds and the complaint identifies none. Indeed, contractors may bid below cost. See CCD Distributors, Inc. v. U.S., 69 Fed. Cl. 277 (2006) ("However, the fact that an offer [for a fixed-price contract] may not include any profit or may be an attempted buy-in (below cost) does not, in itself, render an otherwise responsible firm ineligible for award."). In short, La Gloria's effort to raise the standard for EPA clauses is rooted neither in La Gloria's contracts nor the applicable law. Accordingly, we see no apparent ground upon which these allegations might state a claim.

C. La Gloria's FAR 15.802(b) Allegation Does Not State A Cause of Action

In yet another effort to create an unfounded legal test for EPA clauses, La Gloria asserts that the clauses were illegal because they somehow violated FAR § 15.802(b) (currently codified at FAR 15.402(a)). Compl. ¶ 38. As this Court has already held, that regulation does not create rights for contractors. In other words, a complaint rooted in this regulation fails to state a claim upon which relief can be granted.

FAR 15.402(a) provides that:

> Contracting officers must-
>
> (a) Purchase supplies and services from responsible sources at fair and reasonable prices. In establishing the reasonableness of the offered prices, the contracting officer must not obtain more information than is necessary. To the extent that cost or pricing data are not required by 15.403-4, the contracting officer must generally use the following order of preference in determining the type of information required:
>
> (1) No additional information from the offeror, if the price is based on adequate price competition, except as provided by 15.403-3(b).
>
> (2) Information other than cost or pricing data:
>
> (i) Information related to prices (e.g., established catalog or market prices or previous contract prices), relying first on information available within the Government; second, on information obtained from sources other than the offeror; and, if necessary, on information obtained from the offeror. When obtaining information from the offeror is necessary, unless an exception under 15.403-1(b)(1) or (2) applies, such information submitted by the offeror shall include, at a minimum, appropriate information on the prices at which the same or similar items have been sold previously, adequate for evaluating the reasonableness of the price.
>
> (ii) Cost information, that does not meet the definition of cost or pricing data at 2.101.
>
> (3) Cost or pricing data. The contracting officer should use every means available to ascertain whether a fair and reasonable price can be determined before requesting cost or pricing data. Contracting officers must not require unnecessarily the submission of cost or pricing data, because it leads to increased proposal preparation costs, generally extends acquisition lead time, and consumes additional contractor and Government resources.

We start with the proposition that not every regulation provides the contractor with an "enforceable interest." Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1381 (Fed. Cir. 2002) ("AT&T V"). And that is precisely where this Court started in Short Bros., PLC v. United

States, 65 Fed. Cl. 695, 764-65 (2005). In rejecting the very argument that La Gloria advances here, the Court explained:

> The FAR provisions cited by plaintiff purport to do no more than to provide internal government direction. For example, FAR § 15.802 (1993), entitled "Policy," only requires that the contracting officer "[p]urchase supplies and services from responsible sources at fair and reasonable prices [.]" FAR § 15.802(b) . . . It does not afford a judicial remedy.

Short Bros. is consistent with the principle that contractors lack standing to bring suit based upon regulations issued for the Government's benefit. E.g., Freightliner Corp. v. Caldera, 225 F.3d 1361(Fed. Cir. 2000). The decision also is consistent with AT&T V's application of that principle. In AT&T V, the court considered a contractor's allegation that, in selecting a fixed-price contract, the Navy had "violated a variety of procurement regulations and directives that guide a contracting officer's selection of contract type." 307 F.3d at 1379. Specifically, the contractor alleged, and there was no dispute, that Navy contracting officials had failed to obtain a statutorily-mandated departmental-level certification that would have permitted it to enter into the fixed-price shipbuilding contract at issue. But, the court refused to entertain the contractor's claim, finding no intent in the legislation to "make any provision for judicial enforcement" (id.) -- and this was so, despite the fact that passage of the statute was prompted by shipbuilding claims of the sort at issue. See Am. Tel. & Tel. Co. v. United States, 177 F.3d 1368, 1370-71 (Fed. Cir.1999) (en banc).

If the court could not find an enforceable interest for contractors in a statute, the enactment of which was motivated by contractors having to bear costs overruns, La Gloria will be hard pressed to find one here. Indeed, the purpose of FAR 15.402(a) is not to protect contractors (other than from needless demands for documents), but to protect the Government

from prices that are "higher than warranted." All Phase Environmental, Inc., B-292-919.2, 2004 CPD ¶ 62, 2004 WL 437450 at 6. That purpose is evident, for example, in the regulation's warning against prices that include "contingency" amounts, i.e., amounts that would make a price "higher than warranted." Professors Nash and Cibinic agree, explaining that: "The primary focus of these requirements is to ensure that the Government does not pay unreasonably high prices," although they caution that "prices that are unreasonably low must also be dealt with before an award is made, because they could be evidence of mistake, non-responsibility, lack of understanding of the work, or a buy-in." Formation of Government Contracts (3rd Ed. 1998) at 1279.[6]

Indeed, if, as La Gloria argues, the contracting officer's obligation to assess price reasonableness is actionable, contract pricing never would be binding, because contractors who failed to realize the *post hoc* demands of their owners or investors could occasion this Court's intervention with no more substantial an allegation than "our price was unfair" That is precisely what La Gloria seeks to do here: insist that it be paid what it calls "fair market value," a term apparently to be defined by an expert at trial.

