No. 02-465C
(Judge Hewitt)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LA GLORIA OIL AND GAS COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT AND SUPPLEMENTAL APPENDIX

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

HOWARD M. KAUFER
Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

DONALD S. TRACY
Trial Attorney
Defense Supply Center
Richmond, VA

March 31, 2006

**TABLE OF CONTENTS**

STATEMENT OF THE ISSUES .......... 1

STATEMENT OF THE CASE .......... 3

I. Nature Of The Case .......... 3

SUMMARY OF MATERIAL FACTS .......... 4

I. La Gloria's Contracts .......... 4

II. DESC's Small Business Set-Aside Program .......... 6

SUMMARY OF THE ARGUMENT .......... 7

ARGUMENT .......... 10

I. Standard of Review .......... 10

II. DESC's EPA Clauses Are Authorized by FAR 16.203-1 .......... 11

A. EPA Clauses Need Not Be Based Upon The Contractor's Own Prices .. 11

B. La Gloria's Fair Market Value Allegations Do Not State A Cause of Action .......... 16

C. La Gloria's FAR 15.802(b) Allegation Does Not State A Cause of Action .......... 17

D. Summary .......... 20

E. La Gloria Cannot Demonstrate Harm .......... 21

III. La Gloria's Alternative Illegality Theories In Counts II-VI Must Be Dismissed 22

A. Count II (Misrepresentation) .......... 22

B. Count III ("Breach of Contract") .......... 23

C. Count IV ("Implied-In-Fact Contract") .......... 24

D. Count V ("Failure of Consideration and Frustration of Purpose") .......... 24

E. Count VI (Mistake) .......... 25

1. Mutual Mistake ........ 26

2. Unilateral Mistake ........ 27

IV. Count VII (Takings Allegation) Fails To State A Claim ........ 29

V. La Gloria's Complaints Concerning DESC's Small Business Program Must Be Dismissed ........ 31

A. The Court Lacks Jurisdiction To Entertain The Fifth Amendment Complaint ........ 31

B. DESC's Small Business Does Not Constitute An Auction ........ 32

C. The Court Lacks Jurisdiction To Entertain The Complaint That DESC's Small Business Program Violates FAR 52.219-7, Which It Does Not .. 34

VI. Waiver and Estoppel Bar La Gloria's Claims ........ 35

CONCLUSION ........ 39

**INDEX TO THE SUPPLEMENTAL APPENDIX**

Declaration of John R. Walker ........ 1

DESC Clauses ........ 4

FAR Part 15, 15.610 Written or oral discussion ........ 8

52.219-7 Notice of Partial Small Business Set-Aside (Oct. 1995) ........ 10

Notice of Evaluation Preference for Small Disadvantaged Business Concerns (Jun. 1997) ....... 11

Notice of Partial Small Business Set-Aside With Preferential Consideration for Small Disadvantaged Business Concerns Clause (May 1995) ........ 14

DFSC Memo, re: Base Reference Date for EPA References Tied to Petroleum Marketing Monthly (PMM), dated January 6, 1986 ........ 18

Defense Logistics Agency Inter-Office Memorandum, dated December 2, 1987 Subject: Economic Price Adjustment in the Domestic Bulk Program ........ 20

Excerpt of Deposition of Lawrence Ervin, dated December 1, 2003 ........ 27

Request for Class Deviation and Permanent Coverage in DLAR, dated May 12, 1995 ............ 37

Comptroller General Opinion re: DFSC Small Business Set-Aside Procurements ..................... 42

Excerpt from Platts web site ........................................................................................ 47

**TABLE OF AUTHORITIES**

**CASES**

All Phase Environmental, Inc.,
B-292-919.2, 2004 CPD ¶ 2004 WL 437450 ........................................................ 19

Am. Tel. & Tel. Co. v. United States,
177 F.3d 1368 (Fed. Cir.1999) ........................................................................ 19

Am. Tel. & Tel. Co. v. United States,
307 F.3d 1374 (Fed. Cir. 2002) ................................................................... passim

American Commerce National Bank v. United States,
38 Fed. Cl. 271 (1997) .................................................................................. 29

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ..................................................................................... 10

Atlas Corp. v. United States,
895 F.2d 745 (Fed. Cir. 1990) ........................................................................ 26

Barrett Refining v. United States,
242 F.3d. 1055 (2001) .................................................................................. 24

Bernaugh v. United States,
38 Fed. Cl. 538 (1997), aff'd., 168 F.3d 1319 (Fed. Cir. 1998) (table) .......................... 30

Brookhard v. Janis,
384 U.S. 1 (1966) ........................................................................................ 36

Calcasieu v. United States, 2003 WL 22049528 .......................................................... 37

CCD Distributors, Inc. v. U.S., 69 Fed. Cl. 277 (2006) ................................................ 16

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ..................................................................................... 10

Conley v. Gibson,
355 U.S. 41 (1957) ........................................................................................ 11

DGS Contract Services, Inc. v. United States,
43 Fed. Cl. 227 (1999) ................................................................................... 33

Dairyland Power Cooperative v. United States,
16 F.3d 1197 (Fed. Cir. 1994) ........................................................................ 26

Dale Ingram, Inc. v. United States,
201 Ct. Cl. 56, 475 F.2d 1177 (1973) ............................................................ 27

Durable Metals Prods., Inc. v. United States,
27 Fed. Cl. 472 aff'd, 11 F.3d 1071 (Fed. Cir. 1993) (table) ......................................... 20

Dynalectron Corp. v. United States,
4 Cl. Ct. 424 (1984), aff'd, 758 F.2d 665 (Fed. Cir. 1984) ............................................ 31

E. Walters & Co., Inc. v. United States,
217 Ct. Cl. 254, 576 F.2d 362 (1978) ........................................................ passim

Eastport Steamship Corp. v. United States,
178 Ct. Cl. 599, 372 F.2d 1002 (1967) ........................................................... 31

Everett Plywood Corp. v. United States,
227 Ct. Cl. 415, 651 F.2d 723 (1981) ............................................................ 25

Far West Fed. Bank v. OTS,
119 F.3d 1358 (9th Cir. 1997) ........................................................................ 25

Florida Rock Indus. Inc. v. United States,
791 F.2d 893 (Fed. Cir. 1986) ........................................................................ 29

Fraass Surgical Mfg. Co., Inc. v. United States,
215 Ct. Cl. 820, 571 F.2d 34 (1978) ........................................................ 28, 29

Freightliner Corp. v. Caldera,
225 F.3d 1361 (Fed. Cir. 2000) ...................................................................... 18

Glopak Corporation v. United States,
12 Cl. Ct. 96 (1987), aff'd., 851 F.2d 334 (1988) .......................................................... 29

Gold Line Refining v. United States, 54 Fed. Cl. 285 (2002) ........................................... 37

Gould, Inc. v. United States,

935 F.2d 1271 (Fed. Cir. 1991) ........................................................................ 11

Gratz v. United States,
25 Cl. Ct. 411, aff'd, 985 F.2d 583 (Fed. Cir. 1992) ............................................ 30, 31

Hermes v. United States, 58 Fed. Cl. 3, 19 (2003)) ................................................................ 37

Hermes v. United States,
58 Fed. Cl. 409 (2003) ........................................................................................ passim

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2001) ........................................................................ 30

Hume v. United States,
21 Ct. Cl. 328 (1886), aff'd., 132 U.S. 406 (1889) ...................................................... 28

Inupiat Community of the Arctic Slope v. United States,
230 Ct. Cl.647, cert. denied, 459 U.S. 969 (1982) ...................................................... 32

J&E Salvage v. United States,
37 Fed. Cl. 256 (1997) .......................................................................................... 27, 28

John Massman Contracting Co., v. United States,
23 Cl. Ct. 24 (1991) .................................................................................................. 23

LaBarge Prods., Inc. v. West,
46 F.3d 1547 (Fed. Cir. 1995) ................................................................ 21, 22, 35

LaGloria v. United States, 56 Fed. Cl. 211 (2003) ................................................................ 37

Larson v. Domestic & Foreign Commerce Corp.,
337 U.S. 682 (1949) ................................................................................................ 30

LeBlanc v. United States,
50 F.3d 1025 (Fed. Cir. 1995) ........................................................................... 32

Liebherr Crane Corp. v. United States,
810 F.2d 1153 (Fed. Cir. 1987) ........................................................................ 28

Ling-Temco-Vought, Inc. v. United States,
201 Ct. Cl. 135 (1973) ........................................................................................ 38, 39

MAPCO Alaska Petroleum, Inc. v. United States,
27 Fed. Cl. 405 (1992) ........................................................................................ passim

Montana v. United States,
124 F.3d 1269 (Fed. Cir. 1999) .................................................................... 10

Morrison-Knudsen Co. v. United States,
170 Ct. Cl. 712 (1965) ................................................................................... 23

Mullenberg v. United States,
857 F.2d 770 (Fed. Cir. 1988) ..................................................................... 32

Navajo v. United States, 58 Fed. Cl. 200, 213 (2003) ..................................................... 37

Northern Helex Co. v. United States,
197 Ct. Cl. 118 (1972) ................................................................................... 38

Perpetual Financial Corp. v. United States,
61 Fed. Cl. 126 (2004) ................................................................................... 25

Reservation Ranch v. United States,
39 Fed. Cl. 696 (1997), aff'd, 217 F.3d 850 (Fed. Cir. 1999) (table) ............................. 36

Rochman v. United States,
27 Fed. Cl. 162 (1992) ................................................................................... 11

Seaboard Lumber Co. v. United States,
903 F.2d 1560 (Fed. Cir. 1980) ..................................................................... 36

Seaboard Lumber v. United States,
308 F.3d 1283 (Fed. Cir. 2002) ..................................................................... 25

Sherwood v. Walker,
66 Mich. 568, 33 N.W. 919 (1887) ................................................................ 26

Short Bros., PLC v. United States,
65 Fed. Cl. 695 (2005) ................................................................................... 18

Spalding & Sons, Inc. v. United States,
28 Fed. Cl. 242 (1993) ................................................................................... 25

Sun Oil Co. v. United States,
215 Ct. Cl. 716, 572 F.2d 786 (1978) ............................................................ 30

Sunoco v. United States, 59 Fed. Cl. 390, 398 (2004) ..................................................... 37

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987) ..................................................................... 10

Tabb Lakes, Ltd. v. United States,
10 F.3d 796 (Fed. Cir. 1993) ........................................................................ 29

Tesoro v. United States, 58 Fed. Cl. 65 (2003) ............................................................ 37

Tesoro et al. v. United States,
405 F. 3d 1339 (Fed. Cir. 2005) ................................................................ passim

Tony Downs Foods Co. v. United States,
209 Ct. Cl. 31, 530 F.2d 367 (1976) ............................................................ 28

Trauma Service Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) .................................................................. 24

United States v. Connolly,
716 F.2d 882 (Fed. Cir. 1983), cert. denied, 104 S. Ct. 1414 (1984) ............................ 31

United States v. Hamilton Enterprises,
711 F.2d 1038 (Fed. Cir. 1983) ............................................................ 27, 28

United States v. Mitchell,
445 U.S. 535 (1980) ................................................................................. 31

United States v. Sherwood,
312 U.S. 584 (1941) ................................................................................. 31

United States v. Testan,
424 U.S. 392 (1976) ................................................................................. 31

Whittaker Electronic Systems v. Dalton,
124 F.3d 1443 (Fed. Cir. 1997) ............................................................ 36, 37

**STATUTES**

10 U.S.C. § 2306(a) ................................................................................ 20

10 U.S.C. § 2323 ...................................................................................... 6

15 U.S.C. § 644 ........................................................................................ 6

15 U.S.C. § 772 ........................................................................................ 5

28 U.S.C. § 1491 ...................................................................................... 31

41 U.S.C. § 423 .......... 33

FAR 15.402(a) .......... passim

FAR 15.610 .......... 32, 33

FAR 15.802(b) .......... passim

FAR 15.804-3 .......... 12, 13, 15

FAR 16.103(a) .......... 20

FAR 16.104 .......... 20

FAR 16.203-1 .......... passim

FAR 16.203-1(a) .......... 12

FAR 16.203-2 .......... 13

FAR 16.203-3 .......... 13, 14

FAR 16.203-4 .......... 12, 20

FAR 19.502-3(c) .......... 34

## MISCELLANEOUS

Formation of Government Contracts (3rd Ed. 1998) at 1279 ..................................................... 19

Restatement (Second) of Contracts § 151a ..................................................................... 28

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LA GLORIA OIL AND GAS COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-465C |
| v. | ) | (Judge Hewitt) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

The United States respectfully requests that the Court dismiss paragraphs 40 and 41 of the Amended Complaint ("Compl.") (small business complaints), pursuant to RCFC 12(b)(1), and the remainder of the complaint, pursuant to RCFC 56(b). In the alternative, defendant respectfully requests that the Court dismiss the remainder of the complaint pursuant to RCFC 12(b)(6). In support of this motion, we rely upon the Amended Complaint, the following brief, our proposed findings of uncontroverted fact ("PFF"), the exhibits filed with our motion for partial summary judgment ("Def. Exh."), and our supplemental appendix ("Supp. App.").

**STATEMENT OF THE ISSUES**

1. Whether the contracts at issue were illegal because their Economic Price Adjustment ("EPA") clauses were based upon "indexes rather than on Plaintiff's own established fuel prices," "were not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel," as alleged in Count I of the Amended Complaint.

2. Whether the allegation contained in Count II that the "PMM [Petroleum Marketing Monthly] indexes were not designed or intended to be used to set or adjust prices and which did not reflect at least the fair market value of military fuel" states a claim upon which

relief can be granted.

3. Whether the allegation contained in Count I that the EPA clauses violate the Federal Acquisition Regulation ("FAR") 15.402(a) states a claim upon which relief can be granted.

4. Whether, if the answers to Issues 2 and 3 are in the negative, Counts II-VI, which state alternative theories of relief based upon the same allegations concerning the PMM and are labeled as "Misrepresentation," "Breach of Contract," "Implied-In-Fact-Contract," "Failure of Consideration and Frustration of Purpose," and "Mistake," also should be dismissed for failing to state a claim upon which relief can be granted.

5. Whether the allegation contained in Count VII, that the contracts at issue effected a taking, states a claim upon which relief can be granted.

6. Whether this Court has jurisdiction to entertain the allegation contained in paragraph 46 that DESC violated "the equal protection component of the fifth amendment's due process clause by extending to minority-owned businesses bidding preferences."

7. Whether this Court has jurisdiction to entertain the allegation contained in paragraph 41 that DESC improperly solicited and awarded "portions of the procurements set aside for small businesses together with those for large businesses" and, if so, whether that is true.

8. Whether DESC used "prohibited auction techniques, whereby DESC awarded contracts to bidders that agreed to match other bidders' prices," as alleged in paragraph 40 of the complaint.

9. If the answers to any of the above are in the affirmative, whether La Gloria has

waived any applicable benefit, or is estopped from litigating their applicability.[1]

## STATEMENT OF THE CASE

I. Nature Of The Case

This case arises from six fuel supply contracts between La Gloria and the Defense Energy Support Center ("DESC"). Compl. ¶¶ 31.[2] La Gloria complains that the EPA clauses contained in DESC fuel contracts were illegal and pads these complaints with various common-law theories of relief and a takings theory of relief, premised upon the very same illegality. La Gloria also asserts that certain features of DESC's small business program also were illegal. Presuming it has thus destroyed the very contracts it made and performed, without complaint, the complaint concludes that La Gloria is "entitled to recover based on the fair market value of the fuel it delivered to DESC." Compl. ¶ 44.

In an earlier phase of this litigation, this case was stayed pending the outcome of an interlocutory appeal certified by this Court, and eventually resolved in Tesoro et al. v. United States, 405 F. 3d 1339 (Fed. Cir. 2005), *petition for reh'g. en banc denied*, No. 04-5064 (Fed. Cir. Aug. 22, 2005) ("Tesoro"). In Tesoro, the Federal Circuit held that DESC's PMM-based EPA clause was legal, and declined to reach the waiver issue. Following the decision in Tesoro, the Court permitted La Gloria to file its Amended Complaint, which includes what we consider

---

[1] In this case, the Court has held that a waiver would not bar La Gloria's FAR 16.203-1 illegality allegation. La Gloria v. United States, 56 Fed. Cl. 211 (2003). Accordingly, although we believe our position was correct, we do not address the applicability of waiver to that allegation here. The Court did not, however, address the effect of waiver upon La Gloria's small business program illegality and common law causes of action.

[2] Until 1998, DESC was called the Defense Fuel Supply Center ("DFSC"). We use the current name.

to be immaterial factual allegations concerning the PMM and to assert a cause of action pursuant to FAR 15.402(a) (contracting officer's duty to assure prices offered are fair and reasonable). See Compl. ¶ 38.

## SUMMARY OF MATERIAL FACTS

The evidence set forth in the accompanying proposed findings of uncontroverted fact is sufficient to establish the Government's right to dismissal of the complaint. Generally, the proposed findings describe the market-based nature of the EPA clauses at issue, DESC's long, controversy-free use of those clauses, La Gloria's failure to object to the use of, or application of, the clauses, until many years after performing the contracts, and La Gloria's long history and familiarity with these clauses. They also demonstrate that DESC's small business program is consistent with applicable laws and regulations.

I. La Gloria's Contracts

La Gloria is a petroleum refiner operating in Texas. It also is an experienced Government contractor. Between 1993 and 1999, DESC paid La Gloria in excess of $137 million pursuant to the contracts at issue here, buying a total of more than 248 million gallons of jet fuel. PFF 4.

At issue are DESC-drafted price adjustment clauses. PFF 8-13.[3] These clauses adjusted the per-gallon "base price" offered by fuel suppliers. Id. Offerors also acknowledged a "reference price" for comparable petroleum products, which, since the early 1980s, has been

[3] DESC began using EPA clauses during the 1973 oil embargo. At that time, the agency allowed offerors to choose between basing price adjustments upon either published prices of refined products, or actual crude oil costs. DESC began using market-prices exclusively in the early 1980s, primarily because the prior practice made it difficult to compare offers for evaluation purposes. PFF 8.

taken from a number of widely-available petroleum price publications. PFF 9-11. After award, the base price per gallon was periodically adjusted up or down, by the exact number of fractions of a cent that the published reference price had risen or fallen since the last adjustment. PFF 9.

La Gloria's 1993 contract contained an EPA clause tied to monthly average sale prices of refined petroleum products, by region, as reported by the Petroleum Marketing Monthly. PFF 10. The PMM is published by the Department of Energy's Energy Information Administration, and reports transaction prices that refiners, including La Gloria, are required by law to submit monthly. PFF 11; 15 U.S.C. § 772.

Pursuant to the PMM-based EPA clause, suppliers' per-gallon prices were adjusted monthly. PFF 11. For example, for in 1993, La Gloria bid a base price of .566300 and .576300 cents per gallon for JP-8, tied to a PMM-based reference price, supplied by DESC, of .569500 cents per gallon for February, 1993. Def. Exh. 10 at 2, 7. Assuming hypothetically that, for the first month in which La Gloria delivered fuel, the reference price increased .10 cents, the contract price for that first month would have been the base price plus the same .10 cents per gallon.

In 1995, DESC adopted as its EPA escalator a widely-used industry publication, <u>Platts Oilgram Price Report</u> ("Platts"). PFF 13. Accordingly, La Gloria's 1995-1999 contracts used <u>Platts</u> as their price reference. <u>Id.</u> DESC did so because, despite substantial advantages offered by the PMM, including the fact that it was a report of <u>actual</u> sale prices, the report of those prices was not available until three months after the sales took place. PFF 12-13. The EPA clauses, however, required monthly payments and, therefore, price adjustments. To accommodate this gap between the payment date and the availability of the data necessary to calculate the economic price adjustment applicable to those payments, DESC made an estimated interim

payment and then reconciled that payment with the amount properly due when the applicable PMM sales data became available. PFF 13. Thus, La Gloria's suggestion that the change from PMM demonstrates that a PMM-based clause was illegal or not market-based is, simply, hyperbole. See, e.g., Compl. ¶¶ 14-19.

La Gloria never objected to the legality of any version of the EPA clause, or to any of the hundreds of price adjustments made pursuant to the clauses. PFF 28. Indeed, it was not until La Gloria submitted its first certified claim in 2001 – approximately eight years after the first contract was awarded, and nine years after MAPCO, 27 Fed. Cl. 405, was decided – that La Gloria alleged that the EPA clauses were illegal. Compl. ¶¶ 31; PFF 29.

II. DESC's Small Business Set-Aside Program

In accordance with 15 U.S.C. § 644 and FAR Part 19, DESC's Bulk Fuels Program solicitations included partial small business set-asides. Beginning in 1988, pursuant to 10 U.S.C. § 2323, DESC solicitations also included an evaluation preference of up to 10 per cent for small disadvantaged business concerns. DESC solicitation clauses I237.05, Notice of Evaluation Preference for Small Disadvantaged Business Concerns, and I237.06, Notice of Partial Small Business Set-Aside with Preferential Consideration for Small Disadvantaged Business Concerns, set forth the operation of these programs. The clauses provided that awards will be made to those small disadvantaged concerns whose offered price does not exceed the highest price the Government would pay for the non-set-aside portion plus ten percent, as adjusted for transportation and other factors. Supp. App. 6 (subparagraph (c)).

DESC's domestic bulk fuels partial small-business set-aside program was described in the solicitation in DESC clauses I237.05 and I237.06 (DEVIATION). PFF 26. DESC also operated a small business set-aside program. Although small businesses could compete for non

set-aside amounts, DESC would award contracts to provide the set-aside amounts, the price for which was to be "negotiated by the Contracting Officer based upon prices the Government would otherwise pay under this solicitation had there been no set-aside for supply of the location at which the set-aside is placed, adjusted for transportation and other factors." Supp. App. 7 (subparagraph (d)). During the negotiations, the contracting officer did not provide small business concerns with either the identity or the prices of other offerors. Supp. App. 2 ¶ 5.

DESC's method of awarding partial set asides in its bulk fuels acquisitions differs from the standard FAR and DFARS procedures, in that DESC makes offers for the set aside quantities before award of the basic quantities. Supp. App. 2 ¶ 5; Supp. App. 5-7. The standard FAR and DFARS procedure is to offer set aside quantities after award of the basic quantities. Supp. App. 14-17. Where there is a set aside failure, the quantities are awarded to the low offeror for the basic quantity rather than being re-solicited as a new requirement. Id. This procedure avoids the delay that would take place in re-soliciting set aside failure quantities under the standard FAR and DFARS procedures. Id. DESC has used this method since the 1960's pursuant to authorized deviations. Id.; Supp. App. 42. The DESC procedure has been approved by the Government Accountability Office ("GAO"), formerly the General Accounting Office, on several occasions. Sup. App. 42.

## SUMMARY OF THE ARGUMENT

This case presents the incredible claim that an experienced Government supplier that performed at least six DESC contracts over seven years, without complaint, now is entitled to damages due to alleged defects in those contracts. Remarkably, La Gloria does not even allege that it misunderstood the clauses at issue, or that the clauses did not operate as their plain language suggests they would.

In Tesoro, 405 F.3d 1339, the Federal Circuit explicitly rejected La Gloria's stubborn contention that the clauses were illegal because they were based upon "indexes rather than on Plaintiff's own established fuel prices" (Compl. ¶ 36) and that DESC's PMM-based EPA clause is prohibited by the FAR. Tesoro also effectively disposed of La Gloria's miscellaneous complaints concerning the EPA clauses, found in Count I. In Tesoro, the court held that, in order to pass muster under FAR 16.203-1, EPA clauses may rely upon "industry-based prices," which "may be established by reference to either a catalog or market sources independent of the manufacturer or vendor." Id. at 1347. DESC's EPA clauses pass muster under Tesoro, because they are undeniably based upon "market sources independent of the manufacturer or vendor."

La Gloria contends that the EPA clauses are suspect because they were not "designed or intended" to set prices and did not "reflect at least the fair market value of military fuel." These allegations do not invoke any part of the legal test for EPA clauses and, therefore, fail to state a claim upon which relief may be granted. Indeed, even if the EPA clauses were shown to be inconsistent with the FAR, La Gloria never has demonstrated that they were administered or interpreted in a manner inconsistent with La Gloria's own understanding and expectations. In short, La Gloria cannot demonstrate an essential element of any request for equitable adjustment, harm.

La Gloria's parallel common law and takings allegations fare no better. The former, Counts II-VI, simply repackage La Gloria's illegality count as "Breach of Contract," "Implied-In-Fact-Contract," "Failure of Consideration and Frustration of Purpose," and "Mistake" counts. All are based upon the legally-unfounded premise that DESC owed a duty to La Gloria to utilize price references that were "designed or intended to be used to set or adjust prices," that the references "reflect at least the fair market value of military fuel," and that DESC pay "fair

market value." None is grounded in the language of La Gloria's actual contracts or the Federal Circuit's standard for assessing the legality of EPA clauses. All are thinly-disguised, back-door attempts to alter the legal standard for EPA clauses, established and applied in Tesoro. Accordingly, none of these states a cause of action upon which relief may be granted. To the extent they might, La Gloria simply cannot demonstrate the elements of proof necessary to sustain these traditional causes of action. The same is true of Count VII, which asserts that DESC's possession of the fuel purchased, *pursuant to the contracts at issue*, effected a taking. Count VII fails for the same reason as Counts II-VI. Moreover, it is well-established that, when the Government action at issue is subject to a contract claim, no Fifth Amendment takings may lie. Accordingly, Count VII, too, should be dismissed.

The complaint also quarrels with various aspects of DESC's small business program, without demonstrating what harm even a demonstrable violation might have had upon any of La Gloria's contracts. Specifically, the complaint alleges that: (1) DESC's small business set-aside program violates the FAR's anti-auction provisions; (2) that program violates the FAR's prohibition against "awarding portions of the procurements set aside for small business together with those for large businesses"; and (3) DESC's small disadvantaged business program violates the equal protection component of the Fifth Amendment. These counts offer little reason to keep this litigation afloat. First, La Gloria cannot demonstrate any link between these allegations and its contracts. Second, this Court has no jurisdiction to address an equal protection claim or the facial attack concerning the order of procurement award. Third, the programs were administered pursuant to applicable regulations.

Finally, if La Gloria's various allegations are not subject to dismissal for the reasons summarized above, we still are entitled to summary judgment, because, years ago, La Gloria

abandoned any rights the FAR, the Fifth Amendment, or small business regulations might have conferred. La Gloria also forfeited any right it might have had to test those rights in litigation when it waited as many as eight years to file the necessary claims. In a case involving similar circumstances, this Court already has held as much. Hermes II, 58 Fed. Cl. 409 (concerning the alleged FAR 16.203 violation). Although the Hermes Court did not explicitly address La Gloria's common law, takings and other auxiliary illegality causes of action, there is no principled basis for treating them differently.

## ARGUMENT

### I. Standard of Review

Summary judgment is warranted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." RCFC 56(c); accord Montana v. United States, 124 F.3d 1269, 1273 (Fed. Cir. 1999). A factual issue is material if it could affect the outcome of the case in light of the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute exists only if a reasonable trier of fact could find for the nonmoving party. Id. The movant need not "produce evidence" of the absence of factual disputes; it need only "point[] out" that the record does not support the other party's case. Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1563 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

We have moved to dismiss some counts of the Amended Complaint pursuant to RCFC 12(b)(6), which permits the dismissal of an allegation that fails to state a claim upon which relief may be granted. Dismissal upon this ground is appropriate whenever "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

In making this determination, the Court must accept the factual allegations set forth in the complaint as true and "indulge in all reasonable inferences in favor of the nonmovant." Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991).[4]

## II. DESC's EPA Clauses Are Authorized by FAR 16.203-1

In Count I, La Gloria presents several theories concerning the illegality of DESC's EPA clauses: (1) that the clauses were illegal because there were not based upon "Plaintiff's own established fuel prices" (Compl. ¶ 36); (2) that the clauses were illegal because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 37); and (3) that the contracts were awarded in violation of FAR § 15.802(b) (currently codified at FAR 15.402(a)) (contracting officer's duty to review offers for price reasonableness) (Compl. ¶ 38). As explained below, none of these allegations entitle La Gloria to readjust its contracts' prices, because, pursuant to the standards enunciated in Tesoro, the clauses are legal. In short, La Gloria's illegality allegations are based upon standards not found in the law and, therefore, fail to state a claim.

### A. EPA Clauses Need Not Be Based Upon The Contractor's Own Prices

FAR 16.203-1 provides as follows:

> A fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies. Economic price adjustments are of three general types:
>
> (a) Adjustments based on established prices. These price adjustments are based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific

---

[4] However, "legal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." Rochman v. United States, 27 Fed. Cl. 162, 168 (1992)(quoting 2A Jeremy C. Moore, Moore's Federal Practice, ¶ 12.07 [2.-5] (2d ed. 1992)).

items or the contract end items.

(b) Adjustments based on actual costs of labor or material. These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.

(c) Adjustments based on cost indexes of labor or material. These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

FAR Section 16.203-1(a) describes two types of "established" price adjustments -- those based upon "published" prices and those based upon "otherwise established" prices – but does not define those terms. However, FAR 16.203-4(a), and (b) ("Clauses"), which prescribe standardized clauses for "adjustments based on established prices," specifically refer to the use of established prices for supplies that have either established "catalog" or "market prices." Since January 1997, FAR 16.203-4 has not explicitly defined the terms "catalog" or "market prices."[5] However, its predecessor made clear that the terms referred to the definitions found in FAR 15.804-3. The predecessor stated that, before using a "published or otherwise established price" EPA clause, the contracting officer must determine that "the requirement is for . . . supplies that have an established catalog or market price <u>verified using the criteria in FAR 15.804-3</u>" (emphasis added). Section 15.804-3 (c), in turn, defined "established catalog prices" as "prices (including discount prices) recorded in a catalog, price list, schedule, or other verifiable and established record that (A) are regularly maintained by the manufacturer or vendor; and (B) are published or otherwise available for customer inspection." FAR 15.804-3(c)(1) (1995). It defined "established market prices" as "current prices that (i) are established

[5] This provision was deleted from the FAR effective January 2, 1997.

in the course of ordinary and usual trade between buyers and sellers free to bargain and (ii) can be substantiated by data from sources independent of the manufacturer or vendor." Id. § 15.804-3(c)(2) (emphasis added).

In Tesoro, the Federal Circuit, reviewing the PMM-based EPA clause at issue here, held that FAR 15.804-3 supplies the meaning for "established prices," which need not be, as La Gloria asserts here, still, the contractor's own prices:

> Although the term "established price" is not expressly defined in FAR § 16.203, the definition of the term in FAR § 15.804-3 is incorporated by reference. FAR § 15.804-3 defines "established prices" to include contractor-specific prices, namely "established catalog prices," and industry-based prices, namely "established market prices." As indicated by FAR § 16.203-2 and FAR § 15.804-3, the policy behind requiring use of "established prices" is to avoid contracts subject to the operational whims of individual contractors.

Tesoro, 405 F.3d at 1347 (emphasis added)..

Rejecting La Gloria's theory, the court held explicitly that the theory that "FAR 16.203-3 requires that adjustments be based only on changes in the prices charged by individual contractors eviscerates the regulatory meaning of the term 'established prices' and the policy reasons for using it." Id. Summarizing, the court explained that: "According to the interplay of all four sections of FAR § 16.203, a 'contractor's established price' may be established by reference to either a catalog or market sources independent of the manufacturer or vendor." Id. at 1347 (emphasis added)..

The court did not stop there, however. Rather, it explicitly considered whether DESC's PMM-based EPA clause was an "established prices" clause contemplated by FAR § 16.203-1 and held that it was – foreclosing consideration of the question anew. Indicating that it was indeed considering the legality of the PMM-based EPA clause, the court recited the PMM's

various features as well as the parties' contentions concerning the effect of those features upon the viability of the PMM-based EPA clause. The court's specific recitations concerning the PMM included the following.

- The court's statement of the certified question as "Did DESC establish the price of fuel in violation of law by employing economic price adjustment clauses indexed to PMM?" Tesoro, 405 F.3d at 1342 (emphasis added).

