# Economic Price Adjustment in the Domestic Bulk Programs

**Issue** - Should the present two-step method of interim and final price adjustment (EPAs or escalators) for domestic bulk fuel contracts be changed to a one-step price adjustment based on current market price indications as published in trade journals? Or should the two-step method be modified to reduce bidder uncertainty with the present system?

**Background** The current system of price adjustment has been used since 1983. All offerors of product to DFSC are required to accept a method of price adjustment based on actual monthly sales price averages as published by the Department of Energy in the Petroleum Marketing Monthly (PMM). Because the PMM data is not published until the third month following the month for which the data is effective, interim billings are paid based on the movement of an interim escalator. The interim escalator is based on prices published in trade journals at the end of the month prior to delivery. Final adjustments in the billings are made according to differences between the interim and PMM (final) escalators, when the PMM is published. When market prices vary greatly from month to month, as they have over the last two years, the final billing adjustments can be substantial. The two-step billing process is administratively cumbersome, and has resulted in a number of contractor complaints over the past 3 years (see Tab A). In the words of one contractor, pricing uncertainty is such that, "we never know if we have made or lost money when you (DFSC) lift a cargo."

Best I can see its going to be the same for [illegible]

**Discussion** There are nine criteria by which proposed escalation systems can be judged, 1) product; 2) geography; 3) timing; 4) timeliness; 5) commonality; 6) independence from contractor influence; 7) basis in actual sales; 8) market risk; and 9) simplicity. The PMM-based system and the alternative trade journal-based systems are evaluated below, according to the criteria.

The current PMM-based system is preferable by three criteria: independence from contractor influence, sales basis, and market risk. Three other criteria, simplicity, timing, and timeliness, favor the switch to trade journals. By the criteria of product, geography, and commonality, there is no clear preference between the alternate systems.

Product - DFSC product prices should escalate with the prices of similar commercial fuels. Both the PMM and trade publications publish prices of the similar commercial products -mogas, jet kerosene, diesel fuels, residual fuels - which are used for bulk price escalation of JP-4, JP-5, and DFM prices. While neither the PMM nor the trade journals publish price data for naphtha-type jet fuel (Jet B or JP-4), escalators for this fuel are constructed by use of mogas and kerojet prices which represent the alternate use-value of the JP-4 blending components. A similar principle is used in the construction of prices and escalators for Navy Special Fuel Oil. Preference based on this criteria - none

Geography - DFSC product prices should escalate with prices of fuels in the geographical area where the requirements are located. PMM data is published on both a statewide and regional (multistate) basis. Trade publication prices are published for most large cities in the United States. Preference: none.

Timing - DFSC prices should escalate concurrently with commercial prices, not with a lead or lag. This reduces the possibility that contractors will build a contingency premium into their prices. PMM prices are available on a monthly basis, while trade journal prices are published on a daily or weekly basis for most fuels. Given that actual market prices change almost continuously, it is preferable for escalators to change more frequently than on a monthly basis. Preference: trade journals, with weekly or daily price adjustment.

Timeliness - Escalator prices should be available to DFSC and the contractors on or immediately following their respective effective dates. PMM prices are published during the third month following the month of effectiveness. Trade journal prices become available within a day to a week following their effective dates. The long lag on PMM availability is the reason why an interim billing system is used which employs trade journals. Preference: trade journals.

Commonality - Proposed escalators should be acceptable to both DFSC and the contractors for use as references. The PMM system has been used successfully in domestic bulk for three years. DFSC has been successful in obtaining commonality based on trade journals in ground fuels procurements and in overseas bulk programs. Preference: none.

Independent of Contractors - Both the PMM and trade journals are independent of control by DFSC contractors. Given their informal method of conducting market surveys, trade publication prices may be influenced by the moves of large market players who may be DFSC contractors. Although this has not been a general problem in ground fuels procurements where trade journals are routinely used for price escalation, there have been situations where questions have been raised regarding independence of the contractor's control. Since this may be a more serious problem in the bulk program, where DFSC contractors may be large market players, any proposed trade publication escalation system would require careful review of the system's susceptibility to manipulation by prospective contractors.

