IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LA GLORIA OIL AND GAS COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-465C |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to RCFC 56(h)(2), Plaintiff, La Gloria Oil and Gas Company ("La Gloria"), respectfully submits its response to Defendant's Proposed Findings of Uncontroverted Fact. La Gloria sets forth its response to each of Defendant's proposed findings of fact below.

1. Plaintiff, La Gloria Gas and Oil Company ("La Gloria") is a Delaware corporation with its principal place of business in Texas. Compl. ¶ 1. During the performance of the contracts at issue, La Gloria was a subsidiary of Crown Central Petroleum Corporation ("Crown"). Defendant's Exhibit ("Def. Exh.") 2.

**La Gloria's Response:**

Admits the allegations to the extent supported by the evidence cited.

2. DESC is a field activity of the Defense Logistics Agency ("DLA"), a component of the Department of Defense ("DoD"). 48 C.F.R. ("DFARS") § 202.1. Among other things, DESC (formerly called the Defense Fuel Supply Center, or "DFSC") purchases refined fuels for the military worldwide. Compl. ¶ 4, 6.

**La Gloria's Response:**

Admits the allegations to the extent supported by the evidence cited.

3. DESC issues annual requests for proposals ("RFPs"), and receives dozens of offers to fill the Government's bulk fuel products. Walker Decl. ¶ 2. No offer is sufficient to fill

the Government's needs. Id. Accordingly, DESC evaluates the proposals and awards contracts to a number of companies each year, based upon the lowest overall cost to the Government. Id.

**La Gloria's Response:**

Admits the allegations to the extent supported by the evidence cited.

4. Between 1993 and 1999, La Gloria entered into at least six DESC contracts in DESC's domestic bulk fuels program, pursuant to which La Gloria supplied DESC with JP-8 jet fuel. Walker Decl. ¶¶ 8-9. Under the contracts, La Gloria delivered more than 248 million gallons of jet fuel and was paid in excess of $137 million. Walker Decl. ¶ 11.

**La Gloria's Response:**

Admits the allegations in the first sentence to the extent supported by the evidence cited. Denies the allegations in the second sentence pursuant to RCFC 56(f).

5. JP-4 jet fuel is naphtha-based and was used primarily by the Air Force and the Army in aircraft. JP-8 jet fuel is kerosene-based and is similar in composition to commercial jet fuel (which is called "kerojet" or "Jet A"). Def. Exh. 48 ¶ 4. See Barrett Refining Corporation v. United States, 42 Fed. Cl. 128, 129 (1998). It is used in both aircraft and ground vehicles. Id.

**La Gloria's Response:**

Admits the allegations to the extent supported by the evidence cited.

6. La Gloria's contracts were competitively awarded through negotiated solicitations, pursuant to 48 C.F.R. ("FAR") part 15 ("Contracting by Negotiation"), and FAR part 12 ("Acquisition of Commercial Items"). Walker Decl ¶ 8. The base prices in La Gloria's contracts were determined to be reasonable based on adequate price competition or on established catalog or market prices of commercial items sold in substantial quantities to the general public. Id.

**La Gloria's Response:**

Denies the allegations pursuant to RCFC 56(f).

7. Virtually all of DESC's fuel supply contracts are of the "fixed price with economic adjustment" variety, see FAR subpart 16.203, and, therefore, contain an economic

price adjustment ("EPA") clause. Walker Decl. ¶ 4, 5. DESC has used several versions of agency-drafted clause B19.33, "Economic Price Adjustment - Published Market Price." Walker Decl. ¶¶ 4, 5.

**La Gloria's Response:**

Admits the allegations to the extent supported by the evidence cited.

