IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

No. 02-465C
(Judge Hewitt)

---

LA GLORIA OIL AND GAS COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

---

J. Keith Burt
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, D.C. 20006
(202) 263-3208

Attorneys for Plaintiff,
La Gloria Oil and Gas Company

*Of Counsel:*

Gary A. Winters
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006

May 1, 2006

**TABLE OF CONTENTS**

INDEX TO APPENDIX .......... iii

TABLE OF AUTHORITIES .......... ix

STATEMENT OF FACTS .......... 2

I. THE PARTIES .......... 2

II. DESC'S MILITARY FUEL PRICES AND ITS STATED INTENT TO PAY FAIR MARKET VALUE FOR FUEL .......... 2

III. DESC'S CONFLICTING INTERNAL ASSESSMENTS AND PUBLIC STATEMENTS ABOUT ITS MILITARY FUEL PRICES .......... 4

IV. THE NON-NEGOTIABILITY OF DESC'S MILITARY FUEL PRICES .......... 7

V. THE FAILURE OF DESC'S MILITARY FUEL PRICES TO REFLECT FAIR MARKET VALUE .......... 8

VI. DESC'S MINORITY PRICE PREFERENCES AND FUEL CONTRACT AUCTIONS .......... 15

VII. LA GLORIA'S AMENDED COMPLAINT .......... 16

ARGUMENT .......... 17

I. DESC'S MOTION FAILS TO SATISFY THE STANDARDS FOR JUDGMENT AS A MATTER OF LAW .......... 17

II. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS THAT DESC'S MILITARY FUEL PRICES VIOLATE FAR§ 16.203 .......... 20

A. Only The Issue Of *Per Se* Illegality Was Before The Court In *Tesoro* .......... 20

B. DESC's Construction Of *Tesoro* Ignores Its Plain Language .......... 23

III. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS THAT DESC'S MILITARY FUEL PRICES VIOLATE FAR § 15.802(b)(1) .......... 27

IV. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS OF MISREPRESENTATION .......... 33

V. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS OF BREACH OF CONTRACT .......... 36

**TABLE OF CONTENTS**
(continued)


VI. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS OF BREACH OF AN IMPLIED-IN-FACT CONTRACT .................... 40

VII. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS OF FAILURE OF CONSIDERATION AND FRUSTRATION OF PURPOSE .............. 41

VIII. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS OF MISTAKE .................... 44

IX. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS OF A FIFTH AMENDMENT TAKING .................... 46

X. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS THAT DESC ILLEGALLY PROVIDED PRICE PREFERENCES TO MINORITY-OWNED SUPPLIERS .................... 53

XI. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS THAT DESC ILLEGALLY AUCTIONED THE AWARD OF MILITARY FUEL CONTRACTS .................... 56

XII. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ITS AFFIRMATIVE DEFENSE THAT LA GLORIA WAIVED ALL OF ITS CLAIMS .................... 65

- A. As A Matter Of Fact, DESC Fails To Establish That La Gloria Waived All Of Its Claims .................... 65
- B. As A Matter Of Law, La Gloria's Claims Of Illegality Cannot Be Waived .................... 73
  - 1. La Gloria Is Entitled To Recover A Lawful Price For Fuel .................... 73
  - 2. Because The Law At Issue Protects Contractors, DESC's Violations Of Law Cannot Be Waived .......... 76
  - 3. DESC May Not Use A Defense Of Waiver To Seek A Judicially-Imposed Statute Of Limitations Congress Did Not Enact .................... 79
  - 4. *Federal Crop Insurance v. Merrill* Does Not Support A Finding Of Waiver .................... 81

CONCLUSION .................... 83

## INDEX TO APPENDIX

Request for Deviation from FAR 16.203 (Jan. 5, 1993)................................App. 1

Economic Price Adjustment – Published Market Price
(Domestic Bulk) (DFSC Nov. 1994) ................................................App. 9

Hearing Transcript, Barrett *Refining Corp. v. United States,*
Nos. 96-15C, 96-724C, 96-725C, 96-726C, 97-321C
(Fed. Cl.) (July 27, 1998).................................................................App. 11

EPA Reference Study (Nov. 28, 1984)...............................................App. 60

Economic Price Adjustment – Published Market Price
(Domestic Bulk) (DFSC Nov. 1992) ..............................................App. 82

Defense Logistics Agency Inter-Office Memorandum from Lawrence
Ervin to DFSC-G regarding Goldline Escalation
(June 23, 1995)................................................................................App. 85

Defense Logistics Agency Memorandum from Lawrence Ervin
to DFSC-PEC (L. Manley) regarding Contract Numbers
DLA600-94-D-4126 and DLA600-94-D-4172, Petrolea
Oil Corp. Escalator Replacement (July 20, 1995) ..........................App. 87

Letter from Edith P. Duhaine to Gaylon H. Simmons
regarding Final Decision of November 1, 1988
Claim (Mar. 30, 1999) ....................................................................App. 90

Letter from John E. Griffith to F.M. Doughty regarding
Calcasieu Claims (Feb. 27, 1983)....................................................App. 96

Letter from Dan C. Calhoun to Director, Defense Logistics
Agency, regarding Review Comments - Escalators for
Bulk Fuels Solicitations (Feb. 9, 1988) ..........................................App. 98

Defense Logistics Agency Memorandum from Christopher
Lee to DFSC-D regarding Proposed Changes in the
Petroleum Marketing Monthly (Mar. 23, 1989) ...........................App. 100

Deposition of Christopher Lee, *MAPCO Alaska Petroleum,*
*Inc. v. United States,* No. 550-89C (Cl. Ct.)
(May 31, 1991)...............................................................................App. 105

Award/Contract for Exxon Company USA with U.S.
Contract No. DLA600-86-D-0583
(effective date Apr. 4, 1986).......................................................App. 112

**INDEX TO APPENDIX**
(continued)

Deposition of Lawrence Ervin, *La Gloria Oil and Gas Co. v. United States*, No. 02-465C (Fed. Cl.) (Dec. 1, 2003) .......... App. 125

Notice of Deposition, *La Gloria Oil and Gas Co. v. United States*, No. 02-465C (Fed. Cl.) (Oct. 2, 2003) .......... App. 141

Price Analysis, RFP No. DLA600-95-R-0061 Region: East/Gulf/Offshore and Rocky Mountain (Nov. 18, 1994) .......... App. 144

Price Analysis, RFP No. DLA600-93-R-0161 Region: Mountain (May 18, 1993) .......... App. 150

Price Analysis, RFP No. DLA600-93-R-0161 Region: Gulf Coast Area (May 18, 1993).......... App. 154

Price Analysis, RFP No. SPO600-96-R-0061 (Oct. 17, 1995) .......... App. 157

Price Analysis, RFP No. SPO600-97-R-0061 Region: East/Gulf & Offshore (Oct. 22, 1996).......... App. 163

DFSC CONUS Bulk Contract Price Escalation: Petroleum Marketing Monthly vs. Published Prices.......... App. 171

Memorandum for the Executive Director (Procurement), Defense Logistics Agency, regarding Request for One-Time Deviation from FAR 16.203-1 .......... App. 195

Memorandum from DFSC CAM STA ALEX VA//DFSC-PZB/5 June 1989 to Mapco Alaska Petroleum, Inc. regarding MAPCO Offer Submitted Under RFP DLA600-89-R-0161 (June 5, 1989).......... App. 198

Letter from Jack Turner to Ola M. Lee regarding Solicitation DLA600-83-R-0461, Contract DLA600-83-D-0586; Item Nos. 0101, 0201, 0301, 0401 (Jan. 23, 1984).......... App. 201

Memorandum of Meeting with Jack Turner, Mapco Petroleum (Alaska), on Jan. 26, 1984 by Ola Lee (Feb. 2, 1984).......... App. 204

Defense Logistics Agency Two-Way Memorandum from DFSC-PD, M. Johnson to DFSC-N regarding Offers from Mapco, Alaska, and Mapco, Tennessee, on the CONUS Solicitation RFP DLA600-83-R-0461 (July 18, 1983) .......... App. 205

**INDEX TO APPENDIX**
(continued)

Pre-Negotiation Briefing Memorandum (July 15, 1986)............................App. 206

Pre-Negotiation Briefing Memorandum (Dec. 15, 1986)...........................App. 214

Pre-Negotiation Briefing Memorandum (Nov. 18, 1987) ..........................App. 219

Pre-Negotiation Briefing Memorandum (Undated)...................................App. 225

Pre-Negotiation Briefing Memorandum (Nov. 1, 1988) ............................App. 230

Pre-Negotiation Briefing Memorandum (May 8, 1989).............................App. 235

Pre-Negotiation Briefing Memorandum (Undated)...................................App. 241

Pre-Negotiation Briefing Memorandum (May 10, 1990)...........................App. 246

Pre-Negotiation Briefing Memorandum (Undated)...................................App. 252

Pre-Negotiation Briefing Memorandum (May 17, 1991)...........................App. 257

Pre-Negotiation Briefing Memorandum (Undated)...................................App. 262

Pre-Negotiation Briefing Memorandum (May 18, 1992)...........................App. 267

Pre-Negotiation Briefing Memorandum (Undated)...................................App. 273

BEM Summary of Award Information (Sept. 30, 1992) ............................App. 279

BEM Summary of Award Information (Mar 16, 1992).............................App. 283

Information to Offerors or Quoters, Section A-Cover Sheet
SPO600-96-R-0161...........................................................................App. 286

Status Conference Hearing Transcript, *Williams Alaska Petroleum v. United States*, No. 02-705C (Fed. Cl.)
(Nov. 18, 2003) ...............................................................................App. 287

Hearing Transcript, Oral Argument Before the Court of Appeals
For the Federal Circuit, No. 04-5064 (Jan. 10, 2005).....................App. 309

Brief of Plaintiffs Tesoro Hawaii Corporation, Tesoro Alaska
Company and Hermes, Consolidated, Inc., No. 04-5064
(Fed. Cir. Apr. 26, 2004) ...............................................................App. 355

Brief of *Amicus Curiae* American Petroleum
Institute in Support of Plaintiffs-Appellants and Affirmance
on The Contract Illegality Issue, No. 04-5064
(Fed. Cir. May 5, 2004) .................................................................App. 429

**INDEX TO APPENDIX**
(continued)


Brief for the United States, Defendant's Appeal from the U.S. Court of Federal Claims in Case Nos. 02-CV-704. Judge Eric Bruggink, and 02-CV-1460, Judge Lawrence Block, (July 2, 2004)........................................App. 461

Defense Procurement and Acquisition Policy - Contract Pricing Reference Guide........................................................................App. 540

Armed Services Procurement Regulation Manual (APSM No. 1), Department of Defense (1975)....................................................App. 545

Armed Services Pricing Manual (ASPM), Department of Defense (1986)..........................................................................................App. 548

DCAA Contract Audit Manual, Vol. 2 of 2 (July 1, 2005) .......................App. 554

Deposition of John Richard Walker, *Pride Companies, L.P., v. United States*, No. 95-897C (Fed. Cl. Sept. 18, 1996)...................App. 556

Letter from John R. Walker to D.R. Neumeyer, Berry Petroleum Company regarding EPA claims (Sept. 28, 2001).........................App. 563

Letter from John R. Walker to Rodney L Nelson, Calcasieu Refining Company regarding EPA claims (Oct. 2, 2001) .............App. 565

Letter from John R. Walker to Todd P. Grubin, Chevron USA, Inc. regarding EPA claims (Feb. 1, 2002)............................................App. 567

Letter from John R. Walker to Chris Conway, Conoco, Inc. regarding EPA claims (Aug. 9, 2002)...........................................App. 569

Letter from John R. Walker to John B. Holmes, El Paso Merchant – Petroleum Company regarding EPA claims (Aug. 9, 2002)........................................................App. 571

Letter from John R. Walker to Herbert V. Rusk, Exxon Mobil Fuels Marketing Company regarding EPA claims (Mar. 25, 2002) ...................................................................App. 573

Letter from John R. Walker to Thomas P Bruskotter, Gary-Williams Energy Corporation regarding EPA claims (Aug. 9, 2002).......................................................App. 575

Letter from John R. Walker to Jeffrey M Shaffer, Koch Petroleum Group, L.P., regarding EPA claims (Oct. 2, 2001) .....................................................................App. 577

**INDEX TO APPENDIX**
(continued)

Letter from John R. Walker to Matt Clifton, Navajo Refining Company, regarding EPA claims (Sept. 28, 2001) ......................... App. 579

Letter from John R. Walker to Dan Robinson, Placid Holding Company, regarding EPA claims (Sept. 28, 2001) ......................... App. 581

Letter from John R. Walker to Patricia Pavlak, Sunoco, Inc., regarding EPA claims (Sept. 28, 2001) ......................................... App. 583

Letter from John R. Walker to Andrew T. Nomura, Tesoro Hawaii Corporation, regarding EPA claims (Dec. 3, 2001) ........... App. 585

Letter from John R. Walker to Kenneth A. Applegate, Diamond Shamrock Refining and Marketing Company, regarding EPA claims (Aug. 19, 2002) ......................................... App. 587

Letter from John R. Walker to Scott Weaver, Western Refining Company, L.P., regarding EPA claims (Sept. 27, 2002) ................ App. 589

Letter from John R. Walker to Keith Selby, Williams Alaska Petroleum, Inc., regarding EPA claims (Sept. 28, 2001) ................ App. 591

Letter from John R. Walker to Wyoming Refining Company regarding EPA claims (Sept. 28, 2001) ......................................................... App. 593

Defense Logistics Agency Inter-Office Memorandum from Christopher Lee to DFSC-D/DD regarding Economic Price Adjustment in the Domestic Bulk Program (May 5, 1997) .................................................................... App. 595

Defense Logistics Agency Inter-Office Memorandum from Christopher Lee to DFSC-C, -G, -P, -L regarding Economic Price Adjustment in the Domestic Bulk Programs (Apr. 9, 1987) ..................................................................... App. 596

Armed Services Pricing Manual (ASPM), Volume 2, Price Analysis, Department of Defense (1987) ....................................................... App. 603

Declaration of Joseph P. Kalt, *La Gloria Oil and Gas Company v. United States*, No. 02-465C (Fed. Cl.) (April 28, 2006) ................. App. 607

Expert Report of Joseph P. Kalt and Peter Killen, *La Gloria Oil and Gas Company v. United States*, No. 02-465C (Fed. Cl.) (April 28, 2006) ........................................................... App. 608

Declaration of Dennis Marple, *La Gloria Oil and Gas Company v. United States*, No. 02-465C (Fed. Cl.) (April 25, 2006) ................. App. 639

**INDEX TO APPENDIX**
(continued)

Declaration of John R. Walker, *Calcasieu Refining Company v. United States*, No. 02-1219C (January 17, 2003) ........................... App. 641

Award/Contract for La Gloria Oil and Gas Company, with United States, Contract No. SPO600-99-D-0478 (effective date March 18, 1999) ........................... App. 648

Award/Contract for La Gloria Oil and Gas Company, with United States, Contract No. SPO600-98-D-0468 (effective date February 27, 1998) ........................... App. 650

Award/Contract for La Gloria Oil and Gas Company, with United States, Contract No. SPO600-97-D-0464 (effective date February 27, 1997) ........................... App. 653

Award/Contract for La Gloria Oil and Gas Company, with United States, Contract No. SPO600-96-D-0475 (effective date March 15, 1996) ........................... App. 656

Award/Contract for La Gloria Oil and Gas Company, with United States, Contract No. SPO600-95-D-0480 (effective date March 30, 1995) ........................... App. 662

Award/Contract for La Gloria Oil and Gas Company, with United States, Contract No. DLA600-93-D-0559 (effective date October 6, 1993) ........................... App. 671

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A Olympic Forwarder, Inc. v. United States*, 33 Fed. Cl. 514 (1995) ....................................66, 73

*AT&T v. United States*, 177 F.3d 1375 (Fed. Cir. 1999) ......................................................32, 40

*AT&T v. United States*, 307 F.3d 1374 (Fed. Cir. 2002) ...........................................31, 32, 78, 82

*Accardi v. Shaughnessy*, 347 U.S. 260 (1954)...................................................................33

*Adams v. United States*, 391 F.3d 1212 (Fed. Cir. 2004) ......................................................18, 65

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995).........................................................53

*Aerojet-General Corp. v. Askew*, 453 F.2d 819 (5th Cir. 1971) ..................................................41

*Agredano v. United States*, No. 05-608C (Fed. Cl. March 27, 2006)...........................................40

*Ahrenholz v. Bd. of Trustees*, 219 F.3d 674 (7th Cir. 2000) .......................................................23

*Alaska Pulp Corp. v. United States*, 48 Fed. Cl. 655 (2001) ........................................................69

*Alde, S.A. v. United States*, 28 Fed. Cl. 26 (1993) ........................................................................52

*Aluminum Co. of Am. v. Essex Group, Inc.*, 499 F. Supp. 53
(W.D. Pa. 1980) ......................................................................................................................46

*American Capital Corp. v. United States*, 58 Fed. Cl. 398 (2003) ...............................................38

*American Sav. Bank, F.A. v. United States*, 62 Fed. Cl. 6 (2004) ................................................39

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..........................................................18, 19

*Applied Devices Corp. v. United States*, 591 F.2d 635 (1979) ...............................................75, 78

*Armstrong v. United States*, 364 U.S. 40 (1960) ...........................................................................51

*Ashford v. United States*, 43 Fed. Cl. 1 (1997) ..............................................................................36

*Barrett Ref. Corp. v. United States*, 242 F.3d 1055 (Fed. Cir. 2001) .................................. *passim*

*Barrett Ref. Corp. v. United States*, 42 Fed. Cl. 128 (1998).................................................3, 8, 45

*Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988) .................................. *passim*

*Blonder-Tongue Lab., Inc. v. University of Ill. Found.*, 402 U.S. 313
(1971) ......................................................................................................................................25

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Board Machine, Inc. v. United States*, 49 Fed. Cl. 325 (2001)....................49

*Boston Edison Co. v. United States*, 64 Fed. Cl. 167 (2005)....................48

*Brown v. Legal Found. of Washington*, 538 U.S. 216 (2003)....................47

*Burness v. Bruce*, 776 P.2d 32 (Or. Ct. App. 1989)....................68

*C & H Comm. Contractors, Inc. v. United States*, 35 Fed. Cl. 246 (1996)....................36, 39, 46

*Cain v. Burns*, 280 P.2d 888 (Cal. Dist. Ct. App. 1955)....................75

*Calcasieu Ref. Co. v. United States*, No. 02-1219C, Slip. Op. (Fed. Cl. July 31, 2003)....................66, 71

*Carter v. Seaboard Fin. Co.*, 203 P.2d 758 (Cal. 1949)....................75

*Castle v. United States*, 48 Fed. Cl. 187 (2000)....................50, 52

*Celotex Corp. v Catrett*, 477 U.S. 317 (1986)....................1, 18, 19, 20

*Centel Communications Co.*, 89-1 B.C.A. (CCH) ¶ 21,225 (Sept. 8, 1988)....................76

*Centex Corp. v. United States*, 395 F.3d 1283 (Fed. Cir. 2005)....................40

*Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442 (Fed. Cir. 1997)....................31, 77, 78, 79

*Cherokee Nation v. United States*, 174 Ct. Cl. 131 (1966)....................66

*Chris Berg, Inc. v. United States*, 426 F.2d 314 (Ct. Cl. 1970)....................76

*Clark v. United States*, 95 U.S. 539 (1877)....................82

*Coastal Corp. v. United States*, 713 F.2d 728 (Fed. Cir. 1983)....................55

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986)....................78, 79

*Conley v. Gibson*, 255 U.S. 42 (1957)....................1, 18

*Consolidated Edison Co. of N.Y., Inc. v. United States*, 67 Fed. Cl. 285 (2005)....................49, 50

*Cont'l Bus. Enter., Inc. v. United States*, 452 F.2d 1016 (Ct. Cl. 1971)....................33

*Cornetta v. United States*, 851 F.2d 1372 (Fed. Cir. 1988)....................81

*Costanzo Coal Mining Co. v. Weirton Steel Co.*, 150 F.2d 929 (4th Cir. 1945)....................74

*D.F.K. Enter., Inc. v. United States*, 45 Fed. Cl. 280 (1999)....................39, 40

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**


*DGS Contract Serv., Inc. v. United States*, 43 Fed. Cl. 227 (1999)....64

*DSI Corp. v. United States*, 655 F.2d 1072 (Ct. Cl. 1981)....52

*Del-Rio Drilling Programs Inc. v. United States*, 146 F.3d 1358 (Fed. Cir. 1998)....49

*Desert Apartments, Inc. v. United States*, 250 F.2d 457 (10th Cir. 1957)....73

*Detroit Edison Co. v. United States*, 56 Fed. Cl. 299 (2003)....48, 51

*District of Columbia v. Thompson*, 281 U.S. 25 (1930)....41

*Dow Chem. Co. v. United States*, 226 F.3d 1334 (Fed. Cir. 2000).... 68-69

*E. Walters & Co. v. United States*, 576 F.2d 362 (Ct. Cl. 1978)....78

*Edwards v. Aguillard*, 482 U.S. 578 (1987)....31

*Everett Plywood Corp. v. United States*, 227 Ct. Cl. 415 (1981)....43, 44

*Far West Fed. Bank, S.B. v. Director, OTS*, 930 F.2d 883 (Fed. Cir. 1991)....42, 43

*Far West Fed. Bank, S.B. v. OTS*, 119 F.3d 1358 (9th Cir. 1997)....43

*Fed. Crop Ins. v. Merrill*, 332 U.S. 380 (1947)....37, 68, 76, 83

*Franconia Assocs. v. United States*, 61 Fed. Cl. 718 (2004)....51

*Freightliner Corp. v. Caldera*, 225 F.3d 1361 (Fed. Cir. 2000)....28, 31

*G.L. Christian & Assocs. v. United States*, 320 F.2d 345 (Ct. Cl. 1963)....75

*Gardner v. Brown*, 5 F.3d 1456 (Fed. Cir. 1993)....58, 63

*Gen. Eng'g & Machine Works v. O'Keefe*, 991 F.2d 775 (Fed. Cir. 1993)....67

*George Solitt Constr. Co. v. United States*, 64 Fed. Cl. 229 (2005)....33

*Gold Line Ref., Ltd. v. United States*, 43 Fed. Cl. 291 (1999)....76

*Gold Line Ref., Ltd. v. United States*, 54 Fed. Cl. 285 (2002)....77, 78

*Gould, Inc. v. United States*, 67 F.3d 925 (Fed. Cir. 1995)....54, 55

*Hamilton v. Williams*, 573 N.E.2d 1276 (Ill. Ct. App. 1991)....67

*Hamlet v. United States*, 873 F.2d 1414 (Fed. Cir. 1989)....54

*Hansen v. United States*, 65 Fed. Cl. 76 (2005)....48

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Hendler v. United States*, 11 Cl. Ct. 91, 95 (1986)....................47

*Hercules, Inc. v. United States*, , 292 F.2d 1378 (Fed. Cir. 2002)....................37

*Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 3 (2003)....................23, 68, 78, 82, 83

*Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 409 (2003)....................23, 68, 77, 82, 83

*Heydt v. United States*, 38 Fed. Cl. 286 (1997)....................48

*Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001)....................51

*INS v. Hibi*, 414 U.S. 5 (1973)....................69, 80

*Integrated Logistics Support Sys. Int'l, Inc. v. United States*, 42 Fed. Cl. 30 (1998)....................49, 50, 51

*Interstate Plywood Sales Co. v. Interstate Container Corp.*, 331 F.2d 449 (9th Cir. 1964)....................35

*Inupiat Community of the Arctic Slope v. United States*, 680 F.2d 122 (Ct. Cl. 1982)....................54

*J&E Salvage v. United States*, 37 Fed. Cl. 256 (1997)....................46

*John C. Grimberg Co. v. United States*, 185 F.3d 1297 (Fed. Cir. 1999)....................33

*John Deere Indus. Equip. v. Triple Cities Equip., Inc.*, 646 F. Supp. 114 (N.D.N.Y. 1986)....................67

*John Massman Contracting Co. v. United States*, 23 Cl. Ct. 24 (1991).................... 35-36

*Johnson v. Zerbst*, 304 U.S. 458 (1938)....................65, 66, 79, 81

*Kaiser Aluminum & Chem. Sales, Inc. v. Avandole Shipyards, Inc.*, 677 F.2d 1045 (5th Cir. 1982)....................74

*Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982)....................74, 76, 79

*Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240 (1933)....................26

*L.W. Matteson, Inc. v. United States*, 61 Fed. Cl. 296 (2004)....................37

*LaBarge Products, Inc. v. West*, 46 F.3d. 1547 (Fed. Cir. 1995).................... *passim*

*La Gloria Oil & Gas Co. v. United States*, 56 Fed. Cl. 211 (2003)....................63, 65

*LeBlanc v. United States*, 50 F.3d 1025 (Fed. Cir. 1995)....................54

**TABLE OF AUTHORITIES**
(continued)


**Page(s)**

*Leiter v. United States*, 271 U.S. 204 (1926) .......... 78

*Logicon, Inc. v. United States*, 22 Cl. Ct. 776 (1991) .......... 64

*Lone Mtn. Prod. Co. v. Nat. Gas Pipeline Co. of Am.*, 710 F. Supp. 305 (D. Utah 1989) .......... 66

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) .......... 47, 48

*Louisville & Nashville R.R. Co. v. Cent. Iron & Coal Co.*, 265 U.S. 59 (1924) .......... 80

*Lynch v. United States*, 292 U.S. 571 (1934) .......... 47, 50

*M.A. Mortenson Co. v. Brownlee*, 363 F.3d 1203 (Fed. Cir. 2003) .......... 37

*MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed. Cl. 205 (1992) .......... *passim*

*M.G. Constr., Inc. v. United States*, 67 Fed. Cl. 176 (2005) .......... 38

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) .......... 50

*Maislin Ind., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116 (1990) .......... 68, 80

*Majernick v. Hartford Cas. Ins. Co.*, 688 A.2d 1330 (Conn. 1997) .......... 67

*McDonnell Douglas Corp. v. United States*, 182 F.3d 1319 (Fed. Cir. 1999) .......... 33

*Motorola Inc. v. West*, 125 F.3d 1470 (Fed. Cir. 1997) .......... 80

*Mullenberg v. United States*, 857 F.2d 770 (Fed. Cir. 1988) .......... 54

*Nat'l Leased Housing Ass'n v. United States*, 24 Cl. Ct. 647 (1991) .......... 56

*Navajo Ref. Co., L.P. v. United States*, 58 Fed. Cl. 200 (2003) .......... 8, 31, 72, 73

*Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757 (Fed. Cir. 1988) .......... 21

*Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81 (D.D.C. 2004) .......... 66

*Northern Helex Co. v. United States*, 455 F.2d 546 (Ct. Cl. 1980) .......... 71

*OPM v. Richmond*, 496 U.S. 414 (1990) .......... 76

*Osprey Pacific Corp. v. United States*, 41 Fed. Cl. 150 (1998) .......... 48, 50