D. Summary

At bottom, La Gloria's complaint concerns the type of market-based clause selected. However, absent a prohibition, the agency had the discretion to select an appropriate clause. See AT&T V, 307 F.3d at 1378-80; accord 10 U.S.C. § 2306(a) (agency head generally "may enter into any kind of contract that he considers will promote the best interests of the United States"); see also FAR 16.103(a) ("Selecting the contract type is generally a matter for negotiation and

---

[6] We are not aware of any allegation of pricing mistake here of the sort referred to in this treatise.

requires the exercise of sound judgment."); FAR 16.104 (selection of contract type turns upon "many factors"). Indeed, the FAR expressly affords the contracting officer latitude to use agency-prescribed EPA clauses when the standard FAR clauses are "inappropriate." FAR 16.203-4 (a)(2), (b)(2), and (c)(2) (1995).

To borrow this Court's phrase: "An important consideration is the prevailing view among courts that determinations in procurement matters should ordinarily be left to the discretion of administrative officials exercising procurement authority." Durable Metals Prods., Inc. v. United States, 27 Fed. Cl. 472, 477 n.6, aff'd, 11 F.3d 1071 (Fed. Cir. 1993) (table). Any doubt concerning the agency's exercise of discretion in this case should be erased by the uncontroverted facts of this case: during years of contract performance, La Gloria did not complain about the legality of its contracts' formation or operation. PFF 28. That silence is telling. There simply is nothing inherently suspicious or illegal about DESC's fuel contracts. La Gloria, which, as claimant must prove otherwise, has not done so.

E. La Gloria Cannot Demonstrate Harm[7]

To maintain a cause of action against the Government, La Gloria must demonstrate that it was injured, damaged, or harmed by the Government's allegedly wrongful action. Failure to prove harm or the existence of injury as part of entitlement is a failure of plaintiff's cause of action. Pennsylvania Dept. of Transp. v. United States, 226 Ct. Cl. 444, 451, 643 F.2d 758, 762-

[7] We have argued that La Gloria could not prevail on its FAR 16.203-1 allegation, because it could demonstrate no harm flowing from the alleged illegality. In its earlier decision in this case, however, the Court disagreed, reasoning that the argument could be addressed in connection with any damages determination and that, once the EPA clause at issue was stricken, harm would be, in essence, irrelevant to the damages. La Gloria, 56 Fed. Cl. at 225. Accordingly, although we believe our position is correct, we do not raise that argument again with respect to the FAR 16.203-1 illegality question.

63 (1981) (observing the "well-established rule" that Government contractors have the "burden of establishing the fundamental facts of liability, causation, and resultant injury"); Servidone Construction Corp. v. United States, 931 F.2d 860 (Fed. Cir. 1991); Elter, S.A., ASBCA No. 52451, 2001-1 BCA ¶ 31,373 (denying entitlement because the contractor failed to establish that a Government delay caused injury); see also 1 Dobbs' Law of Remedies § 3.1 (2d. ed. 1993) ("The amount of harm may be either more or less than the amount of damages. . . . [T]he term damages is best reserved for the claim or the remedy rather than the underlying loss or injury."). The appellate court's decision in LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1557 (Fed. Cir. 1995), is instructive. There, plaintiff asserted that it was entitled to reformation of its contract, because the Government had violated the FAR by sharing plaintiff's prices with a competitor. The court disagreed, explaining that "Even though the [price] disclosures to [a competitor] clearly violated the FAR . . . LaBarge was not harmed by the disclosures in any concrete way contemplated by the FAR and, therefore, is not entitled to relief." Id. at 1556. See also PCL Construction, 41 Fed. Cl. 242 (no damages where plaintiff could not demonstrate prejudice stemming from the Government's inclusion of an unauthorized "subject to availability of funds" clause in its contract).

Thus, assuming there still exists otherwise viable causes of action, before La Gloria will be entitled to a remedy, it first must demonstrate that it was harmed in some way, e.g., that it was caused to do or refrain from doing something to its detriment -- for example by offering prices it otherwise would not have offered. In other words, simply alleging the Government acted incorrectly alone is an allegation of "injury without harm" and, therefore, must be dismissed.