- "The reference prices to which the price adjustments were tied were drawn from market publications. Until June 23, 1994, DESC drew its EPA reference prices from the market publication known as the [PMM]." Id. at 1341.

- The court's observation that the PMM is published by DOE and reports "monthly average sales figures for specified fuels for five fuel regions known as Petroleum Administration for Defense Districts ('PADDS')." Id.

- "All refiners, including Tesoro and Hermes, are required by law to submit monthly sales data to the DOE, which then compiles the data to report the monthly average sales prices per PADD for various products." Id.

- The observation that the complaints in both suits claimed that "DESC's actions were per se illegal because the PMM-based EPA clause was inconsistent with the applicable section of the FAR." Id. at 1342 (emphasis added).

- The observation that the contractors argued that "DESC's use of an EPA clause tied particularly to the PMM does not comport with the express requirements of FAR § 16.203-3 . . . Relying on the language of MAPCO, Appellants claim that a PMM-based EPA clause fails to address either of the "mischiefs" specified in FAR § 16.203-3, because the PMM is an "amalgamation" of petroleum sales that does not reflect the product, the market, or the price for the military fuel Tesoro and Hermes supplied." Id. at 1348 (emphasis added).

- A review of the MAPCO analysis of the PMM itself, which was distinct from MAPCO's analysis of whether, in general, EPA clauses must be based upon the contractor's prices. See MAPCO, 27 Fed. Cl. at 410-11.

- The appellate court's review included MAPCO's dissection of the PMM, including the fact that it was an "amalgamation of the previous month's sales data" and, as such, did not comport with the dictionary definition of "established." The review also recited MAPCO's conclusion ("In sum, the index at issue is neither the contractor's, nor does it reflect an established price"), which underscored the fact that the appellate court and the MAPCO court considered the general question of whether an "established prices" EPA clause could be market

> based as well as whether DESC's PMM clause was an "established prices" clause. Id. at 1347 (emphasis added).

Following these recitations, the court concluded, in unmistakable language, that the PMM-based EPA clause was, indeed, a permissible EPA clause:

> Because we conclude that DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR, we do not reach the other issues raised in the certified questions . . . . Our holding that the use of the PMM-based EPA clause was authorized under the statute moots the issue of [waiver].
>
> * * *
>
> For the foregoing reasons, we hold that the Court of Federal Claims erred in holding that DESC's use of a PMM-based EPA clause was not authorized under the FAR.

Id. at 1348-49 (emphasis added).

The appellate court's conclusion is not surprising. The PMM is based upon sales data from a large number of refiners and sellers of petroleum products. It reports averages of the actual prices sellers have charged and buyers have paid for various petroleum products in different states and regions of the country. PFF 11. Because the prices are established in actual sales between a number of sellers and buyers, they clearly are "market prices," and satisfy the FAR 15.804-3 requirement that market prices be established in the course of ordinary business between "buyers and sellers free to bargain."

The Platts Oilgram Price Report, also is a market-based publication that is widely used to adjust prices. PFF 13, 22-23; Supp. App. 47. Indeed, La Gloria's own "fair market value" claim is based upon Platts. PFF 30. Accordingly, La Gloria's Platts-based EPA clauses easily pass muster under Tesoro's "market sources"/ "market-based" standard. La Gloria's complaint does not assert otherwise. Indeed, La Gloria's sole complaint concerning these publications is that: "[o]n information and belief, DESC also knew that some of the other indexes it used to set or

adjust prices were not appropriate for these purposes." Compl. ¶ 25. This allegation appears to be of the same character as La Gloria's alternative EPA clause illegality argument, i.e., that EPA clauses must meet a higher standard than that defined in Tesoro. We discuss that argument in the next section.

B. La Gloria's Fair Market Value Allegations Do Not State A Cause of Action

The above analysis establishes that DESC's EPA clauses pass muster under the Tesoro standard for EPA clauses and, therefore, are legal. However, La Gloria asserts that the clauses may not be considered legal, because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 37). But, we are aware of no legal basis for invalidating EPA clauses upon these grounds and the complaint identifies none. Indeed, contractors may bid below cost. See CCD Distributors, Inc. v. U.S., 69 Fed. Cl. 277 (2006) ("However, the fact that an offer [for a fixed-price contract] may not include any profit or may be an attempted buy-in (below cost) does not, in itself, render an otherwise responsible firm ineligible for award."). In short, La Gloria's effort to raise the standard for EPA clauses is rooted neither in La Gloria's contracts nor the applicable law. Accordingly, we see no apparent ground upon which these allegations might state a claim.

C. La Gloria's FAR 15.802(b) Allegation Does Not State A Cause of Action

In yet another effort to create an unfounded legal test for EPA clauses, La Gloria asserts that the clauses were illegal because they somehow violated FAR § 15.802(b) (currently codified at FAR 15.402(a)). Compl. ¶ 38. As this Court has already held, that regulation does not create rights for contractors. In other words, a complaint rooted in this regulation fails to state a claim upon which relief can be granted.

FAR 15.402(a) provides that:

> Contracting officers must-
>
> (a) Purchase supplies and services from responsible sources at fair and reasonable prices. In establishing the reasonableness of the offered prices, the contracting officer must not obtain more information than is necessary. To the extent that cost or pricing data are not required by 15.403-4, the contracting officer must generally use the following order of preference in determining the type of information required:
>
> (1) No additional information from the offeror, if the price is based on adequate price competition, except as provided by 15.403-3(b).
>
> (2) Information other than cost or pricing data:
>
> (i) Information related to prices (e.g., established catalog or market prices or previous contract prices), relying first on information available within the Government; second, on information obtained from sources other than the offeror; and, if necessary, on information obtained from the offeror. When obtaining information from the offeror is necessary, unless an exception under 15.403-1(b)(1) or (2) applies, such information submitted by the offeror shall include, at a minimum, appropriate information on the prices at which the same or similar items have been sold previously, adequate for evaluating the reasonableness of the price.
>
> (ii) Cost information, that does not meet the definition of cost or pricing data at 2.101.
>
> (3) Cost or pricing data. The contracting officer should use every means available to ascertain whether a fair and reasonable price can be determined before requesting cost or pricing data. Contracting officers must not require unnecessarily the submission of cost or pricing data, because it leads to increased proposal preparation costs, generally extends acquisition lead time, and consumes additional contractor and Government resources.

We start with the proposition that not every regulation provides the contractor with an "enforceable interest." Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1381 (Fed. Cir. 2002) ("AT&T V"). And that is precisely where this Court started in Short Bros., PLC v. United

States, 65 Fed. Cl. 695, 764-65 (2005). In rejecting the very argument that La Gloria advances here, the Court explained:

> The FAR provisions cited by plaintiff purport to do no more than to provide internal government direction. For example, FAR § 15.802 (1993), entitled "Policy," only requires that the contracting officer "[p]urchase supplies and services from responsible sources at fair and reasonable prices [.]" FAR § 15.802(b) . . . It does not afford a judicial remedy.

Short Bros. is consistent with the principle that contractors lack standing to bring suit based upon regulations issued for the Government's benefit. E.g., Freightliner Corp. v. Caldera, 225 F.3d 1361(Fed. Cir. 2000). The decision also is consistent with AT&T V's application of that principle. In AT&T V, the court considered a contractor's allegation that, in selecting a fixed-price contract, the Navy had "violated a variety of procurement regulations and directives that guide a contracting officer's selection of contract type." 307 F.3d at 1379. Specifically, the contractor alleged, and there was no dispute, that Navy contracting officials had failed to obtain a statutorily-mandated departmental-level certification that would have permitted it to enter into the fixed-price shipbuilding contract at issue. But, the court refused to entertain the contractor's claim, finding no intent in the legislation to "make any provision for judicial enforcement" (id.) -- and this was so, despite the fact that passage of the statute was prompted by shipbuilding claims of the sort at issue. See Am. Tel. & Tel. Co. v. United States, 177 F.3d 1368, 1370-71 (Fed. Cir.1999) (en banc).

If the court could not find an enforceable interest for contractors in a statute, the enactment of which was motivated by contractors having to bear costs overruns, La Gloria will be hard pressed to find one here. Indeed, the purpose of FAR 15.402(a) is not to protect contractors (other than from needless demands for documents), but to protect the Government

from prices that are "higher than warranted." All Phase Environmental, Inc., B-292-919.2, 2004 CPD ¶ 62, 2004 WL 437450 at 6. That purpose is evident, for example, in the regulation's warning against prices that include "contingency" amounts, i.e., amounts that would make a price "higher than warranted." Professors Nash and Cibinic agree, explaining that: "The primary focus of these requirements is to ensure that the Government does not pay unreasonably high prices," although they caution that "prices that are unreasonably low must also be dealt with before an award is made, because they could be evidence of mistake, non-responsibility, lack of understanding of the work, or a buy-in." Formation of Government Contracts (3rd Ed. 1998) at 1279.[6]

Indeed, if, as La Gloria argues, the contracting officer's obligation to assess price reasonableness is actionable, contract pricing never would be binding, because contractors who failed to realize the *post hoc* demands of their owners or investors could occasion this Court's intervention with no more substantial an allegation than "our price was unfair" That is precisely what La Gloria seeks to do here: insist that it be paid what it calls "fair market value," a term apparently to be defined by an expert at trial.

D. Summary

At bottom, La Gloria's complaint concerns the type of market-based clause selected. However, absent a prohibition, the agency had the discretion to select an appropriate clause. See AT&T V, 307 F.3d at 1378-80; accord 10 U.S.C. § 2306(a) (agency head generally "may enter into any kind of contract that he considers will promote the best interests of the United States"); see also FAR 16.103(a) ("Selecting the contract type is generally a matter for negotiation and

[6] We are not aware of any allegation of pricing mistake here of the sort referred to in this treatise.

requires the exercise of sound judgment."); FAR 16.104 (selection of contract type turns upon "many factors"). Indeed, the FAR expressly affords the contracting officer latitude to use agency-prescribed EPA clauses when the standard FAR clauses are "inappropriate." FAR 16.203-4 (a)(2), (b)(2), and (c)(2) (1995).

To borrow this Court's phrase: "An important consideration is the prevailing view among courts that determinations in procurement matters should ordinarily be left to the discretion of administrative officials exercising procurement authority." Durable Metals Prods., Inc. v. United States, 27 Fed. Cl. 472, 477 n.6, aff'd, 11 F.3d 1071 (Fed. Cir. 1993) (table). Any doubt concerning the agency's exercise of discretion in this case should be erased by the uncontroverted facts of this case: during years of contract performance, La Gloria did not complain about the legality of its contracts' formation or operation. PFF 28. That silence is telling. There simply is nothing inherently suspicious or illegal about DESC's fuel contracts. La Gloria, which, as claimant must prove otherwise, has not done so.

E. La Gloria Cannot Demonstrate Harm[7]

To maintain a cause of action against the Government, La Gloria must demonstrate that it was injured, damaged, or harmed by the Government's allegedly wrongful action. Failure to prove harm or the existence of injury as part of entitlement is a failure of plaintiff's cause of action. Pennsylvania Dept. of Transp. v. United States, 226 Ct. Cl. 444, 451, 643 F.2d 758, 762-

[7] We have argued that La Gloria could not prevail on its FAR 16.203-1 allegation, because it could demonstrate no harm flowing from the alleged illegality. In its earlier decision in this case, however, the Court disagreed, reasoning that the argument could be addressed in connection with any damages determination and that, once the EPA clause at issue was stricken, harm would be, in essence, irrelevant to the damages. La Gloria, 56 Fed. Cl. at 225. Accordingly, although we believe our position is correct, we do not raise that argument again with respect to the FAR 16.203-1 illegality question.

63 (1981) (observing the "well-established rule" that Government contractors have the "burden of establishing the fundamental facts of liability, causation, and resultant injury"); Servidone Construction Corp. v. United States, 931 F.2d 860 (Fed. Cir. 1991); Elter, S.A., ASBCA No. 52451, 2001-1 BCA ¶ 31,373 (denying entitlement because the contractor failed to establish that a Government delay caused injury); see also 1 Dobbs' Law of Remedies § 3.1 (2d. ed. 1993) ("The amount of harm may be either more or less than the amount of damages. . . . [T]he term damages is best reserved for the claim or the remedy rather than the underlying loss or injury."). The appellate court's decision in LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1557 (Fed. Cir. 1995), is instructive. There, plaintiff asserted that it was entitled to reformation of its contract, because the Government had violated the FAR by sharing plaintiff's prices with a competitor. The court disagreed, explaining that "Even though the [price] disclosures to [a competitor] clearly violated the FAR . . . LaBarge was not harmed by the disclosures in any concrete way contemplated by the FAR and, therefore, is not entitled to relief." Id. at 1556. See also PCL Construction, 41 Fed. Cl. 242 (no damages where plaintiff could not demonstrate prejudice stemming from the Government's inclusion of an unauthorized "subject to availability of funds" clause in its contract).

Thus, assuming there still exists otherwise viable causes of action, before La Gloria will be entitled to a remedy, it first must demonstrate that it was harmed in some way, e.g., that it was caused to do or refrain from doing something to its detriment -- for example by offering prices it otherwise would not have offered. In other words, simply alleging the Government acted incorrectly alone is an allegation of "injury without harm" and, therefore, must be dismissed.

## III. La Gloria's Alternative Illegality Theories In Counts II-VI Must Be Dismissed

In addition to its core complaint, that the EPA clauses violate the FAR, La Gloria

presents several common-law theories of relief in Counts II-VI. These trojan horse allegations merely repackage the premise discussed in Sections II.B. and C., above: that EPA clauses must be "designed and intended," and, in fact, provide for the payment of "fair market value." As explained, however, this premise arises neither from La Gloria's contracts nor from the Federal Circuit's announced standard for EPA clauses. As explained below, the premise gains no traction in a common law guise and, therefore, Counts II-VI also fail to state a claim.

A. Count II (Misrepresentation)

In sum, Count II alleges that DESC "misrepresented and otherwise failed to disclose that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value." Compl. ¶ 53. The apparent premise for this allegation is that "[i]n basing price adjustments on PMM, DESC represented and warranted that PMM accurately reflected at least the fair market value for fuel and that prices for military fuel were fair and reasonable." Compl. ¶ 12.

"Misrepresentation occurs when the government misleads a contractor by a negligently untrue representation of fact, or fails to disclose information it has a duty to disclose." John Massman Contracting Co., v. United States, 23 Cl. Ct. 24, 32 (1991) (citing Morrison-Knudsen Co. v. United States, 170 Ct. Cl. 712 (1965)). La Gloria has not identified a fact that DESC had a duty to disclose or one that was material to its bargain. The essential terms of the DESC contracts are that La Gloria would supply fuel at a given location and that DESC would pay La Gloria according to a specified formula. La Gloria has not alleged that any part of the contract was ambiguous, that DESC failed to honor the pricing clause, or that the clause failed to operate as described in the contract.

B. Count III ("Breach of Contract")

Count III is based upon the premise that "DESC's basing price adjustments on PMM and other indexes that were adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value was a material condition of the contracts upon which Plaintiff reasonably relied in entering the contracts." Compl. ¶ 61. The complaint also alleges that a material part of the parties' bargain was DESC basing price adjustments "on standards that were designed or intended to be used to set or adjust prices," id. at ¶ 62, and DESC's "paying at least fair market value." Id. at ¶ 63. The short answer is that there is nothing in the contract that recites any such condition. Accordingly, there is no basis for concluding that these were "material" conditions of the contracts or that the contracts were breached, even assuming that these conditions never materialized.

C. Count IV ("Implied-In-Fact Contract")

Count IV alleges that DESC committed a "violation of law and regulation" in awarding and administering La Gloria's contracts. Compl. ¶ 74. As we have explained, there has been no violation of law or regulation. Nonetheless, an "implied-in-fact contract cannot exist if an express contract already covers the same subject matter." Trauma Service Group v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997). Here, the alleged implied-in-fact contract concerns the same subject as that addressed directly by the contracts at issue, the price of fuel already bought and sold. Accordingly, if, according to the contracts, La Gloria is entitled to additional compensation, contracts and contract principles will provide La Gloria its remedy.[8]

[8] We understand that this allegation has not been plead as an independent ground for relief, but as an allegation of law concerning how a remedy might be obtained should the contract's express pricing clause be stricken as illegal. See Barrett Refining v. United States, 242 F.3d. 1055, 1060 (2001) (remedy for illegal pricing term is found in any implied contract concerning that term).

D. Count V ("Failure of Consideration and Frustration of Purpose")

Count V, too, is based upon the triumvirate of premises discussed above, that DESC was required to: (1) base prices upon an index "adequate" to "protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value;" (2) base prices upon an index "designed or intended to be used to set or adjust prices" and that did "reflect at least fair market value;" (3) and pay "fair and reasonable prices" and "at least fair market value." Compl. ¶¶ 81-83.

As we have explained, these allegations are not the proper basis for a contractually-based claim and pleading them as a breach-type claim does not increase their heft. Moreover, these theories are bases for avoiding performance, and not applicable here, because performance already has occurred. See, e.g., Everett Plywood Corp. v. United States, 227 Ct. Cl. 415, 423-24, 651 F.2d 723, 728-29 (1981) (frustration excuses performance); Far West Fed. Bank v. OTS, 119 F.3d 1358, 1364 (9th Cir. 1997)(frustration of purpose is an excuse for non-performance, not a cause of action (citing Restatement (Second) of Contracts sec. 265)); Perpetual Financial Corp. v. United States, 61 Fed. Cl. 126, 138 (2004) (frustration of purpose count must be dismissed); Spalding & Sons, Inc. v. United States, 28 Fed. Cl. 242, 248-49 (1993) (frustration is a "rule respecting discharge," based on frustration of purpose, citing section 265 of the Restatement (Second) of Contracts).

But, even if the Court were to recognize frustration as an affirmative cause of action, the frustration allegations would fail. The Federal Circuit has held that, to excuse performance based upon frustration of purpose, a party must establish that: (1) a supervening event occurred;

---

However, as we have noted, these contracts are legal. Thus, this count adds no new allegations or necessary cause of action and should be dismissed.

(2) the moving party did not bear the risk of the supervening event; and (3) the event rendered the value of performance worthless. Seaboard Lumber v. United States, 308 F.3d 1283, 1295 (Fed. Cir. 2002). La Gloria has not alleged such factors.

E. Count VI (Mistake)

In Count VI, La Gloria argues that the same "no fair prices, no fair market value, no intent to track fair market value" litany presented in the other alternative counts entitles La Gloria to reprice its DESC contracts. Compl. ¶¶ 99-101. In Count VI, the litany is further fractured into yet two more alternatives -- mutual mistake and unilateral mistake. However, because the litany (in addition to being untrue) has no legal significance, Count VI, too, must be dismissed.

1. Mutual Mistake

To establish mutual mistake so as to justify rescission of a contract, a party must demonstrate that: (1) at the time of their agreement, both parties shared a mistaken belief "regarding a fact"; (2) that the mistaken belief "constituted a basic assumption underlying the contract"; (3) that the mistake "had a material effect on the bargain;" and (4) the claimant did not assume the risk of mistake. Dairyland Power Cooperative v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994); Atlas Corp. v. United States, 895 F.2d 745, 750 (Fed. Cir. 1990).

The kind of "mistake" necessary to support reformation of a contract concerns a belief not in accord with the facts in existence at the time of contracting. Atlas Corp., 895 F.2d at 750 (rejecting claim of mutual mistake where fact had not come into existence at time of contracting).[9] Therefore, "'[a] party's prediction or judgment as to events to occur in the future,

[9] The archetypal example is Sherwood v. Walker, 66 Mich. 568, 576, 33 N.W. 919 (1887). There, a seller was permitted to void his contract to sell a cow that the parties had supposed was

even if erroneous, is not a ‘mistake’ as that word is defined [under the doctrine of mutual mistake of fact].'" Dairyland Power Cooperative, 16 F.3d at 1202 (citing cases and treatises).

Here, La Gloria’s contention is that the PMM does not track fair market value. But, La Gloria offers no evidence concerning the elements of a mistake claim, including that both parties held an unrealized belief concerning a basic assumption underlying their bargain. Indeed, La Gloria is unlikely to do so, inasmuch as the best evidence of what the parties believed concerning their agreement is the plain language of the contract itself. Yet, La Gloria has identified no evidence that the parties believed that the PMM or Platts were anything other than what they are: publications of certain price data. Moreover, the gravaman of the complaint is not that the parties failed to understand the EPA clauses, but that they were illegal. However, in light of the Federal Circuit's decision in Tesoro, that is not the case. As a result, if there was any mistake, it was La Gloria’s legal conclusion at the time it filed its claim -- and not one concerning a fact "existing" at contract formation.

2. Unilateral Mistake

To succeed on a claim of unilateral mistake, a party must demonstrate:

> (1) mistake by one party, not bearing the risk of such mistake, as to a basic assumption on which he made the contract;
>
> (2) that has a material effect on the agreed exchange of performance; and
>
> (a) the effect of the mistake is such that enforcement of the contract would be unconscionable; or
>
> (b) the other party to the contract has reason to know of the mistake.

---

barren, when, in fact, she was fertile, and of good breeding stock.

J&E Salvage v. United States, 37 Fed. Cl. 256, 265 (1997) (citing Restatement (Second) of Contracts § 153 (1981)).

A contract will not be reformed because of a unilateral mistake in a bid unless the contractor establishes that the mistake resulted from a clear cut clerical or arithmetical error, or a misreading of the specifications. United States v. Hamilton Enterprises, 711 F.2d 1038, 1046 (Fed. Cir. 1983); Dale Ingram, Inc. v. United States, 201 Ct. Cl. 56, 74, 475 F.2d 1177, 1186 (1973). But, an agreement cannot be revised to reflect one party's subjective understanding of which the other party does not and should not have been aware. Id. Accordingly, the doctrine of mistake of fact does not apply when the error made by one of the parties was based upon an erroneous prediction or judgment. Restatement (Second) of Contracts § 151a.

An actionable "mistake" is a discrepancy between an offeror's state of mind and his offer. Tony Downs Foods Co. v. United States, 209 Ct. Cl. 31, 530 F.2d 367, 372 (1976) (holding that "difficulty of performance or losses in carrying out a contract will not be treated as a basis for relief by the courts in the absence of special clause in the contract stipulations providing for such relief"). In Hamilton Enterprises, 711 F.2d at 1046, the court found no mistake because the contractor could not demonstrate that the price it bid was not "the price it intended to bid." Accord Liebherr Crane Corp. v. United States, 810 F.2d 1153, 1157 (Fed. Cir. 1987) ("there is no difference in this case between Liebherr's intended bid and the bid Liebherr actually submitted").

La Gloria cannot make the necessary showing, because the vague allegations concerning the inappropriateness of the EPA clauses are, at best, legal characterizations of the clauses or of payment eventualities that postdated La Gloria's offers (the payment, or not, of "fair market value") – and not true mistakes concerning what La Gloria intended to bid. Indeed, if that were

not true, we would expect to see allegations and supporting declarations concerning the state of mind of La Gloria's contract pricing teams. Instead, we have La Gloria's thinly-disguised, and now debunked, allegations of law concerning the legal nature of the EPA clauses - and none concerning the factual circumstances of La Gloria's offers.

The final test (the alternative second prong) of a unilateral mistake claim is that the contract was unconscionable. J&E Salvage, 37 Fed. Cl. at 265. This jurisdiction has defined an unconscionable contract as one "which no man in his senses, not under delusion, would make on the one hand, and which no fair and honest man would accept on the other...." Hume v. United States, 21 Ct. Cl. 328, 330 (1886), aff'd., 132 U.S. 406 (1889); accord Fraass Surgical Mfg. Co., Inc. v. United States, 215 Ct. Cl. 820, 571 F.2d 34 (1978).

As this Court has explained:

> In analyzing the allegation of unconscionability the court should look for some type of oppression, unfair surprise and lack of consent at the time of entering into the contract. Gregory Lumber, 11 Cl. Ct. at 504 . . . . As pointed out in the Fraass decision . . . "discretion to deny enforcement to an unconscionable clause ... is not extended to permit courts to redistribute risks allocated by differences in bargaining power, but rather to prevent oppression and unfair surprise." Fraass, 215 Ct. Cl. at 830, 571 F.2d at 40.

Glopak Corporation v. United States, 12 Cl. Ct. 96, 102 (1987), aff'd., 851 F.2d 334, 338 (1988).

Here, nothing about the award was unconscionable. As many as eight years of La Gloria silence tells us that.

IV. Count VII (Takings Allegation) Fails To State A Claim

In yet another expression of La Gloria's legal view of the EPA clauses, Count VII states: "With no fully supporting claim of right DESC took possession of and infringed upon Plaintiff's

property rights in and in relation to the fuel it delivered." Compl. ¶ 126.[10] The Complaint further supposes that the fuel was taken "in conjunction with a violation of law and regulation." Id. at ¶ 128. Although the Court possesses jurisdiction under the Tucker Act to entertain claims properly founded upon the Takings Clause of the Fifth Amendment, these allegations fail to state such a claim.

The Takings Clause mandates "just compensation" when the Federal Government appropriates private property for "public use." U.S. Const. amend V; Bernaugh v. United States, 38 Fed. Cl. 538, 542 (1997), aff'd., 168 F.3d 1319 (Fed. Cir. 1998) (table). Here, however, the Government did not "take" property. Rather, according to the complaint, the Government purchased fuel in alleged breach of a contract.[11] "This Court's predecessor has cautioned against commingling takings compensation and contract damages." Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001). As the court explained, "In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." Id. at 1070 (quoting Sun Oil Co. v. United States, 215 Ct. Cl. 716, 769-70, 572 F.2d 786, 818 (1978)). In other words, remedies for alleged infringement of rights established contractually generally lie in contract, not the Fifth Amendment, as it is the terms of the contract

---

[10] If by this, La Gloria means that DESC took the fuel illegally, it has failed to state a claim under the Fifth Amendment, because, to maintain an action based upon a Fifth Amendment taking, a plaintiff "must concede the validity of the government action which is the basis of the taking claim." Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802 (Fed. Cir. 1993) (citing Florida Rock Indus. Inc. v. United States, 791 F.2d 893, 899 (Fed. Cir. 1986)). "The remedy for an unlawful seizure of property is in tort," which is beyond this Court's jurisdiction. American Commerce National Bank v. United States, 38 Fed. Cl. 271, 272-73 (1997).

[11] As the complaint describes it, "Plaintiff has property rights in and in relation to the fuel it delivered to DESC. In addition, Plaintiff has property rights in relation to DESC's procurement of the fuel Plaintiff delivered." Compl. ¶ 125.

that govern the parties' respective rights and obligations. Sun Oil, 215 Ct. Cl. at 769-70, 572 F.2d at 818; accord Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 703 n.27 (1949) (if there is a contract remedy, party cannot pursue takings claim in this Court).

These decisions are consistent with the important distinction courts draw between the Government's actions in its sovereign capacity and those undertaken in its proprietary capacity. "A taking can occur only when the Government acts in a sovereign capacity." Gratz v. United States, 25 Cl. Ct. 411, 420, aff'd, 985 F.2d 583 (Fed. Cir. 1992). By contrast, when the Government negotiates and enters into a contract with a private party, "this represents activity by [the Government] in a proprietary capacity." Id. (citing Sun Oil, 215 Ct. Cl. at 770, 572 F.2d at 818). As the Gratz court explained: "This transaction is a classic illustration of the Government's acting in a proprietary capacity. Each side incurred rights and responsibilities. Plaintiff's sole remedy is a breach of contract action." Id. at 420.

Here, La Gloria does not allege – and cannot – that DESC's alleged breach resulted in the taking of the contract itself, or its potential contractual remedies. Thus, its remedies, if any, are those provided by contract law – and not the Fifth Amendment.

## V. La Gloria's Small Business Program Complaints Must Be Dismissed

### A. The Court Lacks Jurisdiction To Entertain The Fifth Amendment Complaint

In paragraph 41 of the Amended Complaint, La Gloria asserts that DESC's "minority-owned business bidding preferences" violate the equal protection component of the Fifth Amendment. The Court lacks jurisdiction to entertain such a complaint.

This is a court of limited jurisdiction. Dynalectron Corp. v. United States, 4 Cl. Ct. 424, 428 (1984), aff'd, 758 F.2d 665 (Fed. Cir. 1984). Absent congressional consent to entertain a claim against the United States, the Court lacks authority to grant relief. United States v. Testan,

424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941). The central provision granting consent to suit in this Court is the Tucker Act, 28 U.S.C. § 1491.

In other words, the Tucker Act itself does not create a substantive right of recovery against the United States. Testan, 424 U.S. at 398; Eastport Steamship Corp. v. United States, 178 Ct. Cl. 599, 605-07, 372 F.2d 1002, 1007-09 (1967); United States v. Connolly, 716 F.2d 882, 885 (Fed. Cir. 1983) (en banc), cert. denied, 104 S. Ct. 1414 (1984). Accordingly, a claimant must identify a contract or some other provision of law that mandates compensation. United States v. Mitchell, 445 U.S. 535, 538 (1980). The equal protection clause of the Fifth Amendment, however, does not provide the requisite substantive right of recovery. Mullenberg v. United States, 857 F.2d 770, 773 (Fed. Cir. 1988); accord LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (no Tucker Act jurisdiction based on the equal protection clause); Inupiat Community of the Arctic Slope v. United States, 230 Ct. Cl. 647, 662, 680 F.2d 122, 132, cert. denied, 459 U.S. 969 (1982).

Here, La Gloria asserts that DESC's contract awards violate the "the equal protection component of the fifth amendment's due process clause by extending to minority-owned businesses bidding preferences that were not narrowly tailored to further a compelling governmental interest." Compl. ¶ 41 (Count I). However, even if that were so, that has nothing to do with the contract claims before this Court, because those claims are based upon contracts actually awarded to La Gloria – not contracts diverted to minority-owned businesses, rightly or wrongly. Accordingly, La Gloria's complaint is nothing more than a facial attack upon the constitutionality of DESC's fuel acquisition program – and does not concern the award or administration of *La Gloria's* contracts. As such, La Gloria cannot be heard to complain that it is its contracts that support the Court's jurisdiction, and, therefore, its complaint concerning

DESC's minority-owned business program must be dismissed.

B. DESC's Small Business Set-Aside Program Does Not Constitute An Auction

In Count I, La Gloria contends that DESC violated ("inter alia,") the "Office of Federal Procurement Policy Act ["OFPP Act"] and its implementing regulations (and, prior to its enactment, FAR § 15.610) by using prohibited auction techniques, whereby DESC awarded contracts to bidders that agreed to match other bidders' prices." Compl. ¶ 39. Apparently, La Gloria is referring to DESC's small business set-aside program, which DESC effects by a technique known as the "match price method." Under this method, DESC informs small businesses of the price that the Government would otherwise pay for a particular fuel product (as the result of a pending solicitation), including, if applicable, the Government's cost for transporting that fuel from the refiner to the ultimate consumer. The small businesses are not informed of any other offeror's actual bid prices or of their identities. PFF 27.

FAR 15.610, the applicable regulation that was in effect in 1995, provided that:

> e) The following conduct may constitute prohibited conduct under section 27 of the Office of Federal Procurement Policy Act, as amended (41 U.S.C. 423), and Subpart 3.104 to which civil and criminal penalties and administrative remedies apply.
>
> (1) Technical transfusion (i.e., Government disclosure of technical information pertaining to a proposal that results in improvement of a competing proposal); or
>
> (2) Auction techniques, such as--
>
> (i) Indicating to an offeror a cost or price that it must meet to obtain further consideration;
>
> (ii) Advising an offeror of its price standing relative to another offeror (however, it is permissible to inform an offeror that its cost or price is considered by the Government to be too high or unrealistic); and

(iii) Otherwise furnishing information about other offerors' prices.

This Court has defined an auction as "direct bidding of price between two competing offerors." DGS Contract Services, Inc. v. United States, 43 Fed. Cl. 227, 239 (1999). Yet, as the contracting officer has explained, these prohibited "auction techniques" were not a part of the DESC small business set-aside program. PFF 27. Either the small business concern met the price or it did not. There was not "bidding." Id. Indeed, as evinced by the set-aside clauses themselves, DESC followed the FAR provisions (FAR 52.219-7, and FAR 19.502-3(c)), which authorized this procedure. For that reason, the Comptroller General has found that DESC's small business procedures are consistent with applicable procurement and small business laws and regulations. See 1988 WL 227932 (Comp. Gen.), B-230556, March 23, 1989. Supp. App. 42.