Basis in Actual Sales - The PMM is based on a mandatory DOE survey of actual sales by refiners and gas plant operators. This survey is subject to DOE audit, although actual audits are rarely performed. Trade journal prices are generally based on seller quotations rather than actual sales because the latter are not generally available to informal, private canvassers. These price series are not auditable. However trade journal prices are closely reflective of actual sales, as these price

How do Commercial Buyers & Sellers do business? (what escalator?)

series are closely correlated with PMM prices over time, particularly if prices are adjusted on a weekly basis (see graphs at Tab B). Contractor complaints about the performance of trade journal escalators have been received in the ground fuels program. Although nearly all of these complaints are unfounded, several complaints have been justified and have required substitution of a replacement economic price adjustment reference. Because trade journal data is a less direct measure of actual market sales, complaints concerning trade journals are more difficult to analyze and defend. Preference: PMM.

Market Risk - DFSC contract prices are susceptible to market risk if they escalate on indices which do not correlate well with actual sales prices. PMM prices are actual sales price averages. Although they generally track sales data quite well, trade journals are more variable in quality, and occasionally are replaced in those programs in which they are used due to poor performance in reflecting market conditions. In ground fuel procurements, a poorly performing escalator can be readily replaced with a substitute from another publication for most fuels in most locations. This would be true for bulk mogas and diesel requirements as well. However, only one trade journal has published jet kerosene prices for the last several years (Platt's Oilgram). While these jet fuel series closely correlate with actual sales, there is, as yet, no substitute publication available should the Platt's data series be discontinued or should it fail to continue to track the market. This potential problem affects both JP-4 and JP-5 escalation in CONUS. Oil Price Information Service has recently begun to publish jet fuel prices, but the reliability of this source will not be established until 12 months of historical data have been accumulated. This will occur by April 1988 in several localities. Preference: PMM.

Another aspect of market risk with trade journals concerns the relative speed with which their prices reflect actual market price changes. Given that the journals generally survey seller quotations, or "postings", some asymmetrical behavior may be expected. Sellers tend to raise postings quickly when actual prices are rising, and to resist lowering postings when actual prices are falling. Sellers may also lower prices by granting hidden discounts off of stable postings. Thus, one would expect that the use of trade journal prices for escalation would cost DFSC money through relative "price stickiness" during periods of declining prices. An analysis of alternative bulk escalation systems by DFSC-N (see attached study at Tab C) found some evidence of this potential problem in the behavior of trade journal prices over the 1984-86 period (which included a major price drop). The analysis assumed that the choice of escalation system had no effect on the level of the initial offer prices. Overpayment due to lagged declines in postings were offset by underpayments due to lagged increases when prices were adjusted weekly. Some evidence of downside stickiness was found in the analysis of twice-monthly and monthly changes. In these cases, over payments would have exceeded under payments and would have resulted in greater expense to the government. Weekly price changes did not suffer from this problem, in general.

Simplicity - Any escalation system should be simple to explain to contractors and simple for DFSC to administer. The trade journal-based system is clearly simpler than the PMM system.

The issue of simplicity is important when the problem of bid preparation is considered. Domestic bulk offerors must submit best-and-final prices which are effective for the month prior to receipt of best-and-final offers. This raises two problems: price timing and margin uncertainty. In the first case, some offerors may bid based on current prices rather than prior-month prices (See study at Tab D). If current prices are lower than prior-month prices (as in July 1986), the offeror's bid will be lower than if it were properly prepared. If market and bid prices are much lower, a mistake-in-bid may eventually be claimed by the offeror. On the other hand, if current prices are higher than the prior-month prices (as in January 1987) this offeror's bid price may be higher than it otherwise would be. It may be so high that it is not in line for award. In fact, price reasonableness of offers may become a serious issue if current prices are higher than prior-month prices, because bid prices will be compared to prior-month market ranges. If such offers are awarded, the government will be paying higher prices than if a simplified one-step escalation system is used. A switch to weekly escalation based on trade journals would enable current prices rather than prior-month prices to be bid and evaluated, and would greatly reduce this preparation problem.