8. DESC began using EPA clauses based upon crude oil costs in 1973, in response to increases in crude oil costs experienced by suppliers as a result of the Arab oil embargo. At that time, the Government had imposed controls upon the price of crude oil. After the price restraints were lifted, DESC gave suppliers the option of selecting an EPA clause based either upon actual crude oil costs, or upon market prices for similar products. In 1981, having concluded that allowing that choice presented too many administrative problems, including difficulties in evaluating and comparing bids that used different EPA indexes, DESC began using market-based indexes exclusively. DESC chose a refined product market index because that index was believed to closely mirror changes in refiners' costs, over time, although a given price index might not track costs over shorter periods. See Def. Exh. 4, 12.

**La Gloria's Response:**

Denies the allegations pursuant to RCFC 56(f).

9. For its domestic bulk fuels contracts, DESC's EPA clauses listed prices for various refined products and regions, taken from available market price publications. See, e.g., Def. Exh. 3 (parts A and D). For example, part D of EPA clause B19.33 provided a unique "reference price" (sometimes called a "base reference price") for each refined petroleum product sought in the RFP. Id. DESC's principal EPA clause (B19.33) listed prices for various refined products and regions, taken from a commercially available market publication. An offeror would propose a "base price" for each product offered. That price was subject to adjustment, based upon changes in the reference price. Specifically, B.19.33 provided that "[t]he prices payable under this contract for listed items shall be the base [proposal] price for the listed item increased or decreased by the same number of cents, or fraction thereof, that the reference price

increases or decreases per like unit of measure from the base reference price." Def. Exh. 3 (part D (c)). The base price was primarily for evaluation purposes, and as the base line from which price adjustments were made. Because the base price would be adjusted during performance, it was not the price the contractor received for fuel. Walker Decl. ¶ 6.

**La Gloria's Response:**

Denies the allegations in the first sentence that all of the listed prices were taken from commercially available market price publications. The PMM is not a commercially available market price publication. It is published by the Department of Energy. *Barrett Ref. Corp. v. United States*, 42 Fed. Cl. 128, 130, 131 (1998), *aff'd in part and rev'd in part*, 242 F.3d 1055 (Fed. Cir. 2001). Admits the allegations in the second through sixth sentences to the extent supported by the evidence cited with respect to at least one of DESC's EPA clauses; however, denies the allegations with respect to all of DESC's EPA clauses pursuant to RCFC 56(f). Denies the allegations in the seventh sentence pursuant to RCFC 56(f). Admits the allegations in the eighth sentence.

10. The EPA clause in La Gloria's 1993 domestic bulk fuels contract was based upon prices published in the Petroleum Marketing Monthly ("PMM"), a Department of Energy ("DOE") publication. Compl. 9; Walker Decl. ¶ 4.

**La Gloria's Response:**

Admits the allegations to the extent supported by the evidence cited.

11. The PMM is published by the Department of Energy, Energy Information Administration, as a compilation of transaction prices in domestic petroleum markets. Walker Decl. ¶ 4. All refiners, including La Gloria, are required by law to submit sales data to DOE monthly. Id.; 15 U.S.C. § 772. DOE compiles the data and reports monthly average sales prices for various petroleum products, grouped by product, type of sale, state and geographic region, in the PMM. Walker Decl. ¶ 4. Prices were adjusted monthly under the PMM EPA clause. Id.

**La Gloria's Response:**

Admits the allegations to the extent supported by the evidence cited; however, denies any implication that the PMM reports the fair market value of fuel. App. 607-638.

12. A significant feature of the PMM is the three-month lag time DOE requires to obtain the sales data for any particular month. Thus, for example, sales data for January are published in April, and data for February are published in May. Walker Decl. ¶ 4. This was significant in DESC's administration of the PMM-based EPA clauses, because B19.33 provided for monthly adjustments. Def .Exh. 3. To accommodate DOE's three-month lag, DESC made monthly adjustments on an interim basis, and then reconciled them when PMM data for that month were published. Id.

**La Gloria's Response:**

Denies the allegations pursuant to RCFC 56(f).