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Pacific Gas & Elec. v. United States*, 3 Cl. Ct. 329 (1983) ....................73

*Pan-American Petroleum & Transp. Co. v. United States*, 273 U.S. 456 (1927) ....................73

*Pauley Petroleum, Inc. v. United States*, 219 Ct. Cl. 24 (1979) ....................44

*Perpetual Fin. Corp. v. United States*, 61 Fed. Cl. 126 (2004) ....................43

*Phoenix Petroleum Co. v. United States*, No. 97-315C Slip Op. (May 11, 1998) ....................77, 78, 79

*Phoenix Petroleum Co. v. United States*, No. 98-5124, 1999 U.S. App. LEXIS 16939 (Fed. Cir. July 23, 1999) ....................26

*Pi Elecs. Corp. v. United States*, 55 Fed. Cl. 279 (2003) ....................51, 52

*Pittsburgh Ry. Co. v. United States*, 250 U.S. 577 (1919) ....................73, 74, 82

*Pleasant Country, Ltd. v. United States*, 37 Fed. Cl. 321 (1997) ....................18

*Princess Cruises, Inc. v. United States*, 397 F.3d 1358 (Fed. Cir. 2005) ....................73

*Puerto Rico Dep't. of Labor & Human Res. v. United States*, 49 Fed. Cl. 24 (2001) ....................37

*RCS Enters., Inc. v. United States*, 53 Fed. Cl. 303 (2002) ....................33

*Randy v. Columbia/HCA Healthcare Corp.*, 2003 U.S. Dist. LEXIS 17270 (N.D. Tex. Sept. 30, 2003) ....................68

*Reliance Ins. Co. v. United States*, 20 Cl. Ct. 715 (1990) ....................66

*Rose v. Mitsubishi Int'l Corp.*, 423 F. Supp. 1162 (E.D. Pa. 1976) ....................67

*Roseburg Lumber Co. v. Madigan*, 978 F.2d 660 (Fed. Cir. 1992) ....................35

*Rothe Dev. Corp. v. United States Dep't of Defense*, 262 F.3d 1306 (Fed. Cir. 2001) ....................54, 55, 56

*Rothe Dev. Corp. v. United States Dep't of Defense*, 413 F.3d 1327 (Fed. Cir. 2005) ....................53

*Rothe Dev. Corp. v. United States Dep't of Defense*, 324 F. Supp. 2d 840 (W.D. Tex. 2004) ....................53

*Rough Diamond Co. v. United States*, 351 F.2d 636 (1965) ....................75

*Roxco, Ltd. v. United States*, 60 Fed. Cl. 39 (2004) ....................66

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**


*S.E.R., Jobs for Progress, Inc. v. United States*, 759 F.2d 1 (Fed. Cir. 1985) .......... 81

*S.J. Amoroso Constr. Co. v. United States*, 12 F.3d 1072 (Fed. Cir. 1993) .......... 75

*Saunders v. Hilpertshauser*, 1988 U.S. Dist. LEXIS 3646 (S.D.N.Y. 1988) .......... 42

*Scan-Tech Security, L.P. v. United States*, 46 Fed. Cl. 326 (2000) .......... *passim*

*In re Schenck Tours, Inc.*, 69 B.R. 906 (E.D.N.Y. 1987) .......... 42

*Seaboard Lumber v. United States*, 308 F.3d 1283 (Fed. Cir. 2002) .......... 43, 44

*Shimrak v. Garcia-Mendoza*, 912 P.2d 822 (Nev. 1996) .......... 75

*Short Bros. PLC v. United States*, 65 Fed. Cl. 695 (2005) .......... 32

*Sola Elec. Co. v. Jefferson Co.*, 317 U.S. 173 (1942) .......... 65, 71, 73, 74

*Southern Pacific Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336 (1982) .......... 74

*Spalding & Sons, Inc. v. United States*, 28 Fed. Cl. 242 (1993) .......... 43

*Sprague Steamship Co. v. United States*, 172 F. Supp. 674 (Ct. Cl. 1959) .......... 75, 82, 83

*State Oil Co. v. Khan*, 522 U.S. 3 (1997) .......... 21

*Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548 (Fed. Cir. 1992) .......... 38, 42

*Sun Oil Co. v. United States*, 572 F.2d 786 (Ct. Cl. 1978) .......... 51

*Sunoco, Inc. v. United States*, 59 Fed. Cl. 390 (2004) .......... 38, 63, 66

*Sunoco, Inc. v. United States*, No. 02-466C (Fed. Cl., Dec. 15, 2005) .......... 38

*Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560 (Fed. Cir. 1987) .......... 1, 18, 19

*System Fuels, Inc. v. United States*, 65 Fed. Cl. 163 (2005) .......... 48, 50

*T. Brown Constructors, Inc. v. Sec'y. of Transp.*, 132 F.3d 724 (Fed. Cir. 1997) .......... 34, 35

*T.L. Roof & Assoc. Constr. Co. v. United States*, 28 Fed. Cl. 572 (1993) .......... 36

*Tesoro Hawaii Corp., et al. v. United States*, 58 Fed Cl. 65 (2003) .......... *passim*

*Tesoro Hawaii Corp., et al. v. United States*, No. 02-704C, 2003 U.S. Claims LEXIS 410 (Fed. Cl. Oct. 30, 2003) .......... 23

**TABLE OF AUTHORITIES**
(continued)


**Page(s)**

*Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339 (Fed. Cir. 2005) .............................. *passim*

*Thomas v. United States*, 125 Ct. Cl. 76 (1953) ..................................................................80

*Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379 (Fed. Cir. 2002)..........................................65

*Trauma Serv. Group v. United States*, 104 F.3d 1321 (Fed. Cir. 1997) ...........................54, 55

*Tylor Bank v. Truck Ins. Exch.*, 51 F.3d 736 (7th Cir. 1995)..........................................67

*USA Petroleum Corp. v. United States*, 821 F.2d 622 (Fed. Cir. 1987) ............................39

*U.S. Philips Corp. v. Sears Roebuck & Co.*, 55 F.3d 592 (Fed. Cir. 1995)......................23, 24

*United Counties Trust Co. v. Maclum, Inc.*, 643 F.2d 1140 (5th Cir. 1981) .......................68

*United States Fid. & Guar. Co. v. Bimco Iron & Metal Corp.*,
464 S.W.2d 353 (Tex. 1971)...................................................................................67

*United States v. Amdahl*, 786 F.2d 387 (Fed. Cir. 1986) ..........................................47, 76, 83

*United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200 (2001).............................30

*United States v. Connolly*, 716 F.2d 882 (Fed. Cir. 1983)..................................................54

*United States v. Mitchell*, 463 U.S. 206 (1983) ..................................................................54

*United States v. Pewee Coal Co.*, 341 U.S. 114 (1951).......................................................48

*United States v. Salerno*, 481 U.S. 739 (1987) ...................................................................21

*United States v. Spearin*, 248 U.S. 132 (1918) ...................................................................39

*Urban Data Sys., Inc. v. United States*, 699 F.2d 1147 (Fed. Cir. 1983) ............................ *passim*

*Utah Power & Light Co. v. United States*, 243 U.S. 389 (1917)..................................69, 80

*Walker v. Cont. Life & Accident Co.*, 445 F.2d 1072 (9th Cir. 1971) ..............................42, 43

*Washington State Hop Producers, Inc. v. Goschie Farms, Inc.*,
773 P.2d 70 (Wash. 1989)........................................................................................42

*Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997) .........................................78

*Williams Alaska Petroleum, Inc. v. United States*, 57 Fed. Cl. 789
(Fed. Cl. 2003) .........................................................................................................34

*Williams Alaska Petroleum, Inc. v. United States*, No. 02-705C (Fed. Cl.) ...........................16, 24

*Yee v. City of Escondido*, 503 U.S. 519 (1992)...................................................................47

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Yerxa v. United States*, 11 Cl. Ct. 110 (1986) .......... 82

*Yosemite Park & Curry Co. v. United States*, 582 F.2d 552 (Ct. Cl. 1978) .......... 83

*Yuba Goldfields, Inc. v. United States*, 723 F.2d 884 (Fed. Cir. 1983) .......... 52

**Statutes and Regulations**

28 U.S.C. § 1292(d)(2) .......... 23

28 U.S.C. § 1491 .......... 54

41 U.S.C. § 253 .......... 33

41 U.S.C. § 423 .......... 57, 58, 60, 63, 64

Contract Disputes Act, 41 U.S.C. § 601 .......... 54

Department of Defense Act, 101 Stat. 1329 .......... 31

DFARS § 252.219-7001(c)(3) .......... 60-61, 64

FAR § 15.306 .......... 64

FAR § 15.402 .......... 16, 28

FAR § 15.506 .......... 60

FAR § 15.610 .......... 57, 58, 59

FAR § 15.802 .......... 16, 19, 28, 29, 31, 32, 33

FAR § 15.803 .......... 28

FAR § 15.804 .......... 2, 3, 27, 28

FAR § 16.203 .......... *passim*

FAR § 19.502 .......... 57, 59, 61, 62, 64

FAR § 19.507 .......... 57, 60, 61, 62, 64

FAR § 33.206 .......... 80

FAR § 52.219.7 .......... 57, 60, 61, 64

H. Rep. No. 100-911 at 21, 18 (Sept. 9, 1988) .......... 57-58, 63

Pub. L. 100-679, § 27 (1988) .......... 57

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Pub. L. 101-28 (1989) ....................................................................................57

Pub. L. 101-84 (1989) ....................................................................................57

Pub. L. 104-106, § 4304 (1996) ....................................................................57

U.S. Const. amend. V ....................................................................................46

**Miscellaneous**

2 DCAM, § 9-201(b) at 924 (July 1, 1989) ....................................................29

*All Phase Environ., Inc.*, B-292919.2, 2004 U.S. Comp. Gen. LEXIS 19 (Feb. 4, 2004) ....................................................................................32

ASPM § 1.3 (Dep't of Def. 1986) ....................................................................29

ASPM § 2.5 (Dep't of Def. 1986), at 2-6 ........................................................29

ASPM § 9.2 (Dep't of Def. 1986), at 2-6 ........................................................29

ASPM No. 1 (Dep't of Defense 1975) at 2B10 ...............................................29

Allan Farnsworth, *Farnsworth on Contracts* § 8.6 at 452 (3d ed. 2004) ..........67

Arthur L. Corbin, 6A *Corbin on Contracts* §§ 40.1, 1255, 1540 (1962) ..........41, 67

CCH Nash & Cibinic eSeries, Government Contracts Reference Book, F Guidebook (2005) (available on Lexis) ....................................................30

*Black's Law Dictionary* (8th ed. 1999) ............................................................20

*Cascading Set-Asides: A Legal and Fair Procedure*, 19 Nash & Cibinic Report ¶ 39 (Aug. 2005) ..................................................61

Chevron Products Company, *Aviation Fuels Technical Review* 13 (2000) ..........2

*Contracting Pricing Reference Guide* § I.2.1 (available at http://www.acq.osd.mil/dpap/contractpricing/vol1intro.htm#I.2.1) (last updated Aug. 26, 2005) ....................................................................30

*Dimensions*, *Defense Logistics Agency News Magazine* (1999 Almanac ed.) available at http//www.dla.mil/dimensions/almanac/desc.htm ..........2

Joseph Perillo, *Calamari And Perillo On Contracts* at 458 (5th ed. 2003) ..........67

Kevin R. Garden, *Fifth Amendment Takings of Rights Arising from Agreements with the Federal Government*, 29 Pub. Cont. L.J. 187, 205 (2000) ....................................................................................51

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Michael J. Sniffen, *Refiner to pay $110 million in underpaid-royalties suit*, *Corpus Christi Caller-Times* (Jan. 24, 2001)....................81

*Polarad Elect., Inc.*, ACAB No. 1116, 2 ECR para. 134 (1971)....................46

*Professional Materials Handling Co., Inc.—Reconsideration*, B-205969.2; B-205969.3, 82-1 CPD ¶ 501 (May 28, 1982)....................59, 65

*Restatement (Second) of Contracts* § 84 (1979)....................67-68

*Restatement (Second) of Contracts* § 93 (1979)....................67

*Restatement (Second) of Contracts*, § 161(b) (1979)....................36

*Restatement (Second) of Contracts* § 162 (1979)....................35

*Restatement (Second) of Contracts* § 237 cmt. a (1979)....................41

*Restatement (Second) of Contracts* § 241 (1979)....................38

*Restatement (Second) of Contracts* § 266 cmt. a (1979)....................42, 43, 44

*Webster's II New Riverside University Dictionary* 161 (1988)....................30

*Webster's New World Dictionary of the American Language* 502 (2d ed. 1984)....................30-31

*WHY R&D, Inc.*, B-221817, 86-1 CPD ¶ 375 (Apr. 16, 1986)....................60

*Williston on Contracts* § 814 (3d ed. 1962)....................41

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LA GLORIA OIL AND GAS COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-465C |
| v. | ) | (Judge Hewitt) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff, La Gloria Oil and Gas Company ("La Gloria"), respectfully submits its Opposition to Defendant's Motion to Dismiss. In its motion, Defendant seeks dismissal of La Gloria's Amended Complaint pursuant to RCFC 12(b)(1) and 12(b)(6), and, alternatively, seeks summary judgment pursuant to RCFC 56(b) on all of La Gloria's claims, save paragraphs 40 and 41 relating to DESC's small business and minority price preferences. DESC's Motion at 1. As set forth below, Defendant's RCFC 12(b) motion to dismiss, which must assume the truth of the well-pleaded allegations in the Amended Complaint, should be denied because Defendant fails to establish that it is entitled to judgment as a matter of law. *Conley v. Gibson*, 255 U.S. 42, 45-46 (1957). Furthermore, Defendant's alternative request for summary judgment must be denied because Defendant fails to provide evidence which "would establish its right to judgment," *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987), and its motion amounts to little more than "a conclusory assertion that the plaintiff has no evidence to prove his case." *Celotex Corp. v Catrett*, 477 U.S. 317, 328 (1986) (White, J., concurring). (*See* discussion pp. 18-20, *infra*.) Moreover, to the extent that DESC could be deemed to satisfy its burden with respect to any material fact, and, to the extent that La Gloria is deemed not to provide sufficient countering evidence to establish a genuine issue with respect to that fact, this Court should, pursuant to La Gloria's accompanying motion under RCFC 56(f), refuse DESC's application for summary judgment or, in the alternative, grant a continuance to permit La Gloria the discovery it requires to establish these facts. *Celotex*, 477 U.S. at 326. For these reasons and as further set forth below, Defendant's Motion should be denied.

## STATEMENT OF FACTS

## I. THE PARTIES

DESC[1] is the principal purchaser of military fuel for the Department of Defense ("DOD"). It is the single largest purchaser of fuel in the world.[2] As relevant here, DESC principally purchased unique types of military jet fuel. Amended Complaint ¶ 2; App. 648-87.[3]

La Gloria was a supplier of military fuel to DESC. La Gloria maintained long-term supply relationships with DESC and committed substantial, long-term capacity to refining military fuel. App. 648-87. DESC purchased military fuel from La Gloria, as it did from essentially all military fuel suppliers, under long-term contracts typically lasting one year. Amended Complaint ¶ 2; App. 648-87. During the period relevant here, La Gloria and DESC entered 6 contracts providing for the purchase of military fuel in Texas. Amended Complaint ¶¶ 31**;** App. 648-87.

## II. DESC'S MILITARY FUEL PRICES AND ITS STATED INTENT TO PAY FAIR MARKET VALUE FOR FUEL

DESC's military fuel contracts contained adjustable prices that permitted DESC to set military fuel prices monthly or weekly during the contract term. App. 648-87. FAR § 16.203 permits use of adjustable prices where, *inter alia*, prices are set based on changes in "established prices." "Established prices" are "established market prices." *Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339, 1345 (Fed. Cir. 2005) (quoting the prior provisions of FAR § 15.804-

[1] DESC previously was known as the Defense Fuel Supply Center ("DFSC"). For simplicity, "DESC" is used throughout.

[2] *Dimensions, Defense Logistics Agency News Magazine* (1999 Almanac ed.), *available at* http//www.dla.mil/dimensions/almanac/desc.htm.

[3] Chevron Products Company, *Aviation Fuels Technical Review* 13 (2000) (military "maintain[s] separate specifications for jet fuel [because of] operational and logistical differences between the military and civilian systems and the additional demands high-performance jet fighter engines place on the fuel").

3(c)(2)). Established market prices may include price references such as indexes, but, where used, indexes must be "market-based references." *Id*. at 1347-48.[4]

As relevant to DESC's motion, DESC set fuel prices under its military fuel contracts using a compilation of petroleum sales data published by the Department of Energy ("DOE") known as the Petroleum Marketing Monthly ("PMM").[5] App. 650-54. The PMM reports a monthly average sales figure for specified fuels, such as jet fuel or diesel fuel, for five regions known as Petroleum Administration for Defense Districts ("PADDs"). *Barrett Ref. Corp. v. United States*, 42 Fed. Cl. 128, 130 n.6, 131 (1998), *aff'd in part and rev'd in part*, 242 F.3d 1055 (Fed. Cir. 2001). As the PMM moved upward or downward each month, DESC's fuel prices also moved upward or downward. App. 650-54.[6]

DESC's Deputy Director of Contracting, Edward Biddle, stated in a 1993 memorandum that the purpose of DESC's adjustable prices was to "ensure[] that the sale will be at the market price, which is a fair and reasonable price. Not only is the government protected, but *the contractor is protected by knowing that its price will always be related to the price it could obtain in the commercial marketplace.*" App. 4 (emphasis added). DESC's Director of the Office of Market Research and Analysis, Lawrence Ervin, testified similarly before this Court in 1998 that DESC used adjustable prices because: "[W]e wanted our prices to reflect, as closely as possible, market levels for the same or similar commercial fuels in the marketplace. . . . We wanted the price to go up and also down when the market prices of similar fuel went [up or] down." App. 14; *see also* App. 62 ("the EPA [economic price adjustment] reference selected is

---

[4] *See infra* fn. 26.

[5] DESC also used other compilations of sales data to set fuel prices. However, in its motion, DESC offers no evidence concerning these other compilations or their relationship to the market for military fuel. Because DESC fails to meet its burden to offer any evidence concerning these other compilations, or otherwise move with respect to them, La Gloria does not address them specifically in its response and limits its discussion to the PMM.

[6] The PMM is designed for Congressional use in developing broad energy policy. *Barrett*, 42 Fed. Cl. at 131.

[intended to be] reflective of changes in commercial market prices"); App. 69 ("the EPA reference is designed to adjust the award price in concert with changes in going market price levels;" "the D[E]SC Office of Market Research and Analysis endeavors to select the reference that most accurately reflects movements of going market prices").

Consistent with this purpose, DESC's pricing clause is titled "Economic Price Adjustment – Published Market Price." App. 9. Among its various iterations over time, the clause states that "[t]he market price [used to set military fuel prices] is derived from quotes, assessments, or sales prices in the market place" and further provides that military fuel prices are "*to reflect market conditions*." App. 9 (emphasis added).[7] It is therefore unsurprising that in *Barrett* the United States Court of Appeals for the Federal Circuit expressly found that DESC's adjustable pricing clause embodied a promise to "pay at least fair market value" for fuel. 242 F.3d at 1060.

## III. DESC'S CONFLICTING INTERNAL ASSESSMENTS AND PUBLIC STATEMENTS ABOUT ITS MILITARY FUEL PRICES

Outwardly, DESC maintained that the PMM was the "gold standard" for measuring fair market value. DESC wrote to its parent organization, the Defense Logistics Agency ("DLA"), that its PMM "references are virtually unimpeachable from an accuracy standpoint, since *they don't just 'track' the market – they are the market.*" App. 98 (emphasis added).[8] In response to a supplier's objection to the PMM, DESC similarly wrote that the PMM "consistently reflects actual market prices," App. 96, and to another objecting supplier DESC wrote that the PMM is "a reliable indicator of price movements in the petroleum products market." App. 91. As late as

[7] *See also* App. 87 (Mr. Ervin stating that, pursuant to DESC's pricing clause, "replacement of the escalation reference is called for if the reference 'consistently fails to reflect market value'"); App. 85 (Mr. Ervin stating that through its pricing clause "DESC assumes the risk of higher product prices").

[8] DESC's public espousal of the PMM is unsurprising, given DESC's acknowledgment that "DOE normally will work with us to see that our needs are satisfied as we are one of the primary users of PMM." App. 100.

1998, DESC's Mr. Ervin testified before this Court that the PMM is "the benchmark against which we . . . compare everything domestically." App. 29.

DESC's statements to DLA, its suppliers and this Court stand in stark contrast to DESC's expert economists' assessment of the PMM. In 1986, DESC's then-Director of the Office of Market Research and Analysis, Mr. Christopher Lee, undertook an assessment of the PMM to compare its performance with commonly used commercial price references for fuel, such as Platts and OPIS (which DLA subsequently directed DESC to use in place of the PMM). Referring to Platts and OPIS as "other references,"[9] Mr. Lee, who holds a Doctorate in Economics,[10] stated: "Yet our analysis of the movement of the PMM as compared to other references as used for interim price adjustments indicates that the PMM may have moves as much as *one or two cents per gallon out of step* with such interim references." App. 103 (emphasis added). In contrast, DESC required its suppliers to submit bids to the one ten-thousandth of a cent ($0.000001). *See, e.g.,* App. 672 (reflecting a bid price of $0.576300).

In 1987, DESC's Office of Market Research and Analysis undertook another study "comparing PMM versus Platts and OPIS." App. 134. That study supported using the commercial price references Platts and OPIS to make price adjustments – not the PMM. App. 134. When DLA ultimately learned of DESC's 1987 study – albeit seven years later – DLA directed DESC to stop using the PMM to set prices and to use Platts and OPIS instead.

Mr. Ervin explains how DESC's 1987 study led to DLA's directive to stop using the PMM in 1994:

---

[9] In the 1986 assessment, Mr. Lee uses the phrase "other references as used for interim price adjustments." App. 103. DESC used its interim price adjustments to set prices on an interim basis at the time fuel was delivered. App. 120. DESC set final prices when the PMM was published three months after the fact – *i.e.*, three months after the fuel was delivered. App. 121. DESC's interim references, as identified in its adjustable pricing clause, were Platts and OPIS. App. 120.

[10] App. 111.

> I was sitting in a room when the decision happened and it was made in response to some pressure from headquarters to do things differently. So the analysis is based on, basically is the analysis in the '87 study. Some people who have read the '87 studies [stated] that they would draw different conclusions than what was presented at the end of the study, certainly a close call. Analysis would have supported that as well so it's really the '87 study which is the basis for that move [in 1994 from PMM to Platts and OPIS].

App. 134.[11]

The 1987 study was written by the Office of Market Research and Analysis with the objective of justifying continued use of its "gold standard," the PMM. App. 595-602.[12] While the all-important statistical analysis behind the study has not yet been produced, the admissions against interest in the narrative of the study are compelling. DESC's expert economists admit that using Platts and OPIS to set prices instead of the PMM "would cost DESC money" and concede that "[t]here is market risk associated with the move away from escalation on actual sales [PMM] particularly with respect to jet kerosene [military jet fuel]." App. 599; App. 602.[13] DESC's economists additionally recount in the 1987 study how its suppliers had complained that, as a result of DESC's use of the PMM to set prices after fuel is delivered, "'*we never know if we have made or lost money when you (D[E]SC) lift a cargo.*'" App. 597 (emphasis added); *see also* App. 595 (cover memorandum to the 1987 study stating with respect to the proposed change in using the PMM, "The issue has been raised several times in recent years, formally and informally, by contractors").

---

[11] DESC proffered Mr. Ervin as a witness in response to a Notice of Deposition served under Rule 30(b)(6) in this case. App. 141. The notice directed DESC to designate a witness to address the existence of documents requested in the plaintiff's requests for production of documents. App. 141. Because, pursuant to the terms of the notice, the deposition was limited to the existence of responsive documents, the plaintiff's ability to inquire into the substance of the conclusions of the documents was limited. App. 141. That inquiry must await further discovery.

[12] While this document is attached to DESC's motion, DESC does not specifically identify the document as the 1987 study referred to by Mr. Ervin in his deposition. Final confirmation of this fact awaits further discovery.

[13] DESC elsewhere has asserted that its statements about the PMM's relationship to the marketplace are, in reality, criticism of DESC's then-interim price references Platts and OPIS and not criticisms of the PMM at all. DESC's assertion is nothing short of startling, given that DESC currently uses Platts and OPIS to set fuel prices.

Once DLA directed DESC to stop using the PMM in 1994 and to set prices using Platts and OPIS instead, DESC made the extraordinary admission that prices it previously had set using the PMM so departed from market value that they could not be compared to prices set based on Platts and OPIS. DESC stated: "Direct contract price comparisons *are not possible* due to the switch from the monthly interim-final (PMM) escalation method to a weekly market price escalation basis [using Platts and OPIS]." App. 144 (emphasis added).[14] DESC's admission is unsurprising, given that DESC had concluded elsewhere that changing from the PMM to commercial references, such as Platts and OPIS, "could significantly influence contract prices," App. 98, and further found, in response to a proposal from one of its largest suppliers to stop using the PMM, that its "PMM JP-5" jet fuel prices were ten cents a gallon higher, then ten cents lower, and yet again ten cents higher than Platts – all within the same year. App. 182.[15]

## IV. <u>THE NON-NEGOTIABILITY OF DESC'S MILITARY FUEL PRICES</u>

Despite DESC's admission that "comparisons are not possible" between the prices it set using the PMM and those set using commercial market references such as Platts and OPIS, DESC had mandated that "[a]ll offerors are required to accept a method of price adjustment based on . . . the Petroleum Marketing Monthly (PMM)." App. 195; *see also* App. 199 (stating that DESC "would not consider" an offer unless objection to the PMM was withdrawn). As Mr. Ervin testified before this Court, DESC used its "leverage as a buyer" as the sole purchaser of

[14] For each procurement, DESC prepares a "Price Analysis Memorandum" to determine its price objectives during contract negotiations. *See, e.g.,* App. 144, 150, 154, 157, 163. In determining its price objectives for the procurement, DESC typically considers, under the heading "Price History," the price it is paying under its current, existing contracts. *See, e.g.,* App. 144, 151, 155, 157, 163, 167-68. However, as noted above, when DESC stopped using the PMM and switched to using Platts and OPIS instead, it stated that its usual practice of making price comparisons with its existing contracts was "not possible." App. 144.

[15] The assessments of the PMM by DESC's expert economists, discussed above, together with DLA's direction to stop using the PMM based on DESC's 1987 study, draw into serious question the credibility of Mr. Ervin's subsequent cross-examination testimony in this Court in 1998 that he never identified any "problem with using the PMM" to set military fuel prices other than "billing" issues. App. 36-37.

military fuel to "improve the competition" for DESC's business by requiring use of the PMM. App. 17.