III. La Gloria's Alternative Illegality Theories In Counts II-VI Must Be Dismissed

In addition to its core complaint, that the EPA clauses violate the FAR, La Gloria

presents several common-law theories of relief in Counts II-VI. These trojan horse allegations merely repackage the premise discussed in Sections II.B. and C., above: that EPA clauses must be "designed and intended," and, in fact, provide for the payment of "fair market value." As explained, however, this premise arises neither from La Gloria's contracts nor from the Federal Circuit's announced standard for EPA clauses. As explained below, the premise gains no traction in a common law guise and, therefore, Counts II-VI also fail to state a claim.

A. Count II (Misrepresentation)

In sum, Count II alleges that DESC "misrepresented and otherwise failed to disclose that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value." Compl. ¶ 53. The apparent premise for this allegation is that "[i]n basing price adjustments on PMM, DESC represented and warranted that PMM accurately reflected at least the fair market value for fuel and that prices for military fuel were fair and reasonable." Compl. ¶ 12.

"Misrepresentation occurs when the government misleads a contractor by a negligently untrue representation of fact, or fails to disclose information it has a duty to disclose." John Massman Contracting Co., v. United States, 23 Cl. Ct. 24, 32 (1991) (citing Morrison-Knudsen Co. v. United States, 170 Ct. Cl. 712 (1965)). La Gloria has not identified a fact that DESC had a duty to disclose or one that was material to its bargain. The essential terms of the DESC contracts are that La Gloria would supply fuel at a given location and that DESC would pay La Gloria according to a specified formula. La Gloria has not alleged that any part of the contract was ambiguous, that DESC failed to honor the pricing clause, or that the clause failed to operate as described in the contract.

B. Count III ("Breach of Contract")

Count III is based upon the premise that "DESC's basing price adjustments on PMM and other indexes that were adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value was a material condition of the contracts upon which Plaintiff reasonably relied in entering the contracts." Compl. ¶ 61. The complaint also alleges that a material part of the parties' bargain was DESC basing price adjustments "on standards that were designed or intended to be used to set or adjust prices," id. at ¶ 62, and DESC's "paying at least fair market value." Id. at ¶ 63. The short answer is that there is nothing in the contract that recites any such condition. Accordingly, there is no basis for concluding that these were "material" conditions of the contracts or that the contracts were breached, even assuming that these conditions never materialized.

C. Count IV ("Implied-In-Fact Contract")

Count IV alleges that DESC committed a "violation of law and regulation" in awarding and administering La Gloria's contracts. Compl. ¶ 74. As we have explained, there has been no violation of law or regulation. Nonetheless, an "implied-in-fact contract cannot exist if an express contract already covers the same subject matter." Trauma Service Group v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997). Here, the alleged implied-in-fact contract concerns the same subject as that addressed directly by the contracts at issue, the price of fuel already bought and sold. Accordingly, if, according to the contracts, La Gloria is entitled to additional compensation, contracts and contract principles will provide La Gloria its remedy.[8]

---

[8] We understand that this allegation has not been plead as an independent ground for relief, but as an allegation of law concerning how a remedy might be obtained should the contract's express pricing clause be stricken as illegal. See Barrett Refining v. United States, 242 F.3d. 1055, 1060 (2001) (remedy for illegal pricing term is found in any implied contract concerning that term).

D. Count V ("Failure of Consideration and Frustration of Purpose")

Count V, too, is based upon the triumvirate of premises discussed above, that DESC was required to: (1) base prices upon an index "adequate" to "protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value;" (2) base prices upon an index "designed or intended to be used to set or adjust prices" and that did "reflect at least fair market value;" (3) and pay "fair and reasonable prices" and "at least fair market value." Compl. ¶¶ 81-83.

As we have explained, these allegations are not the proper basis for a contractually-based claim and pleading them as a breach-type claim does not increase their heft. Moreover, these theories are bases for avoiding performance, and not applicable here, because performance already has occurred. See, e.g., Everett Plywood Corp. v. United States, 227 Ct. Cl. 415, 423-24, 651 F.2d 723, 728-29 (1981) (frustration excuses performance); Far West Fed. Bank v. OTS, 119 F.3d 1358, 1364 (9th Cir. 1997)(frustration of purpose is an excuse for non-performance, not a cause of action (citing Restatement (Second) of Contracts sec. 265)); Perpetual Financial Corp. v. United States, 61 Fed. Cl. 126, 138 (2004) (frustration of purpose count must be dismissed); Spalding & Sons, Inc. v. United States, 28 Fed. Cl. 242, 248-49 (1993) (frustration is a "rule respecting discharge," based on frustration of purpose, citing section 265 of the Restatement (Second) of Contracts).

But, even if the Court were to recognize frustration as an affirmative cause of action, the frustration allegations would fail. The Federal Circuit has held that, to excuse performance based upon frustration of purpose, a party must establish that: (1) a supervening event occurred;

---

However, as we have noted, these contracts are legal. Thus, this count adds no new allegations or necessary cause of action and should be dismissed.