C. The Court Lacks Jurisdiction To Entertain The Complaint That DESC's Small Business Program Violates FAR 52.219-7, Which It Does Not

La Gloria also alleges that DESC violated the Defense Federal Acquisition Regulation Supplement, part 219 by "improperly soliciting and awarding portions of the procurement set aside for small businesses together with those for large businesses." Compl. ¶ 40. The applicable FAR provision, 52.219-7 ("Notice of Partial Small Business Set-Aside") provides that:

> b) General.
>
> (1) A portion of this requirement, identified elsewhere in this solicitation, has been set aside for award to one or more small business concerns.
>
> (2) Offers on the non-set-aside portion will be evaluated first and award will be made on that portion in accordance with the provisions of this solicitation.

> (3) The set-aside portion will be awarded at the highest unit price(s) in the contract(s) for the non-set-aside portion, adjusted to reflect transportation and other costs appropriate for the selected contractor(s).
> (4) The contractor(s) for the set-aside portion will be selected from among the small business concerns that submitted responsive offers on the non-set-aside portion. Negotiations will be conducted with the concern that submitted the lowest responsive offer on the non-set-aside portion. If the negotiations are not successful or if only part of the set-aside portion is awarded to that concern, negotiations will be conducted with the concern that submitted the second-lowest responsive offer on the non-set-aside portion. This process will continue until a contract or contracts are awarded for the entire set-aside portion.

As explained by the contracting officer, the DESC small business set-aside procedure is substantially similar to the one set forth in the FAR and is specifically in keeping with the authorized DESC deviation clause contained in the solicitation. PFF 27. That clause permits DESC to determine whether small businesses will qualify for awards. If they do, separate awards are made. If not, the affected fuel set-aside is returned to the non set-aside portion. This procedure avoids the delay that would take place in re-soliciting set aside failure quantities under the standard FAR and DFARS procedures, has been used since the 1960's pursuant to authorized deviations, and has been approved by the GAO on several occasions. PFF 27.

In any event, the complaint fails to demonstrate that La Gloria was "harmed in [a] concrete way contemplated by the FAR . . . ." LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1556 (Fed. Cir. 1995) (contractor complaining of unauthorized disclosure of procurement information must demonstrate that it was harmed by the disclosure). In fact, the complaint does nothing to link any particular action taken under this program to any contract La Gloria was awarded. Accordingly, the complaint presents nothing more than a facial attack upon DESC's small business program, an attack that this Court possesses no jurisdiction to entertain.

VI. Waiver and Estoppel Bar La Gloria's Claims

As explained above, neither the FAR, any of the other plead small business statutes and regulations, nor the common law confer any unrealized right upon La Gloria. However, even assuming that were not the case, we are entitled to summary judgment concerning all counts for which the Court has not already decided our waiver argument, because, long ago, La Gloria waived whatever rights it imagines these sources of law might have been conferred upon it. Similarly, through its years of inaction, La Gloria is estopped from pursuing any of these rights in litigation.

Waiver has been defined as an "intentional relinquishment or abandonment of a known right or privilege." Hermes II, 58 Fed. Cl. at 409 (quoting Johnson v. Zerbst, 304 U.S. 458 (1938)); see also Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1563 (Fed. Cir. 1980) (citing Brookhard v. Janis, 384 U.S. 1, 4, 5 (1966)). Absent an affirmative congressional prohibition, a party may waive regulatory, statutory, and even constitutional rights Reservation Ranch v. United States, 39 Fed. Cl. 696, 712 (1997), aff'd, 217 F.3d 850 (Fed. Cir. 1999) (table). This circuit already has held that the defense of waiver is applicable against claims of illegality founded upon assertions that the Government has violated the FAR. E.g., E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978); Whittaker Electronic Systems v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997).

Here, La Gloria performed six one-year DESC contracts of the sort about which it now complains, over approximately six years, and waited eight years from its first contract to file a complaint. In Hermes II, this Court held that a contractor that had performed nine such contracts, over a seven-year period, and waited 14 years after entering its first PMM-based contract before filing its complaint, had waived its right to complain that those contracts were

illegal. Hermes II, 58 Fed. Cl. at 413.

In reaching its conclusion, the Court first considered whether the defense of waiver was available in this circuit, against a claim of illegality. In concluding that waiver was available, the Court observed that the Federal Circuit "*seems* to be of two minds on this issue," observing that Whittaker Elec. Sys., 124 F.3d 1443, E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978) (per curiam), and AT&T V, 307 F.3d 1374 support the availability of waiver, whereas the Beta/Chris Berg line of cases can be seen as supporting an alternate view. Hermes, 58 Fed. Cl. at 412.

The Court reconciled the apparent division of authority by identifying a "key factual distinction" between the two lines of cases cited, i.e., that, where waiver was not found, "the contractors either complained during contract formation or, at the very least, at an early stage in the history of the conflict." Id. at 413 (quoting Hermes I, 58 Fed. Cl. 3, 19 (2003)). In Hermes II, the Court noted, the contractor "astonishingly waited 14 years after entering the first [contract at issue] and eight years after entering the last [contract at issue] before litigating." 58 Fed. Cl. at 413.[12]

Reasoning that the defense of waiver was available under the right circumstances, the Court proceeded to find that the contractor had, in fact, waived its claims, because knowledge of its rights under the law could be presumed, as knowledge of the law generally is, and that

[12] In Calcasieu v. United States, 2003 WL 22049528, *13 (Fed. Cl.) and Sunoco v. United States, 59 Fed. Cl. 390, 398 (2004), the Court agreed that the asserted illegality claims were waivable, but declined to enter summary judgment, without further discovery. Other judges of the Court have disagreed, including the presiding judge here (LaGloria v. United States, 56 Fed. Cl. 211 (2003)). See, e.g., Navajo v. United States, 58 Fed. Cl. 200, 213 (2003), Tesoro v. United States, 58 Fed. Cl. 65 (2003), Gold Line Refining v. United States, 54 Fed. Cl. 285 (2002). In Tesoro, the waiver question was certified for interlocutory review, which, although accepted by the Federal Circuit, was not reached.

"intelligent waiver" could be discerned from Hermes' general sophistication and lengthy failure to signal its dissatisfaction whatsoever. Id. at 416-18. As the Court explained it:

> It is almost universally conceded that "'wherever a contract not already fully performed is continued in spite of a known breach, the wronged party cannot avail himself of that excuse . . . . As a general proposition, one side cannot continue after a material breach by the other . . ., act as if the contract remains fully in force (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court.'"

Id. at 418 (citing Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 146 (1973) (quoting Northern Helex Co. v. United States, 197 Ct. Cl. 118, 125-26 (1972)).

The Court's conclusion in Hermes applies with equal force to La Gloria's variously alleged causes of action, for it, too, is a sophisticated contractor (see PFF 1), with a history with and, therefore, understanding of DESC contracts. Indeed, La Gloria performed these contracts for approximately six years, did not complain about their award or administration, and did not even submit a claim until 2001 – approximately eight years after the first contract was awarded, and nine years after MAPCO, 27 Fed. Cl. 405, was decided. This conclusion applies with equal force to Counts II-VII, which merely repackage La Gloria's illegality claim. Given La Gloria's long history with DESC's fuel acquisition program, its evident sophistication in these matters, and its long silence, there is nothing about Counts II-VII that suggests that waiver does not apply. The gravaman of these counts is that La Gloria has been deprived of a contractually-based right. Yet, La Gloria does not even allege that the contracts changed in any material fashion in La Gloria's eight years of performing them.

Estoppel also is applicable. Estoppel requires that the party asserting estoppel rely to its detriment upon its opponent's action or inaction. E.g., E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978). Here, because of its superior knowledge of its own costs,

its market options, and because of its extensive experience with the clauses at issue, La Gloria was in the best position to assess the efficacy of the EPA clauses regarding its own situation. By adopting the EPA clauses in its offers with the text of the FAR available to it, La Gloria signaled its intent to forego any presumed benefits contained in what it now urges as the FAR's required clause. Now, it is too late to revoke that election, because La Gloria continued willingness to offer these clauses, coupled with its failure to protest their inclusion, clearly prejudiced the Government, because, as subsequent events showed, the Government could have obtained a deviation or refused La Gloria's offers and turned elsewhere. PFF 22-24. The same can be said of La Gloria's remaining complaints. Either option would have been a "relatively painless alternative" to the after-the-fact, competition-free, speculative recovery La Gloria now seeks. Indeed, as did the contractor in Ling-Temco-Vought, La Gloria has "in effect retained all options for itself . . . made its calculations entirely in its own favor, without proper consideration of the defendant's position," and violated the "basic principle calling for fair treatment of both parties." 201 Ct. Cl. at 148, 475 F.2d at 638.

## CONCLUSION

For these reasons, defendant respectfully requests that the Court dismiss the Amended Complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Department of Justice
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

OF COUNSEL:

DONALD S. TRACY
Trial Attorney
Defense Supply Center Richmond
Richmond, VA 23297

HOWARD M. KAUFER
Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

Attorneys for Defendant

March 31, 2006

CERTIFICATE OF FILING

I hereby certify that on March 31, 2006, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Steven J. Gillingham

SUPPLEMENTAL APPENDIX

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LA GLORIA OIL AND GAS COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-465C |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF JOHN R. WALKER

1. My name is John R. Walker and I am a contracting officer with the Defense Energy Support Center (DESC). I have been with DESC since 1983, except for a period from 1987-1989, when I worked for the Naval Sea Systems Command. I have been a DESC contracting officer since 1989.

2. DESC or its predecessor, the Defense Fuel Supply Center (DFSC), awarded La Gloria Oil and Gas Company (La Gloria) a series of 6 contracts between 1993 and 1999 that are the subject of economic price adjustment (EPA) clause claims.

3. These contracts were awarded in DESC's domestic bulk fuels program, were indefinite quantity-type contracts for one year, and called for the delivery of large volumes of fuel.

4. Many of the solicitations for the domestic bulk fuels contracts provided that a portion of the requirement was set aside for participation by small business concerns. A copy of a sample of the DESC clause implementing the partial small business set aside, I237.07, is included in Defendant's supplemental appendix at 4. Prior to 1988, similar clauses were included in DESC's solicitations. Beginning in 1988, DESC solicitations included an evaluation

preference of up to 10 percent for small disadvantaged business concerns, a copy of DESC clause I237.05, which implemented this preference, is included in Def. Supp. App. at 5. Beginning in 1988 the solicitations also included DESC clause I237.06, which provided that a portion of the requirement was set aside for exclusive participation by small business concerns with preferential consideration for small disadvantaged business concerns. A copy of that clause is at Def. Supp. App. 6.

5. DESC's partial set aside clauses operated in substantially the same manner as the standard FAR and DFARS clauses for partial small business set asides. After offers were received under the solicitations they would be evaluated as if there were no set aside quantity. The set aside quantities would then be offered to small businesses based upon prices that DESC would otherwise pay under the solicitation had there been no set aside for supply of the location at which the set aside was placed, adjusted for transportation charges. In awarding the set aside quantities, the contracting officer would not furnish either the identity, or the amount of the offered price that DESC would otherwise pay.

6. The difference between the standard FAR and DFARS clauses and set aside procedures and the set aside clauses and procedures used in DESC domestic bulk acquisitions was that set aside quantities were offered to small businesses and small disadvantaged businesses before award of the basic quantities. If no small or small disadvantaged business offeror was willing to accept the set aside quantities at the offered price, *i.e.*, there was a set aside "failure," the set aside quantities would be added back to the basic quantities and awarded to the low offeror. The standard FAR and DFARS procedures provide that set aside quantities are offered after the basic quantities are awarded. Under the standard FAR and DFARS procedure, if there is a set aside failure, the quantities are not awarded under the basic acquisition, but are re-

solicited under a new acquisition. The delay that would result from re-solicitation could adversely affect the mission and readiness posture of military units dependent upon those requirements. As the clauses at Supp. App. 4-7 show, DESC has, for decades, had a FAR deviation authorizing the use of its clauses and procedures.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 3-29-06.

JOHN R. WALKER
Contracting Officer

The following clause applies only to other than DoD set-aside items.

1237.07 NOTICE OF PARTIAL SMALL BUSINESS SET-ASIDE (DFSC AUG 1984) (DEVIATION)

(a) Any offer imposing a minimum of the quantity which may be awarded, which is in excess of the non-set-aside quantity of the item or items involved, will not be considered.

(b) General Information.

(1) *A portion of certain items of this procurement, as listed in the Schedule, has been set- aside for* award to eligible small business concerns. The quantities indicated for such items in the Schedule include the set-aside portion. All offerors are urged to offer the maximum quantities they desire and are capable of delivering. A small business concern interested in receiving a set-aside contract should submit an offer in the same manner as though there were no set-aside. To be considered for the set-aside portion of this procurement, an offeror qualifying as a small business concern must offer on the non-set-aside and set-aside portions of the procurement. Separate offers should not be submitted on the non-set-aside and set-aside portions.

(2) *The successful contractors for the set-aside portion will be determined in accordance with the* procedures set forth below. The partial small business set-aside of the procurement is based on a determination by the Contracting Officer that it is in the interest of maintaining or mobilizing the nation's full production capacity, or in the interest of national defense programs, or in the interest of assuring that a fair portion of Government procurement is placed with small business concerns.

(3) The offeror must recognize that if it accepts a set-aside contract, its obligation is to furnish product which conforms with all small business requirements set forth herein.

(c) Award Procedure.

(1) All of the offers received under this solicitation will first be negotiated as to price and an evaluation will be made as though there were no set-aside. The price for the set-aside portion of this procurement will be *negotiated by the Contracting Officer based upon prices the Government would otherwise pay under this solicitation had there* been no set-aside for supply of the location at which the set-aside is placed, adjusted for transportation charges and other factors. Awards to small business concerns whose offers are determined by this evaluation to be low for the set-aside portion of an item will be made as to such portion without further negotiation. Contracts for the remaining set-aside portions will be negotiated with those eligible small business concerns who have submitted a responsive offer on the various items for which a set-aside has been indicated.

(2) Negotiations for set-aside awards will commence with the small business concern that has submitted the *lowest offer of product on the non-set-aside portion and that has remaining a quantity of product after the award pattern has* been established for the set-aside portion. If the low small business concern on the item does not accept the set-aside quantity, the next low small business concern on the item will be given the same opportunity, continuing with the next low small business concern until all small business concerns have been contacted.

(3) For the purpose of negotiation, when an offer contains increments at different prices, each increment will be considered a separate offer. Negotiation will be limited to the quantity offered (except as provided in (4) below) and which is not acceptable under the provision of (1) above.

(4) After set-aside negotiations have been concluded, a final evaluation will be accomplished. All businesses, without regard to the size of the company, will be afforded an opportunity to compete for non-set- aside quantities. The Government reserves the right to make awards to the otherwise low offeror for all or any portion of the set-*aside quantities, without regard to the size of the company, if eligible small business concerns do not offer a quantity of* product sufficient to meet a set-aside or do not accept set-aside offers. The total quantity which will be awarded a small business concern on both the unreserved and reserved portions will not exceed the total quantity offered under this solicitation by such small business offer. However, if insufficient product is offered by small businesses to meet the quantity setaside for small business, the small business concerns with which negotiations have commenced may be given an opportunity to offer additional product.

(DFSC 52.219-9F07)

1251(F) ANTI-KICKBACK PROCEDURES (OCT 1988)

(a) *Definitions.*

"Kickback," as used in this clause, means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime Contractor, prime Contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

"Person," as used in this clause, means a corporation, partnership, business association of any kind, trust, joint-stock company, or individual.

"Prime Contract," *as used in this clause, means a contract or contractual action entered into by the United* States for the purpose of obtaining supplies, materials, equipment, or services of any kind.

"Prime Contractor," as used in this clause, means a person who has entered into a prime contract with the United States.

"Prime Contractor Employee," as used in this clause, means any officer, partner, employee, or agent of a prime Contractor.

"Subcontract," as used in this clause, means a contract or contractual action entered into by a prime Contractor or subcontractor for the purpose of obtaining supplies, materials, equipment, or services of any kind under a prime contract.

I211.200 ORDERING (APR 1984)

(a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders by the individuals or activities designated in the Schedule. Such orders may be issued from Date of Award through 30 September 1996.

(b) All delivery orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order and this contract, the contract shall control.

(c) If mailed, a delivery order is considered "issued" when the Government deposits the order in the mail. *Orders may be issued orally or by written telecommunications only if authorized in the Schedule.*

(FAR 52.216-18)

I211.02 ORDERING (CONT'D) (DFSC JAN 1991)

(d) For product funded and paid for by the Defense Logistics Agency, the Contractor will be furnished with a document entitled "Source Identification and Ordering Authorization." This document is for planning purposes only and does not constitute an order under the contract. This document will also indicate the activity(ies) authorized to place orders under this contract. This document does not in any manner modify or limit Contractor's obligation to deliver pursuant to properly placed orders as provided in the contract.

(DFSC 52.216-9F12)

I225 PAYMENTS (APR 1984)

The Government shall pay the Contractor, upon the submission of proper invoices or vouchers, the prices stipulated in this contract for supplies delivered and accepted or services rendered and accepted, less any deductions provided in this contract. Unless otherwise specified in this contract, payment shall be made on partial deliveries accepted by the Government if--

(a) The amount due on the deliveries warrants it; or

*(b) The Contractor requests it and the amount due on the deliveries is at least $1,000 or 50 percent of the* total contract price. (FAR 52.232-1)

I229 RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT (JUL 1985)

(a) Except as provided in (b) below, the Contractor shall not enter into any agreement with an actual or prospective subcontractor, nor otherwise act in any manner, which has or may have the effect of restricting sales by such subcontractors directly to the Government of any item or process (including computer software) made or furnished by the subcontractor under this contract or under any follow-on production contract.

(b) The prohibition in (a) above does not preclude the Contractor from asserting rights that are otherwise authorized by law or regulation.

(c) The Contractor agrees to incorporate the substance of this clause, including this paragraph (c), in all subcontracts under this contract. (FAR 52.203-6)

If this document contains partial small business set-aside items in the Schedule, the evaluation preference described in the following clause is not applicable to the non-set-aside portion of those items, or to the unreserved portion of items partially reserved for contracting with the SBA under the 8(a) program.

I237.05 NOTICE OF EVALUATION PREFERENCE FOR SMALL DISADVANTAGED BUSINESS CONCERNS (DFSC AUG 1994) (DEVIATION)

(a) DEFINITIONS. The term "small disadvantaged business (SDB) concern," as used in this clause, has the meaning set forth in the REPRESENTATIONS clause of this contract. SDB concerns must supply petroleum product from an SDB manufacturer, who complies with the *petroleum products size standards at 13 CFR 121, to be eligible for the evaluation* preference.

(b) EVALUATION PREFERENCE.

(1) After all other evaluation factors described in this solicitation are applied, offers will be evaluated by adding a factor of 10 percent to the price of all offers, except--

*(i) Offers from SDB concerns that have not waived the preference;*

(ii) Otherwise successful offers of eligible products under the Trade Agreements Act when the dollar threshold for application of the Act is exceeded.

(2) The 10 percent factor will be applied on a line item by line item basis or to any group of items on which award may be made. Other evaluation factors described in the solicitation will be applied before application of the 10 percent factor. However, in no event may award be made to an SDB concern at a price that exceeds fair market price (as determined under FAR 19.806-2) by more than 10 percent.

(c) WAIVER OF EVALUATION PREFERENCE.

An SDB may elect to waive the preference, in which case the 10 percent factor will be added to its offer for evaluation purposes.

[ ] Offeror elects to waive the preference in paragraph (b) above.

(DFSC 52.219-9F05)

The following clause applies to set-aside items.

1237.06 NOTICE OF PARTIAL SMALL BUSINESS SET-ASIDE WITH PREFERENTIAL CONSIDERATION FOR SMALL DISADVANTAGED BUSINESS CONCERNS (DFSC AUG 1994) (DEVIATION)

(a) DEFINITIONS.

"Small business concern," as used in this clause, means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the size standards in this solicitation.

"Small disadvantaged business (SDB) concern," as used in this clause, means a small business concern, owned and controlled by individuals who are both socially and economically disadvantaged, as defined by the Small Business Administration at 13 CFR Part 124, the majority of earnings of which directly accrue to such individuals. This term also *means a small business concern owned and controlled by an economically disadvantaged Indian tribe or Native Hawaiian* organization which meets the requirements of 13 CFR 124.112 or 13 CFR 124.113, respectively. In order to be eligible for preferential consideration set forth in paragraph (c) below, SDB concerns must supply product from an SDB manufacturer.

(b) GENERAL.

(1) A portion of certain items of this procurement, as listed in the Schedule, has been set aside for *award to eligible small businesses, with preferential consideration for SDB concerns. The quantities indicated for such items* in the Schedule include the set-aside portion. All offerors are urged to offer the maximum quantities they desire and are capable of delivering. Small business and SDB concerns interested in receiving a set-aside contract should submit an offer in the same manner as though there were no set-aside. Volumes offered by qualified small businesses or SDB concerns will be ~~evaluated for the non-set-aside and set-aside portions of the procurement. Separate offers should not be submitted on the non-set-aside and set-aside portions.~~

(2) The partial small business set-aside of the procurement is based on a determination by the Contracting Officer that it is in the interest of maintaining or mobilizing the nation's full production capacity or in the interest of national defense programs, or in the interest of assuring that a fair portion of Government procurement is placed with small business concerns.

(3) All of the offers received under this solicitation will first be negotiated as to price and an evaluation will be made as though there were no set-aside.

(4) For the purposes of set-aside evaluation, when an offer contains increments at different prices, each increment will be considered a separate offer. Except as provided in paragraph (e) below, negotiations will be limited to the offered quantities not awarded under the provision of subparagraph (d)(2).

(c) SET-ASIDE AWARD PROCEDURE (Preferential Consideration for SDB Concerns).

(1) Offers from SDB and small business concerns will be evaluated with preferential consideration, as described below, given to eligible SDB concerns.

(2) Offers from SDB concerns will be reviewed first to determine if an award can be made to an SDB concern at its offered price, beginning with the SDB concern offering the lowest evaluated price for that item. Awards to SDB concerns on the set-aside portion of this procurement will be made at the price offered by the SDB concern if that evaluated *price does not exceed the highest award price on the non-set-aside portion by more than 10 percent, as adjusted for* transportation charges and other factors. If the SDB price exceeds the highest non-set-aside price by more than 10 percent, the SDB offer will be treated as a small business and the procedures set forth in (d) below will apply.

I237.06 (Cont'd)

(3) Any volumes remaining on the set-aside portion that are not awarded to the lowest priced eligible SDB concern under subparagraph (c)(2) will be awarded to any other SDBs eligible for award under the procedures set forth above, beginning with the SDB concern offering the next lowest price.

(d) SET-ASIDE AWARD PROCEDURE (Small Business Concerns).

(1) After evaluation and award to eligible SDB concerns, if any, negotiations will be conducted with small business concerns for any set-aside volumes not awarded to eligible SDB concerns under paragraph (c).

(2) The price for the small business set-aside portion will be negotiated by the Contracting Officer based upon prices the Government would otherwise pay under this solicitation had there been no set-aside for supply of the location at which the set-aside is placed, adjusted for transportation charges and other factors. For the set-aside portion of an item not already awarded to SDB concerns, awards will be made to the small business concern whose offer is determined by this evaluation to be low without further negotiation. Contracts for the remaining set-aside portions will be negotiated with those eligible small business concerns who have submitted a responsive offer on the various items for which a set-aside has been established.

(3) Negotiations for small business set-aside awards will begin with the small business concern with the lowest evaluated price and a quantity of offered product remaining. If the low small business concern on the item does not offer to supply product at the set-aside price, the next low small business concern on the item will be given the same opportunity and continuing with the next low small business concern until all small business concerns have been contacted.

~~(e) After set-aside negotiations have been concluded, a final evaluation will be accomplished. All eligible offerors, without regard to the size of the company, will be afforded an opportunity to compete for more set-aside quantities.~~
The Government reserves the right to make awards to the otherwise low offeror for all or any portion of the set-aside quantities, without regard to the size of the company, if eligible SDB or small business concerns do not offer a quantity of product sufficient to meet a set-aside requirement or do not offer to supply at the set-aside prices. The total quantity which will be awarded a small business or an SDB offeror on both the unreserved and reserved portions will not exceed the total quantity offered under this solicitation by such small business or SDB offerors. However, if insufficient product is offered by small business and SDB concerns to meet the quantity set-aside for small business, SDB and small business concerns with whom the Government has already commenced negotiations may be given an opportunity to offer additional product.

(f) Where the Trade Agreements Act applies to the non-set-aside portion, offers of eligible products will be treated as if they were qualifying country end products.

(g) TOKEN OFFERS.

The Government reserves the right to not consider token offers or offers designed to secure an unfair advantage over other offerors eligible for the set-aside portion.

(DFSC 52.219-9F06)

I251(F) ANTI-KICKBACK PROCEDURES (OCT 1988)

(a) Definitions.

"Kickback," as used in this clause, means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime Contractor, prime Contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

"Person," as used in this clause, means a corporation, partnership, business association of any kind, trust, joint-stock company, or individual.

"Prime Contract," as used in this clause, means a contract or contractual action entered into by the United States for the purpose of obtaining supplies, materials, equipment, or services of any kind.

"Prime Contractor," as used in this clause, means a person who has entered into a prime contract with the United States.

"Prime Contractor Employee," as used in this clause, means any officer, partner, employee, or agent of a prime Contractor.

"Subcontract," as used in this clause, means a contract or contractual action entered into by a prime Contractor or subcontractor for the purpose of obtaining supplies, materials, equipment, or services of any kind under a prime contract.

"Subcontractor," as used in this clause, (1) means any person, other than the prime Contractor, who offers to furnish or furnishes any supplies, materials, equipment, or services of any kind under a prime contract or a subcontract entered into in connection with such prime contract; and (2) includes any person who offers to furnish or furnishes general supplies to the prime Contractor or a higher tier subcontractor.

"Subcontractor Employee," as used in this clause, means any officer, partner, employee, or agent of a subcontractor.

(b) The Anti-Kickback Act of 1986 (41 U.S.C. 51-58) (the Act) prohibits any person from--

(1) Providing or attempting to provide or offering to provide any kickback;

(2) Soliciting, accepting, or attempting to accept any kickback; or

(3) Including, directly or indirectly, the amount of any kickback in the contract price charged by a prime Contractor to the United States or in the contract price charged by a subcontractor to a prime Contractor or higher tier subcontractor.

**15.610 Written or oral discussion.**

(a) The requirement in paragraph (b) of this section for written or oral discussion need not be applied in acquisitions--

(1) In which prices are fixed by law or regulation;

(2) Of the set-aside portion of a partial set-aside; or

(3) In which the solicitation notified all offerors that the Government intends to evaluate proposals and make award without discussion, unless the contracting officer determines that discussions (other than communications conducted for the purpose of minor clarification) are considered necessary (see 15.407 (d)(4)). Once the Government states its intent to award without discussion, the rationale for reversal of this decision shall be documented in the contract file.

(b) Except as provided in paragraph (a) of this section, the contracting officer shall conduct written or oral discussions with all responsible offerors who submit proposals within the competitive range. The content and extent of the discussions is a matter of the contracting officer's judgment, based on the particular facts of each acquisition (but see paragraphs (c) and (d) of this section).

(c) The contracting officer shall--

(1) Control all discussions;

(2) Advise the offeror of deficiencies in its proposal so that the offeror is given an opportunity to satisfy the Government's requirements;

(3) Attempt to resolve any uncertainties concerning the technical proposal and other terms and conditions of the proposal;

(4) Resolve any suspected mistakes by calling them to the offeror's attention as specifically as possible without disclosing information concerning other offerors' proposals or the evaluation process (see 15.607 and Part 24);

(5) Provide the offeror a reasonable opportunity to submit any cost or price, technical, or other revisions to its proposal that may result from the discussions; and

(6) Provide the offeror an opportunity to discuss past performance information obtained from references on which the offeror had not had a previous opportunity to comment. Names of individuals providing reference information about an offeror's past performance shall not be disclosed.

(d) The contracting officer and other Government personnel involved shall not engage in technical leveling (i.e., helping an offeror to bring its proposal up to the level of other proposals through successive rounds of discussion, such as by pointing out weaknesses resulting from the offeror's lack of diligence, competence, or inventiveness in preparing the proposal).

(e) The following conduct may constitute prohibited conduct under section 27 of the Office of Federal Procurement Policy Act, as amended (41 U.S.C. 423), and Subpart 3.104 to which civil and criminal penalties and administrative remedies apply.

(1) Technical transfusion (i.e., Government disclosure of technical information pertaining to a proposal

that results in improvement of a competing proposal); or

(2) Auction techniques, such as--

(i) Indicating to an offeror a cost or price that it must meet to obtain further consideration;

(ii) Advising an offeror of its price standing relative to another offeror (however, it is permissible to inform an offeror that its cost or price is considered by the Government to be too high or unrealistic); and

(iii) Otherwise furnishing information about other offerors' prices.

**52.219-7 Notice of Partial Small Business Set-Aside.**

As prescribed in 19.508(d), insert the following clause:

NOTICE OF PARTIAL SMALL BUSINESS SET-ASIDE (OCT 1995)

(a) *Definitions.*

"Small business concern", as used in this clause, means
a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the size standards in this solicitation.

(b) *General.* (1) A portion of this requirement, identified elsewhere in this solicitation, has been set aside for award to one or more small business concerns.

(2) Offers on the non-set-aside portion will be evaluated first and award will be made on that portion in accordance with the provisions of this solicitation.

(3) The set-aside portion will be awarded at the highest unit price(s) in the contract(s) for the non-set-aside portion, adjusted to reflect transportation and other costs appropriate for the selected contractor(s).

(4) The contractor(s) for the set-aside portion will be selected from among the small business concerns that submitted responsive offers on the non-set-aside portion. Negotiations will be conducted with the concern that submitted the lowest responsive offer on the non-set-aside portion. If the negotiations are not successful or if only part of the set-aside portion is awarded to that concern, negotiations will be conducted with the concern that submitted the second-lowest responsive offer on the non-set-aside portion. This process will continue until a contract or contracts are awarded for the entire set-aside portion.

(5) The Government reserves the right to not consider token offers or offers designed to secure an unfair advantage over other offerors eligible for the set-aside

portion.

(c) *Agreement.* For the set-aside portion of the acquisition, a manufacturer or regular dealer submitting an offer in its own name agrees to furnish, in performing the contract, only end items manufactured or produced by small business concerns inside the United States, its territories and possessions, the Commonwealth of Puerto Rico, the Trust Territory of the Pacific Islands, or the District of Columbia. However, this requirement does not apply in connection with construction or service contracts.

(End of clause)

*Alternate I* (OCT 1995). When the acquisition is for a product in a class for which the Small Business Administration has determined that there are no small business manufacturers or processors in the Federal market in accordance with 19.502-2(c), delete paragraph (c).

**252.219-7006 Notice of Evaluation Preference for Small Disadvantaged Business Concerns.**
As prescribed in 219.7003, use the following clause:
**NOTICE OF EVALUATION PREFERENCE FOR SMALL DISADVANTAGED BUSINESS CONCERNS (JUN 1997)**

(a) **Definitions.**

"Historically black colleges and universities," as used in this clause, means institutions determined by the Secretary of Education to meet the requirements of 34 CFR Section 608.2. The term also means any nonprofit research institution that was an integral part of such a college or university before November 14, 1986.

"Minority institutions," as used in this clause, means institutions meeting the requirements of Section 1046(3) of the Higher Education Act of 1965 (20 U.S.C. 1135d-5(3)). The term also include Hispanic-serving institutions as defined in Section 316(b)(1) of such Act (20 U.S.C. 1059c(b)(1)).