The current method of escalation introduces another element of uncertainty into the bid preparation process. At the time of receipt of best-and-final offers, the offer price and the relationship (margin) between the interim escalator and the offer price is fixed. However, the margin between the offer price and the final escalator (PMM) is unknown and remains so for some two months following the receipt of best-and-finals. While the base value of the interim escalator is known, the relationship between the base values of the interim and final escalators is subject to statistical uncertainty. Because the margin between the offer price and the base final reference (PMM) determines the actual margin (and, thus, the actual price) for final billing purposes, offerors who are risk-averse may build a contingency premium into their offer price to protect themselves against uncertainty about the ultimate level of their margin. To the extent that offerors perceive this as a problem, the prices that the government pays for fuel will be higher than under a one-step escalation system based on trade journals. Recent experience and contractor comment suggest that both the margin problem and the bid preparation problem are real and significant.

Another way of reducing the problem of bid preparation would be to have offerors bid with prices effective with the most recent PMM available. Offerors on the recent East and Gulf procurement would have made their bids (in January 1987) effective in

October 1986 rather than December 1986 as was done during that procurement. This would have had the effect of eliminating margin uncertainty. The process would still have been susceptible to the generally upward market price movement over that period. In this case, however, at least one company was able to agree to a price reduction (when requested by DFSC-P), after the December PMM became available, in part as a result of margin certainty with December pricing. On the previous Inland and West procurement, one company reduced its offered volume when the June PMM became available prior to time of award, and actual June price levels were found to have been higher than this company assumed when it prepared its bid. In this case, the latest PMM at the time of receipt of best and final offers contained April prices. Under a modified bid process, offerors would have made their best and final prices effective in April rather than in June. Several individuals and contractors have suggested that DFSC modify its current system in this manner. The experience with the recent bulk procurements and with an analagous situation several years ago in an overseas procurement suggest that this is a feasible improvement on the current escalation system.

Decision Options

Option I - Maintain current two-step method of domestic bulk price escalation.

Pro - This system is already in use and contractors are familiar with it. There is no market risk to continuation of its use. DFSC prices are adjusted according to the movement of actual monthly sales price averages.

Con - This system is complex and a~~dministratively~~y cumbersome. There are 12 monthly escalations plus 12 monthly corrections. The problems associated with bid preparation probably result in additional expense to the U.S. Government. There will continue to be contractor complaints about the size of final payment adjustments. This system, by escalating on monthly averages, fails to reflect intramonthly price movements.

How much

Option II - Modify the current two-step escalation method so that offerors can establish their bid prices as effective with the month of the most recent PMM.

Pro - This system has the same advantages as Option I, and removes margin uncertainty from the offerors' bid preparation problem.

Con - This system has the same disadvantages as Option I, and forces the offeror to focus on a point two months further into the past when formulating the bid prices, thus possibly making the process even more susceptible to market price movement over the intervening period between the most recent PMM and the date of best and final offers.

Option III - Change to twice-monthly escalation using trade journals escalating with prices effective on the 1st and 15th of the month.

Pro - This system is administratively simpler than the current system (with 24 "final-only" escalations). There is no need for final billing adjustments. There is less need for contractors to build contingency premiums into their offer prices due to margin uncertainty.

Con - There is market risk associated with the move away from escalation on actual sales, particularly with respect to jet kerosene. Twice-monthly price changes do not track actual sales as well as weekly changes, so offerors may still add contingency premiums to their prices. There will likely be several contractor complaints each year about the short-term performance of these escalators.

Option IV - Change to weekly escalation using trade journals.

Pro - This system can be administered as easily as the identical system currently used in ground fuels. There is no need for final billing adjustments. The bid preparation problems would be virtually eliminated. Weekly price changes track actual sales better than monthly or twice-monthly price changes, because they better reflect the continuous nature of price movements in the marketplace. Thus there is even less need for contractors to build in contingency premiums as offer prices can be updated to the time of receipt of best-and-final offers.

Con - There is market risk associated with the move away from escalation on actual sales, particularly with respect to jet kerosene. There would be 52 price escalations per year, more than twice the number in Options I, II, and III. There will likely be several contractor complaints each year concerning the short term performance of these escalators.