13. Beginning in 1995, La Gloria's DESC contracts included an EPA clause based, not upon PMM prices, but upon regional average prices reported in a commercial publication, Platts Oilgram Price Report ("Platts"). Walker Decl. ¶ 5. Platts is published daily. Id. A sample Platts Oilgram Price Report begins at page 47 of our Supplemental Appendix. Contract prices were adjusted weekly pursuant to DESC's Platts-based EPA clause, that is, contract prices remained in effect for one week. Id. Therefore, DESC was able to discontinue the burdensome interim payment and reconciliation process required by the PMM-based EPA clause.

**La Gloria's Response:**

Admits the allegations in the first, second, third, and fourth sentences to the extent supported by the evidence cited. Denies the allegations in the fifth sentence pursuant to RCFC 56(f).

14. In January, 1986, DESC's Office of Market Research and Analysis prepared a recommendation to change the procedure by which offers were submitted in DESC's solicitations for bulk fuels. Supp. App. 18. Due to the three-month lag time for prices to be published in PMM, offerors were required to submit offers tied to a reference price that had not

yet been published. See PFF 12; Supp. App. 18 ¶¶ 1, 2. That is, the clause provided that the base reference price was the PMM price published for the month before the submission of best and final offers. Id. As the recommendation noted, "[s]ince the Best and Final offers are submitted before the base reference is known, offerors must guess at the relationship between the offered price and the reference." Id. at 2. The recommendation noted that "the movement of PMM compared to other references as used for interim price adjustments may have moves as much as one or two cents per gallon out of step with such interim references." Id. at 3. The recommendation noted that offerors might increase their price to compensate for the unknown factor of what the PMM reference price would be when it was eventually published and, therefore, recommended that the best and final price be tied to an already published final and interim reference price. "For example, if the best and final date were November 15th, the final base EPA reference price would be PMM for August and the interim base reference would be the publication(s) . . . for the month of July." Supp. App. 18 ¶ 4.

**La Gloria's Response:**

Denies the allegations pursuant to RCFC 56(f).

15. In 1987, DESC's Office of Market Research and Analysis prepared a decision paper concerning the ". . . means of price escalation used in the domestic programs." Supp. App. 20 ¶ 1. The purpose of the decision paper was to decide whether the economic price adjustment clauses DESC was then using to adjust contract prices in long term contracts for the supply of domestic bulk fuels should be either modified to change the use of the unpublished PMM reference price, or changed to use market prices published in Platts and other "trade journals" rather than prices in PMM. Supp. App. 21 ¶ 1 (Issue). The paper considered four options for adjusting long term contract prices in domestic bulk fuel contracts. Supp. App. 20 ¶ 2. The four options were: 1) to keep the price adjustment system then in use by DESC, 2) to modify the system then in use to " . . . reduce offer price uncertainties," 3) to adjust prices twice monthly using "trade journal" prices, and 4) to adjust prices weekly using "trade journal" prices. Id., at 2; Supp. App. 25-26, Decision Options.

**La Gloria's Response:**

Denies the allegations pursuant to RCFC 56(f).

16. The decision paper included a detailed discussion of the options available to DESC to adjust contract prices. Supp. App. 21-26. In a paragraph entitled "Background," the paper described the economic price adjustment system that DESC had been using since 1983. Supp. App. 21, Background. The paper set forth nine criteria by which to judge proposed escalation systems, " . . . 1) product; 2) geography; 3) timing; 4) timeliness; 5) commonality; 6) independence from contractor influence; 7) basis in actual sales; 8) market risk; and 9) simplicity." Id. at Discussion. The paper then compared PMM prices to "trade journal" prices using those nine criteria. Supp. App. 21-25.

**La Gloria's Response:**

Denies the allegations pursuant to RCFC 56(f).

17. The paper concluded that:

> [t]he current PMM based system is preferable by three criteria: independence from contractor influence, sales basis, and market risk. Three other criteria, simplicity, timing, and timeliness, favor the switch to trade journals. By the criteria of product, geography, and commonality there is no clear alternate between the alternate systems.