Accordingly, even though suppliers objected to DESC's use of the PMM as "coerced," App. 201; App. 204, the use of the PMM to set prices was "not negotiable as a matter of policy." App. 205. DESC's procurement authorizations expressly stated under the heading "POTENTIAL PROBLEMS" that "common escalation [using the PMM] is non-negotiable." App. 206-278; *Navajo Ref. Co., L.P. v. United States*, 58 Fed. Cl. 200, 214 (2003) ("DESC explicitly stated in its pre-negotiation briefing memoranda that it deemed its price adjustment clause to be non-negotiable"); *see also Barrett Ref. Corp. v. United States*, 45 Fed. Cl. 166, 171 (1999) (supplier "had no control over use of PMM EPA clause, and indeed attempted, unsuccessfully, to persuade the agency not to use it"), *aff'd in part and rev'd in part*, 242 F.3d 1055 (Fed. Cir. 2001). Evidencing the futility of objecting to DESC's pricing clause, even after a supplier filed a claim in 1988 challenging DESC's use of the PMM, DESC continued to use the PMM for six more years, until it was directed to use Platts and OPIS instead. *MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed. Cl. 205, 407 (1992).

## V. THE FAILURE OF DESC'S MILITARY FUEL PRICES TO REFLECT FAIR MARKET VALUE

While La Gloria knew that DESC's use of its adjustable pricing clause and the PMM were non-negotiable, what La Gloria did not know was that DOE had not designed the PMM to be used to set fuel prices or to reflect market value. As Dr. John Cook, Director of the Petroleum Marketing Division of the Department of Energy's Energy Information Administration (which publishes the PMM), has since testified and as this Court found: "[T]he PMM is not intended to be an index that is used for setting prices." *Barrett*, 42 Fed. Cl. at 131. Thus, while La Gloria "entered the fuel contracts with the intent that the prices DESC set would reflect fair market value[,]" it could not have been more wrong. App. 639.

An assessment of the PMM as an established market price is set forth in the Expert Report of Joseph Kalt[16] and Peter Killen.[17] In their report, Kalt and Killen conclude that DESC's "PMM-based adjustment clauses failed to provide an effective measure of established market prices or the fair market value of military fuels." App. 611.

[16] Joseph Kalt is the Ford Foundation Professor of International Political Economy at the John F. Kennedy School of Government, Harvard University. App. 609-10.

[17] Peter Killen is a Senior Advisor in the Houston offices of the firm of Muse Stancil & Company, a global consulting firm specializing in the energy industry. He holds a B.S. in Chemical Engineering and is a Registered Professional Engineer. App. 610.

The following chart, drawn from Kalt and Killen's report, dramatically illustrates the PMM's departure from the marketplace:

Figure 3
PMM ADJUSTMENT FAILS TO TRACK THE MARKET:
DIFFERENCES BETWEEN MONTHLY CHANGES IN MARKET-BASED ESCALATOR AND PMM-BASED ESCALATOR ARE UNSTABLE IN MAGNITUDE AND DIRECTION
January 1992 – March 1995




The chart illustrates how many cents per gallon the marketplace changed more or less than the PMM during the years surrounding DESC's use of the PMM to set La Gloria's JP-8 jet fuel prices. App. 634; App. 623-24.[18] If the change in the PMM was equal to the change in the marketplace, the bars in the chart would be zero or nonexistent. Thus, as the chart shows, in January of 1994 the marketplace increased by almost 6 cents a gallon more than the PMM. Indeed, not only did the change in the PMM depart substantially from the change in marketplace,

---

[18] As Kalt and Killen explain, it is the change in price levels of the PMM and the marketplace, rather than the absolute prices levels themselves, that are relevant here, because "the PMM is used by the DESC to index *changes* in price levels, rather than the price levels themselves." App. 623 (emphasis original).

but also the PMM's relationship to the marketplace was fundamentally unstable, inasmuch as the change in the PMM substantially understated the change in the market one month and then substantially overstated the change in the market in the next. As Kalt and Killen explain: "The fact that we see significant bars indicates that the relationship between the movements of the two series [the PMM and marketplace] is notably unstable." App. 624. Thus, as Kalt and Killen demonstrate, the chart shows the PMM's relationship with the marketplace to be highly volatile with the change in the PMM varying from the change in the market place from approximately -6 cents to approximately +6 cents during the relevant period. App. 623-25; App. 634.[19]

Equally compelling, Kalt and Killen explain that the PMM and the marketplace "frequently actually move in different directions [*e.g.*, the market goes up and the PMM goes down] in a starkly erratic fashion." App. 625-26. Kalt and Killen demonstrate that, with respect to DESC's purchase of JP-4 jet fuel over the broader period from 1984 to 1994,[20] the PMM moved in the opposite direction of the marketplace on average "24% of the time," while, in each of the years 1987, 1988 and 1992, the PMM moved in the opposite direction of the marketplace 33% of the time. App. 626; App. 636.

---

[19] As Kalt and Killen further explain, the fact the PMM overstated the change in market does not mean that La Gloria was overpaid. Given the PMM's random relationship with the market, "the winning bidder could readily [and erroneously] forecast that the Defendant's PMM index in any particular contract period would turn out to yield payments in the next contract period in excess of fair market value – pushing the optimistic bidder's base price bid downward." App. 613; *see also* App. 628-31.

[20] While, as relevant to La Gloria's contracts, DESC only used the PMM to set JP-8 prices during 1994 and 1995, consideration of DESC's use of PMM to set JP-4 jet fuel prices permits a broader comparison over time.

The next chart, again drawn from Kalt and Killen's report, illustrates on an annual basis how much the change in the PMM departed from the change in the marketplace for JP-4 jet fuel:

Figure 6
THE AVERAGE MONTHLY DIFFERENCE BETWEEN CHANGES IN MARKET-BASED AND PMM-BASED ESCALATORS OVER THE COURSE OF A CONTRACT IS HIGHLY UNSTABLE




*Note: 1985 Contract assumed to have same reference date as 1986 contract; 1994 Contract assumed to have same reference date as 1993 Contract.

The height of the bars shows for each year how many cents per gallon, on average, the change in the PMM departed from the change in the marketplace. App. 636; App. 626-27. Once again, not only is the amount of the error significant (in 1986 the PMM *understated* the marketplace on average 4 cents a gallon), but both the amount and the direction of the error are erratic (in 1987 the PMM *overstated* the market by 3 cents a gallon).

This volatile nature of the PMM is significant, because it made it essentially impossible for a bidder to predict correctly how the PMM would relate to the marketplace and, therefore, to

bid in a way that would provide some meaningful protection from the PMM. As Kalt and Killen explain: "The deviations between changes in the Market-based JP-4 escalator and the PMM-based JP-4 escalator are quite volatile . . . This volatility confounds rational prediction by which a rational bidder might reliably adjust bid prices so as to ensure receipt of no less than market value under a given period's fuel contract." App. 627.

Kalt and Killen state that there are a number of reasons why the PMM does not reflect the marketplace. Among them, Kalt and Killen explain, "the PMM data were not designed or intended to be used as an index." App. 611. They also show that the PMM suffers from a statistical flaw known as an "index number problem." App. 616-19. This statistical flaw, Kalt and Killen state, results in the PMM erroneously reporting changing in the volume of fuel sold as changes in the price of fuel. Because of the PMM's index number problem, Kalt and Killen conclude:

> PMM data do not contain accurate information needed to understand how the prices of specific products, such as a particular grade of military jet fuel, may have changed over time. An index that relies on these data, such as the DESC's PMM-based escalator, is readily susceptible to situations in which the index reports a price increase (or decrease) even though the actual market value of the fuel has declined (or risen) in the marketplace.

App. 617-18.[21]

Significantly, Kalt and Killen point out that, unlike DOE here, other federal agencies that publish indexes intended to be used as price indexes go to great lengths to ensure that the indexes do not suffer an index number problem. Kalt and Killen state:

> It is important to note here that statisticians at government agencies and in other organizations often go to great lengths to address the "index number" problem when constructing indices such as the PPI and the CPI, which are used to reflect the underlying changes in price levels for specific products used by producers and consumers. Each of these indices is constructed using fixed weights from period

[21] DESC elsewhere takes issue with Kalt and Killen's analysis of the PMM's index number problem, claiming that Kalt and Killen wrongly assert that the PMM mixes different fuel products. However, the PMM index for kerosene-type jet fuel does encompass several different fuel products, including Jet-A, JP-5 and JP-8, a fact DESC does not and cannot dispute. App. 616.

to period such that short-term variation in the mix of products sold is not mistaken for actual changes in the levels of prices.

App. 618 (footnote omitted).

Beyond the PMM's index number problem, Kalt and Killen further conclude that DESC's PMM-based pricing clause failed to reflect the marketplace because "the formula used by the government to create the index did not track changes in the value of the military jet fuel." App. 611. As they explain, DESC simply used the wrong fuels, and thus the wrong PMM data, in its pricing clause. App. 619-21.

Thus, for the military jet fuel known as JP-8, DESC based price adjustments on the PMM data for kerosene-type jet fuel. App. 619-20. However, kerosene-type jet fuel does not reflect the physical characteristics or market value of JP-8. Kalt and Killen state: "The DESC's simplistic use of kerosene-type jet fuel prices to proxy for JP-8 market prices is inappropriate for economic price adjustment purposes given the technical and economic considerations of how JP-8 is actually produced." App. 619-20.

Kalt and Killen explain that a proper measure of the physical characteristics and market value of JP-8 should be based on a combination of naphtha, kerosene-type jet fuel, and diesel fuel. App. 620-21. Notably, both this Court and the Federal Circuit in *Barrett* also concluded, over DESC's objection, that, with respect to JP-4 jet fuel, DESC used the wrong PMM data in its pricing clause. *Barrett*, 242 F.3d at 1061 ("However, the government does not dispute the Court of Federal Claims' finding that the naphtha-based index 'provides data that more closely reflect the product [JP-4] Barrett was actually selling.'").[22]

Finally, in addition to using the PMM data for the wrong fuels, Kalt and Killen point out that DESC used the PMM data for the wrong market. DESC set La Gloria's military fuel prices based on aggregate PMM data for all of the East and Gulf coasts. App. 620. However, as Kalt

[22] DESC elsewhere claims that Kalt and Killen's analysis assumes that an index used to adjust prices must be an index for the identical product the government purchases. This is a misstatement of Kalt and Killen's analysis. As set forth above, Kalt and Killen's analysis of JP-8 reflects naphtha, kerosene-type jet fuel, and diesel fuel. App. 620-21.

and Killen explain: "DESC's use of the weighted average prices across the broad geographic region that encompasses PADD I and PADD III [reflecting the East and Gulf Coasts] fails to properly reflect the market environment in the U.S. Gulf Coast region that most directly affects the economic performance of La Gloria's Tyler, Texas refining operation." App. 621.

For these and other reasons, Kalt and Killen observe that commercial buyers and sellers do not use the PMM as a price index. They conclude that the PMM's failure to pass "[t]his 'market test' reinforces the conclusion that a PMM-based escalator of the type used by the DESC is simply not suited to represent actual movements of established market prices for any fuel, much less military jet fuel." App. 619.[23]

## VI. DESC'S MINORITY PRICE PREFERENCES AND FUEL CONTRACT AUCTIONS

Beyond DESC's use of the PMM to set military fuel prices, DESC distorted the market price for fuel in two other ways. First, DESC provided a ten-percent price preference to minority-owned suppliers. Under this price preference, DESC awarded fuel contracts to minority-owned suppliers if their bids were within ten percent of that of the otherwise successful bidder. Def. Supp. App. 6-7; Amended Complaint ¶ 28. In some years, more than twenty percent of the fuel offered (as a percent of that purchased) was subject to DESC's minority price preference. App. 279 (showing volumes offered by minority firms with the designation "SD" and total volume awarded in the procurement); App. 283 (same); Amended Complaint ¶ 28.

Second, DESC conducted an auction for fuel contracts, whereby DESC offered fuel contracts to suppliers that agreed to match the price, or adjusted price, of other bidders. Under this auction, DESC awarded contracts to small businesses willing to match the price, or adjusted price, offered by the otherwise successful bidder. Def. Supp. App. 10-13; Amended Complaint

[23] DESC elsewhere takes issue with Kalt and Killen's conclusions because they compare the PMM to Platts spot prices. DESC's assertion is nothing short of extraordinary in view of the fact that DESC currently uses Platts spot prices to set military fuel prices in its military fuel contracts.

¶ 27. More than fifty percent of the fuel DESC procured commonly was set aside for award to small businesses. App. 286; Amended Complaint ¶ 27. Both DESC's minority price preference and its auction, by their very nature, placed downward pressure on bid prices, as non-minority and non-small businesses were forced to compete on an uneven playing field. Amended Complaint ¶ 29.

## VII. LA GLORIA'S AMENDED COMPLAINT

In its Amended Complaint, La Gloria seeks relief from DESC's military fuel prices in seven counts. Count I challenges DESC's fuel prices on several grounds of illegality. La Gloria alleges that DESC violated FAR § 16.203, because DESC did not set military fuel prices using "established fuel prices" that are "market-based" references. Amended Complaint ¶ 37; *see generally Tesoro*, 405 F.3d at 1347-48.

In *Williams Alaska Petroleum, Inc. v. United States*, No. 02-705C (Fed. Cl.), the Court articulated this claim as follows:

> I thought the situation is one in which the question was may the government use[] a market-based-index, and I said of course it can. . . . But that says nothing about . . . whether the index provides an accurate measure of the market it's attempting to draw data from.
>
> If, for example, it was an index of apples and oranges and bananas, no one could conceivably argue, well, it's there in the contract and therefore it's law. No. You may have a right to use a market-based index, *but the index itself must be representative of the market it's purporting to represent.* That's the issue that I see is still there to be decided.

Transcript of Nov. 18, 2003 Proceedings at 24-25 (emphasis added), App. 292-93.

In addition to its claim that DESC's fuel prices violated FAR § 16.203, La Gloria alleges in Count I that DESC's prices violate FAR § 15.802(b)(1) (currently FAR § 15.402(a)) because DESC used the PMM to set prices that were not "fair and reasonable." Amended Complaint ¶ 38. La Gloria also alleges in Count I that DESC provided price preferences to minority-owned firms in violation of the equal protection component of the Fifth Amendment's due process clause, and that DESC auctioned the award of fuel contracts to small businesses in violation of the Office of Federal Procurement Policy Act and the FAR. Amended Complaint ¶¶ 39-41.

In Count II, La Gloria challenges DESC's military fuel prices on the ground of misrepresentation. La Gloria alleges, *inter alia*, that DESC misrepresented that the PMM was designed to measure fair market value, misrepresented that the PMM was intended to be used to set prices, and misrepresented that the PMM and the prices set using it reflected fair market value. Amended Complaint ¶¶ 9-25, 45-58. In Count III, La Gloria challenges DESC's military fuel prices on the ground of breach of contract. La Gloria alleges, *inter alia*, that DESC's adjustable pricing clause requires DESC to set and pay prices for fuel that reflect fair market value and that DESC failed to do so when it set prices using the PMM. Amended Complaint ¶¶ 59-72.

In Count IV, La Gloria challenges DESC's military fuel prices on the ground that DESC's violation of law in setting fuel prices gave rise to an implied-in-fact contract to pay fair market value, which La Gloria alleges DESC breached. Amended Complaint ¶¶ 73-78. In Count V, La Gloria alleges that DESC's failure to pay fair market value for military fuel caused a failure of consideration and frustrated the purpose of the fuel contracts. Amended Complaint ¶¶ 79-96.

In Count VI, La Gloria alleges that the fuel contracts were entered, *inter alia*, as the product of the parties' mistaken belief that (1) the PMM was designed to and did measure the fair market value of fuel and (2) the PMM was intended to be used to set prices. Amended Complaint ¶¶ 97-123. Finally, in Count VII, La Gloria alleges that DESC effected a taking of La Gloria's property without just compensation in violation of the due process clause of the Fifth Amendment, *inter alia*, when it set the price of fuel in violation of law. Amended Complaint ¶¶ 124-132.

## ARGUMENT

### I. DESC'S MOTION FAILS TO SATISFY THE STANDARDS FOR JUDGMENT AS A MATTER OF LAW

DESC styles its motion as a "Motion to Dismiss," although DESC variously seeks dismissal of La Gloria's claims under RCFC 12(b)(1) and RCFC 12(b)(6) and summary

judgment under RCFC 56(b). DESC's Motion at 1. With regard to RCFC 12(b)(1) and 12(b)(6), DESC faces a substantial burden in seeking dismissal. It must demonstrate that, accepting the truth of all well-pleaded allegations in the Amended Complaint, La Gloria fails to state a claim as a matter of law. *Adams v. United States*, 391 F.3d 1212, 1218 (Fed. Cir. 2004). Evidence is irrelevant on such a motion; rather, for the movant to prevail, it must show that, even if the plaintiff could prove all the facts alleged in the complaint, the law does not recognize the claim. *Conley*, 255 U.S. at 45-46. As established below, DESC's motion fails to meet these standards.

With regard to DESC's alternative approach of seeking summary judgment under RCFC 56(b), DESC must demonstrate – with respect to each claim on which it seeks judgment – that there is no genuine issue as to any material fact and it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Material facts are those "that might significantly affect the outcome of a suit," *Pleasant Country, Ltd. v. United States*, 37 Fed. Cl. 321, 325 (1997), and, with respect to those facts, DESC must provide "affidavits or other evidence which, unopposed, would establish its right to judgment." *Sweats Fashions*, 833 F.2d at 1562. "It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case." *Celotex*, 477 U.S. at 328 (White, J., concurring). Only after the movant has provided evidence that, unopposed, would establish a right to judgment with respect to the material facts does the non-movant have an obligation to "proffer countering evidence sufficient to create a genuine factual dispute." *Sweats Fashions*, 833 F.2d at 1562.[24] Moreover, when such countering evidence is proffered, a court cannot weigh the evidence or determine the truth of any matter on a motion for summary judgment. Instead, the question is simply whether the evidence creates a genuine issue for trial. *Anderson*, 477 U.S. at 249.

[24] Nor, prior to "an opportunity to make full discovery," may DESC seek to meet its burden by alleging that "the record does not support the other party's case." *Celotex*, 477 U.S. at 325-26.

As set forth below, DESC offers essentially no evidence addressing the material facts in this case. For example, DESC offers no evidence addressing whether the PMM is a "market-based reference" as required by FAR § 16.203, no evidence concerning whether its military fuel prices were "fair and reasonable" as required by FAR § 15.802(b)(1), and, outside the contracts themselves, no evidence addressing the substance of La Gloria's allegations of misrepresentation, breach of contract, failure of consideration or mistake. With regard to its affirmative defense of waiver, DESC relies only upon the existence of the contracts and a declaration of John Walker that fails to meet even basic standards of evidentiary competence.

Accordingly, DESC's motion for summary judgment amounts to little more than "a conclusory assertion that the plaintiff has no evidence to prove his case," *Celotex*, 477 U.S. at 328, and DESC's request for judgment must be denied for failure to "support[] its motion." *Sweats Fashions*, 833 F.2d at 1562. Moreover, because DESC fails to meet its moving burden, DESC may not prevail on its motion, and La Gloria is under no obligation here to proffer "countering evidence." *Id*. Thus, for example, because DESC points to no evidence concerning La Gloria's allegations of misrepresentation or mistake, and because DESC offers essentially no evidence concerning its affirmative defense of waiver, La Gloria has no obligation here to present evidence concerning these issues. Further, to the extent that DESC somehow could be deemed to satisfy its burden with respect to any material fact, and, to the extent that La Gloria is deemed not to provide sufficient countering evidence to establish a genuine issue with respect to that fact, La Gloria invokes its discovery rights pursuant to RCFC 56(f). (*See* La Gloria's RCFC 56(f) Motion accompanying this Opposition.) As the Supreme Court has made clear, summary judgment should not be granted until the non-movant has "had an opportunity to make full discovery." *Celotex*, 477 U.S. at 326.[25]

---

[25] In support of its current Motion to Dismiss, DESC cites to portions of the record submitted in support of its earlier motion for summary judgment in this case. DESC's Motion at 1. DESC's attempt to create a "rolling record" is inappropriate. Evidence submitted as part of the record for DESC's earlier motion may not have been deemed material and, therefore, may not have been

(footnote continued)

## II. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS THAT DESC'S MILITARY FUEL PRICES VIOLATE FAR§ 16.203

DESC seeks to dismiss La Gloria's claims that DESC's military fuel prices violate FAR § 16.203 relying on *Tesoro*. DESC asserts that in *Tesoro* the Federal Circuit held that DESC's use of the PMM to set military fuel prices was legal for all purposes. DESC therefore concludes that *Tesoro* requires denial of La Gloria's claims that the PMM is not an "established price" which is "a market-based reference" within the meaning of FAR § 16.203. DESC's Motion at 11-16. Contrary to DESC's assertion, the issue of whether the PMM is a market-based reference within the meaning of FAR § 16.203 was not before the Federal Circuit in *Tesoro*, and, accordingly, the court could not and did not decide the issue.

### A. Only The Issue Of *Per Se* Illegality Was Before The Court In *Tesoro*

In *Tesoro*, the Appellants challenged DESC's military fuel prices on the sole ground that they were "*per se* illegal." Brief of Plaintiffs-Appellants at 8 n.5, App. 377. A claim of *per se* illegality, of course, is one where the illegality is "of, in or by itself," where it is "standing alone, without reference to additional facts." *Black's Law Dictionary* (8th ed. 1999); *see LaBarge Products, Inc. v. West*, 46 F.3d. 1547, 1556 (Fed. Cir. 1995) ("Disclosure of one offeror's bid does not make later negotiations per se illegal."); *cf. State Oil Co. v. Khan*, 522 U.S. 3, 12 (1997) (explaining in the antitrust context, when a party challenges the lawfulness *per se* of a particular practice, "the proper inquiry [i]s 'not whether [that practice] is *ever* illegal, but whether it is *always* illegal'" (emphasis in original); *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount

---

disputed for purposes of that earlier motion; however, it may be material here, but lurk undisputed in the earlier record. La Gloria, and ultimately this Court, have no idea what portions of that substantial and uncited record DESC may later seek to rely upon for purposes of appeal or otherwise. La Gloria, and ultimately this Court, are entitled to a clearly defined record. Accordingly, to the extent that DESC's Motion to Dismiss relies upon the record submitted for a different motion, those portions of DESC's motion should be stricken.

successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). The Appellants in *Tesoro* asserted that DESC's military fuel prices were *per se* illegal because the prices were based on an index and not on changes in the contractor's own prices. As the Appellants stated in their principal brief: "[O]nly the portion of Count I alleging *per se* illegality was the subject of the parties' cross motions [for summary judgment below] and therefore within the scope of this certified appeal." Brief of Plaintiffs-Appellants at 8 n.5, App. 377.[26]

DESC similarly characterized the Appellants' claim as one of *per se* illegality and expressly told the Federal Circuit that the issue of whether the PMM was a market-based reference within the meaning of FAR § 16.203 was not before the court. DESC stated during oral argument:

> This is not a beauty contest about one economist's view of the best marketplace indicator versus another. Both parties have affidavits either championing or damning the PMM, but the question in this case is whether the government may rely on a market value indicator . . . The *challenge here is a per se challenge to the government's use of market-based indicators.*

App. 326-27 (emphasis added; paragraphing omitted). DESC's comments during oral argument echo those in its principal brief, where, in responding to criticisms of the *amicus curiae* The American Petroleum Institute about the "'suitability' and 'appropriateness'" of PMM as a measure of market prices.[27] DESC told the Federal Circuit: "We do not regard this appeal as a

---

[26] La Gloria continues to maintain that DESC's use of the PMM and other indexes to set military fuel prices is *per se* illegal, *inter alia*, for the reasons set forth in *MAPCO*, 27 Fed. Cl. at 405. La Gloria maintains that the Federal Circuit's holding in *Barrett*, 242 F.3d at 1060, 1064, that DESC's price adjustment clause was illegal controls over the Federal Circuit's later, conflicting decision in *Tesoro*. *See generally Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988) ("This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned in banc . . . Where there is direct conflict, the precedential decision is the first."). La Gloria further maintains that *Tesoro* was wrongly decided. However, given the arguable precedential value of *Tesoro* in this Court, La Gloria recognizes that final resolution of these questions may have to await further appellate consideration.

[27] Brief of The American Petroleum Institute at 16, App. 449.

referendum upon the appropriateness or suitability of particular price references." Brief of Defendant-Appellee at 25, App. 499-500.

The Federal Circuit concurred with both DESC and the Appellants that the claim before it was, in fact, only one of *per se* illegality and not one challenging the PMM on the ground that it was not a market-based reference. The court stated: "The complaints in both suits included among their claims the charge that DESC's actions were per se illegal because the PMM-based EPA clause was inconsistent with the applicable section of the FAR." *Tesoro*, 405 F.3d at 1342; *see also Id*. ("The parties in both suits filed cross-motions for summary judgment on the claim of per se illegality.") The court went on to articulate the Appellants' *per se* illegality claim in the same manner as the Appellants had:

> Appellants assert that the term "established prices" in FAR § 16.203-1 should be read as "contractor's established prices" in order to be consistent with the term found in FAR § 16.203-3. Under this reading of the two sections, prices could only be adjusted based on changes in the individual contractor's prices and not based on changes in overall market prices.

*Id*. at 1343-44.

Importantly, DESC opposed the Appellants' *per se* illegality claim on the sole ground that it was "inconsistent with the plain meaning of the regulatory language," and the Federal Circuit agreed, holding that "the plain meaning of the regulatory language contradicts Appellants' arguments" without ever discussing whether the PMM was or was not a market-based reference. *Id*. at 1344, 1346.

Thus, fully respecting DESC's admonition that the PMM's relationship to the marketplace for fuel was not before the court, the Federal Circuit held:

> The regulations permit use of contracts that include adjustments based on established prices, but do not limit those adjustments to changes only in specific prices offered by an individual contractor. Thus, DESC's use of market-based references to determine adjustments to established price was authorized under the law.

*Id*. at 1348; *see also id*. ("[C]ontrary to the conclusion of the Court of Federal Claims, market-based EPA clauses are permitted under the FAR").

The Federal Circuit's narrow holding that DESC's use of the PMM was not *per se* illegal comports with the limitations on the court's jurisdiction to entertain the appeal. Jurisdiction in *Tesoro* was based on 28 U.S.C. § 1292(d)(2), which by its express terms permits appeal only of "controlling questions of law" certified by the Court of Federal Claims. *Tesoro*, 405 F.3d at 1342-43; *see Ahrenholz v. Bd. of Trustees*, 219 F.3d 674, 677 (7th Cir. 2000) (certified appeal under the analogous provisions of 28 U.S.C. § 1292(b) extends only to "abstract issue[s] of law") (Posner, J.). The issue of the PMM's relationship to the marketplace (and, therefore, the determination of whether it is a market-based reference) is solely a question of fact – not a question of law reviewable under section 1292(d)(2). *Id*. Furthermore, the Federal Circuit's jurisdiction was circumscribed by the scope of the orders certified, *U.S. Philips Corp. v. Sears Roebuck & Co.*, 55 F.3d 592, 597 (Fed. Cir. 1995), and neither of the certified orders before the court made factual findings concerning whether the PMM reflected the marketplace for the military fuel DESC purchased from the Appellants. *Tesoro Hawaii Corp., et al. v. United States*, 58 Fed Cl. 65 (2003); *Tesoro Hawaii Corp., et al. v. United States*, No. 02-704C, 2003 U.S. Claims LEXIS 410 (Fed. Cl. Oct. 30, 2003); *Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 3 (2003) (hereafter *"Hermes I")*; *Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 409 (2003) (hereafter *"Hermes II")*. Accordingly, the Federal Circuit in *Tesoro* would have exceeded its jurisdiction in contravention of the express language of section 1292(d)(2) by entertaining, to say nothing of deciding, the issue of whether the PMM is a market-based reference. *U.S. Philips Corp.*, 55 F. 3d at 597. As established above, it did not do so.