(2) the moving party did not bear the risk of the supervening event; and (3) the event rendered the value of performance worthless. Seaboard Lumber v. United States, 308 F.3d 1283, 1295 (Fed. Cir. 2002). La Gloria has not alleged such factors.

E. Count VI (Mistake)

In Count VI, La Gloria argues that the same "no fair prices, no fair market value, no intent to track fair market value" litany presented in the other alternative counts entitles La Gloria to reprice its DESC contracts. Compl. ¶¶ 99-101. In Count VI, the litany is further fractured into yet two more alternatives -- mutual mistake and unilateral mistake. However, because the litany (in addition to being untrue) has no legal significance, Count VI, too, must be dismissed.

1. Mutual Mistake

To establish mutual mistake so as to justify rescission of a contract, a party must demonstrate that: (1) at the time of their agreement, both parties shared a mistaken belief "regarding a fact"; (2) that the mistaken belief "constituted a basic assumption underlying the contract"; (3) that the mistake "had a material effect on the bargain;" and (4) the claimant did not assume the risk of mistake. Dairyland Power Cooperative v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994); Atlas Corp. v. United States, 895 F.2d 745, 750 (Fed. Cir. 1990).

The kind of "mistake" necessary to support reformation of a contract concerns a belief not in accord with the facts in existence at the time of contracting. Atlas Corp., 895 F.2d at 750 (rejecting claim of mutual mistake where fact had not come into existence at time of contracting).[9] Therefore, "'[a] party's prediction or judgment as to events to occur in the future,

[9] The archetypal example is Sherwood v. Walker, 66 Mich. 568, 576, 33 N.W. 919 (1887). There, a seller was permitted to void his contract to sell a cow that the parties had supposed was

even if erroneous, is not a 'mistake' as that word is defined [under the doctrine of mutual mistake of fact].'" Dairyland Power Cooperative, 16 F.3d at 1202 (citing cases and treatises).

Here, La Gloria's contention is that the PMM does not track fair market value. But, La Gloria offers no evidence concerning the elements of a mistake claim, including that both parties held an unrealized belief concerning a basic assumption underlying their bargain. Indeed, La Gloria is unlikely to do so, inasmuch as the best evidence of what the parties believed concerning their agreement is the plain language of the contract itself. Yet, La Gloria has identified no evidence that the parties believed that the PMM or Platts were anything other than what they are: publications of certain price data. Moreover, the gravaman of the complaint is not that the parties failed to understand the EPA clauses, but that they were illegal. However, in light of the Federal Circuit's decision in Tesoro, that is not the case. As a result, if there was any mistake, it was La Gloria's legal conclusion at the time it filed its claim -- and not one concerning a fact "existing" at contract formation.

2. Unilateral Mistake

To succeed on a claim of unilateral mistake, a party must demonstrate:

> (1) mistake by one party, not bearing the risk of such mistake, as to a basic assumption on which he made the contract;
>
> (2) that has a material effect on the agreed exchange of performance; and
>
> (a) the effect of the mistake is such that enforcement of the contract would be unconscionable; or
>
> (b) the other party to the contract has reason to know of the mistake.

---

barren, when, in fact, she was fertile, and of good breeding stock.

J&E Salvage v. United States, 37 Fed. Cl. 256, 265 (1997) (citing Restatement (Second) of Contracts § 153 (1981)).

A contract will not be reformed because of a unilateral mistake in a bid unless the contractor establishes that the mistake resulted from a clear cut clerical or arithmetical error, or a misreading of the specifications. United States v. Hamilton Enterprises, 711 F.2d 1038, 1046 (Fed. Cir. 1983); Dale Ingram, Inc. v. United States, 201 Ct. Cl. 56, 74, 475 F.2d 1177, 1186 (1973). But, an agreement cannot be revised to reflect one party's subjective understanding of which the other party does not and should not have been aware. Id. Accordingly, the doctrine of mistake of fact does not apply when the error made by one of the parties was based upon an erroneous prediction or judgment. Restatement (Second) of Contracts § 151a.

An actionable "mistake" is a discrepancy between an offeror's state of mind and his offer. Tony Downs Foods Co. v. United States, 209 Ct. Cl. 31, 530 F.2d 367, 372 (1976) (holding that "difficulty of performance or losses in carrying out a contract will not be treated as a basis for relief by the courts in the absence of special clause in the contract stipulations providing for such relief"). In Hamilton Enterprises, 711 F.2d at 1046, the court found no mistake because the contractor could not demonstrate that the price it bid was not "the price it intended to bid." Accord Liebherr Crane Corp. v. United States, 810 F.2d 1153, 1157 (Fed. Cir. 1987) ("there is no difference in this case between Liebherr's intended bid and the bid Liebherr actually submitted").