"Small disadvantaged business concern," as used in this clause, means a small business concern, owned and controlled by individuals who are both socially and economically disadvantaged, as defined by the Small Business Administration at 13 CFR Part 124, the majority of earnings of whichdirectly accrue to such individuals. This term also means a small business concern owned and controlled by an economically disadvantaged Indian tribe or Native Hawaiian organization which meets the requirements of 13 CFR 124.112 or 13 CFR 124.113, respectively.

"United States," as used in this clause, means the United States, its territories and possessions, the Commonwealth of Puerto Rico, the U.S. Trust Territory of the Pacific Islands, or the District of Columbia.

(b) **Evaluation preference.**

(1) Offers will be evaluated by adding a factor of ten percent to the price of all offers, except --
(i) Offers from small disadvantaged business concerns, which have not waived the preference;
(ii) Offers from historically black colleges and universities or minority institutions, which have not waived the preference;
(iii) Otherwise successful offers of --

(A) Eligible products under the Trade Agreements Act when the dollar threshold for application of the Act is exceeded;

(B) Qualifying country end products (as defined in the Defense Federal Acquisition Regulation Supplement clause at 252.225-7001, Buy American Act and Balance of Payments Program); and

(iv) Offers where application of the factor would be inconsistent with a Memorandum of Understanding or other international agreement with a foreign government.
(2) The ten percent factor will be applied on a line item by line item basis or to any group of items on which award may be made. Other evaluation factors described in the solicitation will be applied before application of the ten percent factor. The ten percent factor will not be applied if using the preference would cause the contract award to be made at a price which exceeds the fair market price by more than ten percent.

(c) **Waiver of evaluation preference.**

A small disadvantaged business, historically black college or university, or minority institution offeror may elect to waive the preference, in which case the ten percent factor will be added to its offer for evaluation purposes. The agreements in paragraph (d) do not apply to offers which waive the preference.
_____ Offeror elects to waive the preference

(d) **Agreements.**

(1) A small disadvantaged business concern, historically black college or university, or minority institution offeror, which did not waive the preference, agrees that in performance of the contract, in the case of a contract for--
(i) Services, except construction, at least 50 percent of the cost of personnel for contract performance will be spent for employees of the concern.
(ii) Supplies, (other than procurement from a regular dealer in such supplies), at least 50 percent of the cost of manufacturing, excluding the cost of materials, will be performed by the concern.
(iii) General construction, at least 15 percent of the cost of the contract, excluding the cost of materials, will be performed by employees of the concern.
(iv) Construction by special trade contractors, at least 25 percent of the cost of the contract, excluding the cost of materials, will be performed by employees of the concern.

(2) A small disadvantaged business, historically black college or university, or minority institution regular dealer submitting an offer in its own name agrees to furnish in performing this contract only end items manufactured or produced in

the United States by small disadvantaged business concerns, historically black colleges or universities, or minority institutions.

(3) Upon request, a historically black college or university or minority institution offeror will provide the Contracting Officer evidence that it has been determined to be an HBCU or MI by the Secretary of Education.

(End of clause)

**252.219-7001 Notice of Partial Small Business Set-Aside with Preferential Consideration for Small Disadvantaged Business Concerns.**
As prescribed in 219.508(d), use the following clause:
**NOTICE OF PARTIAL SMALL BUSINESS SET-ASIDE WITH PREFERENTIAL CONSIDERATION FOR SMALL DISADVANTAGED BUSINESS CONCERNS (MAY 1995)**

(a) **Definitions.**

"Labor surplus area," as used in this clause, means a geographical area identified by the Department of Labor as an area of labor surplus.

"Labor surplus area concern," as used in this clause, means a concern that, together with its first tier subcontractors, will perform substantially in labor surplus areas.

"Perform substantially in labor surplus areas," as used in this clause, means that the costs incurred under the contract on account of manufacturing, production, and performance of services in labor surplus areas exceed 50 percent of the contract price.

"Small business concern," as used in this clause, means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the size standards in this solicitation.

"Small disadvantaged business concern," as used in this clause, means a small business concern, owned and controlled by individuals who are both socially and economically disadvantaged, as defined by the Small Business Administration at 13 CFR Part 124, the majority of earnings of which directly accrue to such individuals. This term also means a small business concern owned and controlled by an economically disadvantaged Indian tribe or Native Hawaiian organization which meets the requirements of 13 CFR 124.112 or 13 CFR 124.113, respectively.

"United States," as used in this clause, means the United States, its territories and possessions, the Commonwealth of Puerto Rico, the U.S. Trust Territory of the Pacific Islands, or the District of Columbia.

(b) **General.**

A portion of this requirement, identified elsewhere in this solicitation, has been set-aside for award to one or more small business concerns. After offers for the non-set-aside portion have been evaluated, negotiations will be conducted for the set-aside portion.

(1) Offers on the non-set-aside portion will be evaluated and award made in accordance with the other provisions of this solicitation.
(2) The set-aside portion will be negotiated, in accordance with this clause, with small business concerns which submitted offers on the non-set-aside portion.

(c) **Award of the set-aside portion.**

(1) Small business offerors on the non-set-aside portion will be selected for negotiation of the set-aside portion based on their standing -- first in terms of group and then in terms of lowest responsive offer on the non-set-aside portion.
(i) Group 1 - Small disadvantaged business concerns which are also labor surplus area concerns.
(ii) Group 2 - Small business concerns which are also labor surplus area concerns.
(iii) Group 3 - Other small disadvantaged business concerns.
(iv) Group 4 - Other small business concerns.
(2) The set-aside portion will be awarded at the highest unit price(s) in the contract(s) for the non-set-aside portion, adjusted to reflect transportation and other costs appropriate for the selected contractor(s), except --
(i) Award of the set-aside portion to a small disadvantaged business concern will be at the lower of --
(A) The price offered by the concern on the non-set-aside portion; or

(B) A price that does not exceed the award price on the non-set-aside portion by more than ten percent.

(ii) When award under the set-aside portion is to a concern offering a nonqualifying country end product and the highest unit price in the contract(s) is for a domestic or qualifying country end product, the set-aside price will be the higher of--

(A) The highest award price for a nonqualifying country end product under the nonset-aside; or
(B) A price which, when adjusted by the Buy American Act evaluation factor, would equal the highest unit price in the contract(s).

(iii) When award under the set-aside portion is to a concern offering a domestic end product and the highest unit price in the contract(s) is for a nonqualifying country end product which was evaluated using the Buy American Act evaluation factor, the set-aside price will be awarded at the evaluated price of the non-qualifying country.
(iv) When award under the set-aside portion is to a concern offering a domestic end product and the highest unit price in the contract(s) is for a

nonqualifying country end product which was evaluated without the Buy American Act factor--

(A) And award was made to a domestic or qualifying country offer at a price lower than the high contract price, the set-aside price will be the highest unit price in the contract(s).
(B) And award was not made to a domestic or qualifying country offer at a price lower than the high contract price, the set-aside price will be the lower of--
(1) The highest unit price under the contract(s) as adjusted by the Buy American Act evaluation factor; or
(2) The lowest offered price for a domestic or qualifying country end product which was not awarded under the nonset-aside.

(v) Where the Trade Agreements Act applies to the nonset-aside portion, offers of eligibleproducts will be treated as if they were qualifying country end products.
(vi) Discount terms used in evaluation of the highest non-set-aside award price will apply to the set-aside award price.
(3) If negotiations are not successful for any part of the set-aside portion, the set-aside will be dissolved for that part and the requirement will be resolicited.

(d) **Token offers.**

The Government reserves the right to not consider token offers or offers designed to secure an unfair advantage over other offerors eligible for the set-aside portion.

(e) **Eligibility for preference as a labor surplus area concern.**

Small business or small disadvantaged business offerors which claim preference for the set-aside portion as a labor surplus area concern, must list the labor surplus area location(s) of offeror or first tier subcontractors, which account for more than 50 percent of the contract price.

Name of Company:
Street Address:
City/County:
State:

(f) **Agreements.**

(1) If awarded a contract as a small disadvantaged business-labor surplus area concern or as a small business-labor surplus area concern, the offeror --

(i) Will perform the contract, or cause it to be performed, substantially in areas classified as labor surplus areas.
(ii) If the contract is in excess of $25,000, will submit a report to the Contracting Officer within 30 days after award that contains the following information--

(A) The dollar amount of the contract.
(B) Identification of each labor surplus area in which contract and subcontract performance is taking or will take place.
(C) The total costs incurred and to be incurred under the contract in each of the labor surplus areas by the contractor and first tier subcontractors.
(D) The total dollar amount attributable to performance in labor surplus areas.

(2) A manufacturer or regular dealer, which claims preference as a small disadvantaged business and submits an offer in its own name, agrees to furnish in performing this contract only end items manufactured or produced by small disadvantaged business concerns in the United States except, as provided in Section 8051 of Pub. L. 103-139,and Section 8012 of Pub. L. 103-335, for contracts awarded during fiscal year 1994,and 1995, a small disadvantaged business manufacturer or regular dealer owned by an Indian tribe, including an Alaska Native Corporation, agrees to furnish only end items manufactured or produced by small business concerns in the United States.

(End of clause)

DFSC-N (A. Harvey/46570/fk) 6 January 1986

SUBJECT: Recommendation to Change Base Reference Date for EPA References Tied to Petroleum Marketing Monthly (PMM)

TO: DFSC-PD

1. The current procedure of adjusting prices on the domestic bulk program has a major drawback. As currently worded, clause B19.33, Part A, (f) states:

> The term "base reference price" means the reference price that will be established when the Petroleum Marketing Monthly publication becomes available for the month prior to the month in which Best and Final offers are due. For example, if Best and Final offers are due in April, the base reference price would be based on the March data of the Petroleum Marketing Monthly's specified Sales Prices of Petroleum Products Tables which would generally be published in mid-June.

2. Since the Best and Final offers are submitted before the base reference is known, offerors must guess at the relationship between their offered price and the reference. In order to compensate for this unknown factor offerors must implicitly increase their price. Whether offerors would admit to this is an interesting question in light of the initial sentence in B19.33:

> The contractor represents that the unit prices set forth in this contract do not include any contingency allowance to cover the possibility of increases in the reference price(s) in the Contractor's bid or proposal.

3. Yet our analysis of the movement of the PMM as compared to other references as used for interim price adjustments indicates that the PMM may have moves as much as one or two cents per gallon out of step with such interim references. This situation is not only difficult for offerors, it provides potentially misleading indications for DFSC.

4. It is the recommendation of this office that the base reference date used on domestic bulk solicitations be changed so that offerors will know exactly the base reference price to which their best and final price is tied. Thus, the best and final offer price would be tied to a known final EPA reference and a known interim EPA reference. For example, if the best and final date were

SUBJECT: Recommendation to Change Base Reference Date for EPA References Tied to Petroleum Marketing Monthly (PMM)

November 15th, the final base EPA reference would be PMM for August and the interim base reference would be the publications(s) as stated in B19.33 Part C for the month of July.

CHRISTOPHER LEE
Director
Office of Market
Research & Analysis

DEFENSE LOGISTICS AGENCY

# Inter-Office Memorandum

IN REPLY REFER TO DFSC-N (L.Ervin/46570/me) 2 December 1987

SUBJECT: Economic Price Adjustment in the Domestic Bulk Program

TO: DFSC-D/DD

1. At the recent prenegotiation briefing for the current East/Gulf domestic bulk procurement, discussion among DFSC-D, -P, and -N concerned the means of price escalation used in the domestic programs. DFSC-N offered to provide DFSC-D with a copy of the decision package on this issue which was prepared last spring for General Griffith. The enclosed material includes the decision paper and related back-up material.

2. The decision problem concerns the use of an administratively cumbersome method of price adjustment which results in contractor complaints and problems in billing and payments by DFSC. The paper discussed four options, including keeping the then current interior/final adjustment system, modifying it to reduce offer price uncertainties, or moving to final-only escalators based on prices published in trade journals. The interested directorates, DFSC-C, -G, -N, and -P, unanimously recommended Option II, a modification of the then current system. General Griffith accepted Option II for use beginning with last summer's Inland/West procurement. At that time, he stated his desire that DFSC move eventually to trade journal-based escalation and asked that the interested directorates work together toward that end.

3. The original decison package included the decision paper and the back-up material at Tabs A through C. The research paper at Tab D was produced prior to the meeting with General Griffith and was discussed at that meeting.

Christopher Lee
CHRISTOPHER LEE
Director
Office of Market Research
and Analysis

cc: DFSC-C
DFSC-G
DFSC-P/PZ

DLA FORM 111 JUL 82 PREVIOUS EDITION MAY BE USED UNTIL EXHAUSTED ☆U.S. G.P.O. 1986-491-133/52541

## Economic Price Adjustment in the Domestic Bulk Programs

**Issue** - Should the present two-step method of interim and final price adjustment (EPAs or escalators) for domestic bulk fuel contracts be changed to a one-step price adjustment based on current market price indications as published in trade journals? Or should the two-step method be modified to reduce bidder uncertainty with the present system?

**Background** The current system of price adjustment has been used since 1983. All offerors of product to DFSC are required to accept a method of price adjustment based on actual monthly sales price averages as published by the Department of Energy in the Petroleum Marketing Monthly (PMM). Because the PMM data is not published until the third month following the month for which the data is effective, interim billings are paid based on the movement of an interim escalator. The interim escalator is based on prices published in trade journals at the end of the month prior to delivery. Final adjustments in the billings are made according to differences between the interim and PMM (final) escalators, when the PMM is published. When market prices vary greatly from month to month, as they have over the last two years, the final billing adjustments can be substantial. The two-step billing process is administratively cumbersome, and has resulted in a number of contractor complaints over the past 3 years (see Tab A). In the words of one contractor, pricing uncertainty is such that, "we never know if we have made or lost money when you (DFSC) lift a cargo."

But of course its going to be the same for [illegible]

**Discussion** There are nine criteria by which proposed escalation systems can be judged, 1) product; 2) geography; 3) timing; 4) timeliness; 5) commonality; 6) independence from contractor influence; 7) basis in actual sales; 8) market risk; and 9) simplicity. The PMM-based system and the alternative trade journal-based systems are evaluated below, according to the criteria.

The current PMM-based system is preferable by three criteria: independence from contractor influence, sales basis, and market risk. Three other criteria, simplicity, timing, and timeliness, favor the switch to trade journals. By the criteria of product, geography, and commonality, there is no clear preference between the alternate systems.

Product - DFSC product prices should escalate with the prices of similar commercial fuels. Both the PMM and trade publications publish prices of the similar commercial products -mogas, jet kerosene, diesel fuels, residual fuels - which are used for bulk price escalation of JP-4, JP-5, and DFM prices. While neither the PMM nor the trade journals publish price data for naphtha-type jet fuel (Jet B or JP-4), escalators for this fuel are constructed by use of mogas and kerojet prices which represent the alternate use-value of the JP-4 blending components. A similar principle is used in the construction of prices and escalators for Navy Special Fuel Oil. Preference based on this criteria - none

Geography - DFSC product prices should escalate with prices of fuels in the geographical area where the requirements are located. PMM data is published on both a statewide and regional (multistate) basis. Trade publication prices are published for most large cities in the United States. Preference: none.

Timing - DFSC prices should escalate concurrently with commercial prices, not with a lead or lag. This reduces the possibility that contractors will build a contingency premium into their prices. PMM prices are available on a monthly basis, while trade journal prices are published on a daily or weekly basis for most fuels. Given that actual market prices change almost continuously, it is preferable for escalators to change more frequently than on a monthly basis. Preference: trade journals, with weekly or daily price adjustment.

Timeliness - Escalator prices should be available to DFSC and the contractors on or immediately following their respective effective dates. PMM prices are published during the third month following the month of effectiveness. Trade journal prices become available within a day to a week following their effective dates. The long lag on PMM availability is the reason why an interim billing system is used which employs trade journals. Preference: trade journals.

Commonality - Proposed escalators should be acceptable to both DFSC and the contractors for use as references. The PMM system has been used successfully in domestic bulk for three years. DFSC has been successful in obtaining commonality based on trade journals in ground fuels procurements and in overseas bulk programs. Preference: none.

Independent of Contractors - Both the PMM and trade journals are independent of control by DFSC contractors. Given their informal method of conducting market surveys, trade publication prices may be influenced by the moves of large market players who may be DFSC contractors. Although this has not been a general problem in ground fuels procurements where trade journals are routinely used for price escalation, there have been situations where questions have been raised regarding independence of the contractor's control. Since this may be a more serious problem in the bulk program, where DFSC contractors may be large market players, any proposed trade publication escalation system would require careful review of the system's susceptibility to manipulation by prospective contractors.

Basis in Actual Sales - The PMM is based on a mandatory DOE survey of actual sales by refiners and gas plant operators. This survey is subject to DOE audit, although actual audits are rarely performed. Trade journal prices are generally based on seller quotations rather than actual sales because the latter are not generally available to informal, private canvassers. These price series are not auditable. However trade journal prices are closely reflective of actual sales, as these price

How do Commercial Buyers & Sellers do Business (w/o escalators?)

series are closely correlated with PMM prices over time, particularly if prices are adjusted on a weekly basis (see graphs at Tab B). Contractor complaints about the performance of trade journal escalators have been received in the ground fuels program. Although nearly all of these complaints are unfounded, several complaints have been justified and have required substitution of a replacement economic price adjustment reference. Because trade journal data is a less direct measure of actual market sales, complaints concerning trade journals are more difficult to analyze and defend. Preference: PMM.

Market Risk - DFSC contract prices are susceptible to market risk if they escalate on indices which do not correlate well with actual sales prices. PMM prices are actual sales price averages. Although they generally track sales data quite well, trade journals are more variable in quality, and occasionally are replaced in those programs in which they are used due to poor performance in reflecting market conditions. In ground fuel procurements, a poorly performing escalator can be readily replaced with a substitute from another publication for most fuels in most locations. This would be true for bulk mogas and diesel requirements as well. However, only one trade journal has published jet kerosene prices for the last several years (Platt's Oilgram). While these jet fuel series closely correlate with actual sales, there is, as yet, no substitute publication available should the Platt's data series be discontinued or should it fail to continue to track the market. This potential problem affects both JP-4 and JP-5 escalation in CONUS. Oil Price Information Service has recently begun to publish jet fuel prices, but the reliability of this source will not be established until 12 months of historical data have been accumulated. This will occur by April 1988 in several localities. Preference: PMM.

Another aspect of market risk with trade journals concerns the relative speed with which their prices reflect actual market price changes. Given that the journals generally survey seller quotations, or "postings", some asymmetrical behavior may be expected. Sellers tend to raise postings quickly when actual prices are rising, and to resist lowering postings when actual prices are falling. Sellers may also lower prices by granting hidden discounts off of stable postings. Thus, one would expect that the use of trade journal prices for escalation would cost DFSC money through relative "price stickiness" during periods of declining prices. An analysis of alternative bulk escalation systems by DFSC-N (see attached study at Tab C) found some evidence of this potential problem in the behavior of trade journal prices over the 1984-86 period (which included a major price drop). The analysis assumed that the choice of escalation system had no effect on the level of the initial offer prices. Overpayment due to lagged declines in postings were offset by underpayments due to lagged increases when prices were adjusted weekly. Some evidence of downside stickiness was found in the analysis of twice-monthly and monthly changes. In these cases, over payments would have exceeded under payments and would have resulted in greater expense to the government. Weekly price changes did not suffer from this problem, in general.

Simplicity - Any escalation system should be simple to explain to contractors and simple for DFSC to administer. The trade journal-based system is clearly simpler than the PMM system.

The issue of simplicity is important when the problem of bid preparation is considered. Domestic bulk offerors must submit best-and-final prices which are effective for the month prior to receipt of best-and-final offers. This raises two problems: price timing and margin uncertainty. In the first case, some offerors may bid based on current prices rather than prior-month prices (See study at Tab D). If current prices are lower than prior-month prices (as in July 1986), the offeror's bid will be lower than if it were properly prepared. If market and bid prices are much lower, a mistake-in-bid may eventually be claimed by the offeror. On the other hand, if current prices are higher than the prior-month prices (as in January 1987) this offeror's bid price may be higher than it otherwise would be. It may be so high that it is not in line for award. In fact, price reasonableness of offers may become a serious issue if current prices are higher than prior-month prices, because bid prices will be compared to prior-month market ranges. If such offers are awarded, the government will be paying higher prices than if a simplified one-step escalation system is used. A switch to weekly escalation based on trade journals would enable current prices rather than prior-month prices to be bid and evaluated, and would greatly reduce this preparation problem.

The current method of escalation introduces another element of uncertainty into the bid preparation process. At the time of receipt of best-and-final offers, the offer price and the relationship (margin) between the interim escalator and the offer price is fixed. However, the margin between the offer price and the final escalator (PMM) is unknown and remains so for some two months following the receipt of best-and-finals. While the base value of the interim escalator is known, the relationship between the base values of the interim and final escalators is subject to statistical uncertainty. Because the margin between the offer price and the base final reference (PMM) determines the actual margin (and, thus, the actual price) for final billing purposes, offerors who are risk-averse may build a contingency premium into their offer price to protect themselves against uncertainty about the ultimate level of their margin. To the extent that offerors perceive this as a problem, the prices that the government pays for fuel will be higher than under a one-step escalation system based on trade journals. Recent experience and contractor comment suggest that both the margin problem and the bid preparation problem are real and significant.

Another way of reducing the problem of bid preparation would be to have offerors bid with prices effective with the most recent PMM available. Offerors on the recent East and Gulf procurement would have made their bids (in January 1987) effective in

October 1986 rather than December 1986 as was done during that procurement. This would have had the effect of eliminating margin uncertainty. The process would still have been susceptible to the generally upward market price movement over that period. In this case, however, at least one company was able to agree to a price reduction (when requested by DFSC-P), after the December PMM became available, in part as a result of margin certainty with December pricing. On the previous Inland and West procurement, one company reduced its offered volume when the June PMM became available prior to time of award, and actual June price levels were found to have been higher than this company assumed when it prepared its bid. In this case, the latest PMM at the time of receipt of best and final offers contained April prices. Under a modified bid process, offerors would have made their best and final prices effective in April rather than in June. Several individuals and contractors have suggested that DFSC modify its current system in this manner. The experience with the recent bulk procurements and with an analagous situation several years ago in an overseas procurement suggest that this is a feasible improvement on the current escalation system.

Decision Options

Option I - Maintain current two-step method of domestic bulk price escalation.

Pro - This system is already in use and contractors are familiar with it. There is no market risk to continuation of its use. DFSC prices are adjusted according to the movement of actual monthly sales price averages.

Con - This system is complex and ~~administratively~~ cumbersome. There are 12 monthly escalations plus 12 monthly corrections. The problems associated with bid preparation probably result in additional expense to the U.S. Government. There will continue to be contractor complaints about the size of final payment adjustments. This system, by escalating on monthly averages, fails to reflect intramonthly price movements.

How much

Option II - Modify the current two-step escalation method so that offerors can establish their bid prices as effective with the month of the most recent PMM.

Pro - This system has the same advantages as Option I, and removes margin uncertainty from the offerors' bid preparation problem.

Con - This system has the same disadvantages as Option I, and forces the offeror to focus on a point two months further into the past when formulating the bid prices, thus possibly making the process even more susceptible to market price movement over the intervening period between the most recent PMM and the date of best and final offers.

Option III - Change to twice-monthly escalation using trade journals escalating with prices effective on the 1st and 15th of the month.

Pro - This system is administratively simpler than the current system (with 24 "final-only" escalations). There is no need for final billing adjustments. There is less need for contractors to build contingency premiums into their offer prices due to margin uncertainty.

Con - There is market risk associated with the move away from escalation on actual sales, particularly with respect to jet kerosene. Twice-monthly price changes do not track actual sales as well as weekly changes, so offerors may still add contingency premiums to their prices. There will likely be several contractor complaints each year about the short-term performance of these escalators.

Option IV - Change to weekly escalation using trade journals.

Pro - This system can be administered as easily as the identical system currently used in ground fuels. There is no need for final billing adjustments. The bid preparation problems would be virtually eliminated. Weekly price changes track actual sales better than monthly or twice-monthly price changes, because they better reflect the continuous nature of price movements in the marketplace. Thus there is even less need for contractors to build in contingency premiums as offer prices can be updated to the time of receipt of best-and-final offers.

Con - There is market risk associated with the move away from escalation on actual sales, particularly with respect to jet kerosene. There would be 52 price escalations per year, more than twice the number in Options I, II, and III. There will likely be several contractor complaints each year concerning the short term performance of these escalators.

Staff Recommendations:

Option II is favored by all of the interested directorates (DFSC-C, -G, -P, and -N). Should the implementation of Option II fail to alleviate the bidding difficulties, the issue can be revisited. In any event, the trade journal options do not appear to be truly viable before mid-1988 at the earliest.

UNITED STATES COURT OF FEDERAL CLAIMS

LA GLORIA OIL AND GAS COMPANY, :

Plaintiff, :

v. : No. 02-465C

THE UNITED STATES, : (Judge Hewitt)

Defendant. :

: Pages 1 - 59

- - - - -

Deposition of Lawrence Ervin

Ft. Belvoir, Virginia

Monday, December 1, 2003

Reported by: Marian E. Cummings, Notary Public

Job No.: 156783

December 1, 2003

12:01 p.m.

Deposition of Lawrence Ervin, held the offices of:

Defense Energy Support Center

8725 John J. Kingman Road

Ft. Belvoir, Virginia 22060-6217

Pursuant to notice, before Marian E. Cummings, a Notary Public of the Commonwealth of Virginia.

APPEARANCES:

Mayer, Brown, Rowe & Maw
For the Plaintiff
1909 K Street, Northwest
Washington, D.C. 20006-1101
(202) 263-3208
BY: J. Keith Burt, Esq.
William L. Olsen, Esq.

*United States Department of Justice*
For the Defendant
Room 4050
1100 L Street, Northwest
Washington, D.C. 20530
(202) 616-2311
BY: Steve Gillingham, Esq.

Defense Energy Support Center
For the Defendant
Suite 1565
8725 John J. Kingman Road
Ft. Belvoir, Virginia 22060
(703) 767-5009
BY: Howard Kaufer, Esq.

Defense Supply Center
Richmond, Virginia
(804) 279-1423
BY: Donald Tracy, Esq.

CONTENTS

EXAMINATION OF LAWRENCE ERVIN PAGE
MR. BURT 6

-0-

EXHIBITS

ERVIN DEPOSITION EXHIBITS: PAGE:

(None)

-0-

PROCEEDINGS

Thereupon,

LAWRENCE ERVIN

the Witness, called for examination by counsel for the Plaintiff, and, after having been sworn by the notary, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. BURT:

Q Would you state your name for the record.

A Lawrence Calvin Ervin.

Q Mr. Ervin, what is your current position?

A I'm the chief of the market research office at the DECS.

Q And how long approximately have you held that position?

A Eight plus years.

Q And generally what are the responsibilities of that position?

A Well, overseeing an effort to -- we do interscreen, analyses of support of the procurement operations center, do support for price negotiation work in the pricing work done in contracting divisions.

There's a certain amount of affiliate work we do for contingency folks.

We actually manage the strategic petroleum program to the extent we're involved with the -- help the budget folks who work for the comptroller with their out year budget projections, price of oil in the future, forecasting, that sort of stuff. I think that I -- probably everything we do falls within that general description.

A The responses is often oral. And the document, it gets generated, provided to the person who asked it. We kind of rely heavily on the contract files to be the repository of that since it's, you know, sort of proprietary information.
Q The contract files meaning an office other than yours or is that a contract file in your office?
A No, we don't maintain contract files.
Q So when you provide some market analysis to the bulk fuels group in connection with their procurement and when that analysis is in writing do you keep a copy of what you give to the bulk fuels group?
A Well, I think the short answer to that is no and maybe something momentarily. Again, it would rely heavily on the contract file.
Q All right. Let's turn to page 6 of Plaintiff's Exhibit 2, request number 15 reads, "All documents relating to DESC's decision to use the PMM indexes, Platts, or OPIS as a basis for adjusting prices in its price adjustment clauses."
A Recollection was that '87 study which I believe you've been provided and a prior '84 study.

Q Can you generally describe those studies for me?
A '84, '87 I was involved in producing and we looked at comparing PMM versus Platts and OPIS and the issue of SC escalating on a different time frame and the documents looked at various things which are nice to have in an escalator. They track -- the '87 study wound up recommending making an adjustment to the PMM based status quo at the time.
The '84 study which I did not prepare, my understanding and recollection is that it's mainly, it deals mostly with the move from the ELS to PMM which was prior to 1985.
Q Where did you find those studies?
A Well, I didn't, I don't think I found the first one.
Q Okay.
A The '84 one, and '87 I had basically on my shelf.
Q Mr. Ervin, I believe that in approximately 1995 DESC switched from using Platts to using PMM as an escalator to using Platts; is that correct?

A Sometime back in there, yeah.

Q Do you know whether there was any sort of any studies or analysis of reports prepared by your office in connection with that change from using the PMM to using Platts?

A Well, there wasn't because I was sitting in a room when the decision happened and it was made in response to some pressure from headquarters to do things differently. So the analysis is based on, basically is the analysis in the '87 study. Some people who have read the '87 studies that they would draw different conclusions than what was presented at the end of the study, certainly a close call. Analysis would have supported that as well so it's really the '87 study which is the basis for that move. That and some pressure from headquarters to, you know, be doing things differently and doing things different in a visible fashion to hopefully over the course of time produce substantial cost savings to the taxpayer.

DEFENSE LOGISTICS AGENCY
DEFENSE FUEL SUPPLY CENTER
CAMERON STATION
ALEXANDRIA, VIRGINIA 22304-6160

IN REPLY REFER TO DFSC-PPR

12 MAY 1995

SUBJECT: Request for Class Deviation and Permanent Coverage in DLAR

TO: AQPLL

1. As you requested, enclosed is a revised Memorandum for the Director of the DAR Council which addresses the one public comment received in response to the Economic Price Adjustment coverage published in the 28 February 1995 edition of the Federal Register.

2. We appreciate your prompt attention to this request. The point of contact for this office is Kerry Pilz, extension 45500, for any questions you may have.

Original Signed By

Encl

L. H. CARPENTER
Captain, SC, USN
Director, Contracting
and Production

MEMORANDUM FOR THE DIRECTOR OF THE DAR COUNCIL

I. PROBLEM:

By letters dated 8 January 1992 and 1 May 1992, the Director of Defense Procurement approved the Defense Fuel Supply Center's (DFSC) economic price adjustment (EPA) clauses as part of the regulatory relief task force review. These clauses, or variations, are in effect today. DFSC wishes to revise the clause used in its domestic bulk fuels programs. None of the three economic-price adjustment types currently encompassed by the FAR are appropriate for many of the competitive procurements of commercial products undertaken by DFSC and other DLA contracting offices. The use of an EPA reference based on an individual contractor's established price or cost of materials is impractical for procurements under which indefinite quantity contracts will be issued. Unique EPA references for each offeror engender relative price variations during the delivery period, making it impossible to determine the most favorable offer at time of award. This creates a significant price risk for the Government and undermines the competitive process. Given the need for a common EPA reference, a reference that more closely follows market prices for the end item reduces price risk for both the Government and the contractor. Such references are also more in conformance with commercial practice.