Staff Recommendations:

Option II is favored by all of the interested directorates (DFSC-C, -G, -P, and -N). Should the implementation of Option II fail to alleviate the bidding difficulties, the issue can be revisited. In any event, the trade journal options do not appear to be truly viable before mid-1988 at the earliest.

UNITED STATES COURT OF FEDERAL CLAIMS

LA GLORIA OIL AND GAS COMPANY, :

Plaintiff, :

v. : No. 02-465C

THE UNITED STATES, : (Judge Hewitt)

Defendant. :

: Pages 1 - 59

\- - - - -

Deposition of Lawrence Ervin

Ft. Belvoir, Virginia

Monday, December 1, 2003

Reported by: Marian E. Cummings, Notary Public

Job No.: 156783

December 1, 2003

12:01 p.m.

Deposition of Lawrence Ervin, held the offices of:

Defense Energy Support Center

8725 John J. Kingman Road

Ft. Belvoir, Virginia 22060-6217

Pursuant to notice, before Marian E. Cummings, a Notary Public of the Commonwealth of Virginia.

APPEARANCES:

Mayer, Brown, Rowe & Maw
For the Plaintiff
1909 K Street, Northwest
Washington, D.C. 20006-1101
(202) 263-3208
BY: J. Keith Burt, Esq.
William L. Olsen, Esq.

*United States Department of Justice*
For the Defendant
Room 4050
1100 L Street, Northwest
Washington, D.C. 20530
(202) 616-2311
BY: Steve Gillingham, Esq.

Defense Energy Support Center
For the Defendant
Suite 1565
8725 John J. Kingman Road
Ft. Belvoir, Virginia 22060
(703) 767-5009
BY: Howard Kaufer, Esq.

Defense Supply Center
Richmond, Virginia
(804) 279-1423
BY: Donald Tracy, Esq.

CONTENTS

EXAMINATION OF LAWRENCE ERVIN PAGE
MR. BURT 6
-0-

EXHIBITS

ERVIN DEPOSITION EXHIBITS: PAGE:
(None)
-0-

P R O C E E D I N G S

Thereupon,

LAWRENCE ERVIN

the Witness, called for examination by counsel for the Plaintiff, and, after having been sworn by the notary, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. BURT:

Q Would you state your name for the record.

A Lawrence Calvin Ervin.

Q Mr. Ervin, what is your current position?

A I'm the chief of the market research office at the DECS.

Q And how long approximately have you held that position?

A Eight plus years.

Q And generally what are the responsibilities of that position?

A Well, overseeing an effort to -- we do interscreen, analyses of support of the procurement operations center, do support for price negotiation work in the pricing work done in contracting divisions.

There's a certain amount of affiliate work we do for contingency folks.

We actually manage the strategic petroleum program to the extent we're involved with the -- help the budget folks who work for the comptroller with their out year budget projections, price of oil in the future, forecasting, that sort of stuff. I think that I -- probably everything we do falls within that general description.

A The responses is often oral. And the document, it gets generated, provided to the person who asked it. We kind of rely heavily on the contract files to be the repository of that since it's, you know, sort of proprietary information.

Q The contract files meaning an office other than yours or is that a contract file in your office?

A No, we don't maintain contract files.

Q So when you provide some market analysis to the bulk fuels group in connection with their procurement and when that analysis is in writing do you keep a copy of what you give to the bulk fuels group?

A Well, I think the short answer to that is no and maybe something momentarily. Again, it would rely heavily on the contract file.

Q All right. Let's turn to page 6 of Plaintiff's Exhibit 2, request number 15 reads, "All documents relating to DESC's decision to use the PMM indexes, Platts, or OPIS as a basis for adjusting prices in its price adjustment clauses."

A Recollection was that '87 study which I believe you've been provided and a prior '84 study.

Q Can you generally describe those studies for
me?
A '84, '87 I was involved in producing and we
looked at comparing PMM versus Platts and OPIS and the
issue of SC escalating on a different time frame and the
documents looked at various things which are nice to
have in an escalator. They track -- the '87 study wound
up recommending making an adjustment to the PMM based
status quo at the time.
The '84 study which I did not prepare, my
understanding and recollection is that it's mainly, it
deals mostly with the move from the ELS to PMM which was
prior to 1985.
Q Where did you find those studies?
A Well, I didn't, I don't think I found the
first one.
Q Okay.
A The '84 one, and '87 I had basically on my
shelf.
Q Mr. Ervin, I believe that in approximately
1995 DESC switched from using Platts to using PMM as an
escalator to using Platts; is that correct?