Supp. App. 21 at Discussion.

**La Gloria's Response:**

Denies the allegations pursuant to RCFC 56(f).

18. The paper included a detailed analysis of each of the nine criteria and whether each favored the PMM, the trade journal prices, or neither. The paper found that the product criterion favored neither, because "[b]oth the PMM and trade publications publish prices of similar commercial products . . . ." Supp. App. 21. Regarding geography, the paper found that both PMM and trade publications prices were published in ". . . the geographical area where the requirements are located." Supp. App. 22. Regarding commonality, the paper found that either PMM or trade publications were acceptable to both DESC and contractors, based upon the fact

that DESC had used PMM prices successfully in bulk fuels for three years and had used trade publication prices successfully in contracts for ground fuels and overseas bulk programs. Id.

**La Gloria's Response:**

Denies the allegations pursuant to RCFC 56(f).

19. The paper concluded that the contractor influence, contractor sales, and market risk factors favored PMM. Supp. App. 22-23. The paper noted that, although both PMM and trade publications were independent of DESC contractors, trade publications might be influenced by the moves of large "market players" "given their informal method of conducting market surveys," whereas the PMM was a survey of actual sale prices. Supp. App. 22. Regarding market risk, the paper found that DESC ". . . contract prices are susceptible to market risk if they escalate on indices which do not correlate well with actual sales prices. PMM prices are actual sales price averages." Supp. App. 23. Trade publication prices were considered more ". . . variable in quality . . . ." Id. The study also found that trade publication prices were more susceptible to "price stickiness," and increased the market risk of higher prices during time periods of declining prices because sellers might be slow to lower posted prices. Id.

**La Gloria's Response:**

Denies the allegations pursuant to RCFC 56(f).

20. The paper concluded that the timing and timeliness criteria favored trade publication prices. As the paper explained, because trade publication prices were published on a daily or weekly basis rather than monthly, the timing of those prices would reduce the ". . . possibility that contractors will build a contingency premium into their prices." Supp. App. 23. On the other hand, because PMM was published with a three month lag-time, it necessitated the use of interim pricing and reconciliations, i.e., more adjustments. Id.

**La Gloria's Response:**

Denies the allegations pursuant to RCFC 56(f).

21. Finally, the paper set forth a summary of the "pros and cons" of the four alternatives. Supp. App. 25-26. The paper concluded that the preferred option was to modify the

existing use of PMM prices by using the latest published PMM price as the base reference price. Supp. App. 26. That, the study reasoned, would eliminate "margin uncertainty" and allow bidders to base their offered prices on a known reference price. Supp. App. 25. The paper pointed out that "[s]everal individuals and contractors have suggested that [DESC] modify its current system in this manner." Id. Starting in 1987, DESC began using this modified PMM-based adjustment, and continued to do so until 1995, when the use of trade publication prices began. See PFF 13. An example of the PMM adjustment clause in use between 1987 and 1993 is contained at Def. Exh. 10 at 3-5.

**La Gloria's Response:**

Denies the allegations pursuant to RCFC 56(f).

22. In September, 1994, DESC requested a one-time FAR deviation to authorize the use of price adjustment based on market prices published in Platts and OPIS for that year's annual bulk fuels contract, in lieu of PMM prices. Def. Exh. 12 at 1. In the request for a FAR deviation, DESC set forth reasons for switching from PMM prices to Platts and OPIS prices. DESC stated that the PMM prices had been reliable, but that using Platts and OPIS would provide several advantages. In addition to eliminating the need for two price adjustments, DESC stated, "commercial publications [such as Platts are] widely accepted by industry" and would be simpler to use. Id. DESC further noted that its Office of Market Research and Analysis had studied the proposed Platts-based clauses and found them to provide reliable bases for price adjustments. Id.

**La Gloria's Response:**

Denies the allegations pursuant to RCFC 56(f).