**B. DESC's Construction Of *Tesoro* Ignores Its Plain Language**

DESC is unable to point to a holding in *Tesoro* that the PMM is a market-based reference. DESC is similarly unable to point to any discussion by the court regarding the relationship between the PMM and marketplace for fuel. Instead, DESC makes the sweeping assertion that the court held that use of the PMM was legal for all purposes. DESC's Motion at 13-16. This assertion cannot be reconciled with the plain language of *Tesoro*.

DESC cites to the court's statement: "we conclude that DESC's use of a *market-based EPA clause* tied to the PMM was authorized under the FAR." DESC's Motion at 15 (citing *Tesoro*, 405 F.3d at 1348) (emphasis added). The court here, however, merely states that market-based EPA clauses are authorized under the FAR. It conspicuously does not characterize the PMM itself as a "market-based reference." Rather, the court merely notes that the PMM is the particular reference used in the iteration of the price adjustment clause before it (which now, for example, uses Platts and OPIS). The court made a similar distinction elsewhere in its decision when it stated without reference to the PMM, "[c]ontrary to the conclusion of the Court of Federal Claims, *market-based EPA clauses* are permitted under the FAR." *Id*. at 1348 (emphasis added); *see also Williams Alaska Petroleum, Inc. v. United States*, No. 02-705C (Fed. Cl.), where this Court drew the same distinction between "the government use [of] *a market-based-index* . . . [and] whether the index provides an *accurate measure of the market* it's attempting to draw data from" (Transcript of Nov. 18, 2003 Proceedings at 24-25) (emphasis added), App. 292-93.[28] DESC, however, would read the words "authorized under the FAR" in the language it quotes to mean authorized for all purposes under all 52 subparts of the FAR, regardless of whether the issue was raised before or considered by the court. Under DESC's

[28] Further, this Court recognized in its October 1, 2003 decision in *Williams Alaska* that a decision that DESC had the authority to use market-based EPA clauses does not "resolve the case in its entirety." Slip op. at 21. As the Court stated:

> There remains to be considered plaintiffs' contention that even if DESC had the authority to use such market-based EPA clauses, these clauses were nevertheless defective because the price index they incorporated failed to ensure payment of the fair market value of the delivered fuel. In support of this argument, plaintiffs rely on various theories of recovery, including misrepresentation, breach of contract, implied-in-fact contract, failure of consideration and frustration of purpose, mistake, and Fifth Amendment taking. The court will consider these remaining issues in the next round of this litigation. At that time, plaintiffs will also be expected to address the question of why their nearly decade-long participation in DESC's annual petroleum procurements should not now preclude them, as a matter of law, from contesting any aspect of the application and operation of the EPA clauses adopted in those procurements.

*Ibid.*

construction, had it violated funding restrictions in FAR subpart 32.7 in setting prices, *Tesoro* nonetheless would require a holding that DESC's prices were authorized. To make such an assertion is to refute it.

Moreover, DESC defies credulity, to say nothing of the fundamental demands of due process,[29] in asserting that the Federal Circuit placed its imprimatur on the PMM as a market-based reference. DESC may not impart to the Federal Circuit an intent to sanction the PMM in the face of the facts that the PMM, *inter alia*, varied randomly with respect to the marketplace, reported changes of volume as changes in price, and moved in the opposite direction of the marketplace 24 percent of the time. App. 626. Nor may DESC claim that the Federal Circuit sanctioned DESC's use of the wrong fuels to measure the fair market value of military fuel, particularly when the court previously found DESC's pricing clause to be wanting in this respect in *Barrett*. *Barrett*, 242 F.3d at 1061. *See generally* App. 619-21. Moreover, it is undisputed here that DESC knew that the PMM did not reflect the marketplace, misrepresented that fact to its suppliers, and, nonetheless, used the PMM to set prices for its own benefit. Amended Complaint ¶¶ 9-25, 45-58. DESC may not make the Federal Circuit an "abettor of iniquity" by claiming that the court absolved DESC even of responsibility for its own misrepresentations. *Phoenix Petroleum Co. v. United States*, No. 98-5124, 1999 U.S. App. LEXIS 16939 at *10 (Fed. Cir. July 23, 1999) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)).

DESC's further reliance on the Federal Circuit's discussion of *MAPCO* is unavailing. DESC's Motion at 14-15. While the Federal Circuit rejected *MAPCO*'s holding that the PMM was not an established price, the court did so on the grounds that *MAPCO* "was premised on a

---

[29] DESC's disregard of the requirements of due process is particularly troubling in this case. Even if the Federal Circuit in *Tesoro* somehow could be deemed to have made a factual finding that the PMM was a market-based reference, La Gloria cannot be bound by the factual record or factual findings in another case to which it is not a party, for, of course, La Gloria is entitled to establish its own record of the PMM's relationship to the marketplace for fuel. *See generally Blonder-Tongue Lab., Inc. v. University of Ill. Found.*, 402 U.S. 313, 329 (1971).

misinterpretation of the meaning of the term 'contractor's established prices.'" *Tesoro*, 405 F.3d at 1348. The lower court in *MAPCO* erred, the Federal Circuit stated, when it reasoned that, because the PMM was an index that did "not reflect any specific vendor's current price," the PMM was not an "established price." *Id*. Nothing in the Federal Circuit's discussion of *MAPCO* even remotely suggests that the Federal Circuit considered *MAPCO* to have found that the PMM was not a market-based reference or, *a fortiori*, that the Federal Circuit took exception to such a finding.

DESC similarly misses the mark in pointing to *Tesoro*'s discussion of the Appellants' contention that, as held in *MAPCO*, the PMM did not address one of the "mischiefs" set forth in FAR § 16.203-3. DESC's Motion at 14 (quoting *Tesoro,* 405 F.3d at 1348). The Appellants simply asserted that the PMM, as an "amalgamation of petroleum sales," did not comply with FAR § 16.203-3's requirement that DESC "provide for price adjustment in the event of changes in the contractor's established prices." Because of this failing, the Appellants argued that the PMM did not reflect their own product, market or price in the same way their own ("contractor's") established prices would. *Tesoro*, 405 F.3d at 1348. *Tesoro*'s holding that an index can be an "established price" for purposes of FAR § 16.203, and that use of the contractor's own prices is not required, rendered this argument a *non sequitur*. *Ibid.*

Recognizing the indefensibility of its proffered reading of *Tesoro*, DESC alternatively retreats to an attempt to rewrite FAR § 16.203. DESC asserts that, under FAR § 16.203, an index used to set prices need be drawn from only "market sources" and that its actual relationship to the marketplace is irrelevant. DESC's Motion at 8 (quoting *Tesoro*, 405 F.3d at 1347). DESC does not meaningfully address *Tesoro's* express holding that, where an index is used to set prices, FAR § 16.203 requires that the index be a "market-based reference[]." *Tesoro*, 405 F.3d at 1347-48; *see also id.* at 1343 ("'established market prices'" must be prices "'established in the course of ordinary and usual trade between buyers and sellers free to bargain'") (quoting FAR § 15.804-3(c)(2)). DESC's reckless assertion that "market sources" need not reflect the marketplace for the product that the government is purchasing would

effectively write the word "market" out of the requirement for "market-based reference[]." Thus, as Kalt and Killen state in their expert report, the PMM "failed to provide an effective measure of established market prices." App. 611.[30]

The Federal Circuit rejected an analogous assertion to that which DESC makes here in *Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988). There, the court struck down as illegal the use of a BLS index to set prices for aluminum mill shapes that did not "fair[ly] measure the economic situation actually confronting the contractor." *Id*. at 1184-85. Consistent with the principles of *Beta Systems*, the Federal Circuit made clear in *Tesoro* that price adjustments based on indexes must be "market-based references" and thereby reflect the marketplace for what the government purchases. *Tesoro*, 405 F.3d at 1347-48.[31]

## III. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS THAT DESC'S MILITARY FUEL PRICES VIOLATE FAR § 15.802(b)(1)

In seeking to dismiss La Gloria's claims that DESC violated the separate, stand-alone requirements of FAR § 15.802(b)(1) for "fair and reasonable prices," DESC makes no effort to support the fairness or reasonableness of its military fuel prices. Instead, DESC seeks to dismiss La Gloria's claims on the sole ground that it is not bound by FAR § 15.802(b)(1), because FAR § 15.802(b)(1) does not protect contractors. DESC's Motion at 16-19. DESC's assertions ignore the weight of overwhelming authority establishing that FAR § 15.802(b)(1) protects contractors.

30 DESC blithely concludes that the other price references it used to set prices in addition to the PMM satisfy DESC's flawed "market sources" standard. DESC's Motion at 15-16. DESC offers no evidence that these other price references reflected the marketplace where DESC purchased fuel or that the fuels it used accurately reflected the physical characteristics of the military fuel DESC purchased. App. 619-21. As DESC does not even attempt to meet its burden of coming forward with evidence in support of its motion on this ground, these issues will have to await determination on a proper record following discovery.

31 DESC asserts that La Gloria's claims of illegality allege "injury without harm" and therefore must be dismissed. DESC's Motion at 20-21. This assertion is makeweight. La Gloria expressly alleges that DESC's violations of law damaged La Gloria. Amended Complaint ¶ 43; *see generally Tesoro*, 58 Fed. Cl. at 75-76. Moreover, DESC offers no evidence challenging La Gloria's allegations.

Accordingly, La Gloria is entitled to seek judicial relief for DESC's violations of that provision. *Freightliner Corp. v. Caldera*, 225 F.3d 1361, 1365 (Fed. Cir. 2000).

FAR § 15.802(b)(1) provides: "Contracting officers shall – (1) Purchase supplies and services from responsible sources at fair and reasonable prices."[32] FAR § 15.802(b)(1) is in FAR Part 15, "Contracting by Negotiation," and should be considered within the context of other provisions in that Part. Significantly, FAR § 15.803(c) states that "[p]rice *negotiation* is intended to permit the contracting officer *and the offeror to agree* on a fair and reasonable price." (Emphasis added). Similarly, FAR § 15.804-1(a) states that "[c]ost or pricing data submitted by an offeror or contractor enable the Government to perform cost or price analysis and ultimately enable the Government *and the contractor to negotiate fair and reasonable prices*." (Emphasis added). Indeed, FAR § 15.803(d) stresses that the "total result" should be "fair and reasonable to both the Government *and the contractor*." (Emphasis added).[33] Thus, the plain language of the FAR – which DESC ignores – establishes beyond any question that the requirement to purchase products at "fair and reasonable prices" is intended to protect contractors. *See Tesoro*, 405 F.3d at 1346 ("We construe a regulation in the same manner as we construe a statute, by ascertaining its plain meaning.").

In addition to ignoring this dispositive language, DESC fails to mention critical portions of its *own guidance* demonstrating that the term "fair and reasonable prices" in FAR § 15.802(b)(1) is meant to protect contractors. DOD issued an "Armed Services Pricing Manual" ("ASPM") in 1986 (Volume 1) and 1987 (Volume 2, "Price Analysis"), and the foreword to each volume states that DOD based the ASPM "on policies and procedures of the [FAR] and the [DFARS]." App. 548-A; App. 604. The ASPM states unequivocally that "[a] fair

[32] During the period relevant here, this provision also was denominated as FAR § 15.802(a) and is currently denominated as FAR § 15.402(a).

[33] The FAR contained each of these provisions in identical form from 1984 through 1997 (1994 for § 15.804-1); subsequent versions are substantially similar.

and reasonable price is one that is fair to *both parties to the contract* . . . ." ASPM § 1.3 (Dep't of Def. 1986) at 1-3 (emphasis added), App. 549; *see also id*. at B-5 (Appendix B) ("Fair and reasonable price: A price that is *fair to both parties*.") (emphasis modified), App. 552; App. 605. Also, like the FAR provisions discussed above, the ASPM expressly links the "fair and reasonable" concept to negotiations: "[T]o be *fair to both parties*, the price must represent a *reasonable compromise between the seller's and the buyer's view of a fair price*. . . . [Y]ou should consider 'fair and reasonable' in three dimensions: fair under current market conditions; *reasonable to the seller; and reasonable to the buyer*." ASPM § 2.5, at 2-6 (emphasis added), App. 550; *see also id*. at § 9.2, 9-12 ("Fair and reasonable describes the conclusion that the price is *acceptable and fair to both parties*.") (emphasis added), App. 551; App. 606.[34] Thus, consistent with the ASPM, DOD's "Defense Procurement and Acquisition Policy, Contracting Pricing Reference Guide" *currently* states – in a section titled "Pay A Fair and Reasonable Price" – that "[t]o be *fair to the seller* a price must be realistic in terms of the seller's ability to satisfy the terms and conditions of the contract." Defense Procurement and Acquisition Policy, Contracting Pricing Reference Guide § I.2.1 (available at http://www.acq.osd.mil/dpap/contractpricing/vol1intro.htm#I.2.1) (last updated Aug. 26, 2005) (last visited Dec. 6, 2005) (emphasis added), App. 542. Such long-standing interpretations of the FAR are entitled to judicial deference. *See generally United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 222 (2001).

[34] DOD promulgated an earlier version of the ASPM in 1975 that contains similar instructions. *See*, *e.g.*, ASPM No. 1 (Dep't of Defense 1975) at 2B10 ("[W]e defined a fair and reasonable price to be one that is *fair to both parties* . . . . Thus, to be fair to both parties, the price must represent a *reasonable compromise* between the seller's *and the buyer's view* of what is fair.") (emphasis added), App. 546; *id*. at 2B11 ("Fair and reasonable describes a conclusion that the price is *acceptable to both the Government and the seller*.") (emphasis added), App. 547. Furthermore, the Defense Contract Audit Agency's ("DCAA's") Contract Audit Manual ("DCAM") states: "The objective in requiring cost or pricing data or information other than cost or pricing data is to enable the Government to perform cost or price analysis and ultimately enable *the Government and the contractor to negotiate fair and reasonable contract prices*." 2 DCAM, § 9-201(b) at 924 (July 1, 1989) (emphasis added), App. 555.

Moreover, the preeminent authorities on federal procurement law, Professors Nash and Cibinic, agree that the requirement of arriving at a "fair and reasonable price" requires taking account of contractors' interests, as well as ensuring that the government does not pay more than is fair to it. In describing the obligations of contracting officers under FAR Parts 14 and 15, they wrote: "Fair and Reasonable Price – A price that is *fair to both parties* . . . ." CCH Nash & Cibinic eSeries, Government Contracts Reference Book, F Guidebook (2005) (available on Lexis) (emphasis added). Even DESC's Deputy Director of Contracting, Edward Biddle, acknowledged this obligation in a 1993 memorandum stating that the purpose of DESC's adjustable prices was to "ensure[] that the sale will be at the market price, which is a *fair and reasonable price*. Not only is the government protected, *but the contractor is protected* by knowing that its price will always be related to the price it could obtain in the commercial marketplace." App. 4 (emphasis added); *see also* App. 67 ("the ultimate goal [of DESC's adjustable prices] is to assure that fuel contract prices are fair and reasonable"); App. 69 ("[t]he contract price should then remain fair and reasonable (within current market range)").

Finally, DESC's insistence that "fair and reasonable" benefits *only one party* cannot be squared with the ordinary and accepted meaning of the word "fair." Webster's defines "fair" as "[j]ust to *all parties*." *Webster's II New Riverside University Dictionary* 161 (1988) (emphasis added); *see also Webster's New World Dictionary of the American Language* 502 (2d ed. 1984) ("[T]he treating of *both or all sides alike*") (emphasis added). Courts usually interpret legal provisions according to their plain meaning (*see Edwards v. Aguillard*, 482 U.S. 578, 594 (1987)), yet DESC urges just the opposite, arguing that "the purpose of [this regulation] is *not* to protect contractors." DESC's Motion at 18 (emphasis added).

The Federal Circuit has made clear that contractors have the right to seek relief when the government violates a provision of law meant to benefit them. In *Freightliner Corp.*, the court articulated the controlling standard as follows: "In order for a private contractor to bring suit against the Government for violation of a regulation, that regulation must exist for the benefit of the private contractor." 225 F.3d at 1365 (*citing Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442,

1451 (Fed. Cir. 1997). Thus, in *LaBarge Prods., Inc.*, the Federal Circuit held that the contractor could seek relief for the government's alleged violation of a regulation that was for the contractor's benefit (the FAR prohibition of auction techniques) and further noted that the Court of Claims had granted contractors relief "when a contract has been written in violation of a law or regulation enacted for the benefit of prospective contractors." 46 F.3d at 1552; *see also Navajo Ref. Co. L.P.*, 58 Fed. Cl. at 213 (noting that, "[i]f a regulation appears intended to define and state the rights of a class of persons, it is presumptively intended to benefit those persons").

None of the cases DESC cites refutes this conclusion. DESC leans on *AT&T v. United States*, 307 F.3d 1374 (Fed. Cir. 2002) (hereafter "*AT&T V*"), claiming hopefully that, "[i]f the court could not find an enforceable interest for contractors in a *statute*, . . . La Gloria will be hard pressed to find one here." DESC's Motion at 18 (emphasis original). Yet the portion of *AT&T V* dealing with a statute – section 8118 of the Department of Defense Act (101 Stat. 1329) – has nothing to do with FAR § 15.802(b)(1). There, the Federal Circuit held that, because the restrictions on the use of appropriated funds in section 8118 included legislative enforcement (compliance reports to Congress), there was no basis for judicial enforcement. *AT&T V*, 307 F.3d at 1378. The court underscored this conclusion by discussing separation of powers principles, noting that "it is not 'the judicial role to discipline the agency's noncompliance with the supervisory and reporting instructions of congressional oversight.'" *Id*. at 1379 (quoting *AT&T v. United States*, 177 F.3d 1368, 1375 (Fed. Cir. 1999) (*en banc*) (hereafter "*AT&T III"*)). By contrast, FAR § 15.802(b)(1) contains no legislative enforcement provision. The Federal Circuit in *AT&T V* also discussed certain regulations dealing with the selection of contract type and determined that those regulations were meant to benefit only the government.[35] *AT&T V*, at

[35] DESC blurs the distinction between the holding in *AT&T V* concerning section 8118 and the separate holding concerning certain regulations. *See* DESC's Motion at 18 (referring in one sentence to AT&T's allegation that the Navy had violated a variety of procurement *regulations*, but claiming in the next sentence that, "[s]pecifically, the contractor alleged . . . that Navy contracting officials had failed to obtain a *statutorily-mandated* departmental-level certification . . . .") (emphasis added). As discussed herein, neither holding in *AT&T* supports the government's arguments.

1379-80. However, as discussed above, FAR § 15.802(b)(1) is intended to benefit contractors. As such, *AT&T V* is simply irrelevant.

DESC's reliance on *Short Bros. PLC v. United States*, 65 Fed. Cl. 695 (2005), is similarly misplaced. The lengthy opinion in that case includes a single statement that FAR § 15.802(b)(1) "does not afford a judicial remedy." *Id.* at 765. The court's limited focus on the FAR provision is understandable, as apparently neither the plaintiff nor, conspicuously, the government provided the court with any of the substantial evidence discussed above (including DOD's long-standing position) demonstrating that the FAR requirement to arrive at fair and reasonable prices is intended to benefit contractors. Moreover, in *Short Bros.*, the contractor ultimately sought to use FAR § 15.802(b)(1) to challenge the selection of contract type, a choice *AT&T* makes clear is uniquely within the province of the government.[36]

Finally, DESC makes the extraordinary assertion that, were FAR § 15.802(b)(1) to be enforced, "contract pricing never would be binding." DESC's Motion at 19. This Court, however, reviews innumerable determinations by contracting officers both before and after contract award, including the requirements of the Competition in Contracting Act that the government award contracts that are "most advantageous to the United States, considering only cost or price and the other factors included." 41 U.S.C. § 253(b). There is simply nothing unique about reviewing whether the contracting officer properly determined that prices were "fair and reasonable." Indeed, La Gloria alleges here that DESC's determination of price

[36] DESC also relies on *All Phase Environ., Inc.*, B-292919.2, 2004 U.S. Comp. Gen. LEXIS 19 (Feb. 4, 2004). There, the GAO observed that, before awarding a fixed-price contract, agencies are required to determine that the price offered is fair and reasonable, citing as support FAR § 15.402(a) (the successor provision to FAR § 15.802(b)). The GAO then noted that "an agency's concern in making a *price reasonableness* determination focuses primarily on whether the offered prices are higher than warranted." *Id*. at *16 (emphasis added). The GAO did not discuss whether the FAR provision benefits contractors, did not discuss the purpose of the provision, did not discuss the term "fair", and certainly did not state that the provision benefits *only* the government. Yet DESC recklessly cites *All Phase* to support its claim that "the purpose of [this regulation] is not to protect contractors (other than from needless demands for documents), but to protect the Government from prices that are 'higher than warranted.'" DESC's Motion at 18-19. *All Phase* provides no such support.

reasonableness was, in essence, a sham: that DESC knew that the PMM did not reflect the marketplace, misrepresented that fact, and then "determined" that its prices were fair and reasonable while knowing they were not. Amended Complaint ¶¶ 9-25, 38. DESC may not seek to shield such conduct from judicial review under the guise that the government will too often be sued for violating the law.[37] *See generally Cont'l Bus. Enter., Inc. v. United States*, 452 F.2d 1016, 1022 (Ct. Cl. 1971) ("the standard of proof which we require in cases such as this will undoubtedly discourage frivolous lawsuits.").[38]

## IV. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS OF MISREPRESENTATION

DESC's motion does not dispute that DESC misrepresented the facts about its military fuel prices. DESC does not dispute that it misrepresented that it set prices to reflect fair market value and does not deny that, in fact, it set prices below fair market value and did so knowingly.[39] Instead, DESC alleges that its misrepresentations were not material and that it had

---

[37] At a minimum, DESC's sham determination of price reasonableness is reviewable for an abuse of discretion. *See, e.g., McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1326 (Fed. Cir. 1999) (the rule that a termination for default is reviewable for an abuse of discretion "is but a part of the well established law governing abuse of discretion by a contracting official"); *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999) ("Of course, courts may review such decisions [concerning contractor's responsibility] by the contracting officer for abuse of discretion . . . ."); *George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229, 247 (2005) (relying on *RCS Enters., Inc. v. United States*, 53 Fed. Cl. 303, 309 (2002), where the court held it could review for abuse of discretion contracting officer's decision not to pay for a value engineering change proposal, in holding that court could review agency performance award determinations). Equally relevant to DESC's sham determination here, the courts have held that refusal to exercise discretion is subject to judicial review quite apart from the review available if that discretion had, in fact, been exercised. *Accardi v. Shaughnessy*, 374 U.S. 260, 266 (1954).

[38] DESC elsewhere has asserted that FAR § 15.802 applies only to the initial award price and not to the price DESC sets using the PMM. This is a distinction without a difference when it is recognized that DESC admits that it never intended to pay the initial award price. *See* DESC's Proposed Findings of Uncontroverted Fact ¶ 9.

[39] DESC elsewhere has resorted to misstating the common-law claims in an effort to have those claims dismissed. DESC has stated that, among others, the allegations of misrepresentation, breach of contract and mistake "depend upon MAPCO for their vitality," and, therefore, *Tesoro's* rejection of *MAPCO* controls disposition of these claims. In its desperation, DESC simply ignores what is alleged.

(footnote continued)

no duty to disclose the truth about its prices.[40] DESC's assertions are simply wrong. DESC's misrepresentations about setting prices below fair market value were material, and DESC had a legal obligation to disclose the material facts about the essential terms of its contracts.

Misrepresentation occurs when "the Government ma[kes] an erroneous representation of a material fact." *T. Brown Constructors, Inc. v. Sec'y. of Transp.*, 132 F.3d 724, 729 (Fed. Cir. 1997). La Gloria alleges that DESC misrepresented that the PMM was designed to measure fair market value, misrepresented that the PMM was intended to be used to set prices, and misrepresented that the PMM and the prices set using it reflected fair market value. Amended Complaint ¶¶ 9-25, 52-54.[41] While these allegations must be deemed true for purposes of DESC's Motion to Dismiss, it is compelling that DESC does not deign even to deny them, likely because its own documents establish that it made similar misrepresentations to its parent organization, DLA, and others that the PMM was "virtually unimpeachable." App. 98; *see also*

---

La Gloria's allegation here that DESC "misrepresented and otherwise failed to disclose that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value" is wholly independent from the issues of illegality addressed in *MAPCO*. *See* Amended Complaint at ¶ 53. These allegations of misrepresentation would stand alone had *MAPCO* never been decided and the issue of illegality never introduced into the case. The same is true for La Gloria's allegations of breach of contract and mistake. *See* Amended Complaint at ¶¶ 62, 68, 112. Indeed, in a similarly situated military fuel case, this Court found that the refiner's claims of illegality stood separately from its claims of misrepresentation, breach of contract and mistake. *See Williams Alaska Petroleum, Inc. v. United States*, 57 Fed. Cl. 789, 803 (Fed. Cl. Nov. 18, 2003), where the court held that a decision that DESC had the authority to use market-based EPA clauses does not "resolve the case in its entirety."

[40] DESC elsewhere has argued that there was no misrepresentation because there is no requirement that a price adjustment clause reflect the marketplace. The requirement that DESC's price adjustment clause reflect the marketplace arises, *inter alia*, from DESC's express representation that it did. It is DESC's knowing misrepresentation of this fact that gives rise to La Gloria's misrepresentation claim, and DESC's defense is, in essence, little more than an assertion of a right to lie to its suppliers about its prices.

[41] La Gloria also alleges that DESC misrepresented the legality of its fuel prices; however, these are separate and distinct allegations from the misrepresentations discussed above. *Compare* Amended Complaint ¶ 46 *with* ¶¶ 52-55. DESC does not specifically address these allegations of misrepresentation in its motion.

App. 96 (writing to a supplier that the PMM "consistently reflects actual market prices"); App. 91 (writing to a supplier that the PMM is "a reliable indicator of price movements in the petroleum products market."); App. 29 (testifying before this Court that the PMM is "the benchmark against which we . . . compare everything domestically").