La Gloria cannot make the necessary showing, because the vague allegations concerning the inappropriateness of the EPA clauses are, at best, legal characterizations of the clauses or of payment eventualities that postdated La Gloria's offers (the payment, or not, of "fair market value") – and not true mistakes concerning what La Gloria intended to bid. Indeed, if that were

not true, we would expect to see allegations and supporting declarations concerning the state of mind of La Gloria's contract pricing teams. Instead, we have La Gloria's thinly-disguised, and now debunked, allegations of law concerning the legal nature of the EPA clauses - and none concerning the factual circumstances of La Gloria's offers.

The final test (the alternative second prong) of a unilateral mistake claim is that the contract was unconscionable. J&E Salvage, 37 Fed. Cl. at 265. This jurisdiction has defined an unconscionable contract as one "which no man in his senses, not under delusion, would make on the one hand, and which no fair and honest man would accept on the other...." Hume v. United States, 21 Ct. Cl. 328, 330 (1886), aff'd., 132 U.S. 406 (1889); accord Fraass Surgical Mfg. Co., Inc. v. United States, 215 Ct. Cl. 820, 571 F.2d 34 (1978).

As this Court has explained:

> In analyzing the allegation of unconscionability the court should look for some type of oppression, unfair surprise and lack of consent at the time of entering into the contract. Gregory Lumber, 11 Cl. Ct. at 504 . . . . As pointed out in the Fraass decision . . . "discretion to deny enforcement to an unconscionable clause ... is not extended to permit courts to redistribute risks allocated by differences in bargaining power, but rather to prevent oppression and unfair surprise." Fraass, 215 Ct. Cl. at 830, 571 F.2d at 40.

Glopak Corporation v. United States, 12 Cl. Ct. 96, 102 (1987), aff'd., 851 F.2d 334, 338 (1988).

Here, nothing about the award was unconscionable. As many as eight years of La Gloria silence tells us that.

## IV. Count VII (Takings Allegation) Fails To State A Claim

In yet another expression of La Gloria's legal view of the EPA clauses, Count VII states: "With no fully supporting claim of right DESC took possession of and infringed upon Plaintiff's

property rights in and in relation to the fuel it delivered." Compl. ¶ 126.[10] The Complaint further supposes that the fuel was taken "in conjunction with a violation of law and regulation." Id. at ¶ 128. Although the Court possesses jurisdiction under the Tucker Act to entertain claims properly founded upon the Takings Clause of the Fifth Amendment, these allegations fail to state such a claim.

The Takings Clause mandates "just compensation" when the Federal Government appropriates private property for "public use." U.S. Const. amend V; Bernaugh v. United States, 38 Fed. Cl. 538, 542 (1997), aff'd., 168 F.3d 1319 (Fed. Cir. 1998) (table). Here, however, the Government did not "take" property. Rather, according to the complaint, the Government purchased fuel in alleged breach of a contract.[11] "This Court's predecessor has cautioned against commingling takings compensation and contract damages." Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001). As the court explained, "In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." Id. at 1070 (quoting Sun Oil Co. v. United States, 215 Ct. Cl. 716, 769-70, 572 F.2d 786, 818 (1978)). In other words, remedies for alleged infringement of rights established contractually generally lie in contract, not the Fifth Amendment, as it is the terms of the contract

[10] If by this, La Gloria means that DESC took the fuel illegally, it has failed to state a claim under the Fifth Amendment, because, to maintain an action based upon a Fifth Amendment taking, a plaintiff "must concede the validity of the government action which is the basis of the taking claim." Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802 (Fed. Cir. 1993) (citing Florida Rock Indus. Inc. v. United States, 791 F.2d 893, 899 (Fed. Cir. 1986)). "The remedy for an unlawful seizure of property is in tort," which is beyond this Court's jurisdiction. American Commerce National Bank v. United States, 38 Fed. Cl. 271, 272-73 (1997).

[11] As the complaint describes it, "Plaintiff has property rights in and in relation to the fuel it delivered to DESC. In addition, Plaintiff has property rights in relation to DESC's procurement of the fuel Plaintiff delivered." Compl. ¶ 125.

that govern the parties' respective rights and obligations. Sun Oil, 215 Ct. Cl. at 769-70, 572 F.2d at 818; accord Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 703 n.27 (1949) (if there is a contract remedy, party cannot pursue takings claim in this Court).

These decisions are consistent with the important distinction courts draw between the Government's actions in its sovereign capacity and those undertaken in its proprietary capacity. "A taking can occur only when the Government acts in a sovereign capacity." Gratz v. United States, 25 Cl. Ct. 411, 420, aff'd, 985 F.2d 583 (Fed. Cir. 1992). By contrast, when the Government negotiates and enters into a contract with a private party, "this represents activity by [the Government] in a proprietary capacity." Id. (citing Sun Oil, 215 Ct. Cl. at 770, 572 F.2d at 818). As the Gratz court explained: "This transaction is a classic illustration of the Government's acting in a proprietary capacity. Each side incurred rights and responsibilities. Plaintiff's sole remedy is a breach of contract action." Id. at 420.