II. RECOMMENDATION:

A class deviation, lasting longer than three years, should be incorporated into the DLAR. This deviation expands the use of EPAs based on established prices to encompass industry-wide and geographically based market price references and expands the use of EPAs based on indexes to encompass indexes for commercial products or services which are identical to or similar to the end products to be provided under the contract. The appropriate coverage in DLAR at 16.203 should read:

*16.203-1 Description*

*(a)(90) Adjustment based on established prices. Established prices may reflect industry-wide and/or geographically based market price fluctuations for commodity groups, specific supplies or services, or contract end items.*

*(c)(90) Adjustments based on cost indexes of labor or material. These price adjustments may also be based on increases or decreases in indexes for commodity groups, specific supplies or services, or contract end items.*

*16.203-3 Limitations*

*(90) A fixed price contract with economic price adjustment may also be used to provide for price adjustments authorized in this section.*

*16.204-4 Contract clauses.*

*(90) When the contracting officer determines that an existing EPA clause is not appropriate, the contracting officer may develop and use another EPA clause in accordance with 16.203-1(a)(90) or (c)(90). Established prices in such clauses need not be verifiable using the criteria in 48 CFR (FAR) 15.804-3. Established prices and cost indexes need not reflect changes in the costs or established prices of a specific contractor. The established price or cost index may be derived from sales prices in the marketplace, quotes, or assessments as reported or made available in a consistent manner in a publication, electronic database, or other form, by an independent trade association, Governmental body, or other third party independent of the contractor. More than one established price or cost index may be combined in a formula for economic price adjustment purposes in the absence of an appropriate single price or cost index.*

III. DISCUSSION:

A. Prior to FARS DEV 94-24, DFSC's current system of price adjustment for bulk petroleum had been used since 1987. All offerors of product to DFSC were required to accept a method of price adjustment based on actual monthly sales price averages as published by the Department of Energy in the *Petroleum Marketing Monthly* (PMM). Because the PMM data is not published until the third month following the month for which data is effective, interim billings are paid based on the movement of an interim escalator. The interim escalator is based on prices published in trade journals at the end of the month prior to delivery. Final adjustments in the billings are made according to differences between the interim and PMM (final) escalators when the PMM is published. When market prices vary greatly from month to month, the final billing adjustments can be substantial. In 1992, the Defense Management Review, as part of a review of all agency clauses, approved the use of the PMM-based EPA clauses. Our authority to use the PMM was reconfirmed by the Director of Defense Procurement in 1993.

B. The revised bulk fuels clause substitutes industry publications, a more current EPA basis, for the prior PMM methodology. This provides a number of advantages. First, it eliminates the need for double calculations of price adjustments, a significant savings to the government. Second, because of the time lag between interim and final billing, contractors likely build in a price cushion. It is probable that the Government would save money with contractors no longer having to include a cushion to cover them for price adjustments. Third, the new EPA method is more similar to the way adjustments are done commercially in that commercial publications are widely accepted by industry. Finally, the new method will be much simpler for all parties to use. The DFSC Office of Market Research and Analysis has studied the proposed EPA provisions and found them to be reliable bases for price adjustments. The publications are already used for EPA purposes in other DFSC programs.

C. DFSC has used the industry market price concept since the early 1980's and has found it to be a reliable method of price adjustment. It is unnecessary to review the deviation every three years as with most class deviations. Therefore, we request that the deviation be made permanent and be included in the DLAR.

D. Additional DFARS 201.402(3) Requirements.

1. This class deviation request has been reviewed and approved by the DFSC Office of Counsel.

2. This class deviation corresponds most closely with the deviation definition of FAR 1.401(c).

3. This is the first request for this class deviation to be published in the DLAR.

4. This class deviation was published in the Federal Register on 28 February 1995. It offered the public 60 days in which to comment on the proposed DLAR language. One public comment was received on 2 May 1995, after the expiration of the public comment period. DFSC, however, addresses the letter received from The National Security Industrial Association as follows.

The National Security Industrial Association is concerned that the EPA references chosen by the contracting officer might not reflect actual market prices and therefore, the price available to the contractor. They stated, "Such a situation could unfairly shift the risk of price uncertainty to the contractor."

DFSC responds that the commentor seems concerned about implementing the market price concept, not the concept itself. Because DFSC sucessfully used the market price EPA concept since the early 1980's, we do not believe that any concern is warranted. None of DFSC's contractors have filed comments regarding the proposal. In any event, DFSC's EPA clauses contain provisions for revising market price indicators, if the contracting officer finds a reference has been discontinued, or if it substantially and consistently fails to reflect market conditions. If these conditions occur, the parties may agree upon an appropriate substitute for the inadequate indicator. If the parties fail to reach agreement, the supplier can utilize the provisions contained in the DISPUTES clause of the contract. DFSC makes every effort to utilize market price indicators that consistently reflect actual market conditions. The National Security Industrial Association recognizes the benefit of such behavior by agreeing in its letter with the Government's statement in the Federal Register: "a reference that more closely follows market prices for the end item reduces price risk for both the Government and the contractor." Accordingly, the comment does not warrant revising the proposed DLAR coverage.

IV. COLLATERALS:

A. The proposed class deviation and DLAR coverage do not impose any paperwork burdens or informal collection requirements. Thus the Paperwork Reduction Act does not apply.

B. The proposed class deviation and DLAR coverage is not expected to have a significant impact on a substantial number of small entities within the meaning of the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.* since the elimination of interim billing will greatly simplify

administrative procedures required of contractors. A regulatory flexibility analysis, therefore, is not required.

Westlaw.

1988 WL 227932 (Comp.Gen.), B- 230,556

(Cite as: 1988 WL 227932 (Comp.Gen.))

COMPTROLLER GENERAL

*1 Subject: Defense Fuel Supply Center's Small Business Set-Aside Procurements (B-230556; Code 396917)
September 6, 1988

To: Group Director, NSIAD--John Rinko
Thru: Senior Attorney, OGC--A.R. Kasdan

DIGEST

The Defense Fuel Supply Center's (DFSC) small business partial set-aside procedures for the acquisition of its fuel supplies, comply and are consistent with the Small Business Act, 15 U.S.C. 631 et.seq., as well as other applicable Federal procurement laws and regulations. The DFSC procedures have been approved as deviations from applicable procurement regulations for over 20 years, and we previously considered these procedures as a reasonable exercise of DFSC's discretion. See B-168576(2), April 28, 1971 and B-171289, April 28, 1971.

This responds to your request for our views on the legality of the Defense Fuel Supply Center's (DFSC) small business set-aside practices (procedures) for the acquisition of its fuel supplies. In his letter of January 11, 1988, to GAO requesting this review, Senator Max Baucus questioned whether DFSC's small business set-aside procedures afford small business a fair opportunity to compete for these fuel acquisitions. He has asked GAO to determine whether DFSC's procurement procedures are consistent with the Small Business Act, as well as other applicable Federal procurement laws and regulations. For the reasons given below, we believe that DFSC's small business set-aside procurement procedures comply and are consistent with those laws and regulations.

Background

The DFSC purchases its bulk fuel supplies for the Department of Defense's (DOD) domestic requirements in a non-traditional way. It makes two major buys of bulk fuels with multiple contract awards based on a geographical division of the country: Inland/West and East/Gulf. It uses a bid evaluation model developed in the 1960's and 70's which allows it to select the particular combination of contract awards for a specific buy which will fulfill the government's requirement at the overall lowest cost (product plus transportation cost). Under this model, multiple awards are needed at many locations so that each individual requirement or location can be completely supplied. Usual procedures of awarding contracts to the lowest sources do not provide the least total cost pattern of awards.

DFSC solicitations request offers from all suppliers, including both large and small business firms, for needs of all DOD locations in the particular geographic

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

area. Using the model developed and taking into account quantities reserved for qualified minority small business firms and small business set-asides, prices for bulk fuels at the various locations in the region are established. DFSC must assure that the small business firms eligible for set-asides are offered an opportunity to receive contracts at a particular location at prices which are not higher than the maximum unit price DFSC would otherwise have to pay. It uses one of three methods--the balanced price, the step price and the matched price--depending on the pattern of bids received to determine the set-aside price. This price is then offered to small business and they have an opportunity to accept or reject it. If it is rejected, the amount set-aside is offered to other sellers at that location to avoid any resolicitation.

*2 Since 1960 DFSC procedures have been approved as a deviation or exception from procurement regulations applicable to small business partial set-asides. The most recent extension of this exception occurred in May 1987 when the DFSC procedures were approved as a deviation from the applicable provisions of the Federal Acquisition Regulation (FAR 19.507, and 19.508(d) ) and of the Defense Supplement to the FAR (DFAR 19.508(d) and 19.508(70) ). DFSC believes that these procedures are necessary to assure awards to small business concerns at prices that are fair and reasonable to the government and to the concerns. DFSC also argues that its procedure results in small business receiving an equal to or higher price for their fuel than they would have received if the standard FAR small business partial set-aside procedures were used. Under the FAR, the price for a partial set-aside is "... the highest unit price(s) in the contract(s) for the non-set-aside portion...." FAR 52.219.7

In his January 11 letter, Senator Baucus expressed concern that the DFSC's partial set-aside procedure may not be consistent with the spirit of the Small Business Set-Aside Program. He stated that in DFSC procurements small businesses do not engage in price competition with other small businesses. Since the "match price" for the fuel is largely set by the prices submitted by large fuel suppliers, small businesses are forced to compete with the cost of production of large suppliers. He therefore contends that DFSC's procedure does not offer small businesses the "maximum practical opportunity to participate in the performance of contracts let by any Federal agency," referring to the Small Business Act, 15 U.S.C. 637. [FN1]

Question: Does the DFSC small business partial set-aside procedure comply with the Small Business Act and other federal procurement laws and regulations?

Answer: Yes. Although the DFSC small business set-aside procedure is an approved deviation from FAR and DFAR provisions, it reserves for small business a portion of a particular acquisition as long as the price does not exceed the market price. The deviation from FAR and DFAR set aside procedures is required because of the nature of DFSC's acquisition of bulk fuel supplies. No provision of the Small Business Act or the FAR or DFAR require that small business compete only against each other in setting the price for the small business set-asides. GAO has previously found substantially similar DFSC procedures to be reasonable.

Explanation: The Small Business Act, 15 U.S.C. 631 et. seq., is designed to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

protect the economic interests of small business concerns, and "... to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the government be placed with small business enterprises ..." 15 U.S.C. 631(a). (Emphasis added.) Identical policy objectives are stated in the Armed Services Procurement Act (ASPA), 10 U.S.C. 2301(b), and the Federal Property and Administrative Services Act (FPASA), 41 U.S.C. 252(b), which respectively govern military and civilian acquisitions. Part 19 of the FAR implements the small business acquisition-related provisions of the Small Business Act and the applicable provisions of the ASPA and FPASA. Also, provisions of the DFAR apply to small business set-aside in DOD acquisitions.

*3 To achieve the Small Business Act's "fair proportion policy", both the Act and the FAR give federal agencies broad authority to award contracts to small business, including on a total or partial set-aside basis. 15 U.S.C. 644(a) and FAR 19.5. An agency may not award a contract to a small business firm if the agency's cost would exceed a fair market price, 15 U.S.C. 644(a). [FN2] Relatedly, the FAR set-aside procedures provide that in both total and partial procurement set-asides, the contracts awarded must be made only at reasonable prices. FAR 19.502-2 and 19.502-3. The FAR also requires that specific clauses be inserted for set-aside contracts, i.e., FAR 52.219-6 (total set-asides) and 52.219-7 (partial set-asides). [FN3]

For partial set-asides, FAR 19.502(3)(c) requires that the contracting officer must first award the non-set-aside portion using normal contracting procedures. Both large firms and businesses eligible for the set-aside submit offers on the non-set-aside portion. After the non-set-aside portion is awarded, the contracting officer negotiates with small business firms who have submitted responsive (acceptable) offers on the non-set-aside portion. The set aside portion will be awarded at the highest unit price(s) in the non-set-aside portion. FAR 52.219-7, part (b)(3) of the required contract clause. If a set-aside acquisition is not awarded, the supplies or services for which no award was made is recompeted. FAR 19.507(a).

The DFSC procedures differ from the FAR procedures in two substantial respects which are said by DFSC to be required to effectuate bulk fuel acquisitions. First, the award of set-aside quantities is made at prices which would have been paid without the set-aside. This can differ from the "highest unit price(s)" paid under the FAR. This variance is the result of the nature of the petroleum refining business. In most businesses, prices will often drop as more product is produced. In the petroleum refinery business, the contrary is the case. Since the refining process can produce many products, e.g., jet fuel, gasoline, diesel fuel, etc., increased quantities of one product are produced at the expense of others and the price of additional production rises.

The second difference is that in the event of set-aside failures, the set-aside portion is not recompeted. Under the DFSC procedures both large and small firms are required to submit offers on total quantities just as if there was no set-aside. In this way, in the event a set-aside acquisition cannot be filled, other offers can be considered.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Under both the FAR partial set-aside regulation and the DFSC deviation large and small business compete against each other. Under the former, the large and small firms submit offers on the non-set-aside portion which is awarded first. The set-aside portion is negotiated with qualified small business who have submitted responsive offers under the non-aside portion. Under the DFSC procedure, both large and small firms compete by submitting offers on total quantities.

*4 We have found no court cases or GAO decisions or opinions which have specifically addressed the issue whether the FAR partial set-aside procedures are a reasonable implementation of the requirements of the Small Business Act. However, GAO has considered DFSC procedures substantially similar to those in effect today as a reasonable exercise of an agency's discretion. In B-168576(2), April 28, 1971, a small business protested the reduction of the small business set-aside and proposed certain changes in DFSC's set-aside procedures. At that time, DFSC's procedures were a deviation from applicable ASPA regulations. The protestor proposed that the formula DFSC uses to calculate the prices paid for the quantities accepted be modified. Under this proposal, the price for the set-aside would be set on the basis of the prices and quantities remaining on each offeror's bid after subtracting the amount awarded on the non-set-aside portion.

DFSC pointed out that the proposed procedure would not only cost the government more money, but might actually result in lower prices for set-asides as the percentage of the total procurement which is set-aside increases. GAO stated that it would not substitute its judgment for that of DFSC "unless it [DFSC] has acted in an arbitrary or capricious manner." We concluded that based on the record, there was "substantial evidence to support DFSC decision not to revise its small business set-aside procedures," as suggested by the protestor. In B-171289, also decided on April 28, 1971, GAO concluded that it failed to see how evaluation procedures--substantially similar to DFSC present procedures--would be contrary to the "congressional purpose and intent in establishing the small business set-aside procedure, 15 U.S.C. 631."

In conclusion, we find no reason to question our previous positions that DFSC procedures are in compliance with the Small Business Act and are a reasonable exercise of agency discretion to implement the policy of the act.

Substantially similar DFSC procedures have been approved as deviations from applicable procurement regulations for partial set-asides for over 20 years. Our view is reenforced by information DFSC has provided that shows that the DFSC set-aside procedure results in small businesses receiving an equal to or a higher price for their fuel than under the FAR set-aside procedure.

Finally, we note that Senator Baucus letter referenced the Small Business Act's requirement that small businesses "... shall have the maximum practical opportunity to participate in the performance of contracts let by any federal agency ..." 15 U.S.C. 637(a). However, this section is not applicable to the award of a federal contract, but to insure that small business receive subcontracts under prime contracts the government has already awarded.

Raymond J. Wyrsch

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Senior Attorney, OCG

FN1 Senator Baucus' request stemmed from a specific DFSC fuel acquisition in which one small business firm, the Wolf Point Refining Company, could not meet the offered "match price" for the delivery of JP-4 fuel to the Minot Air Force Base, because to do so would have resulted in a $900,000 loss to the company. The attorney representing the company believes that DFSC's small business set-aside procedure offers little opportunity for small businesses to compete against large firms. In view of the Senator's request for a general assessment of DFSC's procedure, and that Wolf Point did not file a bid protest concerning the Minot fuel acquisition, we will not address this case.

FN2 The Small Business Act also requires that the head of each agency shall establish goals for the participation by small business concerns in the award of its procurement contracts having a value of $25,000 or more, 15 U.S.C. 644(g).

FN3 The DFAR also requires that similar clauses be inserted in DOD contracts, i.e., DFAR 52.219-7003.

1988 WL 227932 (Comp.Gen.), B- 230,556

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# About Platts

**About Platts**
Platts is the world leader in providing energy information. For nearly a century, Platts has helped to enable ever-changing global energy markets enhance their performance through such offerings as independent industry news and price benchmarks. From 15 offices worldwide, Platts covers the oil, natural gas, electricity, nuclear power, coal, petrochemical and metals markets.

**About The McGraw-Hill Companies**
Founded in 1888, The McGraw-Hill Companies is a leading global information services provider meeting worldwide needs in the financial services, education and business information markets through leading brands such as Standard & Poor's, McGraw-Hill Education, BusinessWeek and J.D. Power and Associates. The Corporation has more than 290 offices in 38 countries. Sales in 2005 were $6.0 billion. Additional information is available at http://www.mcgraw-hill.com.

Copyright © 2006 - Platts, All Rights Reserved
The McGraw-Hill Companies

platts

# Oilgram Price Report

Platts **Oilgram Price Report** is a daily report that covers market changes, market fundamentals and factors driving prices. Platts Oilgram Price Report also brings a vast array of Platts international prices for crude and products, netback tables, and market critical data.

Platts **Oilgram Price Report** helps you by delivering—

- **Monthly price supplements, product price assessments, crude oil price assessments**—See offers, bids, and transactions.
- **Monthly world crude table and weekly feeder crude table**—Keep up with the major traded crudes.
- **Spot tanker rates**—Get freight rate assessments from around the world.
- **Crude oil postings, rack prices, five-day rolling averages**—Make your supply planning more cost-effective.
- **Market commentary, Platts daily yield, news, and analysis**—Know what's moving the market and why.
- **Futures settlements**—Secure the most cost-effective transportation to the refinery at the right time.

Add **Oilgram Price Report** to your business toolbox and you'll also receive—at NO ADDITIONAL COST—**OPR Extra**, a daily electronic service that gives you most of the contents of **Oilgram Price Report**, in the same format you'll find in the newsletter that has provided the industry benchmark for more than 80 years. With **OPR Extra** you'll receive

- The entire day's US West Coast product price assessments;
- Daily spot ethanol assessments for the US East Coast, West Coast, and Midwest;
- Contract cargo prices and posted Atlantic and Gulf Coast residual prices;
- Market commentary, news, and analysis;
- Weekly API statistics;
- Lubes and asphalt price assessments; and
- NYMEX and IPE futures settlements

That's not all. When you order **Oilgram Price Report**, you will also receive Platts **US Futures Update**, a valuable summary of the past week in the US futures market as well as a look ahead.

*For Information*

Contact Us
Request For Trial
See a Sample
Buy Now

*Related Products*

Platts Global Alert
Crude Oil Marketwire
North American Crude Wire
Bunkerwire
Platts Oilgram News
Platts Refiner
European Marketscan

platts

www.platts.com

Friday, August 26, 2005
Prices effective August 25, 2005
Volume 83 / Number 165

Oilgram Price Report

## Hawaii to cap wholesale gasoline prices Sep 1

**Refiner Tesoro may move product to US West Coast in response**

*New York, Singapore*—The Hawaiian business environment just got tougher for Tesoro and Chevron, the islands' only two refiners, who will have to contend with wholesale gasoline price caps starting Sep 1.

Hawaii's Public Utilities Commission Aug 24 introduced pre-tax wholesale price caps on gasoline sold throughout the state, in compliance with laws enacted by the state's legislature in 2002 and amended in 2004.

Tesoro, which produces gasoline at its 95,000 b/d Kapolei plant, has told *Platts* such a move could cause it to sell its product to the US West Coast. Chevron, whose 54,000 b/d Honolulu refinery supplies 60% of the Hawaiian gasoline market, has said price caps create a "hostile business environment."

This is the second Hawaiian setback for Chevron this year. The US Supreme Court May 23 upheld a Hawaii law limiting rents oil companies charge service station dealers, rejecting Chevron's claim the rent cap is an unconstitutional taking of property.

Tesoro and Chevron also have to deal with a 2006 ethanol mandate that has spurred the island's struggling sugar producers into action. Chevron backed export of local ethanol production rather than an ethanol mandate for gasoline it said would force costly infrastructure upgrades.

Meanwhile, the new minimum wholesale gasoline prices go into effect across the island state beginning Sep 1, and will be adjusted on a weekly basis keyed off of five-day average spot gasoline prices in New York Harbor, the US Gulf Coast and Los Angeles. While the spot prices will fluctuate, the marketing margin is capped at 18 cts/gal.

Hawaii gasoline prices are typically among the highest in the US due in part to lack of proximity to supply. Hawaii's current average retail unleaded gasoline prices are \$2.846/gal (regular), \$3.010 (mid-grade) and \$3.066 (premium), according to AAA, citing Oil Price Information Service. That compares to a national average of \$2.603/gal, \$2.763/gal and \$2.865/gal.

Both Chevron and Tesoro's refineries are on the island of Oahu, reducing transportation and storage costs associated with wholesale prices on that island. The PUC's Sep 1-4 wholesale unleaded gasoline price caps in central, heavily populated Oahu are \$2.1578/gal (regular), \$2.2078/gal (mid-grade) and \$2.2478/gal (premium). The wholesale prices exclude associated taxes and subsequent retailer markups.

The highest PUC wholesale gasoline price caps are for the relatively isolated island of Lanai, where the maximum wholesale

(Continued on page 5)

## Product shortage spreads through eastern China

*Hong Kong*—A menacing shortage of gasoil and gasoline that has gripped China's southern Guangdong province since early August has now spread to the eastern province of Shandong, with some independent retail stations in the major city of Qingdao being forced to close, market players said Aug 25.

The shortage was attributed to tight supplies of products from the refiners in that region, observers said.

The squeeze has been intensified by the ongoing Qingdao International Beer Festival in the city, which opened Aug 13 and has received about 5,000 visitors each day, putting pressure on the already short-supplied market. "Only few stations could supply 90 RON gasoline, and 44 independent retail stations had stopped operations," an observer said. The festival ends Aug 28.

There are 795 retail stations in Qingdao city, of which 323 belong to state-owned refiners Sinopec and PetroChina, and the rest to independent refiners. The average retail consumption of oil products is around 3,000 mt/d, sources said.

Firm demand and short supplies have kicked up average 90 RON gasoline prices in Shandong to Yuan 4.06/l (50 cts/l), up 2.3% from the central government's guidance price of Yuan 3.97/liter. China's National Development Reform Commission sets "guidance" prices at the ex-refinery, wholesale and retail levels and allows market

(Continued on page 13)

## NYMEX to list new RBOB contract Oct 1

*New York*—The New York Mercantile Exchange will list a new RBOB gasoline futures contract for the months January-December 2006 beginning Oct 1, responding to the anticipated eventual phase-out of MTBE-blended gasoline in the US, according to a market source who participated in an Aug 25 NYMEX product committee conference call.

NYMEX also announced Aug 25 it expects to launch its open outcry trading floor in London Sep 12.

The source said a motion to list all 12 monthly RBOB contracts was passed unanimously by the product panel.

The new RBOB contract will run side-by-side with the exchange's existing reformulated gasoline contract until August 2006. The committee has not yet decided whether it will extend the RFG contract past August 2006, or pull the contract off the board.

"They will keep the RFG contracts in place through August 2006 that are already listed," the source said. "So for at least eight months there will be two [NYMEX gasoline] contracts. And it is looking likely that they will extend listing of RFG contract for September-December 2006, but that is not yet a done deal."

The current unleaded futures contract is for RFG using the oxygenate MTBE. However, there is little incentive for refiners to continue blending with MTBE. The recently passed US energy bill does not limit refiners' liability for MTBE, which has been banned in several states because of concerns over groundwater contamination.

The contract originally called for delivery on either the New Jersey or New York sides of the river, but an MTBE ban by both New York and Connecticut that went into effect in January 2004 forced the exchange to do away with four delivery terminals in New York and make it effectively an all-New Jersey contract. However, New Jersey's governor has just signed a bill banning MTBE effective 2009.

Area refiners are already said to be switching away from MTBE ahead of the 2009 ban. A Royal Dutch Shell spokesman told *Platts* the company would transition to RFG using ethanol later this year in northern New Jersey. He said Shell would switch the racks at its

(Continued on page 13)

The McGraw·Hill Companies

# Market by Market

## International crude: Dubai, Tapis strike up new highs

Front-month Oct Dubai was assessed at a record high $58.25 at the close of Asian trade Thursday, up $1.05 from Wednesday and rising above $58.00 for the first time since Platts began assessing the grade in 1984. Oct Dubai physical partials closed, without any deals done, at $58.10-58.30 (Phibro vs Koch) during the trading window Thursday. There was also no trades on Oct Oman partials, which closed at $59.32-59.40 (Phibro vs Unipec).

Meantime, falling regional demand has exerted pressure on PG sour crudes as prices moved lower in the latest deals. Formosa heard bought Oct Oman from BP at MOG minus 37-38 cts. Prices could fall further as amid signs that CPC might not issue any buy tender for Oct. That left the market with over six Oct cargoes of Oman, Qatar Marine and Banano Arab Medium still unsold. Elsewhere, Hyundai heard bought Oct Banaco Arab Medium from Shell at OSP minus 90 cts, with the supply glut seen pressurizing its price lower to OSP minus $1.00. Nippon Oil heard bought Oct Lower Zakum at less than OSP plus 10 cts, below the last transacted level. A Japanese refiner heard bought Oct Murban at OSP plus 5-6 cts, while offers stayed at a high single-digit premium to the OSP.

Front-month Oct Tapis soared to an all-time high $69.63/bbl at Thursday's Asian close, according to Platts data. The grade is a benchmark off which light, sweet crudes in Asia-Pacific are priced. The marker was up 95 cts/bbl between 0930GMT Wednesday and the Asian close on Aug 25 but marginally lagged the rise in Brent and WTI over the same timeframe. Tapis' strength could be largely attributed to gains in Western indicators and the sharp recovery in naphtha margins, traders said.

**Far East** crudes pegged on Tapis typically contain a naphtha yield of 20-45% and, therefore, any change in the naphtha/Tapis relationship would significantly impact Tapis values, traders said. The naphtha/Tapis margin has narrowed $2.42 from minus $10.90 on Aug 1 to minus $8.48 on Aug 25. The paper market was flushed with activity as traders took advantage of the directionally bullish overtones to resuscitate liquidity after several muted sessions. Oct Brent/Dubai EFS changed hands repeatedly from $6.88 through to $6.72 only to claw back up to $6.75 on close. Some players ventured to take a stab far further along the curve with Dec '06 EFS heard dealt at $6.52. Dubai timespreads were locked in a thin range.

Statoil took many in the **North Sea** market by surprise by offering a Sep 12-14 Brent cargo in the market-on-close. The cargo, parcel 0906, was originally scheduled to load Sep 17-19 but was the dates were brought forward sometime during the day as the Norwegian oil company attempted to extract value in the current backwardation. The cargo, which otherwise could have been passed into the chains, was offered down to Dated plus 45 cts/bbl. BP bid for the cargo at October less 60 cts/bbl.

Meanwhile, BP kept a Sep 15-17 Oseberg cargo, parcel 0907, that was passed in the chains, leaving the major with three parcels of the grade in a row (0905 and 0906) after picking up Sep 11-13 and Sep 13-15 in the chains previously. The forward curve continued to soften with Sep 5-9 CFD week trading as low as Oct-56 cts in the MOC on perception that both Brent and Oseberg are unsustainable at current values. Although Oseberg was passed in the chains rather than Brent, Statoil's Brent offer at Dated plus 45 cts set the Dated Brent/BFO assessment as the weakest grade, at Dated plus 40 cts/bbl, or a flat $65.85/bbl.

Versus October cash BFO, the market was minus 8 cts. Oseberg has traded at Dated plus 50 cts/bbl twice this week, while traders said the value of Brent will be determined next week on the unknown factor of whether there will be European demand or whether the grade will fall to arbitrage value to the US Gulf. BP is likely to offer at least one of its Oseberg cargoes next week, sources said, while another source pegged the full conversion margins of Oseberg at around 40 cts/bbl better for Brent for their particular refining model. Other grade talk was thin and there appeared little appetite to buy cargoes in the current Dated Brent/BFO structure. Shell was rumored to be offering a Forties cargo at Dated plus 100 cts/bbl, but this was unconfirmed.

Azeri was seen supported at the current level between Dated plus $1.20-1.30/bbl. Saharan was seen slightly lower with an offer by Arcadia for a Sep 13-15 cargo down to Dated plus 20cts/bbl. The trading window for Saharan continued to provide focus for discussion with a number of market participants suggesting that Saharan is trading more in line with the competitive Nigerian grades, which already trade for October loading. Some Med sources however suggested that in the Med trading may be done for earlier dates. No trades were heard on CPC with values seen at a wide range between minus 70 cts to minus $1.50/bbl. "Minus $1 is a very reasonable level, until it gets weaker," a trader said.

**Urals** NWE was seen heading further south Thursday as healthy avails were putting pressure on differentials. Earlier in the day values were seen around Dated minus $7/bbl, though in the afternoon Vitol traded to Shell at Dated minus $7.20/bbl, Sep 4-5 Primorsk, with the trade confirmed by both parties. Gunvor offered in the window a cargo loading Sep 6-10 down to Dated minus $6.90/bbl with a 2 day laycan to be declared by the seller the latest by Sep 1. At least one source indicated that refineries would not give such a flexibility "when there are plenty of sellers who will offer specific dates and ports in the 1st decade".

## Gasoline rally fuels crude's new high on the NYMEX

New York—Front-month crude on the New York Mercantile Exchange settled at an all-time high of $67.49/bbl Thursday for a gain of 17 cts on the session, pulled along by another day of sharp gains in the gasoline market. Dwindling gasoline inventories, resulting from below-normal production levels and steady demand, have caused the latest surge in petroleum prices.

The market has also been kept on edge by uncertainty surrounding Tropical Storm Katrina, which was upgraded to a Hurricane Thursday (see story pag 13).

Gasoline continued to surge in spill-over buying from Wednesday's session following the release of the weekly inventory data. The Department of Energy reported a 3.2-mil bbl draw in gasoline stocks, leaving total inventories at 109.9-mil bbl, 10.8-mil bbl below year-ago levels and 8.3-mil bbl below the five-year average.

Below-average gasoline production and the September switch to winter grade have contributed to the slide in inventories. While crude was edging towards the all-time intra-day high of $68/bbl posted in the previous Access session, gasoline had 7 cts to go before touching record levels.

"...there is a fundamental mis-pricing of oil products, with gasoline prices still being too low relative to heating oil," Paul Horsnell and Kevin Norrish, energy analysts at Barclays Capital, said in a report. "There is a view that one should now sell gasoline because the peak driving season is coming to an end, while you should buy heating oil because winter is approaching." But now that is likely to result in an unprofitable trade.

September unleaded settled 3.79 cts higher at $1.9637/gal and September heating oil settled 41 points higher at $1.8695/gal. Heating oil was under pressure throughout the session with fundamentals weighing on prices and as natural gas prices eased following a larger-than-expected 60 Bcf addition to working gas in storage.

"All factors considered, we are maintaining a trading theme centered on a potentially tight gasoline market that could prove capable of pulling the entire complex to fresh record highs with or without the help of additional storm activity," energy consultant Jim Ritterbusch said in a report.—*Linda Rafield*

## Gasoline: Asia surges

Asian gasoline surged to new, all-time highs Thursday, for the second straight session, in part tracking FOB Singapore naphtha that added $0.73/bbl from a day ago to be valued at $61.20/bbl. All three gasoline grades, 92, 95 and 97 RON, were assessed $1.25/bbl higher to $75.30/bbl, $76.00/bbl and $77.45/bbl, respectively. Apart from a spike in crude, the rise in lower octane value was driven by a relatively tight supply given that China, the biggest gasoline exporter in Asia, may have slashed those shipments.

Gasoline shortages in China's southern Guangdong province has now spread to the eastern province of Shandong, with some independent retail stations in the major city of Qingdao being forced to close shop, market players said Thursday (see story page 1).

**US Atlantic Coast** premium high octane gasoline cash differentials moved up sharply Thursday on reports of tighter supply, sources said. Conventional premium 93 cash firmed 4 cts/gal with trade reported at 31 cts over the Sept NYMEX for 47,000 bbl delivered early Sep (BP-CITGO). Sources said that there was a lack of re-supply shipped from the Gulf Coast. RBOB premium cash was talked at 30-31 cts over Sep NYMEX. RFG unleaded 87 cash firmed on tight prompt barrels and stronger MTBE prices, sources said. Trade was reported at 2.50 and 2.75 cts over the Sep NYMEX. RBOB unleaded cash firmed with trade reported at 1.75 ct under Sep NYMEX for prompt delivery. Another sale was heard at 1.40 ct under Sep NYMEX for 75,000 bbl Aug 30-31 (SUNOCO-BP).