A Sometime back in there, yeah.
Q Do you know whether there was any sort of any studies or analysis of reports prepared by your office in connection with that change from using the PMM to using Platts?
A Well, there wasn't because I was sitting in a room when the decision happened and it was made in response to some pressure from headquarters to do things differently. So the analysis is based on, basically is the analysis in the '87 study. Some people who have read the '87 studies that they would draw different conclusions than what was presented at the end of the study, certainly a close call. Analysis would have supported that as well so it's really the '87 study which is the basis for that move. That and some pressure from headquarters to, you know, be doing things differently and doing things different in a visible fashion to hopefully over the course of time produce substantial cost savings to the taxpayer.

DEFENSE LOGISTICS AGENCY
DEFENSE FUEL SUPPLY CENTER
CAMERON STATION
ALEXANDRIA, VIRGINIA 22304-6160

IN REPLY REFER TO DFSC-PPR

12 MAY 1995

SUBJECT: Request for Class Deviation and Permanent Coverage in DLAR

TO: AQPLL

1. As you requested, enclosed is a revised Memorandum for the Director of the DAR Council which addresses the one public comment received in response to the Economic Price Adjustment coverage published in the 28 February 1995 edition of the Federal Register.

2. We appreciate your prompt attention to this request. The point of contact for this office is Kerry Pilz, extension 45500, for any questions you may have.

Original Signed By

Encl

L. H. CARPENTER
Captain, SC, USN
Director, Contracting
and Production

MEMORANDUM FOR THE DIRECTOR OF THE DAR COUNCIL

I. PROBLEM:

By letters dated 8 January 1992 and 1 May 1992, the Director of Defense Procurement approved the Defense Fuel Supply Center's (DFSC) economic price adjustment (EPA) clauses as part of the regulatory relief task force review. These clauses, or variations, are in effect today. DFSC wishes to revise the clause used in its domestic bulk fuels programs. None of the three economic price adjustment types currently encompassed by the FAR are appropriate for many of the competitive procurements of commercial products undertaken by DFSC and other DLA contracting offices. The use of an EPA reference based on an individual contractor's established price or cost of materials is impractical for procurements under which indefinite quantity contracts will be issued. Unique EPA references for each offeror engender relative price variations during the delivery period, making it impossible to determine the most favorable offer at time of award. This creates a significant price risk for the Government and undermines the competitive process. Given the need for a common EPA reference, a reference that more closely follows market prices for the end item reduces price risk for both the Government and the contractor. Such references are also more in conformance with commercial practice.

II. RECOMMENDATION:

A class deviation, lasting longer than three years, should be incorporated into the DLAR. This deviation expands the use of EPAs based on established prices to encompass industry-wide and geographically based market price references and expands the use of EPAs based on indexes to encompass indexes for commercial products or services which are identical to or similar to the end products to be provided under the contract. The appropriate coverage in DLAR at 16.203 should read:

*16.203-1 Description*

*(a)(90) Adjustment based on established prices. Established prices may reflect industry-wide and/or geographically based market price fluctuations for commodity groups, specific supplies or services, or contract end items.*

*(c)(90) Adjustments based on cost indexes of labor or material. These price adjustments may also be based on increases or decreases in indexes for commodity groups, specific supplies or services, or contract end items.*

*16.203-3 Limitations*

*(90) A fixed price contract with economic price adjustment may also be used to provide for price adjustments authorized in this section.*

*16.204-4 Contract clauses.*

*(90) When the contracting officer determines that an existing EPA clause is not appropriate, the contracting officer may develop and use another EPA clause in accordance with 16.203-1(a)(90) or (c)(90). Established prices in such clauses need not be verifiable using the criteria in 48 CFR (FAR) 15.804-3. Established prices and cost indexes need not reflect changes in the costs or established prices of a specific contractor. The established price or cost index may be derived from sales prices in the marketplace, quotes, or assessments as reported or made available in a consistent manner in a publication, electronic database, or other form, by an independent trade association, Governmental body, or other third party independent of the contractor. More than one established price or cost index may be combined in a formula for economic price adjustment purposes in the absence of an appropriate single price or cost index.*