23. In May, 1995, DESC sought a Class Deviation and change to the Defense Logistics Agency Acquisition Regulation ("DLAR") that would explicitly authorize DESC to base its EPA clauses upon "industry publications" (including Platts and OPIS). Supp. App. 37. The bases for DESC's request for such permanent authorization were the same as set forth in its request for an individual deviation the previous fall. Supp. App. 39 ¶ III. B. DESC noted that

"industry publications" were published more often and would eliminate the "need for double calculations or price adjustments, a significant savings to the government." Id. The deviation request noted that, due to the lag time between interim and final billing under PMM, "contractors likely build in a price cushion." The deviation also noted that the use of an "industry publication" was similar to the "way adjustments are done commercially in that commercial publications are widely accepted by industry." Id.

**La Gloria's Response:**

Denies the allegations pursuant to RCFC 56(f).

24. The DESC request also noted that "industry publications" had been used for DESC programs other than bulk fuels for years. Id. As it did in its earlier request, DESC stated that its "Office of Market Research and Analysis has studied the proposed EPA provisions and found them to be reliable for price adjustments." Id. The Office of Market Research and Analysis study to which both deviation requests referred was the 1987 study described in PFF PFF 15-21. Supp. App. 36.

**La Gloria's Response:**

Denies the allegations pursuant to RCFC 56(f).

25. Thus, beginning in 1995, the "base reference" price for La Gloria's Bulk Fuels Program contracts were regional average prices reported in Platts. Walker Decl. ¶ 5. Because Platts was published daily, DESC was able to adjust prices weekly, and, therefore, was able to discontinue the burdensome interim payment and reconciliation process required by the PMM-based EPA clause. Id.

**La Gloria's Response:**

Admits the allegations in the first sentence to the extent supported by the evidence cited. Denies the allegations in the second sentence pursuant to RCFC 56(f).

26. In accordance with 15 U.S.C. § 644 and FAR Part 19, many of DESC's bulk fuels program solicitations included partial small business set-asides. Supp. App. 2 ¶ 4. Beginning in 1988, pursuant to 10 U.S.C. § 2323, DESC solicitations also included an evaluation preference

of up to 10 per cent for small disadvantaged business concerns. Id.; Supp. App. 5. DESC solicitation clauses I237.05, Notice of Evaluation Preference for Small Disadvantaged Business Concerns, and I237.06, Notice of Partial Small Business Set-Aside with Preferential Consideration for Small Disadvantaged Business Concerns, set forth the operation of these programs. Supp. App. 5-7. The clauses provided that awards will be made to those small disadvantaged concerns whose offered price does not exceed the highest price the Government would pay for the non-set-aside portion plus ten percent, as adjusted for transportation and other factors. Supp. App. 6 (subparagraph (c)).

**La Gloria's Response:**

Denies the allegations in the first sentence that DESC's solicitations were "[i]n accordance with 15 U.S.C. § 644 and FAR Part 19" on the grounds that they are conclusions of law to which no response is required. Admits the remaining allegations in the first sentence to the extent supported by the evidence cited. Denies the allegations in the second sentence that DESC's solicitations included an evaluation preference pursuant to 10 U.S.C. §2323 on the grounds that they are conclusions of law to which no response is required. Admits the remaining allegations in the second sentence to the extent supported by the evidence cited. Admits the allegations in the third and fourth sentences to the extent supported by the evidence cited.