Unable to deny La Gloria's allegations of misrepresentation, DESC asserts that its misrepresentations about its fuel prices were not material. Price, however, is always material. *See, e.g.*, *Roseburg Lumber Co. v. Madigan*, 978 F.2d 660, 666 (Fed. Cir. 1992) (holding that the minimum acceptable bid rates, calculated by the Forest Service, were essential to the claimant's bid and were, therefore, material underlying premises of the contract); *Interstate Plywood Sales Co. v. Interstate Container Corp.*, 331 F.2d 449, 452 (9th Cir. 1964) ("Price is an essential contract element"). Indeed, a representation that a party will pay fair market value, when it knows it will not, could not be more material. *See T. Brown Constructors, Inc*, 132 F.3d at 729 ("A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent") (quoting *Restatement (Second) of Contracts* § 162 (1979)).[42]

DESC's further assertion that it had no duty to disclose the truth about its military fuel prices profits is naught in the face of its undisputed, affirmative misrepresentations. *John Massman Contracting Co. v. United States*, 23 Cl. Ct. 24, 31 (1991). In any event, DESC had a duty to disclose material facts known to it. *Id*.; *Ashford v. United States*, 43 Fed. Cl. 1, 4 (1997) ("a contracting party is never free to disregard, or to fail to call attention to, mistakes of fact that can be seen to shape or influence the other party's understanding of the expected contract's essential terms and conditions. *Restatement (Second) of Contracts*, § 161(b) [addressing misrepresentation]"). DESC does not deny that it failed to meet this duty, nor does DESC offer any evidence even suggesting that La Gloria was aware of the facts that DESC failed to disclose.

[42] At a minimum, the determination whether DESC's misrepresentations are material raises factual issues about which DESC offers no evidence. On this ground as well, DESC's motion must be denied.

DESC's final assertion that the terms of the fuel contracts somehow absolve it of responsibility for its misrepresentations ignores the well-established rule that "[e]xtrinsic evidence is admissible to prove that a plaintiff entered a contract based on a misrepresentation by defendant." *C & H Comm. Contractors, Inc. v. United States*, 35 Fed. Cl. 246, 256 (1996) (citing *T.L. Roof & Assoc. Constr. Co. v. United States*, 28 Fed. Cl. 572 (1993)). Once again, DESC does not deny La Gloria's allegations of what the extrinsic evidence establishes – that DESC knew that the PMM did not reflect fair market value and misrepresented what it knew for its own benefit. Amended Complaint ¶¶ 9-25, 52-54.

## V. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS OF BREACH OF CONTRACT

DESC seeks to dismiss La Gloria's claims that DESC breached the military fuel contracts when, *inter alia*, it failed to pay fair market value for the fuel La Gloria delivered. DESC does not claim that it paid fair market value but, instead, asserts that it was not required to do so. DESC contends that it set fuel prices according to changes in the PMM and that that is all the contracts required. DESC's Motion at 22-23. DESC's assertions ignore the purpose of its adjustable pricing clause, its own admissions of what its pricing clause requires, and the clause's express language – all of which mandate the payment of fair market value.[43]

"A court must construe a 'contract to effectuate its spirit and purpose.'" *M.A. Mortenson Co. v. Brownlee*, 363 F.3d 1203, 1206 (Fed. Cir. 2003) (quoting *Hercules, Inc. v. United States*, 292 F.2d 1378, 1381 (Fed. Cir. 2002)); *see also L.W. Matteson, Inc. v. United States*, 61 Fed. Cl. 296, 307 (2004). Here, the purpose of an adjustable pricing clause as authorized by the FAR is to ensure that the contract price reflects changes in the marketplace during the term of contract. *Beta Systems, Inc.*, 838 F.2d at 1185 ("The government concedes, as it must, that the purpose of

[43] La Gloria also alleges that DESC breached the contracts when it awarded them in violation of law; however, these are separate and distinct allegations from the breaches of contract discussed above. *Compare* Amended Complaint ¶ 65 *with* ¶¶ 66-69. DESC does not address specifically these allegations of breach in its motion.

the EPA clause was to accommodate inflationary/deflationary changes in the costs of labor and materials.”). With respect to DESC’s pricing clause, the Federal Circuit expressly found in *Barrett* that DESC’s clause embodied “a promise by the government to pay at least fair market value” for fuel, and, as cited above, DESC’s documents expressly confirm this purpose. *Barrett*, 242 F.3d at 1060; App. 4; App. 14; App. 62; App. 67. The only construction of DESC’s pricing clause that gives effect to its purpose, as required by the FAR, found by the Federal Circuit, and as admitted by DESC itself, is one that provides for DESC to pay the fair market value for its purchases. *See generally M.A. Mortenson*, 363 F.3d at 1206.[44]

Unsurprisingly, the language of DESC’s pricing clause makes clear that DESC’s contractual obligation was to pay fair market value. The very title of the clause, “Economic Price Adjustment – Published Market Price,” indicates that DESC was to pay the “market price.” App. 9. In some iterations of the clause, the “market price” that is used to set fuel prices is defined as “derived from quotes, assessments, or sales prices in the market place.” App. 9. A more express recognition that the “*market price*” is to reflect the “*market place*” is difficult to imagine. Removing any possible ambiguity, however, versions of DESC’s pricing clause provide that the index used to set prices shall be changed if “the Contracting Officer determines that the *market price* indicator consistently and substantially fails to reflect *market conditions*.”

---

[44] Moreover, the mandate of the Deputy Director of Contracting that DESC’s pricing clause “ensure[] that the sale will be at the market price” establishes a restriction on the contracting officer’s authority. App. 4. Once again, the only interpretation of DESC’s pricing clause that is consistent with this limitation on the contracting officer’s authority, and that would not render the clause void for lack of authority, is one that provides for DESC to pay the fair market value for what it purchases. *Puerto Rico Dep’t. of Labor & Human Res. v. United States*, 49 Fed. Cl. 24, 31 (2001) (because “parties are presumed to have intended to create a valid, binding contract . . . the court must dismiss an interpretation which would find that the parties intended to create a contract with even a portion of the contract void”); *see generally Fed. Crop Ins. v. Merrill*, 332 U.S. 380 (1947) (unauthorized governmental actions without effect). DESC cannot credibly allege that its contracting officers have authority to contract in derogation of policies established by its own Office of the Director of Contracting. Were DESC to make such an allegation, La Gloria, of course, would be entitled to discovery to challenge it.

App. 9 (emphasis added).[45] The totality of this contractual language clearly demonstrates a contractual obligation, to say nothing of the parties' intent, that DESC pay fair market value for the fuel it purchases. *Sunoco, Inc. v. United States*, 59 Fed. Cl. 390, 392-93 (2004) ("The intention of the parties to a contract controls its interpretation.") (citing *Beta Systems, Inc.*, 838 F.2d at 1185).[46]

DESC's assertion that its pricing clause should be read not to impose an obligation to pay fair market value assumes that the indexes selected for the clause were chosen essentially randomly, and thus without a purpose, and could as easily have been an index of apples, oranges and bananas (continuing with an earlier analogy) as the PMM. This "head-in-the-sand" construction of DESC's pricing clause is absurd. The PMM was chosen for a reason, and that

[45] While the language of DESC's pricing clause has changed over time, the structure and the purpose of the different iterations of the clause are the same, and DESC has not alleged that a different intent and obligation underlie different iterations of the clause. *See, e.g.*, Def.'s Mot. to Dismiss in *Sunoco, Inc. v. United States*, No. 02-466C (Fed. Cl.), filed December 15, 2005, in which DESC challenges claims under military fuel contracts entered between 1984 and 1999 without alleging that a different intent and obligation underlie different iterations of its pricing clause.

[46] If any credence could be given to DESC's construction of its pricing clause as not providing for payment of fair market value, that construction, at a bare minimum, raises an ambiguity with respect to the language quoted above, and extrinsic evidence would be admissible to resolve that ambiguity. *M.G. Constr., Inc. v. United States*, 67 Fed. Cl. 176, 182-83 (2005) ("But, if an ambiguous or uncertain writing can only be understood upon consideration of the surrounding circumstances, extrinsic evidence will be allowed to interpret the language."). However, DESC's own documents and testimony before this Court, to say nothing of the Federal Circuit's finding in *Barrett*, make clear that DESC's pricing clause required payment of fair market value. App. 4; App. 14; *Barrett*, 242 F.3d at 1060.

Moreover, even in the absence of ambiguity, this evidence may be considered. "The Federal Circuit requires the court to review the totality of events and circumstances in determining whether there has been a material breach of contract." *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1552 (Fed. Cir. 1992) (citing *Restatement (Second) of Contracts* § 241). Among the factors to be considered include the nature and effect of the breach in light of how the contract was viewed, bargained for, entered into, and performed. *Id*. at 1551." *American Capital Corp. v. United States*, 58 Fed. Cl. 398, 408-09 (2003). In addition, "[t]here are exceptions to the parole evidence rule applicable when a written agreement is based upon mutual mistake or is procured by one of the parties through fraud or material misrepresentation on which the other party relies." *C & H Comm. Contractors, Inc. v. United States*, 35 Fed. Cl. 246, 254 (1996). Here, La Gloria has alleged both mutual mistake and misrepresentation. Amended Complaint ¶¶ 97-123, 45-58.

reason was to provide for the payment of fair market value. App. 4; App. 14; App. 62; App. 67; *see generally American Sav. Bank, F.A. v. United States*, 62 Fed. Cl. 6, 13 (2004) (regarding plaintiff's allegations that it accepted a lower interest rate based on government's promise of a note of forbearance: "Certainly there was some reason why this particular rate was chosen, and Defendant offers no explanation that counters Plaintiff's characterization of the negotiations").

Moreover, under the *Spearin* doctrine, DESC warranted that the indexes it picked to set prices would be adequate to accomplish the purpose for which they were used – namely, to reflect changes in economic conditions during the term of the contracts. *United States v. Spearin*, 248 U.S. 132, 136 (1918) (the government impliedly warrants the accuracy of matters set forth in contract documents); *D.F.K. Enter., Inc. v. United States*, 45 Fed. Cl. 280 (1999) (same). Thus, in *USA Petroleum Corp. v. United States*, 821 F.2d 622 (Fed. Cir. 1987), where the quantity of fuel delivered was measured based on defective strapping tables selected by the government, the court held: "We conclude, applying the *Spearin* doctrine, that the government breached its implied warranty to provide accurate strapping tables and is responsible for the consequences of its breach." *Id*. at 624. Similarly, in *D.F.K. Enterprises*, this Court relied on the *Spearin* doctrine to hold that a chart entitled "Anticipated Adverse Weather Delays" constituted an "affirmative representation" that the "government had undertaken some analysis to determine the usual weather at the job site." 45 Fed. Cl. at 286. In language equally applicable to DESC's construction of its pricing clause here, the Court held: "Under the government's reading, the numbers in the chart could have been completely arbitrary. This is not a fair reading of a chart entitled 'Anticipated Adverse Weather Delays,' and we do not think that offerors can be faulted for having viewed the chart as something more than an entirely arbitrary set of numbers chosen by the government." *Id*. at 287. Clearly, the use of the words "market prices" in the title of DESC's pricing clause, like the title of the chart in *D.F.K.*

*Enterprises*, alone conveyed "something more than an arbitrary set of numbers," as DESC attempts to argue. *Id*.[47]

## VI. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS OF BREACH OF AN IMPLIED-IN-FACT CONTRACT

DESC seeks to dismiss La Gloria's allegations that DESC's violations of law gave rise to an implied-in-fact contract to pay fair market value – a contract in turn that DESC breached. DESC asserts that there cannot be an implied-in-fact contract to pay for fuel if an express contract addresses the same subject. DESC's Motion at 23. DESC's argument ignores *Barrett*. *Barrett* holds that, when the price of a contract is found to be illegal, it is "unenforceable." 242 F. 3d at 1060 n.2. Arising in place of the unenforceable price, *Barrett* further holds, is an "implied-in-fact" contract and that contract is one to "pay at least fair market value." *Id*. (citing *Urban Data Sys. v. United States*, 699 F.2d 1147, 1148, 1154 (Fed. Cir. 1983)); *see also AT&T III*, 177 F.3d at 1376 (upholding the availability of implied-in-fact contract relief in the presence of illegality). This is exactly what La Gloria alleges in its Amended Complaint. Amended Complaint ¶¶ 73-78. DESC has not established that its fuel prices were legal, nor does DESC deny La Gloria's allegation that DESC breached the resulting implied-in-fact contract by failing to pay fair market value for the fuel it received.

---

47 Finally, La Gloria alleges that DESC breached its obligation of good faith and fair dealing. *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005) ("The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner. . . . The duty applies to the government just as it does to private parties.") (internal citations omitted). La Gloria alleges that DESC imposed a non-negotiable price clause that it knew would not reflect the fair market value of fuel and, without disclosure to La Gloria, worked with DOE to "see that our needs are satisfied" in the way the PMM was published. Amended Complaint ¶ 69; App. 100. DESC does not dispute that it acted in bad faith or deny these allegations of breach. *See generally Agredano v. United States*, No. 05-608C, slip op. at 13 (Fed. Cl. March 27, 2006) ("This could be a case of the government's appropriating profits to itself at the expense of its contracting partner indirect contravention of the covenant of good faith and fair dealing.").

## VII. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS OF FAILURE OF CONSIDERATION AND FRUSTRATION OF PURPOSE

In seeking to dismiss La Gloria's claims of failure of consideration and frustration of purpose, DESC does not contest that the illegality of its prices and its failure to pay fair market value for fuel caused consideration to fail and frustrated the purpose of the contracts. Rather, DESC principally asserts that failure of consideration and frustration of purpose provide a basis only for avoiding further performance and do not provide a basis for affirmative relief by way of restitution of the value of the benefit La Gloria conferred on DESC when it delivered fuel. DESC's Motion at 24-25. This assertion is contrary to recognized precedent.

A claim of "failure of consideration exists wherever one who has promised to give some performance fails, without his fault, to receive in some material respect the agreed exchange for that performance." *Williston on Contracts* § 814 (3d ed. 1962); *see also Restatement (Second) of Contracts* § 237 cmt. a. The doctrine of failure of consideration supports contractual relief even in the absence of a breach of contract and without regard to the fault of the non-performing party. As the United States Court of Appeals for the Fifth Circuit explained in *Aerojet-General Corp. v. Askew*, 453 F.2d 819, 831 (5th Cir. 1971): "The failure to render a promised performance may not be a breach of contract for the reason that performance has become impossible without fault; but it is nonetheless a failure of consideration discharging the other party from his duty to make the agreed return and *giving him a right to restitution of payments already made or other benefits already conferred*." (emphasis added) (quoting *Corbin on Contracts* §1255). In addition to *Aerojet*, ample authority establishes that failure of consideration provides a basis for affirmative relief. *District of Columbia v. Thompson*, 281 U.S. 25, 31 (1930) (holding that the D.C. government, that had assessed a landowner costs for road improvements that were never completed, "was under an obligation imposed by law to return, as for a failure of consideration, the assessment of benefits that had been paid by the plaintiff"); *Stone Forest Indus., Inc.*, 973 F.2d at 1553 (granting restitution to a contractor who was unable to extract the timber for which it had provided a deposit because of intervening environmental legislation); *see generally Far*

*West Fed. Bank, S.B. v. Director, OTS*, 930 F.2d 883, 887 (Fed. Cir. 1991) (alleging that a statute abrogating a regulatory agreement had "effected a complete frustration of the Conversion Agreement, and a failure of the consideration for which the investment group bargained"). DESC cites no authority to the contrary.

Similarly, the doctrine of frustration of purpose supports affirmative relief. As the *Restatement (Second) of Contracts* explains: "Where a party has partly performed before discovery of the impracticability or frustration, he may claim relief including restitution under the rules stated in §§ 240 and 370-77." *Restatement (Second) Contracts* § 266 cmt. a. Restitution, by way of recovery of the value of the benefit it conferred, is exactly the relief La Gloria seeks from DESC. Amended Complaint ¶ 96. Once again, ample authority supports such recovery, recognizing that there is no reason to assign randomly a forfeiture to one of the parties when the purpose of a contract is frustrated. *Walker v. Cont. Life & Accident Co.*, 445 F.2d 1072, 1074-75 (9th Cir. 1971) (upholding claim of frustration and granting restitution to investors in tax-based transactions later held impermissible); *Saunders v. Hilpertshauser*, 1988 U.S. Dist. LEXIS 3646, at *28 (S.D.N.Y. 1988) (rejecting a statute of limitations argument, because, "[i]n an action to reform a contract on the grounds of frustration, the cause of action accrues only when unforeseen circumstances nearly or quite completely destroy the purpose of the bargain"); *In re Schenck Tours, Inc.*, 69 B.R. 906, 911 (Bankr. E.D.N.Y.) (denying a frustration claim on the merits, but noting that the claimant would have been entitled to rescission had it prevailed), *aff'd*, 75 B.R. 249 (E.D.N.Y. 1987); *Washington State Hop Producers, Inc. v. Goschie Farms, Inc.*, 773 P.2d 70 (Wash. 1989) (granting rescission and restitution based on frustration of purpose).

Furthermore, the cases which DESC cites do not support its position. In *Everett Plywood Corp. v. United States*, 227 Ct. Cl. 415, 423 (1981), and *Spalding & Sons, Inc. v. United States*, 28 Fed. Cl. 242, 249 (1993), frustration was offered only as a defense, and the court did not consider whether the doctrine could be applied to support affirmative relief. In *Far West Fed. Bank, S.B. v. OTS*, 119 F.3d 1358 (9th Cir. 1997), the court denied a frustration of purpose claim

finding in essence that "the Investors seek damages" couched as restitution, which is not the remedy recognized by the *Restatement* or sought by La Gloria here. *Id*. at 1364. Instead, the court found that the "best framework" for addressing the claims was breach of contract (thereby rendering its comments on frustration of purpose dicta). *Id*. Furthermore, *Far West* relies solely on the *Restatement (Second) of Contracts* to support its statement that frustration of purpose does not support affirmative recovery; *id*., however, as quoted above, the *Restatement* expressly *does* provide that frustration of purpose supports a "claim for relief including restitution." *Restatement (Second) Contracts* § 266 cmt. a. In any event, the Ninth Circuit's decision in *Far West* is inconsistent with that same court's earlier decision in *Walker*, 445 F.2d at 1074-75, cited above, and the Federal Circuit appears to have held a more sympathetic view when the plaintiffs in *Far West* sought restitution before it earlier in the same case based, *inter alia*, on "complete frustration of the conversion agreement." *Far West Fed. Bank, S.B.*, 930 F.2d at 889 ("We conclude that Far West's claim for rescission and restitution may be brought in the district court under the 'sue and be sued' clause.")[48]

So, too, DESC's reliance on *Seaboard Lumber v. United States*, 308 F.3d 1283 (Fed. Cir. 2002), is misplaced. Initially, *Seaboard* involved claims of supervening frustration caused by an unanticipated spike in interest rates, whereas La Gloria also alleges what the *Restatement* recognizes as frustration at the time the contract is made. *Restatement (Second) Contracts* § 266 cmt. a. Such frustration exists "where, at the time a contract is made, a party's principal purpose is substantially frustrated without his fault by a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made." *Id*. Thus, La Gloria alleges that DESC's violations of law in awarding the contracts, its use of the PMM, and its failure to pay fair market value frustrated the principal purpose of the contracts both at their inception and based on intervening events. Amended Complaint ¶¶ 79-96.

---

[48] *Perpetual Fin. Corp. v. United States*, 61 Fed. Cl. 126, 138 (2004), also relied upon by DESC, cites *Everett* and *Far West* but provides no analysis.

As applicable here, *Seaboard* provides that the party seeking relief not bear the risk of frustration of purpose. *Seaboard*, 308 F.3d at 1295. DESC, of course, cannot foist the risk of its own violation of law on La Gloria, and DESC's use of the PMM and failure to pay fair market value is similarly alleged to be the product of DESC's own misrepresentation, the risk of which La Gloria cannot be deemed to have assumed.

Moreover, the extent of frustration required to maintain a claim for frustration of purpose, also addressed in *Seaboard*, is properly viewed as one of "commercial impracticability," as *Pauley Petroleum, Inc. v. United States*, 219 Ct. Cl. 24, 41 n.13 (1979), holds. *Pauley Petroleum*, in turn, provides the support for *Everett Plywood Corp.*, 227 Ct. Cl. at 424, upon which *Seaboard* ultimately relies. *Seaboard*, 308 F.3d at 1295. This "commercial impracticability" standard is in line with the *Restatement*'s "substantially frustrated" standard. *Restatement (Second) of Contracts* § 266 cmt. a. Here, the voiding of DESC's pricing clause on the grounds of illegality, *Barrett*, 242 F.3d at 1060 n.2, *per se* renders the fuel contracts commercially impractical, if not commercially "worthless" as articulated in *Seaboard*, as does DESC's use of the PMM and failure to pay fair market value. *Seaboard*, 308 F.3d at 1295. In any event, the extent of frustration is a factual issue upon which DESC offers no evidence and which is, therefore, not ripe for decision.

## VIII. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS OF MISTAKE

In seeking dismissal of La Gloria's allegations of mistake, DESC does not dispute that DESC's military fuel prices are the product of a mistake of the parties or seek dismissal on the grounds of the absence of a mistake. Instead, DESC asserts that the parties' mistake was not one about an existing fact at the time the contracts were entered but, rather, was a mistaken prediction about the future. DESC's Motion at 25-26. DESC's assertion simply ignores the allegations in La Gloria's Amended Complaint.

La Gloria alleges that, if DESC did not misrepresent the facts about its military fuel prices as discussed above, then DESC's fuel prices are the product of a mistake of the parties.

La Gloria alleges that, at the time the contracts were awarded, the parties were mistaken in their then-existing belief about what the PMM was, how it was designed, and for what it was intended to be used. Amended Complaint ¶¶ 97-122. Specifically, La Gloria alleges, and it is not disputed here, that, at the time the contracts were awarded, the parties were mistaken in their then-existing belief that the PMM was designed to and did measure the fair market value of fuel and that the PMM was intended to be used to set prices. Amended Complaint ¶¶ 97-122.[49]

It is now clear, however, that the PMM was not designed to measure fair market value and did not do so. App. 611. Indeed, the record establishes that, among other failings alleged to be unknown to the parties, the PMM suffered an "index number problem," whereby mere changes in the volume of fuel sold were reported as changes in price. App. 616-19. Given the PMM's index number problem, the PMM may as well have measured the price of apples, oranges and bananas for all it was designed to reflect the market for fuel. In fact, DOE has testified and this Court has found that, as alleged to be unknown to the parties here, "the PMM is not intended to be an index that is used for setting prices." *Barrett*, 42 Fed. Cl. at 131.

Similar allegations were held to support a claim of mistake in *Beta Systems.* There, an index did not "fair[ly] measure the economic situation actually confronting the contractor," because the index effectively eliminated the contractor's "principal construction material from fair weight in the inflation adjustment." 838 F.2d at 1184-85. Accordingly, the court held in language equally applicable here: The "inclusion of an 'inappropriate and inadequate . . . price index in the escalation clause' constitute[s] mutual mistake of material fact." *Id.* at 1186 (citing *Polarad Elect., Inc.*, ACAB No. 1116, 2 ECR para. 134 (1971)).[50]

[49] La Gloria also alleges that the parties were mistaken concerning the legality of DESC's fuel prices; however, these are separate and distinct allegations from the mistakes discussed above. *Compare* Amended Complaint ¶ 110 *with* ¶¶ 111-13.

[50] At the very least, whether the mistake regarding the PMM was one of present fact or future prediction is itself a question of fact, not suitable at this juncture for resolution on summary judgment. *See, e.g., Aluminum Co. of Am. v. Essex Group, Inc.*, 499 F. Supp. 53, 62 (W.D. Pa. 1980) ("ALCOA calls the mistaken assumption that the index was suitable a factual assumption. Essex calls it a prediction. This is a dispute of fact[], not law.")

DESC further errs in asserting that the parties' specific mistake must be expressly stated in the contract itself to support a claim. DESC's Motion at 26. In *Beta Systems*, the applicable index, like that at issue here, was identified in the contract; however, it was the parties' erroneous assumptions about the index, erroneous assumptions that are undisputed here, that supported a mistake claim. 838 F.2d at 1185-86. Thus, contrary to DESC's assertion, it is well-recognized that extrinsic evidence is admissible to prove mistake. *Ibid*.; *C & H Comm. Contractors, Inc. v. United States*, 35 Fed. Cl. 246, 254 (1996).[51]

## IX. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS OF A FIFTH AMENDMENT TAKING

DESC argues that La Gloria has failed to state a legally cognizable takings claim pursuant to the Fifth Amendment of the U.S. Constitution. DESC's Motion at 28-30. That Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. "To properly state a takings claim," a plaintiff "first must show some legally cognizable interest in the property at the time of the alleged taking," and, second, "must demonstrate that DESC interfered with plaintiff's use of its property." *Scan-Tech Security, L.P. v. United States*, 46 Fed. Cl. 326, 341 (2000).

"Supreme Court taking cases can be divided into two lines of authority: the so-called regulatory taking cases and the physical occupation cases." *Hendler v. United States*, 11 Cl. Ct. 91, 95 (1986); *see Yee v. City of Escondido*, 503 U.S. 519, 522 (1992). "Where the government authorizes a physical occupation of property (or actually takes title), the Takings Clause

[51] DESC's challenge to La Gloria's allegations of unilateral mistake similarly fails. A party may maintain a claim of unilateral mistake if "the other party to the contract ha[d] reason to know of the mistake." *J&E Salvage v. United States*, 37 Fed. Cl. 256, 265 (1997). Here, La Gloria expressly alleges that DESC knew or had reason to know of its mistake about the PMM – indeed, that DESC misrepresented the underlying facts – and DESC does not dispute these assertions. Amended Complaint ¶¶ 118-121. A claim of unilateral mistake also will lie if it would be unconscionable not to correct the mistake. *J&E Salvage*, 37 Fed. Cl. at 265. Here, permitting DESC to retain the benefits of its prices in the face of La Gloria's mistake, when DESC knew the PMM did not reflect market value and nonetheless used it to set prices, would be unconscionable.

generally requires compensation." *Yee*, 503 U.S. at 522; *see Brown v. Legal Found. of Washington*, 538 U.S. 216, 233 (2003) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." (internal citation omitted)). Where the government merely regulates the use of property, however, "compensation is required only if . . . the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." *Yee*, 503 U.S. at 523. La Gloria pursues its takings claim based on DESC's physical possession of the military fuel.[52] As the Supreme Court observed in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982), the Court's "cases uniformly have found a taking" where, like here, there has been a permanent physical occupation of private property.