Here, La Gloria does not allege – and cannot – that DESC's alleged breach resulted in the taking of the contract itself, or its potential contractual remedies. Thus, its remedies, if any, are those provided by contract law – and not the Fifth Amendment.

## V. La Gloria's Small Business Program Complaints Must Be Dismissed

### A. The Court Lacks Jurisdiction To Entertain The Fifth Amendment Complaint

In paragraph 41 of the Amended Complaint, La Gloria asserts that DESC's "minority-owned business bidding preferences" violate the equal protection component of the Fifth Amendment. The Court lacks jurisdiction to entertain such a complaint.

This is a court of limited jurisdiction. Dynalectron Corp. v. United States, 4 Cl. Ct. 424, 428 (1984), aff'd, 758 F.2d 665 (Fed. Cir. 1984). Absent congressional consent to entertain a claim against the United States, the Court lacks authority to grant relief. United States v. Testan,

424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941). The central provision granting consent to suit in this Court is the Tucker Act, 28 U.S.C. § 1491.

In other words, the Tucker Act itself does not create a substantive right of recovery against the United States. Testan, 424 U.S. at 398; Eastport Steamship Corp. v. United States, 178 Ct. Cl. 599, 605-07, 372 F.2d 1002, 1007-09 (1967); United States v. Connolly, 716 F.2d 882, 885 (Fed. Cir. 1983) (en banc), cert. denied, 104 S. Ct. 1414 (1984). Accordingly, a claimant must identify a contract or some other provision of law that mandates compensation. United States v. Mitchell, 445 U.S. 535, 538 (1980). The equal protection clause of the Fifth Amendment, however, does not provide the requisite substantive right of recovery. Mullenberg v. United States, 857 F.2d 770, 773 (Fed. Cir. 1988); accord LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (no Tucker Act jurisdiction based on the equal protection clause); Inupiat Community of the Arctic Slope v. United States, 230 Ct. Cl. 647, 662, 680 F.2d 122, 132, cert. denied, 459 U.S. 969 (1982).

Here, La Gloria asserts that DESC's contract awards violate the "the equal protection component of the fifth amendment's due process clause by extending to minority-owned businesses bidding preferences that were not narrowly tailored to further a compelling governmental interest." Compl. ¶ 41 (Count I). However, even if that were so, that has nothing to do with the contract claims before this Court, because those claims are based upon contracts actually awarded to La Gloria – not contracts diverted to minority-owned businesses, rightly or wrongly. Accordingly, La Gloria's complaint is nothing more than a facial attack upon the constitutionality of DESC's fuel acquisition program – and does not concern the award or administration of *La Gloria's* contracts. As such, La Gloria cannot be heard to complain that it is its contracts that support the Court's jurisdiction, and, therefore, its complaint concerning

DESC's minority-owned business program must be dismissed.

B. DESC's Small Business Set-Aside Program Does Not Constitute An Auction

In Count I, La Gloria contends that DESC violated ("inter alia,") the "Office of Federal Procurement Policy Act ["OFPP Act"] and its implementing regulations (and, prior to its enactment, FAR § 15.610) by using prohibited auction techniques, whereby DESC awarded contracts to bidders that agreed to match other bidders' prices." Compl. ¶ 39. Apparently, La Gloria is referring to DESC's small business set-aside program, which DESC effects by a technique known as the "match price method." Under this method, DESC informs small businesses of the price that the Government would otherwise pay for a particular fuel product (as the result of a pending solicitation), including, if applicable, the Government's cost for transporting that fuel from the refiner to the ultimate consumer. The small businesses are not informed of any other offeror's actual bid prices or of their identities. PFF 27.

FAR 15.610, the applicable regulation that was in effect in 1995, provided that:

> e) The following conduct may constitute prohibited conduct under section 27 of the Office of Federal Procurement Policy Act, as amended (41 U.S.C. 423), and Subpart 3.104 to which civil and criminal penalties and administrative remedies apply.
>
> (1) Technical transfusion (i.e., Government disclosure of technical information pertaining to a proposal that results in improvement of a competing proposal); or
>
> (2) Auction techniques, such as--
>
> (i) Indicating to an offeror a cost or price that it must meet to obtain further consideration;
>
> (ii) Advising an offeror of its price standing relative to another offeror (however, it is permissible to inform an offeror that its cost or price is considered by the Government to be too high or unrealistic); and

(iii) Otherwise furnishing information about other offerors' prices.