The lower RVP gasoline, so desperately in demand all summer long in the **US Gulf Coast,** lost ground on the cash differential side with traders unloading barrels before the Summer to Fall RVP changeover. Cash differentials for 7.8 RVP ranged from 3.25 cts/gal under the October NYMEX gasoline contract to 4.25 ct/gal under the NYMEX. The 9.0 RVP was 4.5 cts/gal under the NYMEX to 5.5 cts/gal under the NYMEX. The 9.0 RVP Prem 93 was 4 to 4.5 cts/gal vs unleaded while the 7.8 RVP was 11 cts/gal vs unleaded. RFG 87 was 3.5 cts/gal over unleaded for 13.5 RVP barrels. Atlanta 87 was done 5 cts/gal over conventional.

The first day in **Chicago** of trading for the first cycle Thursday was extremely quiet as players attending an industry meeting. Unleaded was discussed at either side of 4.50 cts/gal over Oct NYMEX gasoline. Premium remained at 3.00 cts/gal even though there were talks of offers at 4.00 cts/gal to cash unleaded. RBOB was assessed at 11.50 cts/gal over cash unleaded.

## Distillates: NWE ticks up

The Northwest Europe jet CIF cargo flat price was assessed marginally higher Thursday due to a $7.25/mt rise in the underlying futures contract, to leave the CIF cargo flat price at $644.75/mt. The jet CIF cargo premium was assessed down, however, at $47.25/mt.

Buyers of CIF cargoes remain thin on the ground in Northwest Europe. Despite three offers that have been seen during the MOC in recent days, the continues to be no sign of buying activity. "There is simply no one with any marginal storage space available in Northwest Europe-so even if you see value at current levels there will be problems with storage" commented one trader. The precarious state of the jet fuel market in NWE was also reflected in reports from market sources that there is a jet cargo in the region which has arrived un-sold with no storage options.

This weakness is further reflected in the fall in the Sep swap, which was assessed at $50/mt down from $62.75/mt Aug 18, with Oct assessed at $60/mt. This has pushed the Sep/Oct spread to minus $10/mt, its lowest point since Dec 2004. "If you have no-where to store a cargo then it doesn't really matter what prices are doing," added one market source. The weakness in the jet market was also evident in the ARA barge market were premiums were once again offered down to be assessed at $43/mt at close of MOC. There were two trades during MOC with Sempra lifting 4kt from KLM at $43/mt, FOB Rotterdam, for Aug 27-31.

"An uncertain market," was a phrase used by a number of **gasoil** traders Thursday, as demand in to Germany appears to be slowing while large quantities of product are due to arrive from Asia in the coming weeks. A number of large cargoes have been fixed from South Korea and South East Asia in recent days with high outright prices in Europe attracting arbitrage players. Prompt demand appears to easing for heating oil in Europe, though BP bought a Sep 15-19 delivery 10kt cargo basis Hamburg at Sep plus $7.5 from Morgan Stanley. FOD was valued slightly lower with ConocoPhillips offering 20kt at Oct plus $2 basis Le Havre. Premiums in the Mediterranean edged lower with Energo Impex offering a Sep 13-17 Sep delivery cargo at Oct plus $2.25 and Total offering Sep swaps at minus $12. The first-decade September loading program from Tuapse has been released within market expectations. Barge premiums were unchanged in a quiet trading day. Mabanaft sold 1.9kt FOB Antwerp to Morgan Stanley in MOC.

## Americas crude: Oman cargoes bound for USWC

Some Oman crude has been fixed for delivery into the US West Coast, arriving most likely in November, market sources said Thursday. Two 1-mil bbl cargoes are fixed for delivery into that region with plenty more still on offer, sources said. Oman does come into the USWC, but those shipments occur only if the arb is open, sources said. Typically, the WTI/Dubai spread is a key indicator for such opportunities, along with favorable freight.

Sources said Oman imports aim to displace requirements in Alaskan North Slope, which has become more expensive. ANS for delivery in September last traded at $2.75/bbl under September WTI. ANS differential indications for October delivery were not cited by traders, nor had any trade been confirmed. It usually takes about 40 days for Oman to travel on the Pacific Ocean from Oman in the Middle East to the USWC. One USWC refiner said the company was shown the Oman oil for November delivery. The refiner was eyeing small volumes of the high-sulfur grade for delivery into the Pacific Northwest, but it was unclear if a trade took place.

Contract holders of Oman crude typically bring the oil into their refining systems, but sometimes the volumes have been resold to third parties. Meanwhile, one mover of Oman into the USWC said it was considering bringing other similar Mideast grades because arbitrage economics were looking as favorable as those for Oman. Late last month, Oman was offered into the USG for September delivery because of potential arbitrage window openings, but no deals were heard done because of unfavorable economics. The September- delivery Oman supplies would likely have loaded in August.

In the **US Gulf Coast,** prices were mixed and activity was generally thin ahead of the rollover of the cash September contract Friday. Sep Poseidon traded at $6.50 under cash WTI. Sep EIC was said bid at $3.75 under cash WTI, with no offers in sight. Sep Bonito was said bid at $3.50 under cash WTI, with no offers in sight. Sep LLS traded at 60-90 cts premium to cash WTI, from Wednesday's $0.90-1.00 over. Sep cash HLS traded at $2.65 under cash WTI, from Wednesday's $2.60- 2.50 under.

In the US cash Mars market Thursday, prices for September-delivery supplies remained weak with differentials sharply lower from where things left off Thursday. Sep Mars traded at $8.75-8.25 under cash WTI. The ongoing bearishness was linked to strong underlying benchmark crude values and the narrowing prompt cash Sep/Oct WTI spread.

## Blendstocks: European naphtha cracks soar

European naphtha crack swaps rose over $1/bbl this week, following a stronger Far Eastern market opening arbitrage opportunities from Europe to Asia, traders said. The September crack swap, measured against North Sea marker Brent, was pegged at minus $3.80/bbl Thursday afternoon after closing last week at minus $4.90/bbl.

Assuming FOB Mediterranean naphtha prices at $524/mt and 2H October CIF Japan naphtha prices at $563.50/mt and a freight cost of about $30/mt, it would imply the arbitrage is workable between the two regions. "I think a few people are trying to make it work, but nothing's done yet. There don't seem to be too many vessels available," said one naphtha trader.

China, generally a feedstock exporter, surprised the market Monday, when Unipec, the trading arm of state-owned Sinopec, bought two 30,000mt import cargoes. While the volumes were not that significant, traders felt it could be an ongoing trend, "The impression I am getting, is that it could last through to the end of the year," said one. Soaring crude costs have put Chinese refining margins under increased pressure lately as the domestic naphtha price has failed to keep pace with the surge in international crude benchmarks. Traders cited the possibility of negative margins in the country, which may have caused run cuts leading to importing products to fulfil contractual commitments.

Interestingly, naphtha margins when measured against sour Dubai have actually increased in recent weeks as demand for naphtha remains very strong. The naphtha crack against Dubai has surged from minus $5.65/bbl to plus $1.45/bbl since end-June, Platts data shows.

Analysts had predicted that China would become a net importer of naphtha feedstock towards the end of 2005, citing the startup of several joint ventures in the country. Sinopec in conjunction with BP and BASF has recently brought online two crackers with the combined capacity of 1,200,000 mt/year of ethylene. A third venture between CNOOC and Shell is due online in November of this year, with 800,000 mt/year capacity. While it was difficult to say if the new ventures were behind the demand, rumors of one new JV, BP-Secco, on the lookout for naphtha added to bullish sentiment.

"Fundamentally, the Asian market is still well supplied in prompt, but the added buying from China has buoyed market sentiment," said a Singapore-based trader. In end-of-day trading Thursday, Shell sold one cargo of naphtha for delivery in the second half of October to Mitsui Tokyo at $572/mt, or $7.50/mt higher than the previous record of $564.50/mt set Aug 24.

## Resid/bunkers: Strength

Singapore fuel oil, prices hit another new high Thursday with 180CST closing at $304.36/mt. Meantime, production of low-sulfur fuel oil in Japan is expected to show a sharp rebound this week, on the back of increased demand from its power producers. LSFO demand in Japan normally peaks in Aug as many utilities crank up thermal power units to meet additional electricity demand. There was an additional enquiry from TEPCO amounting to 200,000 kl (1.3-mil bbl) of fuel oil and crude oil around Aug 10, as higher-than-expected power consumption due to the hot summer reduced LSFO stocks.

Sources anticipate that TEPCO's buy includes LSFO and crude will total 800,000 kl for Aug against 696,000 kl in Jul. Another factor likely to boost LSFO production is the possible purchase of LSFO by Tohoku Electric Power, which shut all its nuclear units with at Onagawa on Aug 16 after an earthquake. Sources estimate additional LSFO demand from Tohoku during Aug to reach 50,000 kl above its baseload requirement of 70,000 kl.

## Unforseen MTBE shortage boosts US blendstock prices

*Houston*—US spot-market gasoline blendstocks on Thursday were talked stronger versus recent prices for bbl delivered through late September, primarily because of an unexpected supply shortage of MTBE and its subsequent spot price recovery, market sources said. If MTBE continues upward, it will drag up the other blendstocks as well," a trading source said, a predicted that and so far has come to fruition.

Spot trade for blendstocks like alkylate and ethanol stalled Thursday because of gyrating NYMEX prices, would-be participants said. But those deals heard done were stronger into mid-September, compared to recent forward-cash assessments. For example, US Gulf Coast alkylate Thursday was heard done 26.50 cts/gal over US Gulf Coast conventional unleaded 87 7.8 waterborne.

Until Thursday, only prompt alkylate was heard in tight supply, trading at 26-28 cts/gal over unleaded; barrels for delivery in September were talked well-offered at 25 cts/gal versus unleaded. Market dynamics shifted drastically upward this week after Huntsman declared force majeure on some MTBE production from the chemical company's Port Neches, Texas, plant. About 16,000 b/d of MTBE production will be curtailed for almost two months, according to a letter Hunstman sent to customers Tuesday. Unscheduled repairs on a PO/MTBE unit would keep it shut for 48 days, sources familiar with the letter told Platts.

"The (US) Gulf is already tight and this takes out 16,000 b/d since last Sunday," a trading source wrote to Platts Wednesday, alluding to the Sunday shutdown of the Hunstman unit being bad timing for short-positioned traders. Thursday's spot market might be a tangible barometer: MTBE remained bid $2.90/gal in both the USGC and New York Harbor, with "no offers in sight," according to one refiner buyer.

Mounting global MTBE demand previously accelerated exports from the USGC, especially to Venezuela, since Aug 10 when MTBE FOB Houston, set a record at $3.25/gal. Two weeks ago, USGC strength was attributed to ongoing tight octane supplies, overall high gasoline prices and a rumored problem with ethanol-blended gasoline in Venezuela that forced PDVSA to use more MTBE for gasoline blending as an alternative to ethanol. It needs more octane boosters while it implements an initiative to remove lead from gasoline, sources have said.

PDVSA was rumored to have tendered to buy more MTBE than usual because its estimated 18,000 b/d Super Octanos MTBE plant was shut for maintenance for more than a month this summer. Consequently, PDVSA tendered to buy at least 850,000 b/d of MTBE since early July. It is unclear whether all tenders resulted in sales, but sources close to PDVSA have said Venezuela purchased at least 600,000 bbl of MTBE, in addition to a public tender of 250,000 bbl—all supplied from the USGC. "Problems in Venezuela are coming home to roost," a source close to the situation said. PDVSA has not returned calls for comment.

It also was unclear whether a reported fire Aug 17 at PDVSA's 450,000 b/d Amuay Bay refining complex has affected production. PDVSA officials also have have not returned repeated phone calls seeking comment.

Meanwhile, sources said the recent US energy bill and a lack of MTBE supplies has translated to increased ethanol demand in the US, especially in Chicago and St Louis areas. Chicago ethanol values through September were talked $2.06/gal, up more than 15 cts/gal from levels a week ago, when Chicago Board of Trade postings Aug 17 were $1.90/gal. Demand for ethanol also is expected to rise over the coming weeks since it is a preferred blending component for winter gasoline.

Specification changes for gasoline shipments on most US products pipelines begin next month, along with the seasonal requirements. Ethanol demand should accelerate further by late September, sources have said, when it will be blended into winter gasoline at the racks.—*Kim Benestante*

# Hawaii...from p. 1

price for the three gasoline grades was set at $2.4958/gal (regular), $2.5458/gal (mid-grade) and $2.5858/gal (premium).

According to a report to the Hawaiian legislature by Stillwater Associates, Chevron supplies Hawaii gasoline wholesalers such as Shell and independent Aloha Petroleum. Tesoro supplies ConocoPhillips and most military and government needs.

Stillwater recommended against adoption of gasoline price caps, in part because the link to the California market's stringent standards via Los Angeles could cause higher prices and increased volatility. In addition, the formula's link to the Gulf Coast means "a hurricane (in that region) is going to cause Hawaii's price to go up," said one market-watcher.

ICF Consulting LLC, which studied the same issue for legislators this year, warned Hawaii's refiners may "closely examine profitability and sustainability" in that state.

With the initial passage of legislation in 2002, Hawaii's staunchly Democratic state legislature aimed to impose price caps on both wholesale and retail unleaded gasoline prices (ON 5/6/02). The move was meant to address "the high price of gasoline in light of the strong tendency of the structure of the gasoline market in the State to perpetuate high and rising prices and the resulting supra-competitive margins realized by market participants."

The provision to cap retail prices was later repealed in 2004 after studies "found that the problem of high gasoline prices is principally due to a lack of vigorous competition in the oligopolistic wholesale market," the law reads, referring to the presence of only two local refineries and limited products imports. "There is competition at the retail level where there are approximately 339 gasoline stations throughout the island," the 2004 amendment reads.—*Beth Evans, with Mike Kobal in Singapore*

## Russia to raise crude export duty by 25% to $175/mt

*Moscow*—Russia plans to raise the crude export duty to a record of at least $175/mt ($23.97/bbl) from Oct 1, up 25% from the current $140/mt, the deputy head of the finance ministry's customs department said Aug 25.

"The last week of August can bring some corrections, but I'm sure that in the end the crude export duties will reach $175 to $180/mt," Alexander Sakovich told Platts.

Russia reviews the crude export duty every two months based on the average world price for Urals, the country's main export grade. Crude prices have repeatedly hit all-time highs during 2005, and US benchmark crude briefly hit $68 in overnight Access trade Aug 24.

Export duty on oil products will rise to $106.6/mt from the current $104.1/mt as of Aug 27, Sakovich said, and will affect gasoline, kerosene, gasoil and other products. Fuel oil duty will rise to $57.4/mt from the current $56/mt.

In September, Russia plans to make some changes to the method of setting oil products export duties, such as increasing the differential between light and heavy products, though the change will not take immediate effect.

"The duties calculated according to a new mechanism will hardly come into force earlier than in late November, given the legal procedure we should follow," Sakovich said.

He also said that according to current rules, light-products duty may reach $130/mt to $135/mt in late October, while fuel oil duty would amount to $70/mt to $72/mt. If the government adopts the new method, duties may rise to $140-$145/mt for light products and drop to $60-$62/mt for fuel oil, he said.

Sakovich also said the government is unlikely to introduce a zero rate of export duty on fuel oil, as suggested by some officials, to give oil companies an incentive to boost capital investment in Russia's mainly outdated oil refineries.

The country's draft budget for next year, which is set to be submitted to lawmakers this week, does not provide for such a move, he said. Any major changes may come into force no sooner than 2007, he suggested.

Even a small change may give companies impetus to increase oil refining capacity in Russia, a move that could help to avoid significant hikes in domestic gasoline and gas oil prices, analysts said.—*Nadia Rodova*

## Correction

—In the Aug 24, 2005 OPR Vol 83, No. 163 (prices effective Aug 23, 2005) under the heading Product Price Assessments, European Bulk, IPE Average (SEP) should have read: 587.00, and IPE Average (OCT) should have read: 589.00.

—In the Aug 25, 2005 OPR Vol 83, No. 164 (prices effective Aug 24, 2005) under the heading Product Price Assessments, European Bulk, Cargoes FOB Med Basis Italy, 1% Fuel Oil should have read: 289.25-290.25; under Cargoes CIF Med Basis Genoa/Lavera, 1% Fuel Oil should have read: 297.50-298.50; under Cargoes CIF NWE Basis ARA, 1% Fuel Oil should have read: 291.50-292.50; and under Cargoes FOB NWE, 1% Fuel Oil should have read: 283.50-284.50.

**platts** Oilgram Price Report

Vol 83 / No 165 / August 26, 2005
(ISSN: 0163-1292)

**Editor-in-Chief:** Jeff Mower; **Global Director Oil:** John Kingston; **Global Director Market Reporting:** J. Montepeque; **Director Americas Oil Markets and Global Crude Oil Manager:** Gerald Bueshel; **Editorial Director, Asia:** David Ernsberger; **Oil Manager, Singapore:** Paul Young; **Oil Manager, Japan:** Mihir Sapru; **Houston Bureau Chief:** Annette Hugh; **Downstream Manager:** Robert Sharp, **Oil Manager, London:** Peter Stewart;

**Vice President, Editorial:** Dan Tanz

**Platts President:** Victoria Chu Pao
**Senior Vice President** James Downham

**Manager, Advertising Sales:** Josie Parnell

**Telephone & e-mail:** New York: +1 800-752-8878 or +1 212-904-4100; Washington DC: +1 202-383-2250; Houston: +1 713-658-3211; London: +44-207-176-6100; Singapore: +65-653-22-800; Tokyo: +813-5403-2731; Hong Kong: +852-2533-3513; Dubai: +971-4-3914818.

*Oilgram Price Report* is published every business day in New York and Houston by Platts, a division of The McGraw-Hill Companies, registered office: Two Penn Plaza, 25th Floor, New York, N.Y. 10121-2298.

Officers of the Corporation: Harold McGraw III, Chairman, President and Chief Executive Officer; Kenneth Vittor, Executive Vice President and General Counsel; Robert J. Bahash, Executive Vice President and Chief Financial Officer; John Weisenseel, Senior Vice President, Treasurer.

Platts makes no warranties, express or implied, as to the accuracy, adequacy or completeness of the data and other information set forth in this publication ('data') or as to the merchantability or fitness for a particular use of the data. Platts assumes no liability in connection with any party's use of the data. Corporate policy prohibits editorial personnel from holding any financial interest in companies they cover and from disclosing information prior to the publication date of an issue.

Copyright © 2005 by Platts, The McGraw-Hill Companies, Inc.

Permission is granted for those registered with the Copyright Clearance Center (CCC) to photocopy material herein for internal reference or personal use only, provided that appropriate payment is made to the CCC, 222 Rosewood Drive, Danvers, MA 01923, phone +1-978-750-8400. Reproduction in any other form, or for any other purpose, is forbidden without express permission of The McGraw-Hill Companies, Inc. Text-only archives available on Dialog, Factiva, LexisNexis, and ProQuest.

Platts is a trademark of the McGraw-Hill Companies, Inc.

**To reach Platts**
**E-mail:** support@platts.com
**North America**
**Tel:** 800-PLATTS-8 (toll-free) +1-212-904-3070 (direct)
**Latin America**
**Tel:** + 54-11-4804-1890
**Europe & Middle East**
**Tel:** +44-20-7176-6111
**Asia Pacific**
**Tel:** +65-6530-6430

**Advertising**
**Tel:** +1-212-904-4367

The McGraw-Hill Companies

## US Wholesale Posted Prices

| | Unleaded | Midgrade | Premium Unleaded | Kerosene No.1Fuel | Diesel No.2 Fuel | Low Sulfur Diesel |
|---|---|---|---|---|---|---|
| **PAD1** | | | | | | |
| MetroNY (Eth) | +192.45-197.90+ | +201.80-203.50+ | +213.90-222.90+ | | +187.55-187.55+ | +193.65-193.65+ |
| N.New Jersey (Eth) | +194.05-196.35+ | +205.85-206.55+ | +222.60-222.75+ | +203.50-210.75+ | +185.35-187.30+ | +189.15-194.60+ |
| Albany (Eth) | +189.00-190.00+ | +194.75-204.00+ | +220.50-226.30+ | +201.20-216.55+ | +188.00-189.50+ | +195.20-196.50+ |
| Atlanta(d) | +191.90-207.45+ | +197.15-203.43+ | +204.15-214.33+ | +210.30-213.99+ | +188.40-188.87+ | +190.90-193.50+ |
| Baltimore (conv) | +186.75-192.40+ | +190.20-199.60+ | +197.50-211.35+ | +210.10-210.10+ | +185.50-189.93+ | +189.65-194.10+ |
| Baltimore (RFG) | +203.20-212.50+ | +207.70-217.20+ | +213.70-225.65+ | | | |
| Boston (RFG) | +196.45-210.07+ | +205.60-207.85+ | +216.60-226.99+ | +210.70-218.05+ | +186.79-193.61+ | +193.95-200.70+ |
| Charleston | +191.05-196.00+ | +194.55-200.76+ | +201.05-210.00+ | +214.65-214.65+ | | +196.25-197.70+ |
| Greensboro,NC(d) | +186.25-191.80+ | +193.45-196.89+ | +194.75-206.80+ | +204.40-213.90+ | +187.10-188.90+ | +190.70-192.65+ |
| Miami | +192.70-192.70+ | +197.97-197.97+ | +208.20-208.20+ | | +189.85-189.85+ | +194.05-197.00+ |
| New Haven (Eth) | +190.35-190.35+ | +201.45-201.45+ | +219.90-219.90+ | +214.40-214.40+ | +184.90-196.55+ | +191.65-196.10+ |
| Norfolk(conv) | +187.00-195.40+ | +189.75-193.65+ | +194.00-201.10+ | | +188.25-188.90+ | +191.10-194.15+ |
| Norfolk(RFG) | +196.55-205.70 | +208.25-209.70 | +216.70-217.40+ | | | |
| Philadelphia(RFG) | +196.80-198.75+ | +207.45-210.75+ | +224.95-224.95+ | | +190.47-193.80+ | +191.75-200.00+ |
| Pittsburgh(d) | +191.55-193.75+ | +203.95-206.70+ | +209.75-209.75- | +197.35-203.35+ | +189.40-190.90+ | +191.25-194.90+ |
| Portland,ME(d) | +188.98-193.05+ | +196.75-203.30+ | +210.75-212.50- | | +186.78-187.00+ | +195.25-195.39+ |
| Savannah | +190.30-193.70+ | +193.69-198.20+ | +200.30-205.70+ | | +191.30-191.30+ | +194.55-197.30+ |
| Spartanburg(d) | +186.50-187.35+ | +189.50-190.50+ | +194.50-197.00+ | +201.85-201.85+ | +187.50-193.36+ | +189.43-193.05+ |
| Tampa | +191.20-193.25+ | +196.20-200.50+ | +204.20-209.00+ | +206.08-210.25+ | +190.00-194.12+ | +191.80-197.95+ |
| Wilmington,NC | +191.10-193.50+ | +193.90-198.90+ | +199.10-206.50+ | | +198.28-198.28+ | +194.50-196.76+ |
| **PAD2** | | | | | | |
| Chicago (RFG) | +213.95-213.95+ | | +225.95-225.95+ | | | |
| Chicago(conv) | | | | +205.40-215.30+ | +188.65-198.40+ | +191.40-195.30+ |
| Columbus | +197.80-199.91+ | +201.80-203.94+ | +208.80-214.50+ | +202.20-202.20+ | +187.95-189.80+ | +192.00-197.89+ |
| Des Moines(d) | +203.85-207.80+ | | +212.60-225.45+ | | +191.35-196.15+ | +194.75-197.45+ |
| Detroit | +197.15-204.10+ | +202.15-214.45+ | +210.15-214.20+ | +204.35-208.55+ | +188.75-191.72+ | +190.25-195.55+ |
| Mpls/St.Paul(a,d) | +205.50-209.10+ | +211.50-213.60+ | +216.50-220.80+ | +207.65-207.65+ | +192.60-196.55+ | +196.45-199.50+ |
| Oklahoma(d) | +205.00-207.55+ | +210.75-211.05+ | +214.80-216.55+ | | | +189.75-196.10+ |
| St.Louis(d) | +201.85-215.00+ | +207.35-214.75+ | +213.35-219.25+ | | +190.40-202.00+ | +193.15-196.10+ |
| **PAD3** | | | | | | |
| Albuquerque(d) | +215.70-223.50+ | +220.70-225.60+ | +225.20-233.50+ | | | +208.83-212.00+ |
| Amarillo(d) | +203.65-210.55+ | +209.65-215.80+ | +215.70-215.70+ | | | +198.60-200.16+ |
| Arkansas(d) | +193.35-194.80+ | +198.30-199.10+ | +205.80-209.85+ | | +191.77-191.77+ | +191.50-195.08+ |
| Birmingham(d) | +184.75-195.05+ | +187.80-198.75- | +192.80-212.69+ | | +186.55-188.34+ | +189.95-192.43+ |
| Corpus Christi(d) | +185.50-189.70+ | +190.50-193.95+ | +199.50-199.70+ | +197.60-197.60+ | +188.80-189.50+ | +188.70-192.80+ |
| Dallas/Ft.Worth(conv) | +198.25-206.30+ | +213.30-213.30+ | +220.80-220.80+ | | | +191.45-194.11+ |
| Dallas/Ft.Worth (RFG) | +200.05-202.65+ | +204.05-206.25+ | 210.05-220.90+ | | | |
| Houston(conv) | | | | +208.20-208.20+ | +186.60-186.60+ | +188.75-192.02+ |
| Houston(RFG) | +192.35-195.30+ | +198.05-200.40+ | +205.35-210.30+ | | | |
| N.Orleans Area(d) | +185.55-189.64+ | +189.85-191.30+ | +195.70-200.15+ | | +185.30-188.09+ | +188.85-192.49+ |
| **PAD4** | | | | | | |
| Billings(d) | +200.50-200.50+ | +204.80-204.80+ | +209.45-215.50+ | | | +209.01-213.00+ |
| Casper(d) | +210.50-211.30+ | | +219.85-225.50+ | | | +212.92-215.50+ |
| Denver(d) | +210.80-210.80+ | +215.30-215.30+ | +220.30-227.60+ | | +209.25-209.25+ | +207.25-209.00+ |
| Salt Lake(d) | +198.00-198.00+ | | +208.00-208.00+ | | | +227.70-230.00+ |
| **PAD5** | | | | | | |
| Los Angeles(e) | +204.75-211.90+ | +211.25-216.90+ | +217.75-228.75+ | | | +206.90-223.65+ |
| Phoenix | 208.10-216.25+ | +213.10-223.75+ | +225.00-225.00+ | | | +216.00-222.00+ |
| Portland,OR | +209.50-213.00+ | +220.00-220.00+ | +224.50-229.00+ | +236.25-236.25+ | 213.00-214.50- | 213.00-217.09+ |
| SanFran-EBay(e) | +200.50-209.00+ | +207.05-216.00+ | +213.05-223.00+ | | | +219.00-231.20+ |
| Seattle/Tacoma | +207.50-213.00+ | +213.50-220.00+ | +220.00-229.00+ | | 207.50-207.50 | 209.50-216.00 |
| Spokane(d) | +208.50-209.75+ | +213.50-217.25+ | +220.50-224.75+ | | +228.75-233.58 | +228.25-230.50+ |

*All prices are provided by Axxis Petroleum. Discounts or temporary allowances offered by individual companies are not included in posted prices. Prices are conventional gasoline unless noted; in cities where both RFG and conventional are sold, prices are noted and listed on separate lines. All prices in cts/gal. (a)=Includes oxygenated gasoline. (d)=Includes branded gasoline. (e)=CARB gasoline/No.2 oil*

## Contract Cargo Prices

**No. 2 Fuel Barge (¢/Gal)**

+205.55-205.55+

**No. 6 Fuel Cargoes ($/bl)**

| Company | Eff Date | 0.3pct | 0.5pct | 1.0pct | 2.2pct | 2.8pct |
|---|---|---|---|---|---|---|
| Global | 08/23 | 65.00 | 63.75 | 58.00 | 53.00 | 51.00 |
| Sprague | 08/19 | | 61.00 | 55.75 | | |

**Ranges (b)**

| 0.3pct | 0.5pct | 1.0pct | 2.2pct | 2.8pct |
|---|---|---|---|---|
| 65.00-65.00 | 61.00-63.75 | 55.75-58.00 | 53.00-53.00 | 51.00-51.00 |

*All prices delivered, N.Y. Harbor. Residual fuels are low pour. (a) Barge prices, FOB Terminal. Some suppliers grant TVAs. (b) Ranges excluded low and high for each grade. W=Withdrawn*

## Atlantic & Gulf Coast Resid

| | | No. 4 Fuel | | No. 6 Fuel |
|---|---|---|---|---|
| New York | 0.3% | +74.25-74.25+ | 0.3% | +67.25-67.25+ |
| Albany | 1.5 | 66.50-66.50 | 1.5 | 50.95-50.95 |
| Boston | 0.5 | 74.00-77.00 | 0.5 | 63.50-66.75 |
| | 1.0 | 71.25-73.50 | 1.0 | 58.00-59.25 |
| | | | 2.2 | 51.75-51.75 |
| New Haven | 1.0 | 73.00-73.00 | 1.0 | 59.25-59.25 |
| Portland | 1.5 | 73.50-73.50 | 2.5 | 53.25-53.25 |
| Providence | 1.0 | 71.25-73.50 | 1.0 | 58.00-59.25 |