III. DISCUSSION:

A. Prior to FARS DEV 94-24, DFSC's current system of price adjustment for bulk petroleum had been used since 1987. All offerors of product to DFSC were required to accept a method of price adjustment based on actual monthly sales price averages as published by the Department of Energy in the *Petroleum Marketing Monthly* (PMM). Because the PMM data is not published until the third month following the month for which data is effective, interim billings are paid based on the movement of an interim escalator. The interim escalator is based on prices published in trade journals at the end of the month prior to delivery. Final adjustments in the billings are made according to differences between the interim and PMM (final) escalators when the PMM is published. When market prices vary greatly from month to month, the final billing adjustments can be substantial. In 1992, the Defense Management Review, as part of a review of all agency clauses, approved the use of the PMM-based EPA clauses. Our authority to use the PMM was reconfirmed by the Director of Defense Procurement in 1993.

B. The revised bulk fuels clause substitutes industry publications, a more current EPA basis, for the prior PMM methodology. This provides a number of advantages. First, it eliminates the need for double calculations of price adjustments, a significant savings to the government. Second, because of the time lag between interim and final billing, contractors likely build in a price cushion. It is probable that the Government would save money with contractors no longer having to include a cushion to cover them for price adjustments. Third, the new EPA method is more similar to the way adjustments are done commercially in that commercial publications are widely accepted by industry. Finally, the new method will be much simpler for all parties to use. The DFSC Office of Market Research and Analysis has studied the proposed EPA provisions and found them to be reliable bases for price adjustments. The publications are already used for EPA purposes in other DFSC programs.

C. DFSC has used the industry market price concept since the early 1980's and has found it to be a reliable method of price adjustment. It is unnecessary to review the deviation every three years as with most class deviations. Therefore, we request that the deviation be made permanent and be included in the DLAR.

D. Additional DFARS 201.402(3) Requirements.

1. This class deviation request has been reviewed and approved by the DFSC Office of Counsel.

2. This class deviation corresponds most closely with the deviation definition of FAR 1.401(c).

3. This is the first request for this class deviation to be published in the DLAR.

4. This class deviation was published in the Federal Register on 28 February 1995. It offered the public 60 days in which to comment on the proposed DLAR language. One public comment was received on 2 May 1995, after the expiration of the public comment period. DFSC, however, addresses the letter received from The National Security Industrial Association as follows.

The National Security Industrial Association is concerned that the EPA references chosen by the contracting officer might not reflect actual market prices and therefore, the price available to the contractor. They stated, "Such a situation could unfairly shift the risk of price uncertainty to the contractor."

DFSC responds that the commentor seems concerned about implementing the market price concept, not the concept itself. Because DFSC sucessfully used the market price EPA concept since the early 1980's, we do not believe that any concern is warranted. None of DFSC's contractors have filed comments regarding the proposal. In any event, DFSC's EPA clauses contain provisions for revising market price indicators, if the contracting officer finds a reference has been discontinued, or if it substantially and consistently fails to reflect market conditions. If these conditions occur, the parties may agree upon an appropriate substitute for the inadequate indicator. If the parties fail to reach agreement, the supplier can utilize the provisions contained in the DISPUTES clause of the contract. DFSC makes every effort to utilize market price indicators that consistently reflect actual market conditions. The National Security Industrial Association recognizes the benefit of such behavior by agreeing in its letter with the Government's statement in the Federal Register: "a reference that more closely follows market prices for the end item reduces price risk for both the Government and the contractor." Accordingly, the comment does not warrant revising the proposed DLAR coverage.

IV. COLLATERALS:

A. The proposed class deviation and DLAR coverage do not impose any paperwork burdens or informal collection requirements. Thus the Paperwork Reduction Act does not apply.

B. The proposed class deviation and DLAR coverage is not expected to have a significant impact on a substantial number of small entities within the meaning of the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.* since the elimination of interim billing will greatly simplify

administrative procedures required of contractors. A regulatory flexibility analysis, therefore, is not required.