27. DESC also operated a small business set-aside program. Although small businesses could compete for non set-aside amounts, DESC would award contracts to provide the set-aside amounts, the price for which was to be "negotiated by the Contracting Officer based upon prices the Government would otherwise pay under this solicitation had there been no set-aside for supply of the location at which the set-aside is placed, adjusted for transportation and other factors." Supp. App. 7 (subparagraph (d)). During the negotiations, the contracting officer did not provide small business concerns with either the identity or the prices of other offerors. Supp. App. 2 ¶ 5. DESC's method of awarding partial set asides in its bulk fuels acquisitions differs from the standard FAR and DFARS procedures, in that DESC makes offers for the set aside quantities before award of the basic quantities. Supp. App. 2 ¶ 5; Supp. App. 5-7. The

standard FAR and DFARS procedure is to offer set aside quantities after award of the basic quantities. Supp. App. 14-17. Where there is a set aside failure, the quantities are awarded to the low offeror for the basic quantity rather than being re-solicited as a new requirement. Id. This procedure avoids the delay that would take place in re-soliciting set aside failure quantities under the standard FAR and DFARS procedures. Id. DESC has used this method since the 1960's pursuant to authorized deviations. Id.; Supp. App. 42. The DESC procedure has been approved by the Government Accountability Office ("GAO"), formerly the General Accounting Office, on several occasions. Sup. App. 42.

**La Gloria's Response:**

Denies the allegations in sentences one through seven pursuant to Rule 56(f). Denies the allegations in the eighth and ninth sentences on the ground that the GAO decision cited does not address the violations of law alleged here, and, indeed, addressed periods of time prior to enactment of the provisions of the Office of Federal Procurement Policy Act ("OFPPA") at issue.

28. During performance of the contracts at issue, La Gloria never raised any question regarding the legality of the EPA clauses, and it never complained that it was not being paid fairly. Walker Decl. ¶ 12. La Gloria also did not object to any of the hundreds of monthly and weekly price adjustments made pursuant to the contracts' EPA clauses. Id.

**La Gloria's Response:**

Denies the allegations pursuant to RCFC 56(f). Furthermore, denies the allegations because the evidence cited is not competent and amounts to little more than rank speculation. The proffered declarant, John Walker, does not even allege that he was involved in a *single one* of La Gloria's contracts, nor does he allege that he ever spoke with a *single person* at La Gloria about its military fuel contracts. In addition, Mr. Walker was not even employed by DESC during part of the period purportedly covered by his overly broad declaration. App. 560.

29. La Gloria submitted claims concerning this matter to the contracting officer, in May, 2001. Compl. ¶ 31; Walker Decl. 13. La Gloria's principal contention was that the EPA

clauses in its contracts were illegal, citing the MAPCO decision. Walker Decl. 13; e.g., Def. Exh. 44. La Gloria did not assert that the clauses were ambiguous, had failed to operate as expected, or that they had failed to protect La Gloria from significant fluctuations in costs or prices. Id.

**La Gloria's Response:**

Admits the allegations in the first sentence to the extent supported by the evidence cited. Denies the allegations in the second and third sentences on the ground that they are legal characterizations to which no response is required, and further denies the allegations as unsupported by the evidence cited.

30. To price its claims, La Gloria began with a price published in Platts Oilgram Price report for a similar product, and added a long-term contract premium and transportation costs. E.g., Def. Exh. 43 at 20-22.

**La Gloria's Response:**

Denies the allegations that all of its claims were calculated in this way as unsupported by the evidence cited, and, with respect to the particular claim cited, denies on the ground that the description is materially incomplete.

31. The contracting officer denied La Gloria's claims in a final decision, dated September 28, 2001. Compl. ¶¶ 32; Walker Decl. ¶ 13. The contracting officer concluded, among other things, that the EPA clauses are authorized and enforceable, and that the prices calculated in La Gloria's claims do not reflect fair market value. Walker Decl. ¶ 13; Def. Exh. 45.

**La Gloria's Response:**

Admits the allegations to the extent supported by the evidence cited.

Respectfully submitted,

s/ J. Keith Burt
J. Keith Burt
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, D.C. 20006
(202) 263-3208 (phone)
(202) 263-5208 (fax)
Counsel for Plaintiff,
La Gloria Oil and Gas Company

*Of Counsel:*

Gary A. Winters
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, D.C. 20006

May 1, 2006