In this case, it is undisputed that La Gloria owned, and had a legally cognizable property interest in, the fuel it provided to DESC. Amended Complaint ¶ 125. Moreover, government agents were authorized to acquire La Gloria's fuel for public use, but did so pursuant to unlawful, and hence unenforceable, contracts. Amended Complaint ¶ 128; *see generally United States v. Amdahl*, 786 F.2d 387, 392-93 (Fed. Cir. 1986) ("[a]dministrative actions taken in violation of statutory authorization or requirement are of no effect"). Thus, DESC took physical possession of La Gloria's fuel without the legal right to do so. Amended Complaint ¶¶ 124-132. Because the fuel was not purchased pursuant to a lawful contract, DESC took possession of property to which it had no valid claim and, as such, is liable for a Fifth Amendment taking for which La Gloria is entitled to just compensation. Amended Complaint ¶ 129; *see Heydt v. United States*, 38 Fed. Cl. 286, 305 (1997) ("A taking occurs when the rightful property,

[52] La Gloria also claims that DESC is liable for a regulatory taking. As *Lynch v. United States*, 292 U.S. 571, 579 (1934), illustrates, there is a taking where, like here, the government abrogates a vested obligation related to a contract. In this case, the FAR granted La Gloria the right to enter into contracts with the government with prices that could be adjusted only in certain ways. *See* Amended Complaint ¶¶ 36-38. That right vested when La Gloria entered into each contract. *Lynch*, 292 U.S. at 577. The government abrogated La Gloria's rights when it awarded contracts to La Gloria that contained an illegal price adjustment clause. Amended Complaint ¶¶ 36-38.

contract, or regulatory powers of the Government are employed to control rights or property which have not been purchased.") (internal citation omitted); *see Loretto*, 458 U.S. at 431 (government's "'actual taking of possession and control'" of property results in taking "as clear as if the Government held full title and ownership" (quoting *United States v. Pewee Coal Co.*, 341 U.S. 114, 116 (1951)). La Gloria's takings claim is substantially identical to the one this Court recognized in *Osprey Pacific Corp. v. United States*, 41 Fed. Cl. 150, 158 (1998), where the government took physical possession of a Navy patrol boat in which it mistakenly believed it had an ownership interest.

DESC moves to dismiss La Gloria's takings claim, arguing that it fails to state a claim for which relief can be granted. DESC's Motion at 28-30. In moving to dismiss, "the Government has the burden to demonstrate beyond a doubt that [the plaintiff] can prove no set of facts in support of its takings claim which would entitle it to relief." *Scan-Tech*, 46 Fed. Cl. at 342. Because of the "fact-intensive and case-specific" nature of takings claims, *System Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 172 (2005), the Court of Federal Claims has repeatedly declined to dismiss such claims before trial, emphasizing the importance of resolving them on a fully developed record. *Hansen v. United States*, 65 Fed. Cl. 76, 94 (2005) ("courts should avoid 'precipitous grants of summary judgment' in takings cases due to their 'fact-intensive' nature" (internal citations omitted)); *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 187-88 (2005) ("developing a more comprehensive record is particularly important to resolve this dispute"); *Detroit Edison Co. v. United States*, 56 Fed. Cl. 299, 301-03 (2003) ("[a] more fully developed record will allow the court to assess . . . property rights implicated in plaintiff's takings claim"); *Scan-Tech*, 46 Fed. Cl. at 342; *Integrated Logistics Support Sys. Int'l, Inc. v. United States*, 42 Fed. Cl. 30, 34-35 (1998). Thus, "[t]he court has denied motions to dismiss in this context to allow for the development of a more complete record." *Consolidated Edison Co. of N.Y., Inc. v. United States*, 67 Fed. Cl. 285, 291-92 (2005).

DESC's first argument is that, to maintain a takings claim, La Gloria "must concede the validity of the government action which is the basis of the taking claim." DESC's Motion at 29

n.10. DESC misstates the law. As the Federal Circuit made clear in *Del-Rio Drilling Programs Inc. v. United States*, 146 F.3d 1358, 1362-63 (Fed. Cir. 1998), to pursue a takings claim all that La Gloria is required to concede is that DESC was authorized to appropriate the property – *not that the government's conduct was lawful*. *Accord Board Machine, Inc. v. United States*, 49 Fed. Cl. 325, 330 (2001). Indeed, as the *Del Rio* court explained, "[n]either the Supreme Court nor this court has held that government conduct is 'unauthorized,' for purposes of takings law, merely because the conduct would have been found legally erroneous if it had been challenged in court." *Del-Rio Drilling Programs*, 146 F.3d at 1363. Thus, "a court's conclusion that government agents acted unlawfully does not defeat a Tucker Act takings claim if the elements of a taking are otherwise satisfied." *Id*. To defeat a takings claim, it must be shown that government agents were acting *ultra vires* when they appropriated the plaintiff's property. *Id*. La Gloria has alleged that DESC's contracting officers who took La Gloria's fuel were authorized to obtain fuel for the military; DESC has never claimed otherwise. Amended Complaint ¶ 128.

Relatedly, DESC contends that, insofar as La Gloria is claiming that DESC took its fuel illegally, this Court lacks jurisdiction, because the proper remedy for an unlawful seizure lies in tort. DESC's Motion at 29 n.10. DESC is wrong. As the Federal Circuit has explained, "if the government has taken property and has done so in a legally improper manner, it has committed two violations of the property-owner's rights." *Del-Rio Drilling Programs*, 146 F.3d at 1363-64. "The two separate wrongs give rise to two separate causes of action, and the property-owner may elect to sue for just compensation or to seek relief for the legal improprieties committed in the course of the taking." *Id*. As explained in *Osprey Pacific Corp.*, 41 Fed. Cl. at 158, "[w]hen there has been an authorized physical seizure of property, and that seizure was substantively wrong, a plaintiff may elect to come to this court and assert a taking claim."

Next, DESC posits that there was no taking because La Gloria alleged only that DESC "purchased fuel in alleged breach of a contract." DESC's Motion at 29. That misreads La Gloria's Amended Complaint. La Gloria clearly averred that the contracts were unlawful – not

merely that they were breached. Amended Complaint ¶¶ 35-44. Thus, La Gloria alleges that DESC did not acquire the fuel pursuant to a *valid* and *lawfully executed* contract, which is what, among other things, DESC would have to establish to defeat La Gloria's takings claim. *See, e.g.*, *Scan-Tech*, 46 Fed. Cl. at 341 ("When the Government asserts its interest in property obtained pursuant to a *valid* contract, no taking occurs and no obligation arises under the Fifth Amendment to compensate the contracting party." (emphasis added)).

DESC further misconstrues La Gloria's takings claim by contending that it is founded upon DESC's interference with La Gloria's contractual rights. DESC's Motion at 29. It insists that La Gloria may pursue only contractual remedies,[53] because "remedies for alleged infringement of rights established contractually generally lie in contract, not the Fifth Amendment." DESC's Motion at 29-30. DESC, however, ignores the fact that La Gloria's takings claim is based on DESC's physical possession of La Gloria's fuel – not an infringement of La Gloria's contractual rights.[54] La Gloria alleges that the contracts were unlawful, and thus DESC physically possessed fuel to which it had no right. The law is clear that when, as here, "the right at issue is not governed by the terms of the parties' contract, plaintiff may pursue a takings remedy to vindicate that right." *Detroit Edison*, 56 Fed. Cl. at 302. That is because when a plaintiff "ha[s] rights in the property separate and distinct from any rights conferred by contract," a takings claim is appropriate. *Pi Elecs. Corp. v. United States*, 55 Fed. Cl. 279, 286 (2003) (internal citation omitted); *cf. Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 740

---

[53] Insofar as DESC is suggesting that La Gloria may not pursue breach of contract and takings claims concurrently, legions of cases have repeatedly rejected that proposition. *Integrated Logistics*, 42 Fed. Cl. at 34 ("[T]akings claims are not presumed to be foreclosed by claims for breach of express contract merely because the claims share the same factual background."); *see, e.g.*, *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000); *Consolidated Edison Co.*, 67 Fed. Cl. at 291-92; *System Fuels*, 65 Fed. Cl. at 172-73.

[54] In any event, there are circumstances where "a litigant may indeed maintain a takings action even where its rights have been created exclusively by contract." *Castle v. United States*, 48 Fed. Cl. 187, 217 (2000) (noting *Lynch v. United States*, 292 U.S. 571 (1934), as one such example), *aff'd in part, rev'd in part*, 301 F.3d 1328 (Fed. Cir. 2002).

(2004) ("[W]hen a contract between a private party and the Government *creates* the property right subject to a Fifth Amendment claim, the proper remedy for infringement lies in a contract claim, not one for a taking." (emphasis added)).[55] In fact, "[t]he Court of Federal Claims has recognized that vindication of rights existing independently of the contract at issue cannot be restricted to contractual remedies." *Pi Elecs.*, 55 Fed. Cl. at 286. Accordingly, in cases, like here, where the government contracts to *purchase* property, courts have consistently permitted the contractor to pursue takings claims in addition to breach of contract claims, because the contractors had rights in the property predating, and that were not created by, the contract with the government. *See id* at 285; *see, e.g., Armstrong v. United States*, 364 U.S. 40, 48 (1960) (acquisition of naval personnel boats, and destruction of value of materialmen's liens against third party on those boats); *Scan-Tech*, 46 Fed. Cl. at 341-43 (payment dispute arising out of government contract to purchase luggage screening system was grounds for a takings claim); *Integrated Logistics*, 42 Fed. Cl. at 34-35 (price dispute arising out of government's purchase of military equipment was grounds for a takings claim).[56]

Finally, DESC contends that, when it acquired La Gloria's fuel, the government was acting in its "proprietary," rather than its "sovereign," capacity, and thus that conduct cannot be the basis for a takings claim. DESC's Motion at 30. DESC's argument is inapposite to La Gloria's claim; La Gloria alleges that DESC was authorized to obtain physical possession of the fuel, but that it did so pursuant to an unlawful contract. Amended Complaint ¶¶ 36-42, 126-27. DESC plainly acts in its sovereign capacity when it takes private property for public use; indeed,

---

[55] DESC's reliance on *Sun Oil Co. v. United States*, 572 F.2d 786 (Ct. Cl. 1978), and *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001), is misplaced. In both of these cases, the only rights at issue were allegedly created entirely by a contract with the government.

[56] As one commentator has explained, "when the Government appropriates the right at issue for itself, a taking occurs, but no taking occurs when the Government merely frustrates the performance of an agreement." Kevin R. Garden, *Fifth Amendment Takings of Rights Arising from Agreements with the Federal Government*, 29 Pub. Cont. L.J. 187, 205 (2000).

no private entity has the power to do so. *See DSI Corp. v. United States*, 655 F.2d 1072, 1074 (Ct. Cl. 1981) ("[w]hen the government 'takes' property, it exercises its right as sovereign to acquire property from the rightful owner for the public good"); *Alde, S.A. v. United States*, 28 Fed. Cl. 26, 34 (1993) ("If the Government acts to secure a benefit for the public, a taking arises.").

In any event, the Federal Circuit has expressly ruled that it is "inappropriate" to grant summary judgment based on a finding "that the [Government] acted in a proprietary rather than a sovereign capacity." *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 889 (Fed. Cir. 1983); *accord Pi Elecs.*, 55 Fed. Cl. at 287-88. That is because, among other things, the proprietary-sovereign inquiry "is not in itself controlling in just compensation jurisprudence." *Yuba Goldfields*, 723 F.2d at 889; *accord Pi Elecs.*, 55 Fed. Cl. at 288 (quoting *Yuba Goldfields*); *see Castle*, 48 Fed. Cl. at 217 n.23 (proprietary-sovereign distinction "is less meaningful in light of the Supreme Court's pronouncement in *Winstar*"). Moreover, an inquiry into the nature of DESC's conduct is inherently factual: "Whether in a property conflict the actions of the government may be equated with those normal to a private citizen is determinable only in light of all the facts." *Yuba Goldfields*, 723 F.2d at 889.

DESC has failed to carry its burden of demonstrating beyond a doubt that plaintiff can prove no set of facts in support of their takings claim that would entitle them to relief. *Scan-Tech*, 46 Fed. Cl. at 342. Its motion to dismiss, therefore, must be denied.[57]

---

[57] DESC elsewhere has argued that the plaintiff does not have a takings claim because DESC took title to the fuel under the fuel contracts. While the Federal Circuit's holding in *Barrett*, 242 F.3d at 1060 & n.2, that the price of DESC's illegal fuel contracts was "unauthorized and unenforceable" undermines DESC's assertion, the issue of whether DESC took title to the fuel at a minimum requires a broader factual inquiry, which, in turn, will require discovery. DESC's further assertion that there could be no taking because the plaintiff has a breach of contract remedy is also undercut by *Barrett*. *Barrett* makes clear that the remedy for DESC's "unauthorized" fuel prices lies "off the contract" in *quantum valebant* and not in breach of contract. *Barrett*, 242 F.3d at 1060-61. At a bare minimum, as long as DESC disputes the existence of the implied-in-fact contract that supports *quantum valebant*, and until La Gloria is permitted discovery to establish that implied-in-fact contract, DESC's request to dismiss La Gloria's takings claim is premature.

## X. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS THAT DESC ILLEGALLY PROVIDED PRICE PREFERENCES TO MINORITY-OWNED SUPPLIERS

DESC asserts that this Court lacks subject matter jurisdiction to consider La Gloria's claims that its contracts with DESC were illegal because they were subjected to unlawful minority-owned business bidding preferences. DESC's Motion at 30-32.[58] In seeking dismissal of La Gloria's claim, DESC mischaracterizes the claim as one seeking redress under the equal protection clause. Contrary to DESC's assertion, La Gloria is pursuing a contractual claim under the Contract Disputes Act (the "CDA"), alleging that its contracts with DESC were illegal because a clause in the agreements is unconstitutional. Because La Gloria is pursuing its claims pursuant to its express contracts with DESC, the claims are subject to this Court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491.[59]

For the Court to have jurisdiction, La Gloria must demonstrate that "either an express or implied-in-fact contract underlies its claims." *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). La Gloria alleges that it had express contracts with DESC that were

[58] Importantly, DESC does not contest that this type of minority-owner price preference is unconstitutional – a conclusion already reached by one federal court. *Rothe Dev. Corp. v. United States Dep't of Defense*, 324 F. Supp. 2d 840, 854 (W.D. Tex. 2004), *aff'd in part and vacated in part*, 413 F.3d 1327 (Fed. Cir. 2005); *see Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995). Compellingly, when the government appealed this decision to the Federal Circuit, it did not challenge this holding of unconstitutionality as it applied to the period prior to 2002, which, of course, includes the period relevant to La Gloria's claims. *Rothe Dev. Corp. v. United States Dep't of Defense*, 413 F.3d 1327, 1330 (Fed. Cir. 2005) ("On the merits, the district court held that the reauthorization of section 1207 in 1992 was facially unconstitutional but the present, i.e., 2002, reauthorization was not. Because the government did not appeal the district court's decision as to the invalidity of the 1992 reauthorization, only the present reauthorization is before us on appeal.") (internal citation omitted).

[59] The Tucker Act does not create a right of action. Rather, La Gloria's right of action must "be grounded expressly or by implication in a contract, an act of Congress or a regulation of an executive department." *United States v. Connolly*, 716 F.2d 882, 885 (Fed. Cir. 1983) (citing *United States v. Mitchell*, 463 U.S. 206 (1983)). Thus, La Gloria's claim must arise from a substantive right created "by some other source of law." *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989). Moreover, the source of that right must provide compensation for violations of that right. *Ibid.* In this case, it is La Gloria's contracts with DESC, and the Contract Disputes Act, 41 U.S.C. § 601, *et seq.*, that provide the source of law that provides the basis for the compensation La Gloria seeks.

tainted by the inclusion of an unlawful minority-owned bidding preference clause. Amended Complaint ¶¶ 29, 41. That alone is adequate to confer jurisdiction on this Court. *Gould, Inc. v. United States*, 67 F.3d 925, 930 (Fed. Cir. 1995) (allegations that express contract was entered into in violation of a statute "is sufficient . . . to confer jurisdiction in the Court of Federal Claims").

La Gloria alleges that DESC knowingly awarded and administered La Gloria's contracts in violation of the equal protection component of the Fifth Amendment's due process clause.[60] Amended Complaint ¶ 41. The Federal Circuit already has expressly held that there is Tucker Act jurisdiction over this precise type of claim. In *Rothe Dev. Corp. v. United States Dep't of Defense*, 262 F.3d 1306 (Fed. Cir. 2001), the court considered plaintiff's equal protection challenge under the Fifth Amendment's due process clause to bidding preferences granted to small, socially and economically disadvantaged businesses by section 1207 of the National Defense Authorization Act of 1987. The court held that the Tucker Act afforded jurisdiction to consider this claim, finding that the claim was founded upon an implied-in-fact contract with the government to evaluate Rothe's bid honestly and fairly. *Id.* at 1316; *accord LaBarge*, 46 F.3d at 1551 (finding CDA jurisdiction over LaBarge's claim because the government breached its implied obligation to treat a bid honestly and fairly, which related to the contract that was allegedly breached). Similarly, there is jurisdiction here under that same implied contract of fair dealing between DESC and La Gloria – in addition to jurisdiction based upon the fact that La Gloria's claim relates to its express contracts with DESC. This result comports with other Federal Circuit decisions, which have consistently recognized that there is CDA jurisdiction to

[60] DESC cites *Mullenberg v. United States*, 857 F.2d 770, 773 (Fed. Cir. 1988) (equal protection claim relating to an alleged improper dismissal), *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (same), and *Inupiat Community of the Arctic Slope v. United States*, 680 F.2d 122, 132 (Ct. Cl. 1982) (denial of notice alleged to be due process violation), for the uncontroversial proposition that the equal protection component of the Fifth Amendment's due process clause does not afford a right of substantive recovery in this Court. Those cases are inapposite, however, because none of them involved a claim, like La Gloria's here, that was based upon an express contract between the plaintiff and the government.

consider contract illegality claims, without regard to whether the provision of law violated mandated the payment of money as DESC seeks to require here. *See, e.g.*, *Gould*, 67 F.3d at 929 (court has jurisdiction over alleged violation of, among other things, a statute requiring Navy to provide a "stable design" for a multi-year contract); *LaBarge Products, Inc.*, 46 F.3d at 1551-52 (court has jurisdiction to consider a breach of contract claim, even though one basis for the breach was a violation of a non-money mandating FAR provision); *Urban Data Sys., Inc.*, 699 F.2d at 1151-52 (alleged violation of statute prohibiting "cost-plus-a-percentage-of cost" pricing).[61]

As the Amended Complaint makes clear, La Gloria is not raising a facial challenge to DESC's minority-owned business preferences. Rather, La Gloria is complaining that its contracts contained an illegal term that resulted in it receiving less than fair market value for the fuel it sold to DESC. Amended Complaint ¶ 29.[62] This is similar to the claim asserted by the plaintiff in *Nat'l Leased Housing Ass'n v. United States*, 24 Cl. Ct. 647, 650 (1991), wherein the plaintiff challenged the rental rates the government set under a housing assistance payments contract as violative of the equal protection clause. Although in that case the court ultimately found that there had not been an equal protection violation, with respect to whether it had jurisdiction to consider the claim, it said: "Clearly, to the extent that [this] alleged violation[] constitute[s] [a] breach[] of the . . . contracts [at issue], this court would have jurisdiction to

[61] The *LaBarge* court rejected the government's argument, based on *Coastal Corp. v. United States*, 713 F.2d 728 (Fed. Cir. 1983), that the Court lacked jurisdiction to consider the claims. In both *LaBarge* and *Coastal*, plaintiff raised claims that the government breached its implied duty to treat bids honestly and fairly. The *LaBarge* court, however, found that, for jurisdictional purposes, there was a critical distinction between the two cases. *Coastal* involved a disappointed bidder that was not awarded the contract; thus, its claim could not relate to a contract for purposes of CDA jurisdiction before the Board of Contract Appeals. *LaBarge*, 46 F.3d at 1551. In contrast, LaBarge – like La Gloria here – did have a contract with the government, and its claim was that the government's unlawful conduct resulted in it receiving a lower price than it should have for the products it provided. As such, LaBarge's claim related to a CDA contract. *Id.; see Trauma Serv. Group*, 104 F.3d at 1325.

[62] Thus, if minority-owned firms are given a ten percent price preference, all else being equal, non-minority firms must bid ten percent lower to be competitive.

entertain such claims pursuant to its Tucker Act jurisdiction over express government contracts." *Id.*[63]

## XI. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LA GLORIA'S CLAIMS THAT DESC ILLEGALLY AUCTIONED THE AWARD OF MILITARY FUEL CONTRACTS

In seeking to dismiss La Gloria's claims that DESC illegally auctioned the award of military fuel contracts, DESC does not meaningfully dispute that it discloses competitors' pricing information to small businesses during an ongoing procurement and awards contracts to those small businesses willing to match their competitors' prices. Rather, DESC in essence asserts that there is nothing wrong with its disclosure of competitors' pricing information during an ongoing procurement. DESC's Motion at 32-34. Contrary to DESC's assertion, its "match price" auction of fuel contracts is prohibited by the Office of Federal Procurement Policy Act (the "OFPPA") and its implementing regulations. DESC's further contention that its auction is authorized by the FAR is demonstrably wrong. FAR § 19.502-3(c)(1), FAR § 19.507(a) and FAR § 52.219.7 expressly prohibit the way DESC awards contracts to small businesses.[64]

The OFPPA prohibits the disclosure of "contractor bid or proposal information or source selection information *before the award* of a Federal agency procurement contract to which the information relates." 41 U.S.C. § 423(a)(1) (emphasis added).[65] The legislative history of the

[63] DESC elsewhere has conceded, as it must, that this Court has jurisdiction over an equal protection challenge to a contract under *Rothe Dev.*, 262 F.3d 1306. DESC, however, adopts a new tack asserting that this Court lacks jurisdiction because DESC's ten percent minority price preference did not impact the plaintiff's contracts. However, La Gloria's Amended Complaint expressly alleges that its contracts were impacted by DESC's minority price preference. *See* Amended Complaint at ¶ 29. Thus, if minority-owned firms are given a ten percent price preference, all else being equal, non-minority firms must bid ten percent lower to be competitive.

[64] Citations to the FAR and DFARS are to the 1995 version of the regulations unless otherwise noted.

[65] The subject provisions of the OFPPA were enacted in 1988, *see* Pub. L. 100-679, § 27, and later amended in 1996. Pub. L. 104-106, § 4304. These provisions initially were effective as of July 16, 1989. Pub. L. 101-28 (1989). Congress suspended them on December 1, 1989 for one year. Pub. L. 101-84 (1989).

OFPPA emphasizes Congress's intent to provide broad protection precluding the disclosure of contractors' bid or pricing information to their competitors during an ongoing procurement. A House Report accompanying the OFPPA describes contractor bidding information as being "of the utmost sensitivity" and states that "[t]he legislation also would prohibit contractors . . . from soliciting or receiving *bidding or other sensitive information about their competitors during the procurement*." H. Rep. No. 100-911 at 21, 18 (Sept. 9, 1988) (emphasis added). The House Report further states Congress's expectation that implementing regulations "will *limit greatly the number of people given access to procurement sensitive information*." *Id*. at 21 (emphasis added).

Consistent with the OFPPA's fundamental purpose of protecting contractors' bid or pricing information from disclosure to their competitors, FAR § 15.610(d)(3) expressly prohibits "auction techniques" as follows:

> The following conduct may constitute prohibited conduct under section 27 of the Office of Federal Procurement Policy Act, as amended (41 U.S.C. 423), and subpart 3.104 to which civil and criminal penalties and administrative remedies apply.
>
> . . .
>
> (2) Auction techniques, such as—
>
> (i) Indicating to an offeror a cost or price that it must meet to obtain further consideration;
>
> (ii) Advising an offeror of its price standing relative to another offeror (however, it is permissible to inform an offeror that its cost or price is considered by the Government to be too high or unrealistic); and
>
> (iii) Otherwise furnishing information about other offerors' prices.[66]

---

[66] FAR § 15.610 first implemented the OFPPA in 1991, and then was repealed in 1997. Prior to 1991, however, FAR § 15.610 independently prohibited auctions, without reference to the OFPPA. Accordingly, even before enactment of the OFPPA in 1988, DESC's match price auction was prohibited by the FAR, and La Gloria challenges its fuel contracts awarded prior to 1988 (and during the one-year suspension of the OFPPA) on that ground.

While the OFPPA permits disclosure of contractors' bid or pricing information to "a person authorized by the head of such agency or the contracting officer," 41 U.S.C. § 423(b)(3) (1989),[67] FAR § 15.610(d)(3) makes abundantly clear that agencies lack the authority to engage in auction techniques. Indeed, any other rule would impermissibly thwart the fundamental purpose of the OFPPA to prevent disclosure of contractors' bid or pricing information to their competitors. *See* H. Rep. No. 100-911 at 21, 18 ("[t]he legislation also would prohibit contractors . . . from soliciting or receiving bidding or other sensitive information about their competitors during the procurement"); *see generally Gardner v. Brown*, 5 F.3d 1456, 1464 (Fed. Cir. 1993) ("[t]he only authority . . . which could be conferred by the statute, is to make regulations to carry out the purposes of the act – not to amend it.") (internal citation omitted).

DESC does not meaningfully contest that it discloses competitors' bid or pricing information to small businesses and that small businesses are awarded contracts if they agree to match the price, or adjusted price, DESC discloses. DESC's Motion at 32-33. DESC's conduct is exactly what FAR § 15.610(d)(3) states the OFPPA prohibits: DESC "indicat[es] to an offeror a cost or price that it must meet to obtain further consideration," and DESC "otherwise furnish[es] information about other offerors' prices."

DESC asserts that it does not disclose "actual bid prices," but only transportation-adjusted bid prices. DESC's Motion at 32. Even if this were true, which La Gloria disputes, the transportation-adjusted price is the price DESC uses in its evaluations to make award decisions and thus constitutes "source selection information" within the meaning of the OFPPA disclosure prohibitions, and certainly constitutes disclosure of "information about other offerors' prices" within the meaning of FAR § 15.610(d)(3). Furthermore, the applicable transportation rates are publicly available, indeed they are currently available on DESC's web site. DESC thus argues

---

[67] The language of this exception was modified in 1996 to permit disclosure in accordance with "applicable agency . . . procedures." 41 U.SC. § 423(h)(1).

form over substance in asserting that bid prices are not disclosed, when they can be so readily reconstructed.

Nor may DESC hide behind the assertion that it only discloses "the price that the Government would otherwise pay." DESC's Motion at 32. The price DESC would otherwise pay is necessarily some bidder's price. Even if the identity of the bidder is not disclosed, as DESC asserts, the damage to the integrity of the competition has been done, as some bidders have information others do not. In any event, the identity of competitors is often readily apparent. *See generally Professional Materials Handling Co., Inc.—Reconsideration*, B-205969.2; B-205969.3, 82-1 CPD ¶ 501 (May 28, 1982) (auctions "undermine the integrity of the competitive bidding system").

DESC errs in seeking to defend its "match price" system by alleging that it is authorized by the FAR. The FAR expressly prohibits the way DESC awards contracts to small businesses. While the FAR permits the portion of a procurement that is set aside for small business to be conducted in parallel with the rest of the larger procurement, the FAR maintains the integrity of contractors' bid or pricing information from their competitors by requiring that the set-aside portion of the procurement be awarded only *after* the rest of the procurement is completed. Thus, FAR § 19.502-3(c)(1) provides that: "The contracting officer shall award the non-set-aside portion using normal contracting procedures . . . . *After all awards have been made on the non-set-aside portion*, the contracting officer shall negotiate with eligible concerns on the set-aside portion." (Emphasis added.) FAR 52.219.7 similarly provides that "[o]ffers on the non-set-aside portion will be evaluated first *and award will be made* on that portion in accordance with the provisions of this solicitation." (Emphasis added.) *See also* Defense Federal Acquisition Regulation ("DFARS") § 252.219-7001(c)(2) ("[t]he set-aside portion will be awarded at the highest unit price(s) in the *contract(s)* for the non-set-aside portion, adjusted to reflect transportation and other costs appropriate for the *selected contractor(s)*") (emphasis added).