This Court has defined an auction as "direct bidding of price between two competing offerors." DGS Contract Services, Inc. v. United States, 43 Fed. Cl. 227, 239 (1999). Yet, as the contracting officer has explained, these prohibited "auction techniques" were not a part of the DESC small business set-aside program. PFF 27. Either the small business concern met the price or it did not. There was not “bidding.” Id. Indeed, as evinced by the set-aside clauses themselves, DESC followed the FAR provisions (FAR 52.219-7, and FAR 19.502-3(c)), which authorized this procedure. For that reason, the Comptroller General has found that DESC’s small business procedures are consistent with applicable procurement and small business laws and regulations. See 1988 WL 227932 (Comp. Gen.), B-230556, March 23, 1989. Supp. App. 42.

C. The Court Lacks Jurisdiction To Entertain The Complaint That DESC’s Small Business Program Violates FAR 52.219-7, Which It Does Not

La Gloria also alleges that DESC violated the Defense Federal Acquisition Regulation Supplement, part 219 by "improperly soliciting and awarding portions of the procurement set aside for small businesses together with those for large businesses." Compl. ¶ 40. The applicable FAR provision, 52.219-7 ("Notice of Partial Small Business Set-Aside") provides that:

> b) General.
>
> (1) A portion of this requirement, identified elsewhere in this solicitation, has been set aside for award to one or more small business concerns.
>
> (2) Offers on the non-set-aside portion will be evaluated first and award will be made on that portion in accordance with the provisions of this solicitation.

> (3) The set-aside portion will be awarded at the highest unit price(s) in the contract(s) for the non-set-aside portion, adjusted to reflect transportation and other costs appropriate for the selected contractor(s).
> (4) The contractor(s) for the set-aside portion will be selected from among the small business concerns that submitted responsive offers on the non-set-aside portion. Negotiations will be conducted with the concern that submitted the lowest responsive offer on the non-set-aside portion. If the negotiations are not successful or if only part of the set-aside portion is awarded to that concern, negotiations will be conducted with the concern that submitted the second-lowest responsive offer on the non-set-aside portion. This process will continue until a contract or contracts are awarded for the entire set-aside portion.

As explained by the contracting officer, the DESC small business set-aside procedure is substantially similar to the one set forth in the FAR and is specifically in keeping with the authorized DESC deviation clause contained in the solicitation. PFF 27. That clause permits DESC to determine whether small businesses will qualify for awards. If they do, separate awards are made. If not, the affected fuel set-aside is returned to the non set-aside portion. This procedure avoids the delay that would take place in re-soliciting set aside failure quantities under the standard FAR and DFARS procedures, has been used since the 1960's pursuant to authorized deviations, and has been approved by the GAO on several occasions. PFF 27.

In any event, the complaint fails to demonstrate that La Gloria was "harmed in [a] concrete way contemplated by the FAR . . . ." LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1556 (Fed. Cir. 1995) (contractor complaining of unauthorized disclosure of procurement information must demonstrate that it was harmed by the disclosure). In fact, the complaint does nothing to link any particular action taken under this program to any contract La Gloria was awarded. Accordingly, the complaint presents nothing more than a facial attack upon DESC's small business program, an attack that this Court possesses no jurisdiction to entertain.

VI. Waiver and Estoppel Bar La Gloria's Claims

As explained above, neither the FAR, any of the other plead small business statutes and regulations, nor the common law confer any unrealized right upon La Gloria. However, even assuming that were not the case, we are entitled to summary judgment concerning all counts for which the Court has not already decided our waiver argument, because, long ago, La Gloria waived whatever rights it imagines these sources of law might have been conferred upon it. Similarly, through its years of inaction, La Gloria is estopped from pursuing any of these rights in litigation.

Waiver has been defined as an "intentional relinquishment or abandonment of a known right or privilege." Hermes II, 58 Fed. Cl. at 409 (quoting Johnson v. Zerbst, 304 U.S. 458 (1938)); see also Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1563 (Fed. Cir. 1980) (citing Brookhard v. Janis, 384 U.S. 1, 4, 5 (1966)). Absent an affirmative congressional prohibition, a party may waive regulatory, statutory, and even constitutional rights Reservation Ranch v. United States, 39 Fed. Cl. 696, 712 (1997), aff'd, 217 F.3d 850 (Fed. Cir. 1999) (table). This circuit already has held that the defense of waiver is applicable against claims of illegality founded upon assertions that the Government has violated the FAR. E.g., E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978); Whittaker Electronic Systems v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997).

Here, La Gloria performed six one-year DESC contracts of the sort about which it now complains, over approximately six years, and waited eight years from its first contract to file a complaint. In Hermes II, this Court held that a contractor that had performed nine such contracts, over a seven-year period, and waited 14 years after entering its first PMM-based contract before filing its complaint, had waived its right to complain that those contracts were

illegal. Hermes II, 58 Fed. Cl. at 413.

In reaching its conclusion, the Court first considered whether the defense of waiver was available in this circuit, against a claim of illegality. In concluding that waiver was available, the Court observed that the Federal Circuit "*seems* to be of two minds on this issue," observing that Whittaker Elec. Sys., 124 F.3d 1443, E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978) (per curiam), and AT&T V, 307 F.3d 1374 support the availability of waiver, whereas the Beta/Chris Berg line of cases can be seen as supporting an alternate view. Hermes, 58 Fed. Cl. at 412.