## Five-Day Rolling Averages*

*Five Days ending Aug 25

| Naphtha | $/Bbl | c/Gal |
|---|---|---|
| Singapore | 58.96—59.00 | 140.37**140.47 |
| | $/MT | c/Gal |
| Japan C/F | 547.50—550.75 | 144.84**145.70 |
| Arab Gulf | 509.96—513.33 | 134.91**135.80 |
| CIF NWE Physical | 537.40—537.90 | 142.17**145.38 |
| Rotterdam Barge | 533.40—533.90 | 141.11**144.30 |
| FOB Med | 518.95—519.45 | 137.29**140.39 |
| CIF Genoa | 533.10—533.60 | 141.03**144.22 |
| US Gulf W | 592.10**594.23 | 166.79—167.39 |
| Carib Cargo | 590.93—593.11 | 162.79**163.39 |

| Jet Kerosene | $/MT | c/Gal |
|---|---|---|
| CIF NWE Cargo | 643.20—644.20 | 194.91**194.04 |
| Rotterdam Barge | 638.55—639.55 | 193.50**192.64 |
| FOB Med | 628.40—629.40 | 190.42**189.58 |
| US Gulf Water | 625.29**628.04 | 188.34—189.17 |
| US Gulf Pipe | 623.63**626.38 | 187.84—188.67 |
| Carib Cargo | 616.98—619.68 | 191.02**191.85 |
| NY Cargo | 627.92**628.85 | 190.28—190.56 |
| LA Pipeline | 626.04**630.18 | 196.25—197.55 |
| Group 3 | 638.87**641.36 | 192.43—193.18 |
| Chicago | 634.62**637.61 | 191.15—192.05 |

| Low Sulfur Resid Fuel Oil | $/Bbl | $/Mt |
|---|---|---|
| Singapore LSWR Mixed/Cracked | 51.81—51.91 | 347.13**347.80 |
| CIF ARA 1% | 44.70**44.85 | 290.55—291.55 |
| Rot Bar 1% | 43.74**43.22 | 279.95—280.95 |
| NWE FOB 1% | 44.16**43.64 | 282.65—283.65 |
| Med FOB 1% | 45.10**44.56 | 288.65—289.65 |
| NY Cargo .3% HP | 57.80—58.25 | 387.26**390.28 |
| NY Cargo .3% LP | 59.95—60.40 | 401.67**404.68 |
| NY Cargo .7% Max | 50.85—51.20 | 330.53**332.80 |
| NY Cargo 1% Max | 45.70—46.05 | 297.05**299.33 |
| US Gulf 1% | 47.75—48.25 | 301.78**304.94 |

| Hi Sulfur Resid Fuel Oil | $/Bbl | $/Mt |
|---|---|---|
| Singapore 180 | 46.09**46.09 | 299.57—299.61 |
| Singapore 380 | 43.93**43.94 | 281.15—281.18 |
| Arab Gulf 180 | 44.78**44.78 | 286.58—286.62 |
| CIF ARA 3.5% | 41.69**41.52 | 262.65—263.65 |
| NWE FOB 3.5% | 40.34**40.18 | 254.15—255.15 |
| Med FOB 3.5% | 40.35**40.19 | 254.20—255.20 |
| CIF Med 3.5% | 41.62**41.45 | 262.20—263.20 |
| NY Cargo 2.2% | 40.40—40.75 | 258.56**260.80 |
| NY Cargo 3.0% | 38.20—38.45 | 244.48**246.08 |
| US Gulf 3% | 39.69—40.03 | 254.02**256.19 |
| Carib 2.0% | 36.40—36.75 | 232.96**235.20 |
| Carib 2.8% | 34.15—34.40 | 218.56**220.16 |

| Crude Oil, FOB Source | $/Bbl |
|---|---|
| West Texas Int | 66.14—66.16 |
| NYMEX Crude | 65.42 |
| Mars | 58.40—58.44 |
| Brent (DTD) | 65.27—65.31 |
| Brent (First Month) | 65.26—65.30 |
| Dubai (First Month) | 56.63—56.65 |
| Oman (First Month) | 57.60—57.62 |
| Urals CIF Med | 58.63—58.68 |
| WTI Posting Plus | 2.68 —2.70 |

| Gasoil/Heating Oil | $/Bbl | c/Gal |
|---|---|---|
| Singapore | 70.01—70.05 | 166.69**166.79 |
| Arab Gulf | 67.38—67.42 | 160.43**160.52 |
| L.A. LS Diesel | 82.78**83.22 | 197.10—198.15 |
| S.F. LS Diesel | 82.70**83.31 | 196.90—198.35 |
| | $/MT | c/Gal |
| 0.2 CIF ARA | 597.00—597.90 | 190.73**191.02 |
| EN590 CIF ARA | 392.20—393.20 | 125.30**125.62 |
| 0.2 Rotterdam Barge | 588.45—589.40 | 188.00**188.31 |
| 0.2 FOB NWE | 586.00—586.90 | 187.22**187.51 |
| 0.2 CIF MED | 595.35—596.35 | 190.21**190.53 |
| EN590 CIF MED | 541.55—542.55 | 173.02**173.34 |
| NY Cargo | 565.87**567.03 | 179.64—180.01 |
| NY Barge | 568.23**569.39 | 180.39—180.76 |
| US Gulf Water | 556.93**557.73 | 180.82—181.08 |
| US Gulf Pipe | 555.39**556.19 | 180.32—180.58 |
| Group 3 | 566.97**568.44 | 184.08—184.56 |
| Carib Cargo | 563.65—564.45 | 181.24**181.50 |
| NYMEX NO. 2 | 573.91 | 182.19 |

| Gasoline,Intl. Market | c/Gal | Prem $/Mt |
|---|---|---|
| CIF ARA Prem Unl | 180.84**181.13 | 634.75—635.75 |
| R dam Barge Prem Unl | 180.41**180.70 | 633.25—634.25 |
| FOB NWE Prem Unl | 178.70**178.99 | 627.25—628.25 |

| Gasoline, U.S. Market | Unleaded | Premium |
|---|---|---|
| NY Cargo | 183.24—184.13 | 216.81—217.26 |
| NY Barge | 183.74—184.63 | 217.31—217.76 |
| US Gulf Water | 182.49—183.09 | 194.29—194.89 |
| US Gulf Pipe | 181.99—182.59 | 193.79—194.39 |
| Group | 197.56—198.58 | 205.11—206.18 |
| LA Pipeline | 198.35—199.45 | 209.80—210.80 |
| SF Pipeline | 195.25—196.25 | 206.70—207.70 |
| Chicago | 190.55—191.70 | 193.55—194.80 |
| NYMEX Unl | 188.24 | |

*Conversions either side of asterisks*

## Product Price Assessments ($/MT)

| | Cargoes FOB Med Basis Italy | Cargoes CIF Med Basis Genoa/Lavera | Cargoes CIF NWE Basis ARA | Barges FOB Rotterdam | Cargoes FOB NWE |
|---|---|---|---|---|---|
| **European Bulk** | | | | +695.00-696.00+ | |
| 98 RON Unl | | | +650.00-651.00+ | +645.75-646.75+ | +642.50-643.50+ |
| Prem Unl | | | +657.25-658.25+ | | +649.75-650.75+ |
| Prem Unl 10 ppm | | | | +638.25-639.25+ | |
| Prem Unl 50 ppm | +629.50-630.50+ | +637.75-638.75+ | +649.00-650.00+ | +642.75-643.75+ | +641.50-642.50+ |
| Reg Unl | | | | -8.00—7.00 | |
| Barge diff 10ppm/50ppm | | | | +975.00-980.00+ | |
| MTBE | | | | +545.75-546.25+ | |
| Naphtha Physical | +530.75-531.25+ | +545.25-545.75+ | +549.75-550.25+ | | |
| Naphtha Swaps | | | +553.75-554.25+ | | |
| Jet Kerosene | | | +644.25-645.25+ | +640.00-641.00+ | +636.00-637.00+ |
| Jet Av. Fuel | +629.25-630.25+ | | | | |
| ULSD | | | +626.50-627.50+ | +617.50-618.00+ | +616.75-617.75+ |
| ULSD 50 ppm | +622.00-623.00+ | +631.50-632.50+ | +623.00-624.00+ | | +611.75-612.75+ |
| Gasoil 10ppm | | | +626.50-627.50+ | +620.25-620.75+ | +617.25-618.25+ |
| Gasoil 0.2 | +586.50-587.50+ | +600.75-601.75+ | +603.25-604.25+ | +596.00-597.00+ | +592.25-593.25+ |
| Russian Gasoil 0.2 | | | +607.25-608.25+ | | |
| 1% Fuel Oil(x) | -283.00-284.00- | -291.25-292.25- | -284.75-285.75- | -275.50-276.50- | -277.25-278.25- |
| 3.5% Fuel Oil | +255.00-256.00+ | +263.25-264.25+ | +264.25-265.25+ | +268.50-269.00+ | +255.75-256.75+ |
| 380 CST | | | | +272.50-275.00+ | |
| 0.5%-0.7% Straight Run | | | | | +382.00-385.50+ |

*0.2 PCT Gasoil does not include -5 -15 spec. IPE Average (SEP) +596.25. IPE Average (OCT) 599.00+.(x)*

*(x)=See corrections page 5.*

## Product Price Assessments

### New York/Boston

| | | Cargo | Barge |
|---|---|---|---|
| 9.0 RVP | Unl 87 0.3% | +188.25-188.45+ | +188.75-188.95+ |
| | Unl 89 0.3% | +203.29-203.81+ | +203.79-204.31+ |
| | Unl 93 0.3% | +225.85-226.85+ | +226.35-227.35+ |
| | Unl 87 RFG* | +198.35-198.60+ | +198.85-199.10+ |
| | Unl 89 RFG* | +209.35-209.90+ | +209.85-210.40+ |
| | Super Unl 93 RFG* | +225.85-226.85+ | +226.35-227.35+ |
| | Unl 87 (Boston RFG) | +199.85-200.10+ | |
| | Unl RBOB 5.9 RVP | | +194.60-194.95+ |
| | Prem RBOB 5.9 RVP | | +226.35-227.35+ |
| | MTBE | +290.00-320.00+ | |
| | Ethanol NYH 5-15 | | 175.00-185.00 |
| | Jet Fuel | +193.95-194.20+ | +194.45-194.70+ |
| | LS Jet/Kero | -195.95-196.95+ | -196.45-197.45+ |
| | LS Jet/Kero(Boston) | -197.45-198.45+ | |
| | No. 2 | +183.45-183.95+ | +184.20-184.70+ |
| | LS Diesel | +189.70-189.95+ | +190.20-190.45+ |
| | No. 2 (Boston) | +185.20-185.70+ | |
| | LS Diesel (Boston) | +191.20-191.45+ | |
| $/Bbl | No. 6 0.3%S HiPr | +58.75-59.00+ | +58.75-59.00+ |
| | No. 6 0.3%S LoPr | +60.75-61.00+ | +60.75-61.00+ |
| | No. 6 0.7%S Max | +51.25-51.75+ | +51.25-51.75+ |
| | No. 6 1%S Max | 45.75-46.25 | 45.75-46.25 |
| | No. 6 2.2%S Max | +40.25-40.50+ | +40.25-40.50+ |
| | No. 6 2.2%S Max (Bstn) | +40.35-40.60+ | |
| | No. 6 3.0%S Max | +40.00-40.25+ | +40.00-40.25+ |
| | No. 6 1.0%S Pap. 1st M | -45.90-46.00- | |
| | No. 6 1.0%S Pap. 2nd M | -46.50-46.60- | |
| *RVP=7.1 | No. 6 1.0%S Pap. Qtrly | -47.55-47.65- | |

### U.S. Buckeye Pipeline

| | |
|---|---|
| Unl 87 0.3% | +188.75-188.95+ |
| Unl 89 0.3% | +203.79-204.31+ |
| Unl 93 0.3% | +226.35-227.35+ |
| Unl RBOB | +194.60-194.95+ |
| Prem RBOB | +226.35-227.35+ |
| No.2 | +184.20-184.70+ |
| LS Diesel | +190.20-190.45+ |
| Jet fuel | +194.45-194.70+ |
| LS Jet/kero | -196.45-197.45+ |

### Laurel Pipeline 9.0 RVP

| | |
|---|---|
| UNL 87 | +188.75-188.95+ |
| UNL 89 | +203.79-204.31+ |
| UNL 93 | +226.35-227.35+ |
| UNL 87 7.8 rvp | +194.25-194.45+ |
| UNL 89 7.8 rvp | +207.49-208.01+ |
| UNL 93 7.8 rvp | +227.35-228.35+ |

*Conventional Gasoline is 9.0 RVP; RBOB is 5.9 RVP

### Gas Liquids (c/Gal)

| | Mont Belvieu | Conway | Other Hubs |
|---|---|---|---|
| Ethane/Propane | -69.750-70.250- | -65.250-65.750- | |
| Ethane Purity | -70.750-71.250- | | |
| Propane | 97.000-97.250- | -96.000-96.250- | |
| Propane TET | -97.250-97.500- | | |
| Normal Butane | -108.750-109.250- | -103.750-104.250- | |
| Butane TET | 106.750-107.250 | | |
| Isobutane | -111.000-111.500- | -127.500-128.000- | |
| Isobutane TET | -112.000-112.500- | | |
| Natural Gasoline | | +139.750-140.250+ | |
| Natural Gasoline TET | +141.500-142.000+ | | |
| Natural Non-Dynegy | +141.500-142.000+ | | |
| Natural Dynegy | +139.500-140.000+ | | |
| Bushton Propane | | | -96.500-96.750- |
| Hattiesburg Propane | | | -99.500-99.750- |
| River Natural Gasoline | | | +142.500-143.000+ |

## ENAP sells gasoline cargoes to Lukoil

*Houston*—Chilean state oil company ENAP this week awarded tenders to sell gasoline to Russian oil company Lukoil, a market source said Thursday. ENAP had tendered to sell 125,000 bbl of 91 RON gasoline, 107,000 bbl of 95 RON gasoline and up to 107,000 bbl of low octane gasoline, with Aug 23 as the deadline for bids, sources said. The gasoline is to load from San Vicente and Quintero on Sep 5-10, sources said. The awarding of the tenders could not be immediately confirmed with the two parties, but it was learned the tender price was based off the US Gulf Coast 87 unleaded price based on published prices.

### U.S. Gulf Coast

| | | Waterborne | Pipeline |
|---|---|---|---|
| 9.0 RVP—Supplemental Summer | | | |
| | Unl 87 | +182.80-183.80+ | +182.30-183.30+ |
| | Unl Midgrade 89 | +184.40-185.60+ | +183.90-185.10+ |
| | Prem Unl 93 | +186.80-188.30+ | +186.30-187.80+ |
| 7.8 RVP | | | |
| c/Gal | Unl 87 | +184.05-185.05+ | +183.55-184.55+ |
| | Unl 87 RFG* | +187.55-188.55+ | +187.05-188.05+ |
| | Unl 89 | -188.45-189.45+ | -187.95-188.95+ |
| | Unl 89 RFG* | +191.55-192.55+ | +191.05-192.05+ |
| | Prem Unl 93 | -195.05-196.05 | -194.55-195.55 |
| | Prem Unl 93 RFG* | +197.55-198.55+ | +197.05-198.05+ |
| | RBOB 83.7* | | +184.55-185.55+ |
| | RBOB 91.4* | | -195.55-196.55 |
| 7.0 RVP | Unl 87 ULS 30 "Atlanta" | | +188.55-189.55+ |
| | Prem Unl 93 ULS 30 "Atlanta" | | +205.55-206.55+ |
| | MTBE | 290.00-320.00+ | |
| | Alkylate** | +26.00-27.00- | |
| | Naphtha | +167.55-168.55+ | |
| | Naphtha Barge | +168.55-169.55+ | |
| | Hvy Naphtha | +170.55-171.55+ | |
| | Hvy Naphtha Barge | +171.55-172.55+ | |
| | Jet/Kero 54 | +192.90-193.30- | +192.40-192.80- |
| | Jet/Kero 55 | -194.80-195.30- | -194.30-194.80- |
| | No. 2 | +184.60-184.85+ | +184.10-184.35+ |
| | LS Diesel | +189.55-189.80+ | +189.05-189.30+ |
| $/Bbl | No. 6 1.0%S 8 API | +43.25-43.75+ | |
| | No. 6 1.0%S 6 API | +48.75-49.25+ | |
| | No. 6 3.5%S | +40.45-40.85+ | |
| | No. 6 3.0%S | +40.45-40.85+ | |
| | No. 6 3.0%S Pap. 1st M | -41.15-41.25- | |
| | No. 6 3.0%S Pap. 2nd M | -41.35-41.45- | |
| | No. 6 3.0%S Pap. Qtrly | 41.75-41.85 | |

**=RVP=13.5 Gasoline assessments reflect cycle 25. No.2 assessments reflect cycle 24. L/S No.2 assessments reflect cycle 25. Jet 54 assessments reflect cycle 25. Jet 55 assessments reflect cycle 25. **=Premium to Gulf Coast waterborne Unl 87.*

### U.S. Gulf Coast Half-Cycle

| | Cycle | Front Half | Back Half |
|---|---|---|---|
| **Gasoline 7.8 RVP** | | | |
| Unl-87 Prompt | 25 | +183.55-184.55+ | +183.55-184.55+ |
| Unl-87 Next | 26 | -182.55-183.05- | -182.55-183.05 |
| Unl-87 After Next | 27 | +182.05-182.55+ | +182.05-182.55+ |
| Prem 93 Prompt | 25 | -194.55-195.55 | -194.55-195.55+ |
| Prem 93 Next | 26 | -193.55-194.05- | -193.55-194.05- |
| Prem 93 After Next | 27 | 193.05-193.55+ | 193.05-193.55+ |
| **Reformulated 13.5 RVP** | | | |
| RFG 87 Prompt | 25 | +187.05-188.05+ | +187.05-188.05+ |
| RFG 87 Next | 26 | -186.05-186.55- | -186.05-186.55 |
| RFG 87 After Next | 27 | +185.55-186.05+ | +185.55-186.05+ |
| RFG 93 Prompt | 25 | +197.05-198.05+ | +197.05-198.05+ |
| RFG 93 Next | 26 | -196.05-196.55- | -196.05-196.55 |
| RFG 93 After Next | 27 | +195.55-196.05+ | +195.55-196.05+ |
| **Supplemental 9.0 RVP** | | | |
| Unl-87 Prompt | 25 | +182.30-183.30+ | +182.30-183.30+ |
| Unl-87 Next | 26 | -181.80-182.30 | +181.80-182.30+ |
| Unl-87 After Next | 27 | +181.30-181.80+ | +181.30-181.80+ |
| Prem 93 Prompt | 25 | +186.30-187.80+ | +186.30-187.80+ |
| Prem 93 Next | 26 | +185.80-186.30+ | +185.80-186.30+ |
| Prem 93 After Next | 27 | +185.30-185.80+ | +185.30-185.80+ |
| **Distillates** | | | |
| No. 2 Prompt | 24 | NA-NA | +184.10-184.35+ |
| No. 2 Next | 25 | +184.55-185.05+ | +184.55-185.05+ |
| No. 2 After Next | 26 | +184.80-185.30+ | +184.80-185.30+ |
| Jet Kero Prompt | 25 | +192.40-192.80- | +192.40-192.80- |
| Jet Kero Next | 26 | +192.80-193.30+ | +192.80-193.30+ |
| Jet Kero After Next | 27 | +193.05-193.55+ | +193.05-193.55+ |
| LS Diesel Prompt | 25 | +189.05-189.30+ | +189.05-189.30+ |
| LS Diesel Next | 26 | +189.20-189.40+ | +189.20-189.40+ |
| LS Diesel After Next | 27 | +189.30-189.55+ | +189.30-189.55+ |

### Chicago Pipeline

| | | |
|---|---|---|
| 9.0 RVP | | |
| c/Gal | Unleaded 87 | -192.05-192.55- |
| | Unleaded 89 | -193.25-193.75- |
| | Prem. Unl 93 | -195.05-195.55- |
| | RBOB | -203.55-204.05- |
| | Jet Fuel | +194.80-195.05+ |
| | No. 2 | +188.55-189.30+ |
| | LS Diesel | +191.05-191.80+ |
| | Ethanol (terminal) | 205.00-207.00 |

### Group Three

| | | |
|---|---|---|
| 9.0 RVP | | |
| c/Gal | Unleaded | +202.60-203.10+ |
| | Prem. Unleaded | +210.10-210.60+ |
| | No. 2 | +187.20-187.70+ |
| | LS Diesel | +190.70-191.20+ |
| | Jet Fuel | +195.70-196.20+ |

## Product Price Assessments

### West Coast Pipeline — Prices effective 24Aug05

| California | | Los Angeles(a) | San Francisco(b) |
|---|---|---|---|
| c/Gal | Unl 87 | +203.75-204.25+ | +200.75-201.25+ |
| | Prem Unl 91 | +216.00-216.50+ | +213.00-213.50+ |
| | CARBOB Unl | +206.25-206.75+ | +203.25-203.75+ |
| | CARBOB Prem | +218.50-219.00+ | +215.50-216.00+ |
| | Jet Fuel | +202.75-203.50+ | +202.75-203.50+ |
| | LS (EPA) Diesel | +203.75-204.00+ | +206.75-207.00+ |
| | CARB Diesel | +206.50-207.00+ | +209.50-210.00+ |
| $/MT | 180 cst | 284.00-289.00 | 290.00-291.00 |
| | 380 cst | +275.00-277.00+ | +270.00-275.00+ |
| Differential to NYMEX | | | |
| | CARBOB | 13.75-14.25 | |
| | CARBOB Paper 1-mo | 17.50-18.50 | |
| | CARBOB Paper 2-mo | 18.00-19.00 | |
| | Jet Fuel | 12.50-13.00 | |
| | LS (EPA) Diesel | 13.25-13.75 | |
| | CARB Diesel | 16.25-16.75 | |

### Other West

| | | Phoenix(j) |
|---|---|---|
| | CBG/RBOB Unl | +213.75-214.25+(e) |
| | CBG/RBOB Prem | +226.00-226.50+(g) |

### Southern California Rail Car Assessments

| | |
|---|---|
| Ethanol Prompt 7-14 days | 190.00-198.00+ |
| Ethanol Forward 15-30 days | 190.00-198.00+ |

### North California Rail Car Assessments

| | |
|---|---|
| Ethanol Prompt 7-14 days | 190.00-198.00+ |
| Ethanol Forward 15-30 days | 190.00-198.00+ |

### Northwest

| | | Portland(c) | Seattle(d) |
|---|---|---|---|
| c/Gal | Unl 87 | +208.00-208.50+ | +207.00-207.50+ |
| | Prem Unl 92 | +220.25-220.75+ | +219.25-219.75+ |
| | Jet Fuel | | +202.75-203.50+ |
| | LS (EPA) Diesel | +215.75-216.25+ | +214.75-215.25+ |
| $/MT | 180 cst | 322.00-324.00 | 322.00-323.00 |
| | 380 cst | +287.00-291.00+ | 281.00-283.00 |

*WEST COAST PIPELINE NOTES: (a)=RVP is 9.00; CARBOB RVP is 5.99;Clear reflects Arizona/Las Vegas specs. (b)=RVP is 7.80; CARBOB RVP is 5.99; Clear reflects Nevada specs.(c)=RVP is 7.80 (d)=RVP is 9.00. (e) = CBG 87.(g) = CBG 91.(j)=RVP is 7.00.*

### West Coast Waterborne — Prices effective 24Aug05

| | | |
|---|---|---|
| c/Gal | Unl 87 | +202.75-203.75+ |
| | Jet Fuel | +201.75-202.25+ |
| $/Bbl | Gasoil 0.05%S | +85.00-85.25+ |
| | No. 6 0.5%S | +44.75-45.00 |
| | No. 6 1.0%S | +43.50-43.75 |
| | No. 6 2.0%S | +42.50-42.75 |

### Caribbean Cargoes, FOB

| | | $/MT | c/Gal |
|---|---|---|---|
| | Naphtha | +593.69-597.32+ | +163.55-164.55+ |
| | Jet Kerosene | +631.80-633.10- | +194.40-194.80- |
| | Gasoil | +575.36-576.14+ | +185.60-185.85+ |
| $/Bbl | No.6 2.0%S | +36.25-36.50+ | |
| | No.6 2.8%S | +35.95-36.20+ | |

### Latin America, FOB

| $/Bbl | | | |
|---|---|---|---|
| **Argentina** | | **Ecuador** | |
| Gasoline84 | +72.68-73.10+ | FO1.5%S | +37.78-37.88+ |
| Gasoil | +78.00-78.11+ | FO2.2%S | +37.40-37.60+ |
| FO0.7%S | 44.00 -44.75 | **Peru** | |
| **Brazil** | | Naphtha | +68.06-68.08+ |
| FO0.5-0.6%S | 41.75 -42.25 | FO1.6%S | 40.00 -40.05 |
| **Colombia** | | FO2.0%S | 40.25 -40.30 |
| FO1.6%S | 41.50 -42.00 | | |

### Arab Gulf, FOB

| $/M T | | $/Bbl | |
|---|---|---|---|
| Naphtha | +528.25-532.85+ | Kerosene | +74.30-74.34+ |
| Naphtha LR2 | +534.83-538.83+ | Kerosene LR2 | +74.88-74.91+ |
| HSFO 180 cst | +291.27-291.31+ | Gasoil 0.05%S | +73.19-73.23+ |
| HSFO 380 cst | +273.51-273.55+ | Gasoil 0.25%S | +68.74-68.78+ |
| 95 RON Unleaded | +72.91-72.95+ | Gasoil | +68.24-68.28+ |
| | | Gasoil LR2 | +68.85-68.89+ |

### Asia

| | | C&F Japan | Singapore* | C+F Australia |
|---|---|---|---|---|
| $/Bbl | Mogas Unl | +77.96-78.00+ | | |
| | Mogas 92 Unl | | +75.28-75.32+ | +80.31-80.35+ |
| | Mogas 95 Unl | | +75.98-76.02+ | +81.01-81.05+ |
| | Mogas 97 Unl | | +77.43-77.47+ | |
| $/MT | MTBE | | 670.00-680.00 | |
| | Naphtha | +566.75-570.75+ | +61.18-61.22+ | |
| | Naphtha 30-45 | +573.75-574.25+ | | |
| | Naphtha 45-60 | +570.25-570.75+ | | |
| | Naphtha 60-75 | +566.75-567.25+ | | |
| $/Bbl | Jet Kerosene | +78.69-78.73+ | +76.82-76.85+ | +81.91-81.95+ |
| | Gasoil | +76.95-76.99+ | | |
| | Gasoil 0.05%S | | +74.95-74.99+ | +80.35-80.39+ |
| | Gasoil 0.25%S | | +72.80-72.84+ | +78.20-78.24+ |
| | Gasoil 0.5%S | | +70.90-70.94+ | +76.30-76.34+ |
| | Gasoil 50ppm | | +76.05-76.09+ | +81.45-81.49+ |
| | Gasoil 50ppm 0.5% | | +2.36-2.40+ | |
| | LSWR Mixed/Cracked | | +53.20-53.30+ | |
| | Naphtha Pap. (Bal Month) | | NA-NA | |
| | Naphtha Pap.(SEP ) | | +60.63-60.67+ | |
| | Naphtha Pap.(OCT ) | | +59.93-59.97+ | |
| | Kerosene Pap.(Bal Month) | | NA-NA | |
| | Kerosene Pap.(SEP ) | | +79.38-79.42+ | |
| | Kerosene Pap.(OCT ) | | +81.58-81.62+ | |
| | Gasoil 0.5% Pap.(Bal Month) | | NA-NA | |
| | Gasoil Pap.(SEP ) | | +73.56-73.59+ | |
| | Gasoil Pap.(OCT ) | | +75.86-75.89+ | |
| $/MT | FO 180 cst 2% | | +306.39-306.43+ | |
| | HSFO 180cst | +316.04-316.08+ | +304.34-304.38+ | |
| | 180cst Disc/Premium | | —0.75—0.35- | |
| | HSFO 380cst | | +286.58-286.62+ | |
| | HSFO 180cst Pap (Bal Month) | | NA-NA | |
| | HSFO 180cst Pap.(SEP ) | | +304.98-305.02+ | |
| | HSFO 180cst Pap.(OCT ) | | +303.23-303.27+ | |

**Singapore Naphtha priced in $/Bbl*

### Asia Product Premium/Discount Assessments

| | MOP Singapore | MOP Arab Gulf | MOP Japan |
|---|---|---|---|
| Jet | —2.69—2.66- | +1.58-1.62+ | |
| Gasoil 0.25%S | +-0.89—0.85+ | 1.48- 1.52 | |
| Gasoil Reg 0.5% | +-2.79—2.75+ | 0.98- 1.02 | |
| 380 CST | -3.00—2.50 | -17.00—16.00 | |
| Naphtha | 0.45- 0.55 | | 5.00- 6.00 |
| LSWR | -0.50- 0.00 | | |

### China

| $/MT | South China FOB | South China, C&F | Hong Kong |
|---|---|---|---|
| Unl 90 RON | +547.25-551.25+ | | |
| Unl 93 RON | +555.75-559.75+ | | |
| Jet Kerosene | | +630.85-634.85+ | |
| Gasoil 0.2% | | +560.40-564.40+ | |
| Gasoil L/P 0.5%S | | +553.70-557.70+ | |
| Fuel Oil 180 cst | | | +320.00-322.00+ |
| Fuel Oil 380 cst | | +295.60-296.00+ | +307.00-309.00+ |
| Marine Diesel | | | +525.00-530.00+ |

## Platts Euro denominated product assessments

| Cargoes CIF NWE/Basis ARA (Euro/mt) | | Barges FOB Rotterdam (Euro/mt) | |
|---|---|---|---|
| Prem Unl | 528.37 - 529.18 | Prem Unl | 524.91 - 525.73 |
| Nap Phy | 446.88 - 447.28 | 10 PPM | 504.19 - 504.59 |
| Jet | 523.70 - 524.51 | Gasoil 0.2% | 484.47 - 485.29 |
| | | 3.5% | 218.26 - 218.66 |

| Cargoes FOB NWE(Euro/mt) | |
|---|---|
| 1% | 225.37 - 226.18 |
| **Conventional cargoes NY harbor (Euro/gallon)** | |
| Unleaded 87 0.3% | 151.36 - 152.17 |
| Unleaded 89 0.3% | 162.58 - 163.23 |
| Unleaded 93 0.3% | 179.40 - 179.81 |
| No. 2 | 148.35 - 148.55 |

*Euro/US$ forex rate: 1.2302 .Platts Euro denominated European & US product assessments are based on market values and a Euro/US$ forex rate at 5:30 PM local London time.*

## Subscriber note

Effective October 1, 2005, Platts proposes to advance by one hour the timings for its European market-on-close assessment processes. From that date, Platts will reflect values at 16:30 London time, rather than 17:30 London time currently, in its assessments for crude oil, European oil products, oil derivatives and the main petrochemical products. Editorial processes and protocols preceding the MOC assessment, including time cutoffs for submission of new bids and offers and for making incremental price changes, will also be advanced by one hour. For comments or questions please contact Peter_stewart@platts.com, annalisa_jeffries@platts.com and jorge_montepeque@platts.com.