Accordingly, only after completion of the larger non-set-aside portion of the procurement may the resulting award prices be disclosed for purposes of offering a match price to small businesses on the portion of the procurement set aside for them. This is entirely consistent with the OFPPA, which precludes disclosure of contractor bid or pricing information only "before the award." 41 U.S.C. § 423(a)(1). For those competitors participating in the larger procurement, the procurement is at an end before disclosure of their bid or pricing information to their small business competitors. *See generally* FAR § 15.506(d); *see, e.g.*, *WHY R&D, Inc.*, B-221817, 86-1 CPD ¶ 375 (Apr. 16, 1986) (protester's reliance on FAR auction provision was misplaced – the provision prohibits pre-award but not post-award disclosure of prices).

Importantly, to insure the integrity of the bidding information that is disclosed, the FAR further provides that if any portion of the procurement that is set aside for small businesses is not awarded, it must be resolicited. FAR § 19.507(a). The larger procurement cannot be reopened for purposes of procuring the unawarded portion set aside for small businesses. Thus, FAR § 19.507(a) provides: "If a set-aside acquisition or portion of an acquisition is not awarded, the unilateral or joint determination to set the acquisition aside is automatically dissolved for the unawarded portion of the set-aside. The required supplies and/or services for which no award was made may be acquired by sealed bidding or negotiation, as appropriate." Similarly, DFARS § 252.219-7001(c)(3) states that "[i]f negotiations are not successful for any part of the set-aside portion, the set-aside will be dissolved for that part and the requirement will be resolicited." *See Cascading Set-Asides: A Legal and Fair Procedure*, 19 Nash & Cibinic Report ¶ 39 (Aug. 2005) ("[F]ailing to resolicit when a set-aside does not succeed, . . . violates express provisions of [the] FAR.").

DESC's match price system violates the FAR because it discloses competitors' bid or pricing information from the larger, non-set-aside portion of the procurement to small businesses before DESC completes the larger procurement. DESC's contract clause I237.07(c)(1) states: "The price for the set-aside portion of this procurement will be negotiated by the Contracting Officer based upon prices the Government would otherwise pay under this solicitation had there

been no set-aside for supply of the location at which the set-aside is placed." Def. Supp. App. 4. Nowhere does DESC's clause provide that awards in the larger, non-set-aside portion of the procurement will be made before disclosure of their bidding information to small businesses as FAR § 19.502-3(c)(1) and FAR 52.219.7 require. This omission permits DESC to return any unawarded portion of the procurement set aside for small business to the larger procurement, rather than resoliciting the unawarded portion as the FAR requires. Thus, DESC's contract clause I2307.07(c)(4) provides in clear derogation of FAR § 19.507(a) and DFARS § 252.219-7001(c)(3): "The Government reserves the right to make awards to the otherwise low offeror for all or any portion of the set-aside quantities, *without regard to the size of the company*, if eligible small business concerns do not offer a quantity of product sufficient to meet a set-aside or do not accept set-aside offers." Def. Supp. App. 4. (emphasis added).

Indeed, despite DESC's assertion in its motion here that it "followed the FAR provisions" and that its "procedures are consistent with applicable procurement and small business laws and regulations,"[68] DESC concedes in a declaration attached to its motion that its match price auction violates the requirements of the FAR. Mr. John Walker, a DESC contracting officer, states in his declaration that DESC violates the FAR in exactly the way La Gloria alleges. Mr. Walker states:

> The difference between the standard FAR and DFARS clauses and set aside procedures and the set aside clauses and procedures in DESC domestic bulk acquisitions was that set aside quantities were offered to small businesses and small disadvantaged businesses before award of the basic quantities. If no small or small disadvantaged business offereor was willing to accept the set aside quantities at the offered price, *i.e.*, there was a set aside "failure," the set aside quantities would be added back to the basic quantities and awarded to the low offeror.

Def. Supp. App. 2. In contrast, Mr. Walker explains the requirements of the FAR as follows:

> The standard FAR and DFARS procedures provide that set aside quantities are offered *after* the basic quantities are awarded. Under the standard FAR and DFARS procedure, if there is a set aside failure, the quantities are not awarded under the basic acquisition, but are re-solicited under a new acquisition.

[68] DESC's Mot. to Dismiss at 33.

Def. Supp. App. 2-3 (emphasis added).

Consistent with La Gloria's position here, GAO has similarly recognized DESC's departure from the FAR when DESC auctions contracts to small businesses. B-230556, 1988 WL 227932 (Comp. Gen. Sept. 6, 1988). GAO states:

> For partial set-asides, FAR 19.502(3)(c) requires that the contracting officer must *first* award the non-set-aside portion using normal contracting procedures. . . . If a set-aside acquisition is not awarded, the supplies or services for which no award was made is recompeted. FAR 19.507(a).
>
> The D[E]SC procedures differ from the FAR procedures in two substantial respects . . . The second difference is that in the event of set-aside failures, the set-aside portion is not recompeted. Under the D[E]SC procedures both large and small firms are required to submit offers on total quantities just as if there was no set-aside. In this way, in the event a set-aside acquisition cannot be filled, other offers can be considered.

1988 WL 227932 at 3 (emphasis added; some internal paragraphing omitted).[69]

As pointed out above, this distinction between awarding contracts to large businesses first and only then awarding "match price" contracts to small businesses is fundamental to compliance with OFPPA. Once contracts are awarded to large businesses, the procurement is at an end for them. Accordingly, the subsequent disclosure of their bid prices does not run afoul of the OFPPA's prohibition on disclosure of pricing information "before the award . . . to which the information relates." 41 U.S.C. § 423(a)(1).

DESC apparently would assert that it has a FAR deviation authorizing both its departure from the FAR and somehow its violation of OFPPA. *See* App. 646 (making the bare assertion that DESC had a FAR deviation authorizing the use of its clauses and procedures). However, a FAR deviation cannot authorize the very conduct OFPPA prohibits. *See generally Gardner*, 5 F.3d at 1464. Indeed, the entire focus of OFPPA is "to prohibit contractors . . . from soliciting or receiving bidding or other sensitive information about their competitors during the procurement" and to "limit greatly the number of people given access to procurement sensitive information."

[69] In its opinion, GAO reviewed DESC procurements that took place prior to enactment of the provisions of OFPPA relevant here. Accordingly, the GAO opinion has no bearing on whether DESC's procurements comply with OFPPA.

H. Rep. No. 100-911 at 21, 18. Permitting the disclosure of competitors' procurement sensitive information to essentially all small businesses during an on-going competition would eviscerate this purpose.

Moreover, DESC has not proffered its alleged deviation, has not established that its alleged deviation authorizes the specific departures at issue here and not others,[70] has not established that its alleged deviation was published in the *Federal Register* for public comments, and, *a fortiori*, has not established that any public comments properly were considered as part of the decision to grant its alleged deviation. *See generally La Gloria Oil and Gas Co. v. United States*, 56 Fed. Cl. 211, 217-24 (2003) (addressing requirements for a FAR deviation); *Sunoco, Inc. v. United States*, 59 Fed. Cl. 390, 395-96 (2004) (same). Whatever DESC may seek to do with its alleged deviation, without a vastly larger showing, it profits DESC nothing here. *Id.*

The end result of DESC's match price auction is that the bid or pricing information from large businesses is disclosed to small business competitors "before award" of contracts is completed in contravention of the OFPPA, to say nothing of violation of FAR § 19.502-3 (c) (1), FAR § 52.219.7, FAR § 19.507(a) and DFARS § 252.219-7001(c)(3).[71] The impact of DESC's

[70] *See* B-230,556, 1988 WL 227932 at 3 (noting that DESC departs from the FAR by not paying small businesses "'the highest unit prices(s)' paid under the FAR").

[71] Where courts have permitted an agency's pre-award disclosure of price information, it has been to preclude violation of another statute or the thwarting of a "bastion of federal procurement policy," such as ensuring that all offerors have access to the same information. *See LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1555 (Fed. Cir. 1995) (citing *Logicon, Inc. v. United States*, 22 Cl. Ct. 776, 787 (1991)). Such disclosures clearly fall within the authorized exception to the OFPPA. 41 U.S.C. § 423(b)(3) (1989). That exception is irrelevant here.

Further, the cases cited by DESC provide no defense against its illegal auction techniques. For example, *DGS Contract Serv., Inc. v. United States*, 43 Fed. Cl. 227 (1999), is easily distinguished. Unlike the situation here, *DGS* did not involve an agency's disclosure of the "price that [an offeror] must meet to obtain further consideration." *Id.* at 239. Rather, the agency in *DGS* merely informed an offeror that its price was "on the lower end, but that [the offeror was] not the lowest priced offeror." *Id.* at 232 n.23. Further, at the time of the solicitation in *DGS*, the FAR's auction prohibitions had been deleted, *id.* at 239, and replaced with a provision that permitted contracting officers to "inform an offeror that its price is considered by the Government to be too high or too low." *See* FAR § 15.306(e) (1998).

(footnote continued)

violation of the OFPPA and the FAR is that DESC pays lower prices for fuel to both large businesses and small businesses.

Thus, DESC sets aside in excess of forty percent of its procurement for small businesses, far more than the proportion of the market held by small refiners. App. 286. With such a large portion of its procurements subject to DESC's match price system, large businesses seeking award of substantial volumes of fuel are forced to bid low enough that small businesses will not accept the resulting match price offered to them, thereupon the award remains with the large business as the otherwise successful offeror. This harms large businesses by forcing them to bid lower, and harms small businesses by providing them an artificially low price to match in order to obtain an award. If DESC conducted its procurements in the way the law required, it would receive higher bids from large businesses and, in turn, offer higher "match prices" to small businesses. The government's disclosure of competitors' bid or pricing information to secure lower prices is the very type of assault on the integrity of competitive procurement that the OFPPA and the FAR were enacted to preclude. *See generally Professional Materials Handling Co., Inc.—Reconsideration*, B-205969.2; B-205969.3, 82-1 CPD ¶ 501 (May 28, 1982).[72]

Accordingly, because DESC fails to establish that there is no set of facts under which it could be found to violate the OFPPA and the FAR, DESC's request for dismissal of La Gloria's illegal auction claims must be denied. *Adams*, 391 F.3d at 1218.

---

The GAO Report DESC cites is similarly unavailing. The report addressed a period prior to enactment of the OFPPA, and, in any event, did not address DESC's disclosure of bidding information prior to award in the larger, non-set-aside portion of the procurement.

[72] DESC claims without support that La Gloria was not harmed by its illegal auction. La Gloria, however, alleges that DESC used its violations of law "to reduce the price it paid for military fuel below fair market value" and that DESC's violations of law "damaged Plaintiff." Amended Complaint ¶¶ 42-43. These allegations must be deemed true on the present record and prior to discovery.

## XII. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ITS AFFIRMATIVE DEFENSE THAT LA GLORIA WAIVED ALL OF ITS CLAIMS

DESC seeks to dismiss all of La Gloria's claims on the grounds of waiver. Because waiver is an affirmative defense, DESC has the burden to establish the absence of any material issue of fact with regard to each element of its defense and to establish that it is entitled to judgment as a matter of law. *Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379, 1383 (Fed. Cir. 2002) ("[T]he Defendants, rather than [plaintiff] bear the burden of proof on a properly pled affirmative defense"). As set forth below, DESC fails to meet its burden either as a matter of fact or law. DESC fails to establish the absence of any material issue of fact concerning whether La Gloria intentionally relinquished a known right. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Indeed, DESC offers no evidence of La Gloria's intent at all. Moreover, as a matter of law, La Gloria's claims of illegality could not be waived, as this Court earlier held with respect to La Gloria's FAR § 16.203 claim. *La Gloria Oil & Gas Co. v. United States*, 56 Fed. Cl. at 225-27.[73] *See also Sola Elec. Co. v. Jefferson Co.*, 317 U.S. 173, 176 (1942).

### A. As A Matter Of Fact, DESC Fails To Establish That La Gloria Waived All Of Its Claims

In its most general form, waiver is an "'intentional relinquishment of a known right.'" *Zerbst*, 304 U.S. at 464; *Roxco, Ltd. v. United States*, 60 Fed. Cl. 39, 42 (2004) (quoting *Cherokee Nation v. United States*, 174 Ct. Cl. 131, 140 (1966)). Because the doctrine of waiver is an equitable one, "'[i]t is a well established rule of law that 'waivers of rights must be voluntary, knowing and intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'" *A Olympic Forwarder, Inc. v. United States*, 33 Fed.

[73] DESC asserts that this Court's earlier holding that DESC's violation of FAR § 16.203 could not be waived does not apply to La Gloria's other allegations of illegality. DESC's Mot. to Dismiss at 3 n.1. As set forth below, however, the same principles that bar waiver of DESC's violation of FAR § 16.203 also bar waiver of DESC's other violations of law. Indeed, DESC offers no basis to distinguish application of this Court's earlier holding to DESC's other violations of law.

Cl. 514, 521 (1995) (quoting *Reliance Ins. Co. v. United States*, 20 Cl. Ct. 715, 723 (1990)). "The determination of whether there has been an intelligent waiver . . . must depend, in each case, upon the particular facts and circumstances surrounding the case." *Zerbst*, 304 U.S. at 458. "Most Circuit Courts of Appeal [have] concluded that waiver is a question of fact." *Sunoco*, 59 Fed. Cl. at 398-99 n.15 (collecting cases); *accord Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81, 88 (D.D.C. 2004) (collecting cases).[74] Because "[t]he applicability of waiver depends upon the intent of the non-breaching party," it is a particularly fact-based inquiry. *Lone Mtn. Prod. Co. v. Nat. Gas Pipeline Co. of Am.*, 710 F. Supp. 305, 311 (D. Utah 1989); *accord A Olympic*, 33 Fed. Cl. at 521 (waiver requires that the non-breaching party "had an intention to relinquish" their claims).

Incredibly, DESC seeks summary judgment on its waiver defense without offering any evidence of La Gloria's knowledge or intent. Thus, DESC fails to offer any evidence establishing either the existence of a "known" right or an "intentional relinquishment" of it. *Zerbst*, 304 U.S. at 464. DESC's failure to offer evidence of La Gloria's knowledge or intent stands in stark contrast to the Declaration of Dennis Marple who was responsible for military fuel contracts for that company during the relevant time period. In his Declaration, Mr. Marple states that La Gloria entered the contracts believing that DESC's prices were legal and with the intent that the prices DESC set would reflect fair market value. App. 639-40. Thus, he expressly states that: "La Gloria was not aware at the time it entered the fuel contracts that . . . DESC awarded the contracts in violation of law," and that "La Gloria entered the fuel contracts with the intent that the prices DESC set would reflect fair market value." *Ibid.* Accordingly, in the absence of knowledge of the essential facts – here, that DESC's prices were illegal and that

[74] *See also Sunoco*, 59 Fed. Cl. at 398 (court held in a similarly situated fuel contract case that it is necessary to "closely examine the particular facts of a case before deciding if waiver is appropriate" and that "there are outstanding issues of fact still to be resolved."); *Calcasieu Refining Co. v. United States*, No. 02-1219C (Fed. Cl.) (July 31, 2003), slip op. at 18-19 ("the court's decision on waiver will benefit from further development of the record.").

DESC would not set prices that reflected fair market value – it is well established that waiver may not be found.[75]

---

75 *See, e.g.*, *Gen. Eng'g & Machine Works v. O'Keefe*, 991 F.2d 775, 781 (Fed. Cir. 1993) ("[t]here can be no waiver or estoppel without evidence of knowledge"); *Tylor Bank v. Truck Ins. Exch.*, 51 F.3d 736, 740 (7th Cir. 1995) (finding no waiver because "there is no evidence that [the bank] knew that the checks had not been properly made payable to the bank") (Posner, J.); *John Deere Indus. Equip. v. Triple Cities Equip., Inc.*, 646 F. Supp. 114, 116-17 (N.D.N.Y. 1986) ("In the absence of [] knowledge [of the breach], there can be no waiver of [the] breach."); *Majernick v. Hartford Cas. Ins. Co.*, 688 A.2d 1330, 1335 (Conn. 1997) ("Where one lacks knowledge of a right there is no basis upon which a waiver of it can rest . . . .") (citation omitted); *Hamilton v. Williams*, 573 N.E.2d 1276, 1284 (Ill. Ct. App. 1991) ("Ignorance of a material fact negatives waiver, however, and waiver is not established where the consent was given under a mistake or misapprehension of fact."); Joseph Perillo, *Calamari And Perillo On Contracts* at 458 (5th ed. 2003) ("The party waiving must know or have reason to know the fact giving rise to the failure of condition."); *Restatement (Second) of Contracts* § 93 ("A promise within the terms of §§ 82-85 [including a promise of waiver under section 84] is not binding unless the promisor knew or had reason to know the essential facts of the previous transaction to which the promise relates. . . .").

Waiver is similarly inapplicable to La Gloria's breach of contract claims, because a material part of the consideration for a contract cannot be unilaterally waived. *See Corbin on Contracts* § 40.1 at 522; *see also id.* ("*A condition of a promisor's duty can be eliminated by a mere voluntary expression of willingness to waive it, if its performance does not constitute a material part of the agreed equivalent of the promise and its nonperformance does not materially affect the value the promisor received.*") (italics original); *Restatement (Second) of Contracts* § 84 and cmt. d ("promise to perform . . . a conditional duty . . . in spite of the non-occurrence of the condition is binding . . . unless . . . occurrence of the condition was a material part of the agreed exchange"); Allan Farnsworth, *Farnsworth on Contracts* § 8.6 at 452 (3d ed. 2004) ("The concept of waiver is restricted to conditions that are relatively minor."); *Tylor Bank*, 51 F.3d at 739 ("Unless the right waived is a minor one (this is the logic of Farnsworth's suggestion), why would someone give it up in exchange for nothing.") (Posner, J.); *Rose v. Mitsubishi Int'l Corp.*, 423 F. Supp. 1162, 1167 (E.D. Pa. 1976) ("If performance of the condition is a material part of the agreed exchange, an agreement to be liable in spite of the non-performance of the condition involves to so great a degree a new undertaking that the requisites for the creation of a new contract must exist."); *United States Fid. & Guar. Co. v. Bimco Iron & Metal Corp.*, 464 S.W.2d 353, 357 (Tex. 1971) ("waiver may be effective after expiration of the time for performance of a condition has expired, if the condition which is asserted to have been waived is not a material part of the agreed equivalent of the obligor's promise and its non-performance does not materially affect the value received by the obligor"); *Burness v. Bruce*, 776 P.2d 32, 34 (Or. Ct. App. 1989) ("Although, as a general rule, a party to a contract may waive performance of a provision included for his benefit, . . . material conditions of the contract cannot be waived.") (citing *Restatement (Second) Contracts*, § 84(1)(a), cmt. c at 218 (1979)). Similarly, waiver cannot bar La Gloria's failure of consideration claims, because, if a contract fails for lack of consideration, there are no underlying obligations left to be waived. *United Counties Trust Co. v. Maclum, Inc.*, 643 F.2d 1140, 1144 (5th Cir. 1981); *Randy v. Columbia/HCA Healthcare Corp.*, 2003 U.S. Dist. LEXIS 17270 (N.D. Tex. Sept. 30, 2003).

Indeed, this case is the counterpoint to the decisions in *Hermes I*, 58 Fed. Cl. 3, and *Hermes II*, 58 Fed. Cl. 409, upon which DESC relies. There, waiver was found based on presumed knowledge of a *per se* violation of the law. 58 Fed. Cl. at 416-18 (relying on *Fed. Crop Ins.*, 332 U.S. 380, to impute knowledge of the law and further finding that "[w]hat is important is that the unauthorized use of the PMM clause is clear"). Here, by contrast, the absence of knowledge of the essential facts giving rising to La Gloria's claims must, on the present record, be presumed, thereby rendering the holding in *Hermes* inapplicable. In relying on *Hermes*, DESC effectively seeks to impute knowledge that the PMM was not a market-based reference, that the PMM was not designed to adjust prices, and that the PMM in fact did not measure the fair market value of fuel. App. 639-40; App. 628-31**.** DESC may not rely on authority imputing knowledge of the law to impute, wholesale, knowledge of the facts.

The only "fact" supported in the record to which DESC points to buttress its waiver defense is that La Gloria entered into a series of contracts with DESC that contained DESC's adjustable price clauses. Contrary to DESC's assertion, La Gloria's entering into those agreements with DESC does not lead ineluctably to the conclusion that La Gloria knew of its rights and their abridgement, and that it intentionally and voluntarily relinquished them. *See generally Maislin Ind., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 122-23, 136 (1990) (even where parties entered "1,081" agreements below the established market price for trucking services, the parties' course of dealing did not bar recovery of the market price); *Dow Chem. Co. v. United States*, 226 F.3d 1334, 1346 (Fed. Cir. 2000) (delay of six years after discovery of a breach held *not* to constitute waiver by the non-breaching party.)

As Mr. Marple makes clear in his Declaration, La Gloria entered into the contracts with DESC containing DESC's pricing clause, because the pricing clause was non-negotiable and because La Gloria had no other choice if it wanted to remain a military fuel supplier. App. 639-40. As Mr. Marple confirms:

> DESC maintained that the way it set fuel prices was non-negotiable and that its fuel prices reflected fair market value throughout its contracts. In entering the fuel contracts, La Gloria understood that it could not be a fuel supplier to DESC

> unless it accepted the way DESC set prices. La Gloria continued to enter fuel contracts with DESC because La Gloria sought to continue to be a supplier to DESC. By continuing to enter fuel contracts with DESC, La Gloria did not . . . intend that it would be paid less than the fair market value of fuel or intend to relinquish the right to payment of fair market value.

App. 639-40 (internal paragraph numbers omitted). Given the Hobson's choice between exiting the military fuel business or accepting DESC's non-negotiable pricing clause, it does not follow that by remaining in the military fuel business La Gloria intended to relinquish fair market value for its fuel or waive its right to seek redress for injuries caused by DESC's pricing clause, particularly when DESC misrepresented its fuel prices. *Alaska Pulp Corp. v. United States*, 48 Fed. Cl. 655, 671 (2001) (concluding that such a Hobson's choice would "reward the breaching party and add further injury to [the non-breaching party.]").[76]

Moreover, DESC wrongly asserts that La Gloria should have been aware of any defects in the PMM when it bid. As Kalt and Killen point out in their expert report, "[s]uch assertions ignore that a company such as La Gloria, based on the information available at the time that it bid, could not have known that it would receive less than fair market value." App. 628 As Kalt and Killen demonstrate, the PMM's departure from the marketplace was "quite random" and "neither stable nor predictable." App. 628-29. Thus, Kalt and Killen explain: "There is no consistent relationship that could be observed by bidders like La Gloria that would have allowed them to reliably calibrate their bid in a manner that would yield actual final contract prices paid that accurately hit the level of and tracked established market prices and attendant market value." App. 629.

Furthermore, given the PMM's random variation with respect to the marketplace, a supplier might well be expected to "alternatively, over- or under-predict the bias," thereby

---

[76] Were the parties' roles here reversed, DESC certainly would not concede that the parties' course of dealing or the passage of time established as a matter of law waiver of its rights, for the mere passage of time "is no defense to a suit . . . to enforce a public right or protect a public interest." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917); *see also INS v. Hibi*, 414 U.S. 5, 8 (1973) (quoting *Utah Power*). If a mere course of dealing or the passage of time, without more, does not give rise to waiver by the government, it should not support a finding of waiver against La Gloria either, and certainly not on a motion to dismiss.

further complicating a supplier's assessment of the PMM's true bias. App. 630. As Kalt and Killen explain:

> The typical response of a bidder to the uncertainty around the bias introduced by the DESC's use of a PMM-based escalator would be to try to forecast this bias by reference to some set of historical prices. Assuming that the deviation of PMM-based escalators from actual market price escalators was a random walk, bidders might, for example, assume that the bias observed in past periods would be present in future periods. In the absence of any better information, this may be a reasonable assumption; however, this forecasting approach does not necessarily lead to consistent after-the-fact results due to the unstable nature of the bias introduced by the DESC's use of a PMM-based escalator. Using the past relationship between the PMM-based escalator and a market-based escalator to forecast the future relationship will, alternatively, over- or under-predict the bias. For example, when the bias is high in one year, the forecast bias for the next year is likely to be too high given the limited availability of data as to the "true" relationship.

App. 630.

Accordingly, Kalt and Killen reject DESC's assertion that, through entering a series of contracts with DESC, La Gloria must be deemed to have intended to relinquish payment of fair market value. They state: "Such assertions ignore that a company such as La Gloria, based on the information available at the time that it bid, could not have known that its would receive less than fair market value." App. 628.

Beyond Kalt and Killen's empirical assessment, the course of dealing between La Gloria and DESC is analogous to the situation where a company buys products from a monopolist that sets prices illegally over a number of years. Even though the company is able to continue in business, it could not be suggested that the company, by continuing to deal with the monopolist, thereby intended to waive its right to receive a legal price. *See Sola Elec. Co.*, 317 U.S. at 176. Nor could it be suggested that the price the company paid the monopolist was fair market value merely because the company continued to do business with the monopolist or was not otherwise driven out of the business. *Ibid.*; *see generally Northern Helex Co. v. United States*, 455 F.2d 546, 549 (Ct. Cl. 1980) (where a commodity's production is so interrelated to other commodities produced that the first commodity must be produced or wasted, it is commercially reasonable to continue performance in a contract even in the event of a material breach by the other party).

In support of its waiver defense, DESC proffers the declaration of John Walker, who asserts that La Gloria never objected to DESC's prices. DESC's Proposed Findings of Fact ¶ 28. Startlingly, Mr. Walker does not even allege that he was involved in a *single one* of La Gloria's contracts, nor does he even allege that he ever spoke with a *single person* at La Gloria about its military fuel contracts. *Ibid*. In fact, Mr. Walker was not even employed by DESC during part of the period purportedly covered by his overly broad declaration. App. 560.[77] DESC's proffer of Mr. Walker's declaration in support of its motion simply mocks the rules of evidence.

While the full delineation of the course of dealing between La Gloria and DESC will have to await discovery (*see* La Gloria's RCFC 56(f) motion accompanying this Opposition), the record here makes clear that every known objection DESC received to its "non-negotiable" pricing clause was rejected out of hand. App. 205; App. 206-78. Beginning as early as 1984, suppliers objected to DESC's pricing clause as "coerced," and, in turn, were met by misrepresentations that the PMM "consistently reflects actual market prices." App. 201; App. 96. DESC's own 1987 study of the PMM recounts that suppliers complained that "'we never know if we have made or lost money when you (D[E]SC) lift a cargo,'" App. 597, and, even though MAPCO filed a claim against DESC challenging its pricing clause in 1988, DESC continued to use the PMM for six more years. *MAPCO*, 27 Fed. Cl. at 407. Clearly, objection was futile. *See Navajo Ref. Co., L.P.*, 58 Fed. Cl. at 214.