The Court reconciled the apparent division of authority by identifying a "key factual distinction" between the two lines of cases cited, i.e., that, where waiver was not found, "the contractors either complained during contract formation or, at the very least, at an early stage in the history of the conflict." Id. at 413 (quoting Hermes I, 58 Fed. Cl. 3, 19 (2003)). In Hermes II, the Court noted, the contractor "astonishingly waited 14 years after entering the first [contract at issue] and eight years after entering the last [contract at issue] before litigating." 58 Fed. Cl. at 413.[12]

Reasoning that the defense of waiver was available under the right circumstances, the Court proceeded to find that the contractor had, in fact, waived its claims, because knowledge of its rights under the law could be presumed, as knowledge of the law generally is, and that

[12] In Calcasieu v. United States, 2003 WL 22049528, *13 (Fed. Cl.) and Sunoco v. United States, 59 Fed. Cl. 390, 398 (2004), the Court agreed that the asserted illegality claims were waivable, but declined to enter summary judgment, without further discovery. Other judges of the Court have disagreed, including the presiding judge here (LaGloria v. United States, 56 Fed. Cl. 211 (2003)). See, e.g., Navajo v. United States, 58 Fed. Cl. 200, 213 (2003), Tesoro v. United States, 58 Fed. Cl. 65 (2003), Gold Line Refining v. United States, 54 Fed. Cl. 285 (2002). In Tesoro, the waiver question was certified for interlocutory review, which, although accepted by the Federal Circuit, was not reached.

"intelligent waiver" could be discerned from Hermes' general sophistication and lengthy failure to signal its dissatisfaction whatsoever. Id. at 416-18. As the Court explained it:

> It is almost universally conceded that "'wherever a contract not already fully performed is continued in spite of a known breach, the wronged party cannot avail himself of that excuse . . . . As a general proposition, one side cannot continue after a material breach by the other . . ., act as if the contract remains fully in force (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court.'"

Id. at 418 (citing Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 146 (1973) (quoting Northern Helex Co. v. United States, 197 Ct. Cl. 118, 125-26 (1972)).

The Court's conclusion in Hermes applies with equal force to La Gloria's variously alleged causes of action, for it, too, is a sophisticated contractor (see PFF 1), with a history with and, therefore, understanding of DESC contracts. Indeed, La Gloria performed these contracts for approximately six years, did not complain about their award or administration, and did not even submit a claim until 2001 – approximately eight years after the first contract was awarded, and nine years after MAPCO, 27 Fed. Cl. 405, was decided. This conclusion applies with equal force to Counts II-VII, which merely repackage La Gloria's illegality claim. Given La Gloria's long history with DESC's fuel acquisition program, its evident sophistication in these matters, and its long silence, there is nothing about Counts II-VII that suggests that waiver does not apply. The gravaman of these counts is that La Gloria has been deprived of a contractually-based right. Yet, La Gloria does not even allege that the contracts changed in any material fashion in La Gloria's eight years of performing them.

Estoppel also is applicable. Estoppel requires that the party asserting estoppel rely to its detriment upon its opponent's action or inaction. E.g., E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978). Here, because of its superior knowledge of its own costs,

its market options, and because of its extensive experience with the clauses at issue, La Gloria was in the best position to assess the efficacy of the EPA clauses regarding its own situation. By adopting the EPA clauses in its offers with the text of the FAR available to it, La Gloria signaled its intent to forego any presumed benefits contained in what it now urges as the FAR's required clause. Now, it is too late to revoke that election, because La Gloria continued willingness to offer these clauses, coupled with its failure to protest their inclusion, clearly prejudiced the Government, because, as subsequent events showed, the Government could have obtained a deviation or refused La Gloria's offers and turned elsewhere. PFF 22-24. The same can be said of La Gloria's remaining complaints. Either option would have been a "relatively painless alternative" to the after-the-fact, competition-free, speculative recovery La Gloria now seeks. Indeed, as did the contractor in Ling-Temco-Vought, La Gloria has "in effect retained all options for itself . . . made its calculations entirely in its own favor, without proper consideration of the defendant's position," and violated the "basic principle calling for fair treatment of both parties." 201 Ct. Cl. at 148, 475 F.2d at 638.

**CONCLUSION**

For these reasons, defendant respectfully requests that the Court dismiss the Amended Complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Department of Justice
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

OF COUNSEL:

DONALD S. TRACY
Trial Attorney
Defense Supply Center Richmond
Richmond, VA 23297

HOWARD M. KAUFER
Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

Attorneys for Defendant

March 31, 2006

CERTIFICATE OF FILING

I hereby certify that on March 31, 2006, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Steven J. Gillingham