## Crude price assessments ($/bbl)

### International

*Swaps

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Brent (SEP) | +65.81-65.85+ | Dubai (OCT) | +58.24-58.26+ | Dubai (SEP)* | +59.18-59.22+ | MOG Diff (AUG)* | 0.43- 0.47 | MOG (SEP)* | +59.70-59.74+ |
| Brent (OCT) | +65.92-65.94+ | Dubai (NOV) | +59.19-59.21+ | Dubai (OCT)* | +59.53-59.57+ | MOG Diff (SEP)* | -0.50-0.54- | MOG (OCT)* | +59.72-59.76+ |
| Brent (NOV) | +66.48-66.52+ | Dubai (DEC) | +59.54-59.56+ | Dubai (NOV)* | +59.88-59.92+ | MOG Diff (OCT)* | +0.17-0.21+ | MOG (NOV)* | +60.78-60.82+ |
| Brent (DTD) | +65.82-65.88+ | Brent EFP (SEP) | NA- NA | BRENT/WTI 1st | —1.02—1.00- | MOG Diff (NOV)* | 0.88- 0.92 | Oman MOG (OCT) | —0.39—0.35- |
| NS Basket | +66.01-66.05+ | Brent EFP (OCT) | 0.02-0.04- | BRENT/WTI 2nd | —1.23—1.21- | Oman (OCT) | +59.36-59.38+ | Oman MOG (NOV) | —0.22—0.18- |
| DTD NSL | +65.82-65.88+ | Brent EFP (NOV) | 0.01-0.03- | BRENT/WTI 3rd | —1.47—1.45- | Oman (NOV) | +60.59-60.61+ | Oman MOG (DEC) | —0.12—0.08- |
| | | | | | | Oman (DEC) | +61.13-61.15+ | | |

### North Sea

| | | Spread vs fwd DTD Brent |
|---|---|---|
| NS DTD Strip | +65.44-65.46+ | |
| Forties | +66.33-66.36+ | 0.89-0.90 |
| Ekofisk | +64.88-64.92+ | -0.56—0.54 |
| Statfjord | +66.13-66.17+ | 0.69-0.71 |
| Oseberg | +65.88-65.92+ | 0.44-0.46 |
| Flotta | +61.14-61.21+ | -4.30—4.25 |

### London

| | Brent CFD | Dated Swap |
|---|---|---|
| 1wk (OCT) | -0.42—0.40- | 65.50-65.54 |
| 2wk (OCT) | -0.57—0.55- | 65.35-65.39 |
| 3wk (OCT) | -0.41—0.39 | 65.51-65.55 |
| 4wk (OCT) | -0.27—0.25+ | 65.65-65.69 |
| 5wk (OCT) | -0.15—0.13+ | 65.77-65.81 |
| 6wk (OCT) | -0.03—0.01+ | 65.89-65.93 |
| 7wk (OCT) | 0.09-0.11 | 66.01-66.05 |
| 8wk (OCT) | 0.21—0.23 | 66.13-66.17 |

### Asia $/Bbl

| | |
|---|---|
| Brent (SEP) | +66.21-66.25+ |
| Brent (OCT) | +66.21-66.25+ |
| Brent (NOV) | +66.69-66.73+ |
| Brent/Dubai | +7.97-7.99+ |

### West Africa

| | | Spread vs fwd DTD Brent |
|---|---|---|
| WAF DTD Strip | +65.76-65.78+ | |
| Brass River | +67.84-67.90+ | 2.08 -2.12 |
| Forcados | +67.64-67.70+ | 1.88 -1.92 |
| Escravos | +67.51-67.58+ | 1.75 -1.80 |
| Qua Ibo | +67.81-67.88+ | 2.05 -2.10 |
| Bonny Light | +67.79-67.85+ | 2.03 -2.07 |
| Cabinda | +62.69-62.74+ | -3.03—2.98 |
| Angola DTD Strip | +65.71-65.72+ | |

### Canada

| | | Spread vs fwd DTD Brent |
|---|---|---|
| Can DTD Strip | +65.85-65.87+ | |
| Terra Nova | +65.36-65.46+ | -0.49—0.41 |
| Hibernia | +66.06-66.16+ | +0.21- 0.29+ |

### Mediterranean

| | Urals CFD | Dtd Brent Swap |
|---|---|---|
| 1mo(Sep) | +60.02/60.13+ | —+5.80/-5.75+ |
| 2mo(Oct) | +60.22/60.33+ | ——5.60/-5.55- |

| | |
|---|---|
| WTI(SEP) | +67.12-67.16+ |
| WTI(OCT) | +67.37-67.41+ |
| WTI(NOV) | +68.09-68.13+ |

### Mediterranean

| | | Spread vs fwd DTD Brent |
|---|---|---|
| MED DTD Strip | +65.47-65.48+ | |
| Urals (Rdam) | +58.42-58.48+ | -7.05—7.00 |
| Urals (Med) | +58.82-58.88+ | -6.65—6.60 |
| Urals FOB Ven | +57.41-57.47+ | —8.06—8.01- |
| Urals FOB Novo | +57.85-57.91+ | —7.62—7.57- |
| Urals FOB Novo 80Kt | +57.63-57.69+ | +-7.84—7.79+ |
| Urals (RCMB) | +59.17-59.28+ | |
| Iran Lt (Sidi) | +62.76-62.83+ | -2.71—2.65 |
| Iran Hvy(Sidi) | +60.51-60.58+ | -4.96—4.90 |
| Es Sider | +61.42-61.48+ | -4.05—4.00 |
| Siberian Lt | +62.57-62.63+ | -2.90—2.85 |
| Saharan Bld | +65.62-65.68+ | -0.15—0.20- |
| Azeri Lt | +66.67-66.73+ | 1.20- 1.25 |
| Azeri Lt FOB | +65.82-65.88+ | -0.35—0.40- |
| Suez Blend | +57.09-57.15+ | -8.38—8.33 |
| Kirkuk | +57.99-58.05+ | -7.48—7.43 |
| Kumkol | +66.02-66.08+ | 0.55- 0.60 |
| Zarzaitaine | +65.87-65.93+ | 0.40- 0.45 |
| Syrian Hvy | +52.02-52.08+ | —13.45—13.40- |
| Syrian Lt | +61.42-61.48+ | —4.05—4.00- |
| CPC Blend CIF | +64.42-64.48+ | —1.05—1.00- |
| CPC Blend FOB | +63.62-63.68+ | —1.85—1.80- |
| CPC FOB 80KT | +63.43-63.49+ | +-2.04—1.99+ |

### Pacific Rim $/Bbl

| | |
|---|---|
| Pap.Tapis (SEP ) | +69.61-69.65+ |
| Pap.Tapis (OCT ) | +68.61-68.65+ |
| Labuan | +70.06-70.10+ |
| Miri | +70.01-70.05+ |
| Gippsland | +67.11-67.15+ |
| Daqing | +60.86-60.90+ |
| Shengli | +55.45-55.49+ |

** Spread vs NW Shelf*

| | | Spread vs NW Shelf |
|---|---|---|
| Tapis | +69.61-69.65+ | 0.95-1.05 |
| Griffin | +67.11-67.15+ | +-1.55—1.45+ |
| Cossack | +67.06-67.10+ | +-1.60—1.50+ |
| Kutubu | +66.96-67.00+ | +-1.70—1.60+ |
| Nanhai | +66.81-66.85+ | +-1.85—1.75+ |
| BachHo | +63.70-63.74+ | —1.55—1.45- |
| Nile Blend | +57.81-57.85+ | -3.40—3.30 |

| | | Spread vs OSP |
|---|---|---|
| Minas | +63.76-63.80+ | 0.65-0.75 |
| Attaka | +67.57-67.61+ | 0.95-1.05 |
| Ardjuna | +63.82-63.86+ | 0.25-0.35 |
| Handil Mix | +63.12-63.16+ | 0.10-0.20 |
| Senipah | +66.36-66.40+ | -3.35—3.25 |
| NWShelf* | +66.49- 66.53+ | -5.05—4.95 |
| Murban | +63.86-63.90+ | -0.04/0.08- |
| Qatar Land | +63.02-63.06+ | -0.05/ 0.05 |
| QatarMarine | +59.70-59.74+ | -0.20/-0.10 |
| Ras Gas | +64.53-64.57+ | +4.95/5.05+ |

| | | Spread vs OSP |
|---|---|---|
| Cinta | +58.87-58.91+ | 0.40-0.50 |
| Duri | +54.95-54.99+ | 1.35-1.45 |
| Widuri | +58.77-58.81+ | 0.40-0.50 |
| Belida | +67.29-67.33+ | 0.90-1.00 |
| Banoco | +56.68-56.71+ | -0.95/-0.85 |
| Lower Zakum | +63.93-63.97+ | -0.03/0.13- |
| Upper Zakum | +59.10-59.14+ | -0.75/-0.65 |
| Umm Shaif | +63.25-63.29+ | 0.05/ 0.15 |
| Al Shaheen | +57.43-57.47+ | -2.15/-2.05 |

### United States $/Bbl

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WTI(SEP) | +67.27-67.29+ | WTI EFP(SEP) | NA/ NA | Mars (SEP) | +58.99-59.01+ | Mars/WTI (SEP) | -8.29—8.27 | P-Plus WTI | +2.81-2.83+ | Kern River | +57.79-57.81+ |
| WTI(OCT) | -67.44-67.47- | WTI EFP(OCT) | 0.00/ 0.01 | Mars (OCT) | -59.36-59.39- | Mars/WTI (OCT) | -8.09—8.07 | P-5 WTI | 64.06 | Thums | +59.19-59.21+ |
| WTI(NOV) | -68.15-68.16- | WTI EFP(NOV) | 0.00/ 0.01 | Mars (NOV) | -60.04-60.06- | Mars/WTI (NOV) | -8.11—8.10 | WTI-Delta | +0.45—0.43+ | Line 63 | -63.31-63.35- |
| | | | | | | | | | | P-Plus Line 63 | 1.44-1.46 |

| | | Spread vs WTI |
|---|---|---|
| WTI Midland | -67.46-67.50- | 0.19-0.21 |
| LLS | -67.98-68.02- | 0.71—0.73 |
| HLS | -64.61-64.65- | -2.66—2.64 |
| WTS | -61.23-61.27- | -6.04—6.02 |

| | | Spread vs WTI |
|---|---|---|
| Poseidon | +60.76-60.80+ | -6.51—6.49 |
| Eugene Island | -63.54-63.62- | -3.73—3.67 |

| | | Spread vs WTI |
|---|---|---|
| Wyo.Sweet | -61.59-61.67- | -5.68—5.62 |
| ANS (Cal) | +64.51-64.55+ | -2.76—2.74 |
| Basrah Lt | -58.46-58.55- | -8.98—8.92 |
| Bonito | -63.79-63.87- | -3.48—3.42 |

### Latin America Crude $/Bbl

| | | Spread vs WTI |
|---|---|---|
| CanadonSeco | -58.64-58.72- | -8.80/-8.75 |
| Medanito | -66.69-66.77- | -0.75/-0.70 |
| Oriente | -56.19-56.27- | -11.25/-11.20 |
| Vasconia | -59.49-59.57- | -7.95/-7.90 |

| | | Spread vs WTI |
|---|---|---|
| Escalante | -58.39-58.47- | -9.05/-9.00 |
| Loreto | -55.19-55.27- | -12.25/-12.20 |
| CanoLimon | -61.94-62.02- | -5.50/-5.45 |
| Cusiana | -67.29-67.37- | -0.15/-0.10 |

| | | Spread vs WTI |
|---|---|---|
| Mesa30 | -61.04-61.12- | -6.40/-6.35 |
| SantaBarbara | -66.64-66.72- | -0.80/-0.75 |
| Marlim | -56.89-56.97- | -10.55/-10.50 |
| Napo | -50.14-50.22- | -17.30/-17.25 |

### Canadian Spot Crude Assessments

| | CDS/CM | US$/bbl | Spread vs Canada Basis |
|---|---|---|---|
| Lloyd Blend | -340.41-341.15- | +45.51-45.61+ | -22.25—22.15 |
| Mixed Sweet | -509.82-510.57- | +68.16-68.26+ | 0.40-0.50 |
| Light Sour Blend | -459.33-460.08- | +61.41-61.51+ | -6.35—6.25 |
| Condensates | -556.20-556.95- | +74.36-74.46+ | 6.60-6.70 |

**Canada Basis: see explanation at http:\\www.platts.com/oil/guidetospec/index.shtml*

### Canadian Postings Derived Crude Assessments

| | CDS/CM | US$/bbl |
|---|---|---|
| Par Crude | +506.40-508.40+ | +67.70-67.97+ |
| Mixed Lt. Sr | +452.50-454.50+ | +60.50-60.76+ |
| Bow River/Hardisty | +377.50-379.50+ | +50.47-50.74+ |
| Lt/Sr Cromer | +471.20-473.20+ | +63.00-63.26+ |
| Sr. Edmonton | +468.00-470.00+ | +62.57-62.84+ |
| Middale Cromer | +446.00-448.00+ | +59.63-59.89+ |

### Daily OPEC basket price ($/Bbl)

| | | |
|---|---|---|
| 24Aug | 58.90 | +0.75 |

Effective June 16, 2005, the daily OPEC basket price represents an index of the following 11 grades: Algeria's Saharan Blend, Indonesia's Minas, Iranian Heavy, Iraq's Basra Light, Kuwait's Export, Libya's Es Sider, Nigeria's Bonny Light, Qatar's Marine, Saudi Arabia's Arab Light, Murban of the UAE and Venezuela's BCF 17.

### Platts Euro denominated crude oil assessments (Euro/bbl)

| | | | |
|---|---|---|---|
| Dated Brent | NA- NA | WTI (SEP) | NA- NA |
| Urals (Mediterranean) | NA- NA | Mars (SEP) | NA- NA |

*Euro/US$ forex rate: 1.2302 .Platts Euro denominated crude oil assessments are based on market values and a Euro/US$ forex rate at 5:30 PM local London time.*

## Spot Tanker Rates

DIRTY

| Route | Size (MT) | WS | Rate ($/MT) | Route | Size (MT) | WS | Rate ($/MT) |
|---|---|---|---|---|---|---|---|
| Carib/USAC | 70k | -142 | -7.04 | AG/Asia | 80k | +170 | +18.48 |
| Carib/USGC | 50k | +180 | +8.33 | AG/USGC | 270k | -63 | -14.48 |
| Med/Med | 80k | -140 | -4.96 | AG/Asia | 260k | -72 | -7.83 |
| Med/USGC | 80k | -156 | -18.16 | UKC/UKC | 80k | -147 | -6.42 |
| Med/USGC | 130k | +108 | +12.57 | UKC/USGC | 130k | +108 | +11.55 |
| WAF/USGC | 130k | +116 | +14.13 | UKC/USAC | 80k | 167 | 13.63 |

CLEAN

| *Route* | *Size* (MT) | *WS* | *Rate* ($/MT) | *Route* | *Size* (MT) | *WS* | *Rate* ($/MT) |
|---|---|---|---|---|---|---|---|
| Carib/USAC | 30k | +315 | +14.27 | AG/India | 30k | 373 | 17.08 |
| Carib/USGC | 30k | +315 | +15.06 | AG/Japan | 30k | 318 | 43.18 |
| Carib/UKC | 30k | 200 | 18.68 | AG/Japan | 55k | +240 | +32.59 |
| Med/UKC | 30k | +205 | +14.74 | AG/Japan | 75k | +212 | +28.79 |
| Med/USAC | 33k | 265 | 25.23 | UKC/UKC | 25k | 205 | 8.16 |
| Med/Med | 30k | +195 | +7.35 | UKC/USAC | 33k | +256 | +20.84 |
| Sing/HK | 30k | 450 | 15.00 | UKC/USGC | 33k | +256 | 18.90 |
| Sing/Japan | 30k | 280 | 19.18 | BSea/Med | 30k | +195 | +13.92 |

## Futures Settlements

| | Close | Low | High | Change | Volume* | Open Interest |
|---|---|---|---|---|---|---|
| **NYMEX Crude ($/Bbl)** | | | | | | |
| OCT | 67.49 | 66.40 | 67.70 | 0.17 | 98722 | 253800 |
| NOV | 68.19 | 67.30 | 68.45 | 0.18 | 34806 | 96417 |
| DEC | 68.72 | 67.85 | 68.95 | 0.21 | 30653 | 116582 |
| JAN | 69.13 | 68.35 | 69.35 | 0.24 | 6746 | 48204 |
| **NYMEX Brent ($/Bbl)** | | | | | | |
| OCT | 66.25 | 65.50 | 66.35 | 0.25 | 2256 | 1619 |
| NOV | 66.78 | 66.05 | 66.32 | 0.28 | 2813 | 2963 |
| DEC | 67.29 | 67.29 | 67.29 | 0.34 | 1608 | 3080 |
| JAN | 67.67 | 67.67 | 67.67 | 0.39 | 175 | 1532 |
| **NYMEX Heating Oil (cts/gal)** | | | | | | |
| SEP | 186.95 | 183.55 | 187.50 | 0.41 | 18887 | 25656 |
| OCT | 190.78 | 187.60 | 191.40 | 0.44 | 20969 | 66784 |
| NOV | 193.68 | 190.50 | 193.90 | 0.54 | 3961 | 21555 |
| DEC | 196.08 | 193.20 | 196.50 | 0.69 | 2398 | 23139 |
| **NYMEX unleaded gasoline (cts/gal)** | | | | | | |
| SEP | 196.37 | 192.20 | 197.00 | 3.79 | 22515 | 24307 |
| OCT | 187.79 | 184.00 | 188.00 | 1.76 | 21993 | 69630 |
| NOV | 184.04 | 181.00 | 184.00 | 0.91 | 5793 | 17914 |
| DEC | 181.84 | 178.50 | 182.00 | 0.81 | 3846 | 16874 |
| **NYMEX natural gas ($/MMBtu)** | | | | | | |
| SEP | 9.770 | 9.400 | 9.820 | -0.21 | 29954 | 36233 |
| OCT | 9.827 | 9.450 | 9.870 | -0.19 | 19250 | 88854 |
| NOV | 10.242 | 9.880 | 10.260 | -0.14 | 5326 | 51276 |
| DEC | 10.642 | 10.310 | 10.640 | -0.10 | — | 38627 |
| Total volumes: Crude, 194733; Brent 6852 ; | | | | | | |
| Heating Oil, 49902 ; Gasoline, 158167; Natural gas, 536273 | | | | | | |
| **IPE Brent ($/Bbl)** | | | | | | |
| OCT | 66.27 | 65.25 | 66.56 | 0.26 | 75680 | 107588 |
| NOV | 66.81 | 65.88 | 67.00 | 0.30 | 33240 | 96040 |
| DEC | 67.33 | 66.41 | 67.48 | 0.38 | 18175 | 45519 |
| JAN | 67.70 | 66.85 | 67.85 | 0.42 | 5290 | 24125 |
| **IPE Brent Weighted Average ($/Bbl)** | | | | | | |
| OCT (1) | 65.85 | | | | | |
| NOV (1) | 66.41 | | | | | |
| **IPE Gasoil ($/Mt)** | | | | | | |
| SEP | 597.50 | 592.00 | 603.75 | 7.25 | 14759 | 52300 |
| OCT | 600.25 | 595.00 | 606.00 | 7.50 | 9142 | 44949 |
| *NOV* | *603.50* | *598.50* | *608.50* | *7.50* | *2181* | *19997* |
| DEC | 607.00 | 602.75 | 611.25 | 8.00 | 2208 | 29049 |

*Total volumes: Brent, 137366 ;Gasoil, 30954 *— Volumes are prior day s figures.*

## Refinery Updates

—Gasoline and diesel production at **Tesoro's** 168,000 b/d Golden Eagle refinery in Martinez, California, was reduced Thursday as a fire Wednesday in the plant's lone fluid catalytic cracker was being investigated, a company spokeswoman said. The downed 66,500 b/d FCC is "part of the gasoline and diesel-making process," said the spokeswoman, at the San Antonio, Texas, headquarters of the western US independent refiner and marketer. The cause of the fire and its impact on the FCC was under investigation, the spokeswoman said. "We're really assessing the entire situation," she said. "It's too early to communicate how long the process will take." The fire began at about 4:15 p.m. PDT Wednesday (0228 GMT Thursday) and was extinguished at 5:05 p.m., the spokeswoman said. There were no injuries. Also in Martinez, a San Francisco Bay Area city near Oakland, a hydrogen plant was reported by market sources to be down at Shell's 157,600 b/d refinery since Tuesday. A Shell spokesman Wednesday would not comment on the status of that refinery.

## Schiehallion field resumes output: BP

*London*—BP said Aug 25 that Schiehallion, the UK's largest single oilfield, resumed production over the weekend after a three-week shutdown to repair damage caused by a fire. Output from the 120,000 b/d field, which lies west of the Shetland Islands in the Atlantic, will build up in the next few days.

BP closed the facility July 29 after a small fire in an air compressor at the field's production vessel forced some staff to be evacuated.

"All the repairs that would allow us to restart were finished," BP spokesman Richard Grant said. "The field is not quite up to full production," he said, without giving precise figures. "It will be another few days."

The outage at Schiehallion, which lasted longer than BP's initial expectation of a "matter of days," and closures at other fields in the UK and Norway has helped support world crude prices.

Schiehallion produces about 7% of daily UK oil output. While repairs to the air compressor were completed within days of the fire, BP on Aug 10 said a review of the area found some cabling nearby had also been damaged, requiring the company to extend the shutdown.

The outage came amid a spate of unplanned shutdowns at other UK and Norwegian fields. Norway's Statoil resumed oil output at its 35,000 b/d Veslefrikk field in the North Sea earlier this month. Shell shut down some 10,000 b/d of Brent crude production and around 10,000 Mcf/d of gas on Aug 19 after the discovery of an oil leak from the Brent Bravo platform, the second outage there in less than a month.

Oil from Schiehallion, which began production in July 1998, is taken by a dedicated shuttle tanker to the Sullom Voe export terminal in Shetland where it loads in up to 1-mil bbl cargoes alongside Brent crude for export. Schiehallion Blend is a heavy, low-sulfur crude with an API gravity of 26.3 degrees and 0.46% sulfur. There are usually around three to four loadings totaling around 3.5-mil bbl a month of the grade.—*Staff reports*

## PLATTS Index

| | | |
|---|---|---|
| Jet Kerosene | 387.05 | 4.02 |
| Gasoline | 297.11 | 3.89 |
| Gasoil | 387.83 | 3.34 |
| Naphtha | 376.51 | 4.12 |
| Resid | 340.26 | 1.75 |
| *Atlantic Sweet Crude* | *413.93* | *5.80* |
| Mediterranean Sour Crude | 404.59 | 6.87 |
| PG/Asia Crude | 422.24 | 12.33 |
| U.S.Pipeline Crude | 391.37 | -1.18 |

# Cross-Asia clean rates soften after China limits gasoline exports

*London/Houston*—In the cross-Asia 30kt market, the biggest story has been the changed policy from the Chinese government to limit the number of gasoline cargoes exported from its shores. Industry sources said China may have slashed exports of low octane gasoline by as much as three to seven cargoes in September amid an acute shortage of the material at the pumps in the country's south since early August.

That has led to several vessels cancelling their charter party and having to ballast back to Singapore minus their intended cargo. The shortage of gasoline in south China means the product will stay within the country.

Sources said freight rates could soften as the number of vessels around Singapore increases, and owners are reluctant to go to China. Indeed, on Thursday shipping sources said the reduction in gasoline exports from China during September has already caused a fall in freight costs for clean tankers returning to Singapore from north Asia. Freight costs fell by $20-30,000 for these "backhaul" journeys, as the lower volume of exports meant there were more vessels competing for cargoes. Freight costs for South Korea to Japan for a 30,000mt cargo (denoted as a lump sum rather than Worldscale) fell to around $370-380,000.

Several vessels have been forced to take other cargoes, some ballasting back to Singapore, as exports from China were withdrawn, shipping sources said. For example, the clean tanker Ming Ze Hu was due to take a gasoline cargo but the Chinese refiner Sinopec has told Heidenreich, which controls the vessel, that it will have to cancel. "Negotiations are ongoing," a well-placed source said. But the Singapore-Japan 30kt market remained relatively stable, moving from W275 to W280 over the week and Sing-Australia pegged at W415.

There has been little fluctuation in clean freight rates in key shipping markets this last week, but markets have in general been quite balanced so rates have maintained.

To the east of Suez, rates for LR1s increased marginally by 5 Worldscale points to W238 by Aug 24 with owners in bullish moods and pushing for W245-250 levels. There is a good deal of tonnage in the Arab Gulf but a lot of the vessels are built in the 1980s and there are only a handful of modern, naphtha-suitable ships left. This has led to owners asking for higher rates for mid-September dates. The LR2 AG-Japan market has remained stable at W210 with only a couple of fixtures at that level.

To the west of Suez, the trans-Atlantic market settled after a short period of sharp upward pressure. Rates were pegged at W250 for most of the week, firming to W253 by mid-week. There were a few cargoes reported open in the market but limited news of any fixtures to act as the reference. In the Mediterranean and Northwest European markets, rates were mainly unchanged, although activity had started to pick up slightly.

Caribbean clean rates for 30kt and 40kt ships also were relatively stable for most of the week in the Caribbean, but some losses in 38kt tanker rates weighed somewhat on the 30kt market. A 38kt vessel on Wednesday for travel from the Carib to the US Gulf/Atlantic coasts was heard fixed at W215, about 35 points lower than levels seen earlier in the week. The 30kt tanker market for clean products was less active in the Caribbean, but rates were talked at notionally weaker levels. The slump in freight rates was considered to be short-lived, given the recently buoyant UKC-US clean tanker market.

By region in **dirty tankers,** it was the Black and Mediterranean markets that saw the most significant movement. For 30kt cross-Med and Black Sea-Med voyages, rates gained 15 Worldscale points in the five days to Aug 24, while rates for Suezmaxes (135kt) gained 11 Worldscale points to finish the period at W118. But dirty overall markets were broadly flat and uneventful in the week to Aug 24, with no sharp movements seen for any key voyages or vessel sizes.

In the 30kt sector, market participants said one reason for the increase could have been due to a slight build up of delays for ships with an overall length of less than 200 meters, due to tunneling work under the Bosporus strait. This was said to have brought about a slight tightening of shipping availability in the region at a time when there has been a pick-up in enquiry from charterers. In Suezmax markets, the key reason for the firmer tone was said to be charterers working cargoes for laycans around Sept 10-15, with a very slight tightening of tonnage seen. Litasco, Clearlake and Alpine were said to be among the players looking for shipping.

Aframax markets were broadly flat over the period. Cross-Med rates were seen at W160, rising five points and dropping two. The ratio of ships versus cargoes was said to be well-balanced, but with some scope to move into charterers' favor going forward.

In VLCCs, players noted a widening gulf in rates for double-hull tankers compared to single-hull rates. Players said the reason was tightness of availability of double hulls relative to single hulls.

Aframax tanker rates slipped in the Caribbean this week as a glut of tonnage overwhelmed chartering demand. Rates for 70kt vessels from the Caribbean to the US Gulf/Atlantic Coasts fell from W170 on Monday to trade as low as W142.5 on Wednesday. Panamax rates for the Caribbean also fell notionally in line with Aframaxes, and Panamax freight rates for Ecuador to the US West Coast were also weaker due to the recent force majeure on Oriente cargoes from Petroecuador. However, no 50kt ships were fixed for that route, so the current tanker rates for Panamaxes off the west coast of South America were difficult to define.—*Paul Hailey, Alaric Nightingale, Suzanne LaFavers*

## Flooding in the Rhine eases

*Bonn*—Rhine flooding that halted shipping from Karlsruhe, Germany to Basle, Switzerland on Wednesday eased going into Thursday, waterway authorities reported Thursday. An all-clear for shipping over the affected 200-km stretch of the river came at around 0700 GMT Thursday. The weather outlook for key Rhine feeder areas in southwestern Germany and Switzerland foresees drier conditions the next few days, indicating that river levels will continue to fall in the south and that stretches to the north will not face flooding, German shipping agents said.

The flooding was at best a minor factor in a rise of roughly 10% in Rhine freight rates for barges from Rotterdam to German and Swiss Rhine ports this week, agents said. Rather, higher rates "seem to stem from product shortages at North Sea ports with a pick-up in demand by our customers," one agent said.

But flooding still has the German Danube closed to shipping with the main wave crest still to come for the 224-km navigable stretch of the German river, a Danube authority expert said Thursday. The wave will begin moving through the stretch at Kehlheim in the west overnight from Thursday to Friday. "It will be a couple of days before the crest moves through (the entire navigable stretch)," the expert said.

Austrian Danube authorities expect that spot stretch closures for shipping on the river still remain ahead, yet see the river staying under flood levels in most places as the crest diminishes. Thursday at 5 a.m. GMT the Danube was over flood levels at several stations between Linz in the west and Vienna in the east.

## Shell, BP evacuating ahead of Hurricane Katrina; Borco terminal halts loadings

*New York*—Shell and BP began evacuating personnel from the eastern Gulf of Mexico ahead of Hurricane Katrina, which was strenghtening as it moved toward southeastern Florida Aug 25.

Both majors said there was no impact on production from the removal of Gulf staff.

Shell Exploration and Production said it would evacuate about 120 non-essential personnel from its easternmost Gulf operations over the next two days. The company, in a notice on its website, said "while most forecast models indicate [Hurricane] Katrina will remain east of Shell's Gulf of Mexico operations, we will continue to treat the storm with caution."

Shell noted "these evacuations are a precuation," adding,"There is no impact on Shell-operated production as a result of [Hurricane] Katrina."

Other Gulf producers, such as Chevron and Murphy Oil, said they would continue to monitor the storm, but had taken no action on platform/rig staffing or production as of presstime.

Meanwhile, the Bahamas Oil Refining Co's (Borco) 14.5-mil bbl oil terminal in Freeport, Bahamas, has halted tanker operations as of late Wednesday due to very high, rough seas in the area after the passing of Tropical Storm Katrina, a source with the terminal said Thursday.

Four fuel oil tankers were affected by the marine weather disruption, the source said. "Three of those vessels are in the neighborhood," while the fourth had not yet arrived, the source said. Some vessels that were expected at Borco this week have altered their arrival times due to the weather and port closure.

Borco's land terminal operations continued Thursday, but sea berthings and all marine operations were suspended until further notice, the source said. "Operations were suspended last night," he said, adding the improvement of weather would dictate when operations will restart. "Winds and waves are high," the source said, adding that improvement in weather is not expected until sometime Friday.

BORCO is owned by Venezuela's PDVSA. It operates oil storage, fuel blending and marine facilities at Freeport, on Grand Bahama island.

Meanwhile, a source at the nearby South Riding Point (SRP) terminal told Platts the SRP port had been shut since late Wednesday. "Katrina has passed us already," the source said. "We [are] just getting the tail winds... but we have very high seas... Both ports closed and I suspect tomorrow [Borco and SRP] will be closed as well."

The source said there were no tanker delays to report so far due to the SRP closure. Two tankers are expected to arrive over the weekend.

The SRP terminal, located 35 miles east of Freeport in High Rock, Grand Bahama, is a 5.25-mil bbl facility that is used as a holding area for onward crude deliveries to North America and as a break-bulk point for transhipment operations.

The National Hurricane Center said the center of Katrina should be near or over the southeast Florida coast late Aug 25 or early Aug 26.—*Staff reports*

## China...from p. 1

rates to fluctuate within a plus/minus 8% range.

Retail gasoline guidance prices in Shandong were last raised July 23 by Yuan 0.05/liter to Yuan 3.97/liter for 90 RON, Yuan 4.23 for 93 RON and Yuan 4.47 for 97 RON. Gasoil also rose by Yuan 0.05/liter to Yuan 4.04.

The same day, wholesale gasoline prices were raised by Yuan 300/mt to Yuan 5,021/mt, Yuan 5,322/mt and Yuan 5,322/mt for 90 RON, 93 RON and 97 RON, respectively. Wholesale gasoil guidance price rose by Yuan 250/mt to Yuan 4,424/mt. But actual wholesale market trading prices are higher at Yuan 5,450-5,500/mt for 90 RON, Yuan 5,500-5,600/mt for 93 RON and Yuan 4,850-4,950/mt for gasoil. The 97 RON grade has not traded in recent days as there are simply no barrels being offered in the wholesale market, sources said (OPR 8/25).

The products shortage in China has been attributed to a number of factors. Some say the government-determined domestic prices are too low and are not providing enough incentive to refiners to supply the local market. Shandong's independent refiners, who crack straight-run fuel oil imported from Russia and South Korea to produce gasoil and gasoline, are also suffering a margin squeeze on account of runaway feedstock costs and capped prices for products. These refiners have a collective capacity of about 13.9-mil mt/yr.

They have forked out an average Yuan 3,137/mt in feedstock costs in August, compared with Yuan 3,023/mt in July and Yuan 2,927/mt in June. Some independent refiners have maintained runs at no higher than 70-80% of capacity, while others have simply suspended operations, traders said.

Independent retailers, meanwhile, are suffering from a lack of product from refiners and wholesalers as Sinopec and PetroChina have elected to channel all supplies to their own retail outlets, leaving the wholesale market high and dry.

Some observers say the refiners are holding back supplies in anticipation of another round of price hikes amid the soaring international oil market. The New York Mercantile Exchange's October WTI futures contract hit a fresh high of $68/bbl in after-hours trade Aug 24, after closing the New York session at a record $67.32/bbl.

Meanwhile, Beijing's pricing policies have come under fire since early this month when the artificially low domestic product prices forced refiners to scale back supplies to pumps, leading to an acute shortage of the material, especially in the economic powerhouse of Guangdong province.

The government has been slow to hike domestic prices despite soaring international prices to protect economic growth and keep a lid on inflation.

Chinese refiners processed 24.62-mil mt or 5.8-mil b/d of crude in July, the second-highest monthly crude throughput since the level last peaked in March 2005 at 24.68-mil mt, figures obtained from the National Bureau of Statistics showed Aug 25. July throughput was up 3.45% from June's 23.8-mil mt and was 7.44% higher on the year.

Gasoline output in July rose 10.75% from June to 4.53-mil mt while gasoil was up 5.9% to 9.31-mil mt, the data showed. Gasoil-to-gasoline output ratio inched lower to 2.06 last month, down from 2.15 in June as refiners adjusted their yields to produce more gasoline.—*Staff reports*

## NYMEX...from p. 1

4.1-mil bbl Sewaren, New Jersey, terminal from finished RFG to RBOB Oct 15.

Getty Oil is already supplying RBOB gasoline at its Newark, New Jersey, terminal, sources said. "We haven't done RFG there since 2003," a source close to Getty said earlier this week.

Meanwhile, NYMEX announced it expects to launch its open outcry trading floor in London Sep 12, offering Brent crude futures and options and Northwest Europe gasoil futures, "subject to final regulatory approval." NYMEX Europe filed its application with UK regulator Financial Services Authority Apr 7.

NYMEX said floor trading of the Brent futures contract in Dublin, which began in November 2004, will cease Sep 9.

A spokeswoman for the exchange said "we have the approval of FSA" to put out the statement on the start of London open outcry trade. "They don't anticipate any problems with our gaining final approval" by the start-up date.

The spokeswoman said the initial pits will accommodate 100 traders in Brent and 25 in gasoil.

In the exchange statement, Samuel Gaer, NYMEX Europe's CEO, said, "We are delighted to be able to offer the marketplace what it has asked for—open outcry trading in London."—*Gary Raynaldo, Robert DiNardo*