Moreover, the record establishes that La Gloria filed its Complaint soon after the Federal Circuit in *Barrett* put a final end to DESC's public assertions that there were no remedies for its military fuel prices. As explained in the Declaration of Mr. Marple, La Gloria submitted claims

[77] Significantly, the record establishes the inaccuracy of Mr. Walker's sworn statements in other similarly situated cases that the suppliers in those cases did not object to DESC's military fuel prices. *Compare* App. 96 (DESC's response to Calcasieu Refining Company's objection to DESC' s military fuel prices) *with* App. 645 (Decl. of John Walker at ¶ 11, Ex. 1 to DESC's Jan. 17, 2003 Mot. for Partial Summary Judgment in *Calcasieu Refining Co. v. United States*, No. 02-1219C (Fed. Cl.) (stating inaccurately that Calcasieu Refining never objected to DESC's military fuel prices)).

under the fuel contracts when it first learned that remedies were available for DESC's pricing. App. 640; *Barrett*, 242 F.3d 1055. *Barrett* effectively ended DESC's misrepresentations, wherein DESC's chief economist had testified before this Court to what DESC's own documents show he knew or should have known not to be true – that the PMM was an appropriate "benchmark" to measure fair market value. App. 29. Despite being unmasked in its misrepresentations in *Barrett*, DESC then proceeded to threaten essentially the entire U.S. refining industry *in writing* with claims of *fraud* should refiners pursue the same claims the Federal Circuit upheld in *Barrett*. App. 563-94.

Thus, the record establishes that, by at least 1986, DESC knew that the PMM did not reflect the marketplace, but continued to tell its suppliers and its parent organization, DLA, that it did. App. 103; App. 98. DESC admits it used its "market leverage" as the sole purchaser of military fuel to "improve the competition" by establishing its pricing clause as "nonnegotiable as a matter of policy" and by further refusing to do business with suppliers that objected. App. 17; App. 205; App. 199. Not until 1994, when DLA ultimately learned of DESC's misrepresentations, did DLA stop DESC's use of the PMM. App. 134. Even then, DESC misled this Court about the PMM and abused the government trust by threatening fraud claims against any refiner that pursued the very claims the Federal Circuit upheld in *Barrett*. If ever the government's unclean hands barred a waiver defense, it is hard to image a more compelling case than that presented here. *Desert Apartments, Inc. v. United States*, 250 F.2d 457, 458 (10th Cir. 1957) (the government may not ask for equitable relief when "for any reason its conduct is such that it must be said that it comes into court with unclean hands") (citing *Pan-American Petroleum & Transp. Co. v. United States*, 273 U.S. 456, 506 (1927)); *Princess Cruises, Inc. v. United States*, 397 F.3d 1358, 1369 (Fed. Cir. 2005) (The doctrine of unclean hands "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness

or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.").[78]

**B. <u>As A Matter Of Law, La Gloria's Claims Of Illegality Cannot Be Waived</u>**

Through its defense of waiver, DESC seeks to retain the benefit of setting its military fuel prices in violation of the law. DESC thereby seeks to give effect to the very illegal prices that the law prohibited. DESC may not invoke rules of estoppel to thwart the laws of the United States, *Sola Elec. Co.*, 317 U.S. at 176, and courts hold that either party to a contract with an illegal price may recover a lawful price. *Pittsburgh Ry. Co. v. United States*, 250 U.S. 577 (1919). This rule is reflected in a long line of decisions holding that the government's violation of provisions of law protecting contractors cannot be waived. *See, e.g., Beta Systems, Inc.*, 838 F.2d at 1186.

**1. <u>La Gloria Is Entitled To Recover A Lawful Price For Fuel</u>**

The Supreme Court has long held that "rules of estoppel will not be permitted to thwart the purposes of the statutes of the United States." *Sola Elec.*, 317 U.S. at 176 (contract violating antitrust law not enforceable, despite parties' agreement); *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 81 n.6 (1982) (quoting *Sola Elec.*). To preserve the law from encroachment, courts permit either party to a contract with an illegal price to recover a lawful price even after payment and performance are rendered. *Pittsburgh Ry.*, 250 U.S. 577; *Costanzo Coal Mining Co. v. Weirton Steel Co.*, 150 F.2d 929 (4th Cir. 1945).

---

[78] DESC's estoppel defense similarly fails. Estoppel requires, in the first instance, that DESC "must be ignorant of the true facts." *A Olympic Forwarder*, 33 Fed. Cl. at 522 (citing *Pacific Gas & Elec. v. United States*, 3 Cl. Ct. 329, 340 (1983)). The record establishes not only that DESC was aware of the facts, but also that it misrepresented them. Amended Complaint ¶¶ 11-23, 51-56. DESC's further assertion that it could have sought a deviation if La Gloria had brought the illegality of DESC's prices to its attention is specious. MAPCO filed a claim challenging the legality of DESC's prices in 1988, and DESC continued using the PMM for six more years, and, when DESC ultimately did seek a deviation for its pricing clause, it did so illegally. *Navajo Ref. Co., L.P.*, 58 Fed. Cl. at 205-12.

In *Pittsburgh Railway*, the Supreme Court held that a railroad could sue for the legal shipping rate despite agreeing to ship at a lower rate. 250 U.S. at 583. While noting that the shipper "paid all that was demanded when the freight was delivered," the Court nonetheless held that payment of the agreed price "cannot change the policy which Congress has embodied in the statute in order to secure uniformity in charges for transportation." *Id*. at 582; *see also Southern Pacific Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 344 (1982) (following *Pittsburgh Railway*).

Relying on *Pittsburgh Railway*, the court in *Costanzo Coal Mining Co.* held that a seller of coal could sue to recover the statutory price for coal, despite agreeing to sell at a lower price. The court stated: "It is our view that a buyer who received deliveries of coal at prices specified in a contract below the legal minimum was not protected by the contract but was subjected to the liabilities imposed by his acceptance of goods whose price was fixed by the statute." 150 F.2d at 936. The court reasoned that "the right to recovery is permissible because it will promote the higher right of the public to effectuate the purposes of the statute." *Id*.; *cf. Kaiser Aluminum & Chem. Sales, Inc. v. Avandole Shipyards, Inc.*, 677 F.2d 1045 (5th Cir. 1982) (purchaser permitted to counterclaim to challenge contract as illegal tying arrangement, though counterclaim ultimately found barred by statute of limitations).[79]

Similarly, in *Sprague Steamship Co. v. United States*, 172 F. Supp. 674 (Ct. Cl. 1959), the Court of Claims held that a purchaser of surplus ships from the United States Maritime Commission could recover the portion of the price it paid above that mandated by the Ship Sales

---

[79] Corbin states the governing principle as follows: "In these cases the refusal of all remedy against a party to the illegal bargain would penalize the very persons for whose benefit the making of such a bargain is prohibited or declared illegal. In such cases, in order to attain the purposes of the law, the courts have frequently enforced the bargain by one or more of the usual remedies, in favor of a party for whose benefit the law was intended and against a party toward whom the prohibition or penalty was directed." Arthur L. Corbin, 6A *Corbin on Contracts* § 1540, at 833-34 (1962). Innumerable cases apply this rule. *See, e.g.*, *Carter v. Seaboard Fin. Co.*, 203 P.2d 758 (Cal. 1949); *Shimrak v. Garcia-Mendoza*, 912 P.2d 822 (Nev. 1996); *Cain v. Burns*, 280 P.2d 888 (Cal. Dist. Ct. App. 1955).

Act because of "a Congressional purpose that the Government's surplus ships should be sold at prices, uniform to all purchasers." *Id*. at 676. The Court of Claims, in construing the doctrine of waiver, commented on *Sprague* in *Rough Diamond Co.*, stating: "Congress' establishment of the sale price-formula was evidently for the benefit of the purchasers themselves – the very persons who brought suit to regain the excess payments they had made or agreed to make." *Rough Diamond Co. v. United States*, 351 F.2d 636, 640 (1965).

The principle that a party to a contract is entitled to recover a lawful price is frequently given effect under the *Christian* doctrine, which reads FAR requirements into contracts where "intentionally or inadvertently omitted" in order to preclude the government from "deliberately or negligently" evading procurement policy. *S.J. Amoroso Constr. Co. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993) (quoting *G.L. Christian & Assocs. v. United States*, 320 F.2d 345, 351 (Ct. Cl. 1963)). In *Applied Devices Corp. v. United States*, 591 F.2d 635, 640-41 (1979), the court relied upon the *Christian* doctrine to reform an illegal price ceiling on the contractor's termination costs, and, in *Chris Berg, Inc. v. United States*, 426 F.2d 314, 317 (Ct. Cl. 1970), the court relied upon the *Christian* doctrine to reform a mistaken and illegally accepted bid price.[80]

Any rule that would preclude a party to a federal procurement contract from recovering a legal price would impermissibly give effect to unauthorized governmental actions. *See Amdahl*, 786 F.2d at 392-93 ("[a]dministrative actions taken in violation of statutory authorization or requirement are of no effect"). Thus, in *Urban Data Sys., Inc.*, the court struck down a price violating statutory proscriptions on cost-plus-percentage-of-cost contracts and ordered *quantum meruit* recovery, because the government "had no power to enter into the challenged price terms." 699 F.2d at 1153 (relying on *Fed. Crop Ins.*, 332 U.S. at 382). In *Barrett*, the Federal Circuit relied upon its holding in *Urban Data Sys., Inc.* to hold that DESC's illegal fuel prices

---

[80] *See also Gold Line Ref., Ltd. v. United States*, 43 Fed. Cl. 291, 296 n.8 (1999) (relying on the *Christian* doctrine to provide a remedy for DESC's illegal military fuel prices); *Centel Communications Co.*, 89-1 B.C.A. (CCH) ¶ 21,225 (Sept. 8, 1988) (invoking the *Christian* doctrine to order price adjustments pursuant to a wage rate price adjustment clause).

were "unauthorized and unenforceable" and to award the contractor *quantum valebant* relief. *Barrett*, 242 F.3d at 1060 & n.2; *see generally OPM v. Richmond*, 496 U.S. 414, 427-29 (1990) (giving effect to unauthorized governmental actions would impermissibly give those actions "the practical force of law," give rise to "improper collusions," and "vest authority in these [government] agents that Congress would be powerless to constrain").

Here, in order to preserve the purposes of the law, La Gloria is entitled to recover a lawful price for the military fuel it delivered to DESC. FAR § 16.203 expressly precluded DESC from setting military fuel prices for its own benefit, and the other provisions of law DESC violated were similarly intended to benefit contractors. DESC may not assert a defense of waiver to preserve the benefit of the very illegal prices the law prohibited or to give effect to "unauthorized and unenforceable" prices DESC "had no power to enter." *Barrett*, 242 F.3d at 1060 & n.2; *Urban Data Sys., Inc.*, 699 F.2d at 1153. DESC's proffered defense of waiver must be denied, lest the rules "of illegality would obviously be ephemeral." *Kaiser Steel*, 455 U.S. at 81 n.6; *see also Tesoro*, 58 Fed. Cl. at 73 ("If we were to adopt DESC's argument that contracting parties are free to waive mandatory FAR requirements, the parties to fuel contracts such as those at issue here would be free to rewrite federal procurement policy through negligence or collusion.").

#### 2. Because The Law At Issue Protects Contractors, DESC's Violations Of Law Cannot Be Waived

The rule that waiver and estoppel may not thwart the law is reflected in a long line of decisions holding that the government's violation of provisions of law protecting contractors cannot be waived. The court stated the governing rule in *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442 (Fed. Cir. 1997): "'[I]f government officials make a contract they are not authorized to make, in violation of a law enacted for the contractor's protection, the contractor is not bound by estoppel, acquiescence, or failure to protest.'" *Id*. at 1451 (quoting *LaBarge Prods., Inc.*, 46 F.3d at 1552). This well-established rule requires denial of DESC's waiver defense. *Tesoro*, 58 Fed. Cl. at 72-75; *Gold Line Ref., Ltd. v. United States*, 54 Fed. Cl. 285, 296-97 (2002); *Phoenix*

*Petroleum Co. v. United States*, No. 97-315C (May 11, 1998), slip op. at 5-7; *but see Hermes II*, 58 Fed. Cl. 409.

In *Beta Systems*, the contractor sought relief from a price adjustment clause on the ground that it failed to track the price of a major construction material as the DAR required. 838 F.2d at 1185. The government argued that the contractor had waived its claim by proceeding with the contract after objecting to the price adjustment clause during contract negotiation. *Id.* at 1184. The Federal Circuit denied the government's waiver defense, holding that "[i]f the BLS index violated the DAR, the government can not, by law, benefit from it." *Id.* at 1185. The court concluded, "[i]f the BLS index that was selected does not comply with [the] DAR . . ., even approximately, it is not controlling whether or not [the contractor] or the government foresaw, or accepted the risk of failing to foresee, this defect in the index." *Id.* at 1186.

The Federal Circuit reiterated its holding in *Beta Systems* in *LaBarge Products, Inc.*, 46 F.3d 1547. In *LaBarge*, the contractor sought reformation of its contract on the ground that the government had awarded the contract using auction techniques prohibited by FAR § 15.610(d). 46 F.3d at 1552. In rejecting the conclusion of the court below that the contractor's "allegations of government misconduct [were] the kind of allegations that are ordinarily made in pre-award bid protests," *id.*, the Federal Circuit reiterated the principles underlying *Beta Systems*, explaining that the contractor could "seek reformation of its price term, even after performance, if that term was allegedly diminished by unlawful government acts." *Id.* at 1552-53. The court held that, where "a breach of law is inherent in the writing of the contract, reformation is available *despite the contractor's initial adherence to the contract provision later shown to be illegal*." *Id.* at 1552 (emphasis added); *see also Applied Devices,* 591 F.2d at 640 (where contract entered in violation of law made for the contractor's protection, the contractor "is not bound by his estoppel, acquiescence, and even failure to protest").[81]

[81] As this Court recognized in its earlier decision (58 Fed. Cl. at 226), DESC's reliance on *Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997), and *AT&T V*, 307 F.3d 1374, is misplaced. *See Tesoro*, 58 Fed. Cl. at 72; *Phoenix Petroleum*, No. 97-315C, slip op. at 6-7; *Gold*

(footnote continued)

*Beta Systems* and *LaBarge* are consistent with *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986). There, the Supreme Court, in addressing waiver of constitutional protections, articulated the more general distinction between structural, institutional interests that cannot be waived and personal interests that can, noting: "[t]o the extent that this structural principle is implicated in a given case . . . notions of consent and waiver cannot be dispositive because the limitations serve institutional interests." *Id*. at 850-51. In illustration of this distinction, the rule is well established that statutory limitations on the amount of funds available to pay for a government contract cannot be waived. *Leiter v. United States*, 271 U.S. 204 (1926).

The interests at stake here – whether a government agency acting without authority may benefit from violating the law – implicate similarly important institutional interests precluding waiver. In *Tesoro*, the court cited *Schor* for this very proposition:

> [T]o extend the [waiver] defense to cases falling within the *Beta Systems* line of case may impinge upon the institutional concerns of the United States in application of the law. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986); *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982). The *Beta Systems* rule acts not only to protect the parties but also to ensure that Federal procurement regulations do not become the private property of parties to a government contract.

*Tesoro*, 58 Fed. Cl. at 75.

The *Beta Systems* rule may not be distinguished on the ground that La Gloria allegedly did not protest before it agreed to enter the contracts. The *Beta Systems* rule expressly provides that "the contractor is not bound by . . . failure to protest." *Cessna*, 126 F.3d at 1451 (quoting *LaBarge*, 46 F.3d at 1552). In fact, raising an objection but nonetheless entering a contract gives rise to a greater, not a lesser, inference of the "intentional relinquishment of a known right" necessary to support waiver. *Zerbst*, 304 U.S. at 464. In any event, the undisputed record

---

*Line*, 54 Fed. Cl. at 296; *but see Hermes I*, 58 Fed. Cl. at 15. DESC's further reliance on *E. Walters & Co. v. United States*, 576 F.2d 362 (Ct. Cl. 1978), also is misplaced, because *Walters* involved funding restrictions that are recognized not to be actionable by contractors. *Id*. at 265-66; *see generally Cessna*, 126 F.3d at 1451-52.

evidence establishes that La Gloria was not aware of DESC's illegal fuel prices when it entered the contracts and could not have objected to the illegality. App. 640.

*Beta Systems* and *LaBarge*, implementing the principles of *Schor*, are materially indistinguishable from the present case. FAR § 16.203 and the other provisions of law at issue here, like the procurement regulations at issue in *Beta Systems* and *LaBarge*, were clearly intended to protect contractors. Indeed, with regard to DESC's violation of FAR § 16.203, the law could not be more emphatic, stating that "economic price adjustment shall not be used unless . . . necessary . . . to protect the contractor . . ." FAR § 16.203-3; *see Tesoro,* 58 Fed. Cl. 72 (citing *Phoenix Petroleum*, No. 97-315C, slip op. at 5). Because the law protected La Gloria, DESC may not seek to retain the benefits of its violation of FAR § 16.203 by asserting a waiver defense. *Beta Systems*, 838 F.2d at 1186; *LaBarge*, 46 F.3d at 1552. The language of the Federal Circuit's proscription in *Beta Systems* is equally applicable here: "If the BLS *[PMM]* index violated the DAR*[FAR]*, the government can not, by law, benefit from it." *Beta Systems*, 838 F.2d at 1185; *see also MAPCO*, 27 Fed. Cl. at 408 (quoting *Beta Systems*).

### 3. DESC May Not Use A Defense Of Waiver To Seek A Judicially-Imposed Statute Of Limitations Congress Did Not Enact

Unable to overcome the rule of *Beta Systems* and *LaBarge*, DESC in essence seeks to bar La Gloria's claims on the ground that too much time has elapsed since DESC began setting prices illegally for La Gloria to seek a remedy. Such prudential limitations based on the passage of time, without more, are the province of statutes of limitation. *Thomas v. United States*, 125 Ct. Cl. 76, 80 (1953). Through its waiver defense, DESC may not seek a judicially-imposed statute of limitations Congress did not enact.

DESC's waiver defense runs squarely into the rule set forth in *Louisville & Nashville R.R. Co. v. Cent. Iron & Coal Co.*, 265 U.S. 59, 65 (1924). *Louisville & Nashville R.R.*, like *Pittsburgh Railway* discussed above, involved a railroad's claim to recover the lawful shipping rate despite agreeing to a lower price. In upholding the railroad's claim, the Supreme Court found: "Nor could any act or omission of the carrier *(except the running of the statute of*

*limitations)* estop or preclude it from enforcing payment of the full amount" of the legal tariff. 265 U.S. at 65 (emphasis added); *see also Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127 n.9 (1990) (quoting *Louisville & Nashville R.R.* (citation omitted)). Congress, of course, did not enact a statute of limitations applicable to La Gloria's claims. *Motorola Inc. v. West*, 125 F.3d 1470, 1472-73 (Fed. Cir. 1997); FAR § 33.206(a). Indeed, when Congress enacted a statute of limitations under the CDA, it chose not to apply it retroactively to claims such as La Gloria's, *id.*, and DESC may not, in effect, seek the very retroactive application Congress chose not to impose.

With respect to the government itself, it has long been the rule that the mere passage of time "is no defense to a suit . . . to enforce a public right or protect a public interest." *Utah Power*, 243 U.S. at 409; *see also INS v. Hibi*, 414 U.S. 5, 8 (1973) (quoting *Utah Power*). Application of this same principle *against* DESC is even more compelling here where DESC unlawfully holds its contractors' funds based on prices it "had no power to enter." *Urban Data Sys., Inc.*, 699 F.2d at 1153. Indeed, the government commonly pursues pricing disputes against refiners that cover decades. *See, e.g.*, Michael J. Sniffen, *Refiner to pay $110 million in underpaid-royalties suit*, *Corpus Christi Caller-Times* (Jan. 24, 2001) (settlement with Department of Interior for underpayment in royalties on oil spanning 1980 to 1999). It may not complain so loudly when the same rule is applied against it.

Nor may DESC seek to overcome the absence of a statute of limitations by cloaking its waiver defense within the rubric of laches. The Federal Circuit has long held that laches requires a showing of actual prejudice by the government. *S.E.R., Jobs for Progress, Inc. v. United States*, 759 F.2d 1, 8 (Fed. Cir. 1985); *Cornetta v. United States*, 851 F.2d 1372, 1378 (Fed. Cir. 1988) (*en banc*). DESC has alleged no such prejudice, nor has it asserted a laches defense.

DESC may not claim surprise that La Gloria filed its claims after the Federal Circuit established the existence of a remedy for DESC's illegal prices in *Barrett*. The undisputed record evidence establishes that La Gloria did not know that DESC's fuel prices were illegal. App. 640. La Gloria could not challenge, or for that matter waive, an illegality of which it was

unaware. *Zerbst*, 304 U.S. at 464 (waiver requires the "intentional relinquishment or abandonment of a known right"). Moreover, as Mr. Marple states in his Declaration, La Gloria timely filed its claims in 2001 when it first learned that there remedies were available for DESC's pricing. App. 640.[82]

#### 4. ***Federal Crop Insurance v. Merrill*** **Does Not Support A Finding Of Waiver**

In support of its waiver defense, DESC relies on this Court's holding in *Hermes II* that a supplier waived its claims for DESC's illegal prices. *Hermes*, in turn, relied on *Fed. Crop Ins.*, 332 U.S. 380, to reason that, because the supplier was deemed to know the law, it is deemed to have waived its claims for DESC's illegal prices when it entered the fuel contracts. *Hermes II*, 58 Fed. Cl. at 416. The holding in *Hermes*, however, proves too much: Under *Hermes II*, a contractor could never seek a remedy under an illegal contract, because it would always be deemed to know the law and thus to have waived its claim upon entering the contract. *Id.* Such a rule cannot be reconciled with the Federal Circuit's *en banc* decision in *AT&T V* which expressly holds that remedies are available under illegal contracts. 307 F.3d at 1376

[82] A different result should not apply even assuming, *arguendo*, that La Gloria knew of the Court of Federal Claims' first ruling in *MAPCO* that DESC's prices were illegal, albeit not on all of the grounds La Gloria alleges here. In *MAPCO*, the court expressly reserved ruling on "the ultimate effect of th[e] illegality" in DESC military fuel prices. 27 Fed. Cl. at 406; *see also id.* at 417. It was not until this Court ruled in *Barrett*, over DESC's challenge to subject matter jurisdiction, that a supplier could recover *quantum valebant* relief that the question the court raised in *MAPCO* was resolved. *Barrett*, 242 F.3d at 1059-60. Moreover, *MAPCO* afforded suppliers time for resolution of the question it posed concerning the existence of a remedy, inasmuch as *MAPCO* (to say nothing of this Court's decision in *Beta Systems* upon which *MAPCO* relied) unambiguously held that "[t]he contractor cannot, by waiver, permit the government to enter an illegal contract." 27 Fed. Cl. at 416. It would be inequitable to charge La Gloria with knowledge of *MAPCO's* ruling of illegality while at the same time depriving them of reliance on *MAPCO's* ruling on waiver. *Yerxa v. United States*, 11 Cl. Ct. 110, 119 (1986) (if knowledge of a decision is imputed, portions to both the party's "disadvantage" and "advantage" must be imputed), *aff'd*, 824 F.2d 978 (Fed. Cir. 1987); *see also Sprague*, 172 F. Supp. at 676 (contractor's lack of knowledge of court's prior holding of illegality did not provide the government a defense for the same conduct).

(relying, *inter alia*, on *Clark v. United States*, 95 U.S. 539, 542 (1877) (over a hundred years ago upholding *quantum meruit* relief under an illegal government contract)).

As the Supreme Court explained in *Pittsburgh Railway*, the parties' deemed knowledge of the law supports implementing the law, not arbitrarily invoking waiver against one party. 250 U.S. at 581-82. In upholding the railroad's claim to recover the statutory tariff notwithstanding the parties' contrary agreement, the Court found that "Fink [the shipper], as well as the carrier, must be presumed to know the law, and to have understood that the rate charged could lawfully be only the one fixed by the tariff." *Id*. at 581. Noting a "mistaken understanding of the rate legally chargeable," the Court held, "[t]he transaction, in light of the [tariff] Act, amounted to an assumption on the part of Fink to pay the only legal rate the carrier had the right to charge." *Id*. at 582. So, too, here, if DESC and La Gloria are deemed to know the law, then they are deemed to have assumed an obligation to pay a legal price, not somehow to have caused La Gloria to waive the law. *Id*.; *see generally Beta Systems*, 838 F.2d at 1186 (because government presumed to violate the law by mistake, reformation available).

That *Fed. Crop Insurance v. Merrill* is consonant with the existence of remedies for illegal contracts is established by *Urban Data Sys., Inc.* and *Yosemite Park & Curry Co. v. United States*, 582 F.2d 552 (Ct. Cl. 1978). In both of those cases, the court relied on *Merrill* to strike down an illegal contract but also granted a remedy ordering *quantum meruit* or *quantum valebant* relief for the contractor. *Urban Data*, 699 F.2d at 1153-54; *Yosemite Park*, 582 F.2d at 558. *Hermes II's* reliance on *Merrill* to deny a remedy for DESC's illegal prices cannot be reconciled with the contrary treatment of *Merrill* in *Urban Data Sys., Inc.* and *Yosemite Park.*[83]

[83] In *Hermes*, the Court relied on what it found to be the contractor's sophistication as a government contractor as a further basis for finding waiver. *Hermes II*, 58 Fed. Cl. at 417-18. As applicable here, the practical effect of the court's finding that waiver of the law turns on a contractor's alleged sophistication is that sophisticated contractors are paid illegal prices but unsophisticated contractors are not. It would not appear that Congress, when it mandated promulgation of the FAR, or the FAR's drafters themselves contemplated such a result. *See Sprague*, 172 F. Supp. at 676 ("We do not think that Congress was willing that that purpose [of

(footnote continued)

the law] should be frustrated, and different prices should be charged to different purchasers, because of different degrees of knowledge, in the purchasers, of facts or law.") Similarly, it would not appear that when *Amdahl* announced the rule that "[a]dministrative actions taken in violation of statutory authorization or requirement are of no effect," the court intended that the rule apply only in the presence of unsophisticated parties. *Amdahl*, 786 F.2d at 392-93. It is perhaps because the issue of sophistication would often weigh against the government in defending an assertion of waiver that, upon express inquiry during oral argument in the *Tesoro* appeal, DESC chose not to defend this portion of the decision in *Hermes*. App. 343.

**CONCLUSION**

For the foregoing reasons, La Gloria respectfully requests that Defendant's Motion to Dismiss be denied.

Respectfully submitted,

s/J. Keith Burt
J. Keith Burt
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006
(202) 263-3208 (phone)
(202) 263-5208 (fax)

Counsel for Plaintiff,
La Gloria Oil and Gas Company

*Of Counsel:*

Gary A. Winters
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006

May 1, 2006