IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LA GLORIA OIL AND GAS COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 02-465C<br>(Judge Hewitt) |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT**

Pursuant to Rule 56(h)(2) of the Court's rules ("RCFC"), defendant responds to Plaintiff's proposed findings of fact ("PFF"), by agreeing, disagreeing, or averring, as follows.

1. DESC[1] is the principal purchaser of military fuel for the Department of Defense ("DOD"). It is the single largest purchaser of fuel in the world.[2] As relevant here, DESC principally purchased unique types of military jet fuel. Amended Complaint ¶ 2; App. 648-87.[3]

Response: Agrees with the first sentence. Denies the second sentence, because there is an Italian entity that is a larger fuel purchaser. With regard to the third sentence, agrees that DESC purchased fuels made to military specifications, but denies that there is anything unique about the fuels. Military specification fuels are made of the same components as commercial fuels. See Defendant's Proposed Finding of Fact (PFF) 5.

---

[1] DESC previously was known as the Defense Fuel Supply Center ("DFSC"). For simplicity, "DESC" is used throughout.

[2] *Dimensions, Defense Logistics Agency News Magazine* (1999 Almanac ed.), *available at* http//www.dla.mil/dimensions/almanac/desc.htm.

[3] Chevron Products Company, *Aviation Fuels Technical Review* 13 (2000) (military "maintain[s] separate specifications for jet fuel [because of] operational and logistical differences between the military and civilian systems and the additional demands high-performance jet fighter engines place on the fuel").

2. La Gloria was a supplier of military fuel to DESC. La Gloria maintained long-term supply relationships with DESC and committed substantial, long-term capacity to refining military fuel. App. 648-87. DESC purchased military fuel from La Gloria, as it did from essentially all military fuel suppliers, under long-term contracts typically lasting one year. Amended Complaint ¶ 2; App. 648-87. During the period relevant here, La Gloria and DESC entered 6 contracts providing for the purchase of military fuel in Texas. Amended Complaint ¶¶ 31**;** App. 648-87.

Response: Agrees with the allegations contained in the first, third, and fourth sentences. Agrees with the second sentence, except for the allegation regarding La Gloria's commitment of long-term refining capacity, which is immaterial, and for which we lack of information sufficient to form a belief as to its truth.

3. DESC's military fuel contracts contained adjustable prices that permitted DESC to set military fuel prices monthly or weekly during the contract term. App. 648-87.

Response: DESC did not "set" prices. Contractors determined their own proposal prices competitively; these prices were subject to adjustment pursuant to the economic price adjustment clause contained in the contracts. PFF 6; Def. Exh.1[4] (Walker Decl. ¶8)

4. As relevant to DESC's motion, DESC set fuel prices under its military fuel contracts using a compilation of petroleum sales data published by the Department of Energy ("DOE") known as the Petroleum Marketing Monthly ("PMM").[5] App. 650-54. The PMM

---

[4] " Def. PFF" refers to Defendant's Proposed Findings of Fact submitted with our recent motion to dismiss. "Def. Exh." refers to the documents submitted with our original motion for partial summary judgment. "Supp. App." refers to the appendix submitted with our recent motion to dismiss, to which this document relates. "SA2" refers to Defendant's Second Supplemental Appendix filed with Defendant's Reply to Plaintiff's Opposition.

[5] DESC also used other compilations of sales data to set fuel prices. However, in its motion, DESC offers no evidence concerning these other compilations or their relationship to the market for military fuel. Because DESC fails to meet its burden to offer any evidence concerning these other compilations, or otherwise move with respect to them, La Gloria does not address them specifically in its response and limits its discussion to the PMM.

reports a monthly average sales figure for specified fuels, such as jet fuel or diesel fuel, for five regions known as Petroleum Administration for Defense Districts ("PADDs"). *Barrett Ref. Corp. v. United States*, 42 Fed. Cl. 128, 130 n.6, 131 (1998), *aff'd in part and rev'd in part*, 242 F.3d 1055 (Fed. Cir. 2001). As the PMM moved upward or downward each month, DESC's fuel prices also moved upward or downward. App. 650-54.[6]

Response: As explained in our response to PFF 3, disagrees with the allegation that DESC "sets" the price of fuel; agrees with the remaining allegations contained in this PFF. Also avers that the economic price adjustment clauses in plaintiff's contracts beginning in 1995 were based on market prices published in Platts. See Defendant's PFF 13.

5. DESC's Deputy Director of Contracting, Edward Biddle, stated in a 1993 memorandum that the purpose of DESC's adjustable prices was to "ensure[] that the sale will be at the market price, which is a fair and reasonable price. Not only is the government protected, but *the contractor is protected by knowing that its price will always be related to the price it could obtain in the commercial marketplace*." App. 4 (emphasis added).

Response: Agrees to the extent supported by the cited document, which is the best evidence of its contents. La Gloria cites no evidence that: it was aware of the document at the time it entered into its contracts with DESC; the document was incorporated into the contracts; or the parties' intent was the subject of discussions at the time the contracts were negotiated and awarded.

6. DESC's Director of the Office of Market Research and Analysis, Lawrence Ervin, testified similarly before this Court in 1998 that DESC used adjustable prices because: "[W]e wanted our prices to reflect, as closely as possible, market levels for the same or similar commercial fuels in the marketplace. . . . We wanted the price to go up and also down when the

[6] The PMM is designed for Congressional use in developing broad energy policy. *Barrett*, 42 Fed. Cl. at 131.

market prices of similar fuel went [up or] down." App. 14; *see also* App. 62 ("the EPA [economic price adjustment] reference selected is [intended to be] reflective of changes in commercial market prices"); App. 69 ("the EPA reference is designed to adjust the award price in concert with changes in going market price levels;" "the D[E]SC Office of Market Research and Analysis endeavors to select the reference that most accurately reflects movements of going market prices").

Response: Agrees to the extent supported by the cited document, which is the best evidence of its contents. La Gloria cites no evidence that: it was aware of the document at the time it entered into its contracts with DESC; the document was incorporated into the contracts; or the parties' intent was the subject of discussions at the time the contracts were negotiated and awarded.

7. Consistent with this purpose, DESC's pricing clause is titled "Economic Price Adjustment – Published Market Price." App. 9. Among its various iterations over time, the clause states that "[t]he market price [used to set military fuel prices] is derived from quotes, assessments, or sales prices in the market place" and further provides that military fuel prices are "*to reflect market conditions*." App. 9 (emphasis added).[7] It is therefore unsurprising that in *Barrett* the United States Court of Appeals for the Federal Circuit expressly found that DESC's adjustable pricing clause embodied a promise to "pay at least fair market value" for fuel. 242 F.3d at 1060.

Response: Agrees with the allegations contained in the first two sentences to the extent supported by the cited documents. However, not all of the EPA clauses contained that language. The third sentence is a conclusion of law and an argument and does not require a response.

---

[7] *See also* App. 87 (Mr. Ervin stating that, pursuant to DESC's pricing clause, "replacement of the escalation reference is called for if the reference 'consistently fails to reflect market value'"); App. 85 (Mr. Ervin stating that through its pricing clause "DESC assumes the risk of higher product prices").

8. Outwardly, DESC maintained that the PMM was the "gold standard" for measuring fair market value. DESC wrote to its parent organization, the Defense Logistics Agency ("DLA"), that its PMM "references are virtually unimpeachable from an accuracy standpoint, since *they don't just 'track' the market – they are the market.*" App. 98 (emphasis added).[8] In response to a supplier's objection to the PMM, DESC similarly wrote that the PMM "consistently reflects actual market prices," App. 96, and to another objecting supplier DESC wrote that the PMM is "a reliable indicator of price movements in the petroleum products market." App. 91. As late as 1998, DESC's Mr. Ervin testified before this Court that the PMM is "the benchmark against which we . . . compare everything domestically." App. 29.

Response: The first sentence is not supported and argumentative and, therefore, does not require a response. Agrees with the second sentence to the extent supported by the cited document. The quotation in footnote 8 is taken out of context. The context for this quotation was DESC's request that DOE delay a format change in the PMM, with one option being a dual reporting system until certain DESC contracts expired. Pl. App. 101. PMM continued to be independent of DESC. With regard to the third sentence, denies that the contractor involved in Pl. App. 96 was complaining about the accuracy of the PMM. From the context of the letter, the contractor was concerned about the unavailability of the PMM reference price at the time it had to submit its offer. DESC remedied that problem the next year. Pl. App. 98. Agrees with the remainder of the third and fourth sentences to the extent supported by the cited documents.

9. DESC's statements to DLA, its suppliers and this Court stand in stark contrast to DESC's expert economists' assessment of the PMM. In 1986, DESC's then-Director of the Office of Market Research and Analysis, Mr. Christopher Lee, undertook an assessment of the PMM to compare its performance with commonly used commercial price references for fuel,

[8] DESC's public espousal of the PMM is unsurprising, given DESC's acknowledgment that "DOE normally will work with us to see that our needs are satisfied as we are one of the primary users of PMM." App. 100.

such as Platts and OPIS (which DLA subsequently directed DESC to use in place of the PMM). Referring to Platts and OPIS as "other references,"[9] Mr. Lee, who holds a Doctorate in Economics,[10] stated: "Yet our analysis of the movement of the PMM as compared to other references as used for interim price adjustments indicates that the PMM may have moves as much as *one or two cents per gallon out of step* with such interim references." App. 103 (emphasis added). In contrast, DESC required its suppliers to submit bids to the one ten-thousandth of a cent ($0.000001). *See, e.g.,* App. 672 (reflecting a bid price of $0.576300).

Response: The first sentence is unsupported and merely argumentative and, therefore, does not require a response. Disagrees with the second sentence. La Gloria misstates the purpose of the cited memorandum and takes its statements out of context. First, the memorandum addressed the concern that the PMM reference price was not available at the time final offers were due. Def. PFF 14. The memorandum recommended that the reference date be changed to remedy the concern. Id. The memorandum did not suggest that there was a problem with the accuracy of the PMM. Id. The third sentence is correctly quoted, but again, is taken out of context and misleading. One would not expect the interim reference and the PMM to move the same; otherwise, there would have been no need to use an interim reference. Second, the interim reference was based upon the last week prior to the month of delivery, while PMM was based on the month of delivery. See, e.g., Def. Exh. 10, pp. 4-5. Thus, comparing the two should lead to different figures. Third, the editor of OPIS testified that these OPIS interim prices

---

[9] In the 1986 assessment, Mr. Lee uses the phrase "other references as used for interim price adjustments." App. 103. DESC used its interim price adjustments to set prices on an interim basis at the time fuel was delivered. App. 120. DESC set final prices when the PMM was published three months after the fact – *i.e.*, three months after the fuel was delivered. App. 121. DESC's interim references, as identified in its adjustable pricing clause, were Platts and OPIS. App. 120.

[10] App. 111.

for jet fuel were list or asking prices rather than transaction prices. Barrett, 42 Fed. Cl. at 131. Disagrees with the fourth sentence. Although DESC evaluated prices to six places from the decimal point, offerors were not required to bid to six places. For example, La Gloria bid to only two places in a contract awarded in 1997. Pl. App. 654.

10. In 1987, DESC's Office of Market Research and Analysis undertook another study "comparing PMM versus Platts and OPIS." App. 134. That study supported using the commercial price references Platts and OPIS to make price adjustments – not the PMM. App. 134. When DLA ultimately learned of DESC's 1987 study – albeit seven years later – DLA directed DESC to stop using the PMM to set prices and to use Platts and OPIS instead.

Response: Agrees with the first sentence. Disagrees with the second sentence. The conclusion of the 1987 study was that DESC should continue using the PMM, but with a different base month, so that offerors would have the reference price at the time of bidding. Def. PFF 21. In reaching its conclusion, the study assessed various alternatives, including the PMM, according to various criteria. The study found that the PMM was preferable to its alternative (trade journals such as Platts), in the crucial categories "Basis in Actual Sales," and "Market Risk." Def. PFF 17, 19. The study found that other market publications had the advantage in the categories of "Timing," "Timeliness," and "Simplicity." Def. PFF 17, 20. However, the study also found that there was "market risk" associated with the use of trade journals such as Platts. Def. PFF 19. Accordingly, the DESC staff recommended continued use of the PMM, with a revised reference date to address the "Simplicity" criterion. Def. PFF 21.

Disagrees with the third sentence. First, it was DESC that requested approval to make the switch to Platts and trade publications, as price references, and DLA approved the change. Def. PFF 22. La Gloria's allegation that DLA ordered the change is based upon the 2003 deposition of DESC's Lawrence Ervin, who participated in the 1987 study. As Mr. Ervin testified, the change to Platts was prompted by a number of circumstances. One was "pressure

from headquarters to do things differently." Pl. App. 134. That pressure, however, was not to adopt Platts, but to do "things differently" that would "produce substantial cost savings to the taxpayer." Id. Accordingly, DESC's requests for individual and class deviations stated that DESC would switch price references from PMM to Platts to avoid having to make interim payments, noting that, in doing so, it would eliminate the "need for double calculations or price adjustments, a significant savings to the government." The deviation request also noted that due to the time lag between interim and final billing under the PMM, "contractors likely build in a price cushion." PFF 23. Mr. Ervin explained that the switch to Platts was supported by the 1987 study, although, as he explained: "Some people who have read the '87 studies [stated] that they would draw different conclusions than what was presented at the end of the study, certainly a close call." Pl. App. 134 (p. 40).

11. Mr. Ervin explains how DESC's 1987 study led to DLA's directive to stop using the PMM in 1994:

> I was sitting in a room when the decision happened and it was made in response to some pressure from headquarters to do things differently. So the analysis is based on, basically is the analysis in the '87 study. Some people who have read the '87 studies [stated] that they would draw different conclusions than what was presented at the end of the study, certainly a close call. Analysis would have supported that as well so it's really the '87 study which is the basis for that move [in 1994 from PMM to Platts and OPIS].

App. 134.[11]

Response: Agrees to the extent supported by the cited transcript. Disagrees with La Gloria's characterization of DESC's headquarters "pressure . . . to do things differently" as a

[11] DESC proffered Mr. Ervin as a witness in response to a Notice of Deposition served under Rule 30(b)(6) in this case. App. 141. The notice directed DESC to designate a witness to address the existence of documents requested in the plaintiff's requests for production of documents. App. 141. Because, pursuant to the terms of the notice, the deposition was limited to the existence of responsive documents, the plaintiff's ability to inquire into the substance of the conclusions of the documents was limited. App. 141. That inquiry must await further discovery.

"directive to stop using the PMM," because there is no evidence to support it. See Response to PFF 10.

12. The 1987 study was written by the Office of Market Research and Analysis with the objective of justifying continued use of its "gold standard," the PMM. App. 595-602.[12] While the all-important statistical analysis behind the study has not yet been produced, the admissions against interest in the narrative of the study are compelling. DESC's expert economists admit that using Platts and OPIS to set prices instead of the PMM "would cost DESC money" and concede that "[t]here is market risk associated with the move away from escalation on actual sales [PMM] particularly with respect to jet kerosene [military jet fuel]." App. 599; App. 602.[13] DESC's economists additionally recount in the 1987 study how its suppliers had complained that, as a result of DESC's use of the PMM to set prices after fuel is delivered, "'*we never know if we have made or lost money when you (D[E]SC) lift a cargo.*'" App. 597 (emphasis added); *see also* App. 595 (cover memorandum to the 1987 study stating with respect to the proposed change in using the PMM, "The issue has been raised several times in recent years, formally and informally, by contractors").

Response: With regard to the first sentence, agrees that the study was prepared by the Office of Market Research and Analysis, disagrees with La Gloria's assertion of the study's objective. As the study explains, the issue was whether the interim and final price adjustment clause (the PMM) should be replaced with a clause based on industry publications (Platts). Def. PFF 15. The second sentence is not an allegation of material fact and does not require a response. Agrees that the third sentence is quoted correctly, but is taken out of context and

[12] While this document is attached to DESC's motion, DESC does not specifically identify the document as the 1987 study referred to by Mr. Ervin in his deposition. Final confirmation of this fact awaits further discovery.

[13] DESC elsewhere has asserted that its statements about the PMM's relationship to the marketplace are, in reality, criticism of DESC's then-interim price references Platts and OPIS and not criticisms of the PMM at all. DESC's assertion is nothing short of startling, given that DESC currently uses Platts and OPIS to set fuel prices.

supports the Government's use of the PMM. As the study explains, the PMM is comprised of actual sales data. The switch to a different reference raised the risk of prices not reflecting the market for fuel. Def. PFF 19. The study's stated concern was that sellers would be slow to reduce their reported prices to the industry publications in a declining market. Id. This contradicts La Gloria's argument that the PMM does not reflect market value. Agrees that the quotations in the fourth sentence are quoted correctly, but, again, are out of context. Suppliers did not know whether they made money at the time of delivery because final prices under the PMM-based clause were not available for another three months. Pl. App. 597. This does not mean that the PMM failed to reflect the market, only that it suffered from a timeliness of publication problem.

13. Once DLA directed DESC to stop using the PMM in 1994 and to set prices using Platts and OPIS instead, DESC made the extraordinary admission that prices it previously had set using the PMM so departed from market value that they could not be compared to prices set based on Platts and OPIS. DESC stated: "Direct contract price comparisons *are not possible* due to the switch from the monthly interim-final (PMM) escalation method to a weekly market price escalation basis [using Platts and OPIS]." App. 144 (emphasis added).[14] DESC's admission is unsurprising, given that DESC had concluded elsewhere that changing from the PMM to commercial references, such as Platts and OPIS, "could significantly influence contract prices," App. 98, and further found, in response to a proposal from one of its largest suppliers to

[14] For each procurement, DESC prepares a "Price Analysis Memorandum" to determine its price objectives during contract negotiations. *See, e.g.*, App. 144, 150, 154, 157, 163. In determining its price objectives for the procurement, DESC typically considers, under the heading "Price History," the price it is paying under its current, existing contracts. *See, e.g.*, App. 144, 151, 155, 157, 163, 167-68. However, as noted above, when DESC stopped using the PMM and switched to using Platts and OPIS instead, it stated that its usual practice of making price comparisons with its existing contracts was "not possible." App. 144.

stop using the PMM, that its "PMM JP-5" jet fuel prices were ten cents a gallon higher, then ten cents lower, and yet again ten cents higher than Platts – all within the same year. App. 182.[15]

Response: With regard to the first sentence, disagrees that DESC "set prices" or that DLA directed DESC to stop using the PMM. Contractors determined their own proposal prices competitively; these prices were subject to adjustment pursuant to the economic price adjustment clause contained in the contracts. Def. PFF 6. DESC made the decision to switch escalators and requested approval from DLA Headquarters. Def. PFF 22. Disagrees that there was any admission. The second sentence is quoted correctly, but taken out of context. The reason that prices could not be compared was because comparing a weekly with a monthly price is like comparing apples to oranges, which does not support LA Gloria's innuendo. The quotation in the third sentence is accurate, but taken out of context. La Gloria avoids quoting the portion of the document that states the PMM escalation system is:

> based upon actual sales in the marketplace. Therefore, the escalation references are virtually unimpeachable from an accuracy standpoint, since they don't just "track" the market – they are the market.

Pl. App. 98.

La Gloria's comment in the footnote is an argument, which does not require comment; but is an obvious product of unfounded allegations addressed above.

14. Despite DESC's admission that "comparisons are not possible" between the prices it set using the PMM and those set using commercial market references such as Platts and

[15] The assessments of the PMM by DESC's expert economists, discussed above, together with DLA's direction to stop using the PMM based on DESC's 1987 study, draw into serious question the credibility of Mr. Ervin's subsequent cross-examination testimony in this Court in 1998 that he never identified any "problem with using the PMM" to set military fuel prices other than "billing" issues. App. 36-37.

OPIS, DESC had mandated that "[a]ll offerors are required to accept a method of price adjustment based on . . . the Petroleum Marketing Monthly (PMM)." App. 195; *see also* App. 199 (stating that DESC "would not consider" an offer unless objection to the PMM was withdrawn). As Mr. Ervin testified before this Court, DESC used its "leverage as a buyer" as the sole purchaser of military fuel to "improve the competition" for DESC's business by requiring use of the PMM. App. 17.

Response: As explained in response to PFF 13, there was no admission and the quotation in the first sentence is taken out of context. Pl. App. 199 is misquoted. The contractor in that situation was advised that it had to agree to common escalation, not the PMM. The second sentence is based upon yet another string of out-of-context quotations. Pl. App. 17 is Mr. Ervin's testimony in the Barrett trial that, in the mid-1980s, as the market became a buyer's market, DESC used its leverage as a buyer to get contractors to bid upon a common escalator. As Mr. Ervin also explained, DESC wanted to be sure that it used a publication that reflected actual sales. Pl. App. 18.

15. Accordingly, even though suppliers objected to DESC's use of the PMM as "coerced," App. 201; App. 204, the use of the PMM to set prices was "not negotiable as a matter of policy." App. 205. DESC's procurement authorizations expressly stated under the heading "POTENTIAL PROBLEMS" that "common escalation [using the PMM] is non-negotiable." App. 206-278; *Navajo Ref. Co., L.P. v. United States*, 58 Fed. Cl. 200, 214 (2003) ("DESC explicitly stated in its pre-negotiation briefing memoranda that it deemed its price adjustment clause to be non-negotiable"); *see also Barrett Ref. Corp. v. United States*, 45 Fed. Cl. 166, 171 (1999) (supplier "had no control over use of PMM EPA clause, and indeed attempted, unsuccessfully, to persuade the agency not to use it"), *aff'd in part and rev'd in part*, 242 F.3d 1055 (Fed. Cir. 2001). Evidencing the futility of objecting to DESC's pricing clause, even after

a supplier filed a claim in 1988 challenging DESC's use of the PMM, DESC continued to use the PMM for six more years, until it was directed to use Platts and OPIS instead. *MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed. Cl. 205, 407 (1992).

Response: Disagrees with the first sentence. A single supplier, not "suppliers," objected to use of the PMM. The quotations in the first two sentences are taken out of context or completed with words not part of the quotation. The documents state that common escalation, not the PMM, was what was non-negotiable. Had a supplier proposed a superior reference, DESC would have considered it. As the contracting officer explained in his declaration, La Gloria never objected to the EPA clause in its contracts – let alone asserted that it was illegal. Def. PFF 28. Regarding the third sentence, La Gloria fails to note that following the MAPCO decision, DESC obtained deviations to continue use of its EPA clauses. PFF 22. As it turned out, MAPCO was wrongly decided and no such deviation was necessary. See Tesoro et al. v. United States, 405 F. 3d 1339 (Fed. Cir. 2005), *petition for reh'g. en banc denied*, No. 04-5064 (Fed. Cir. Aug. 22, 2005) ("Tesoro"). In short, DESC had no obligation to stop using PMM merely because one supplier filed an erroneous claim.

16. While La Gloria knew that DESC's use of its adjustable pricing clause and the PMM were non-negotiable, what La Gloria did not know was that DOE had not designed the PMM to be used to set fuel prices or to reflect market value. As Dr. John Cook, Director of the Petroleum Marketing Division of the Department of Energy's Energy Information Administration (which publishes the PMM), has since testified and as this Court found: "[T]he PMM is not intended to be an index that is used for setting prices." *Barrett*, 42 Fed. Cl. at 131. Thus, while La Gloria "entered the fuel contracts with the intent that the prices DESC set would reflect fair market value[,]" it could not have been more wrong. App. 639.

Response: La Gloria has cited no evidence to support the allegation contained in the first sentence. Accordingly, we have no obligation to respond and, in any case, lack information sufficient to form a belief as to the truth of what is a completely immaterial fact. Disagrees with

the second sentence. The Barrett decision does not fully reflect Dr. Cook's testimony, during which he stated that he had no objection to the use of PMM to adjust prices. SA2 5 (p. 632).

17. An assessment of the PMM as an established market price is set forth in the Expert Report of Joseph Kalt[16] and Peter Killen.[17] In their report, Kalt and Killen conclude that DESC's "PMM-based adjustment clauses failed to provide an effective measure of established market prices or the fair market value of military fuels." App. 611.

Response: Agrees with the allegation concerning what the report states to the extent supported by the document cited; however, the statement is immaterial because it does not apply the standard for a legal EPA clause, which was established in Tesoro, 405 F. 3d 1339, and specifically included the PMM. Avers that, from a pricing and contracting point of view, the use of the PMM was appropriate. Def. Exh. 2-3.

18. The following chart, drawn from Kalt and Killen's report, dramatically illustrates the PMM's departure from the marketplace:

Response: Agrees with the allegation concerning what the report states, to the extent supported by the document cited; however, the statement is immaterial because it does not apply the standard for a legal EPA clause that was established in Tesoro, 405 F. 3d 1339, which specifically approved DESC's use of the PMM. Moreover, the report depends for its truth upon its unproven assumption that the "market" is represented only by data published in Platts. Yet, Platts publishes spot market price assessments. Def. Exh. 43, 19-21.; see also Barrett Refining Corp. v. U.S., 42 Fed. Cl. 128, 131 (Fed. Cl. 1998). The PMM reports all sales. SA2 12 (item III) and 19 (item 23). Avers that, from a pricing and contracting point of view, the use of the PMM was appropriate. Def. Exh. 2-3.

---

[16] Joseph Kalt is the Ford Foundation Professor of International Political Economy at the John F. Kennedy School of Government, Harvard University. App. 609-10.

[17] Peter Killen is a Senior Advisor in the Houston offices of the firm of Muse Stancil & Company, a global consulting firm specializing in the energy industry. He holds a B.S. in Chemical Engineering and is a Registered Professional Engineer. App. 610.

19. The chart illustrates how many cents per gallon the marketplace changed more or less than the PMM during the years surrounding DESC's use of the PMM to set La Gloria's JP-8 jet fuel prices. App. 634; App. 623-24.[18] If the change in the PMM was equal to the change in the marketplace, the bars in the chart would be zero or nonexistent. Thus, as the chart shows, in January of 1994 the marketplace increased by almost 6 cents a gallon more than the PMM. Indeed, not only did the change in the PMM depart substantially from the change in marketplace, but also the PMM's relationship to the marketplace was fundamentally unstable, inasmuch as the change in the PMM substantially understated the change in the market one month and then substantially overstated the change in the market in the next. As Kalt and Killen explain: "The fact that we see significant bars indicates that the relationship between the movements of the two series [the PMM and marketplace] is notably unstable." App. 624. Thus, as Kalt and Killen demonstrate, the chart shows the PMM's relationship with the marketplace to be highly volatile with the change in the PMM varying from the change in the market place from approximately -6 cents to approximately +6 cents during the relevant period. App. 623-25; App. 634.[19]

Response: Agrees with the allegation concerning what the report states, to the extent supported by the document cited; however, the statement is immaterial because it does not apply the standard for a legal EPA clause that was established in Tesoro, 405 F. 3d 1339, which specifically approved DESC's use of the PMM. Moreover, the report depends for its truth upon its unproven assumption that the "market" is represented only by data published in Platts. Yet,

[18] As Kalt and Killen explain, it is the change in price levels of the PMM and the marketplace, rather than the absolute prices levels themselves, that are relevant here, because "the PMM is used by the DESC to index *changes* in price levels, rather than the price levels themselves." App. 623 (emphasis original).

[19] As Kalt and Killen further explain, the fact the PMM overstated the change in market does not mean that La Gloria was overpaid. Given the PMM's random relationship with the market, "the winning bidder could readily [and erroneously] forecast that the Defendant's PMM index in any particular contract period would turn out to yield payments in the next contract period in excess of fair market value – pushing the optimistic bidder's base price bid downward." App. 613; *see also* App. 628-31.

Platts publishes spot market price assessments. Def. Exh. 43, 19-21.; see also Barrett Refining Corp. v. U.S., 42 Fed. Cl. 128, 131 (Fed. Cl. 1998). The PMM reports all sales. SA2 12 (item III) and 19 (item 23). Avers that, from a pricing and contracting point of view, the use of the PMM was appropriate. Def. Exh. 2-3.

20. Equally compelling, Kalt and Killen explain that the PMM and the marketplace "frequently actually move in different directions [*e.g.*, the market goes up and the PMM goes down] in a starkly erratic fashion." App. 625-26.

Response: Agrees with the allegation concerning what the report states, to the extent supported by the document cited; however, the statement is immaterial because it does not apply the standard for a legal EPA clause that was established in Tesoro, 405 F. 3d 1339, which specifically approved DESC's use of the PMM. Moreover, the report depends for its truth upon its unproven assumption that the "market" is represented only by data published in Platts. Yet, Platts publishes spot market price assessments. Def. Exh. 43, 19-21.; see also Barrett Refining Corp. v. U.S., 42 Fed. Cl. 128, 131 (Fed. Cl. 1998). The PMM reports all sales. SA2 12 (item III) and 19 (item 23). Avers that, from a pricing and contracting point of view, the use of the PMM was appropriate. Def. Exh. 2-3.

21. The next chart, again drawn from Kalt and Killen's report, illustrates on an annual basis how much the change in the PMM departed from the change in the marketplace:

Response: Agrees with the allegation concerning what the report states, to the extent supported by the document cited; however, the statement is immaterial because it does not apply the standard for a legal EPA clause that was established in Tesoro, 405 F. 3d 1339, which specifically approved DESC's use of the PMM. Moreover, the report depends for its truth upon its unproven assumption that the "market" is represented only by data published in Platts. Yet, Platts publishes spot market price assessments. Def. Exh. 43, 19-21.; see also Barrett Refining Corp. v. U.S., 42 Fed. Cl. 128, 131 (Fed. Cl. 1998). The PMM reports all sales. SA2 12 (item III) and 19 (item 23). Avers that, from a pricing and contracting point of view, the use of the PMM was appropriate. Def. Exh. 2-3.

22. The height of the bars shows for each year how many cents per gallon, on average, the change in the PMM departed from the change in the marketplace. App. 636; App. 626-27. Once again, not only is the amount of the error significant (in 1986 the PMM *understated* the marketplace on average 4 cents a gallon), but both the amount and the direction of the error are erratic (in 1987 the PMM *overstated* the market by 3 cents a gallon).

Response: Agrees with the allegation concerning what the report states, to the extent supported by the document cited; however, the statement is immaterial because it does not apply the standard for a legal EPA clause that was established in Tesoro, 405 F. 3d 1339, which specifically approved DESC's use of the PMM. Moreover, the report depends for its truth upon its unproven assumption that the "market" is represented only by data published in Platts. Yet, Platts publishes spot market price assessments. Def. Exh. 43, 19-21.; see also Barrett Refining Corp. v. U.S., 42 Fed. Cl. 128, 131 (Fed. Cl. 1998). The PMM reports all sales. SA2 12 (item III) and 19 (item 23). Avers that, from a pricing and contracting point of view, the use of the PMM was appropriate. Def. Exh. 2-3.

23. This volatile nature of the PMM is significant, because it made it essentially impossible for a bidder to predict correctly how the PMM would relate to the marketplace and, therefore, to bid in a way that would provide some meaningful protection from the PMM. As Kalt and Killen explain: "The deviations between changes in the Market-based JP-4 escalator and the PMM-based JP-4 escalator are quite volatile . . . This volatility confounds rational prediction by which a rational bidder might reliably adjust bid prices so as to ensure receipt of no less than market value under a given period's fuel contract." App. 627.

Response: Agrees with the allegation concerning what the report states, to the extent supported by the document cited; however, the statement is immaterial because it does not apply the standard for a legal EPA clause that was established in Tesoro, 405 F. 3d 1339, which specifically approved DESC's use of the PMM. Moreover, the report depends for its truth upon its unproven assumption that the "market" is represented only by data published in Platts. Yet, Platts publishes spot market price assessments. Def. Exh. 43, 19-21.; see also Barrett Refining

Corp. v. U.S., 42 Fed. Cl. 128, 131 (Fed. Cl. 1998). The PMM reports all sales. SA2 12 (item III) and 19 (item 23). Avers that, from a pricing and contracting point of view, the use of the PMM was appropriate. Def. Exh. 2-3.

24. Kalt and Killen state that there are a number of reasons why the PMM does not reflect the marketplace. Among them, Kalt and Killen explain, "the PMM data were not designed or intended to be used as an index." App. 611. They also show that the PMM suffers from a statistical flaw known as an "index number problem." App. 616-19. This statistical flaw, Kalt and Killen state, results in the PMM erroneously reporting changing in the volume of fuel sold as changes in the price of fuel. Because of the PMM's index number problem, Kalt and Killen conclude:

> PMM data do not contain accurate information needed to understand how the prices of specific products, such as a particular grade of military jet fuel, may have changed over time. An index that relies on these data, such as the DESC's PMM-based escalator, is readily susceptible to situations in which the index reports a price increase (or decrease) even though the actual market value of the fuel has declined (or risen) in the marketplace.

App. 617-18.[20]

Response: Agrees with the allegation concerning what the report states, to the extent supported by the document cited; however, the statement is immaterial because it does not apply the standard for a legal EPA clause that was established in Tesoro, 405 F. 3d 1339, which specifically approved DESC's use of the PMM. Moreover, the report depends for its truth upon its unproven assumption that the "market" is represented only by data published in Platts. Yet, Platts publishes spot market price assessments. Def. Exh. 43, 19-21.; see also Barrett Refining Corp. v. U.S., 42 Fed. Cl. 128, 131 (Fed. Cl. 1998). The PMM reports all sales. SA2 12 (item

[20] DESC elsewhere takes issue with Kalt and Killen's analysis of the PMM's index number problem, claiming that Kalt and Killen wrongly assert that the PMM mixes different fuel products. However, the PMM index for kerosene-type jet fuel does encompass several different fuel products, including Jet-A, JP-5 and JP-8, a fact DESC does not and cannot dispute. App. 616.

III) and 19 (item 23). Avers that, from a pricing and contracting point of view, the use of the PMM was appropriate. Def. Exh. 2-3.

25. Significantly, Kalt and Killen point out that, unlike DOE here, other federal agencies that publish indexes intended to be used as price indexes go to great lengths to ensure that the indexes do not suffer an index number problem. Kalt and Killen state:

> It is important to note here that statisticians at government agencies and in other organizations often go to great lengths to address the "index number" problem when constructing indices such as the PPI and the CPI, which are used to reflect the underlying changes in price levels for specific products used by producers and consumers. Each of these indices is constructed using fixed weights from period to period such that short-term variation in the mix of products sold is not mistaken for actual changes in the levels of prices.

App. 618 (footnote omitted).

Response: Agrees with the allegation concerning what the report states, to the extent supported by the document cited; however, the statement is immaterial because it does not apply the standard for a legal EPA clause that was established in Tesoro, 405 F. 3d 1339, which specifically approved DESC's use of the PMM. Moreover, the report depends for its truth upon its unproven assumption that the "market" is represented only by data published in Platts. Yet, Platts publishes spot market price assessments. Def. Exh. 43, 19-21.; see also Barrett Refining Corp. v. U.S., 42 Fed. Cl. 128, 131 (Fed. Cl. 1998). The PMM reports all sales. SA2 12 (item III) and 19 (item 23). The report also incorrectly assumes that the PMM is an "index," and that it mixes products in its calculations. Avers that, from a pricing and contracting point of view, the use of the PMM was appropriate. Def. Exh. 2-3.

26. Beyond the PMM's index number problem, Kalt and Killen further conclude that DESC's PMM-based pricing clause failed to reflect the marketplace because "the formula used by the government to create the index did not track changes in the value of the military jet fuel." App. 611. As they explain, DESC simply used the wrong fuels, and thus the wrong PMM data, in its pricing clause. App. 619-21.

Response: Agrees with the allegation concerning what the report states, to the extent supported by the document cited; however, the statement is immaterial because it does not apply

the standard for a legal EPA clause that was established in Tesoro, 405 F. 3d 1339, which specifically approved DESC's use of the PMM. Moreover, the report depends for its truth upon its unproven assumption that the "market" is represented only by data published in Platts. Yet, Platts publishes spot market price assessments. Def. Exh. 43, 19-21.; see also Barrett Refining Corp. v. U.S., 42 Fed. Cl. 128, 131 (Fed. Cl. 1998). The PMM reports all sales. SA2 12 (item III) and 19 (item 23). The report also incorrectly assumes that the PMM is an "index," and that it mixes products in its calculations. Avers that, from a pricing and contracting point of view, the use of the PMM was appropriate. Def. Exh. 2-3.

27. Thus, for the military jet fuel known as JP-8, DESC based price adjustments on the PMM data for kerosene-type jet fuel. App. 619-20. However, kerosene-type jet fuel does not reflect the physical characteristics or market value of JP-8. Kalt and Killen state: "The DESC's simplistic use of kerosene-type jet fuel prices to proxy for JP-8 market prices is inappropriate for economic price adjustment purposes given the technical and economic considerations of how JP-8 is actually produced." App. 619-20.

Response: Admits the first sentence to the extent that one of La Gloria's contracts based price adjustments on PMM. Def. PFF 10. Disagrees with the second sentence that the PMM data for kerosene-type jet fuel "does not reflect the physical characteristics or market value of JP-8." In fact, the total volumes of sales of JP-8, and their sales prices, including the amounts and prices of JP-8, sold by La Gloria are reported in PMM under "Kerosene-type Jet Fuel." SA 19, item 13. La Gloria's other 5 contracts based price adjustments on market prices published in Platts Oilgram Price Reports, a widely used commercial publication of market prices for refined petroleum products. Def. PFF 13; See, SA 48-61

28. Kalt and Killen explain that a proper measure of the physical characteristics and market value of JP-8 should be based on a combination of naphtha, kerosene-type jet fuel, and diesel fuel. App. 620-21. Notably, both this Court and the Federal Circuit in *Barrett* also concluded, over DESC's objection, that, with respect to JP-4 jet fuel, DESC used the wrong PMM data in its pricing clause. *Barrett*, 242 F.3d at 1061 ("However, the government does not

dispute the Court of Federal Claims' finding that the naphtha-based index 'provides data that more closely reflect the product [JP-4] Barrett was actually selling.'").[21]

Response: The first sentence is a conclusion of law to which we need not respond. The citation from Barrett is immaterial, as its premise was that the PMM-based EPA clause was illegal. Additionally, the Barrett finding was based on PMM data used for price adjustments in contracts for JP-4. La Gloria's contracts were for the supply of JP-8. As stated above, sales prices of JP-8 are included in the PMM in the category of kerosene-type jet fuels. In any event, the proposed finding is immaterial because it does not apply the standard for a legal EPA clause that was established in Tesoro, 405 F. 3d 1339, which specifically approved DESC's use of the PMM.

29. For these and other reasons, Kalt and Killen observe that commercial buyers and sellers do not use the PMM as a price index. They conclude that the PMM's failure to pass "[t]his 'market test' reinforces the conclusion that a PMM-based escalator of the type used by the DESC is simply not suited to represent actual movements of established market prices for any fuel, much less military jet fuel." App. 619.[22]

Response: Agrees with the allegation concerning what the report states, to the extent supported by the document cited; however, the statement is immaterial because it does not apply the standard for a legal EPA clause that was established in Tesoro, 405 F. 3d 1339, which specifically approved DESC's use of the PMM. Moreover, the report depends for its truth upon its unproven assumption that the "market" is represented only by data published in Platts. Yet, Platts publishes spot market price assessments. Def. Exh. 43, 19-21.; see also Barrett Refining

[21] DESC elsewhere claims that Kalt and Killen's analysis assumes that an index used to adjust prices must be an index for the identical product the government purchases. This is a misstatement of Kalt and Killen's analysis. As set forth above, Kalt and Killen's analysis of JP-8 reflects naphtha, kerosene-type jet fuel, and diesel fuel. App. 620-21.

[22] DESC elsewhere takes issue with Kalt and Killen's conclusions because they compare the PMM to Platts spot prices. DESC's assertion is nothing short of extraordinary in view of the fact that DESC currently uses Platts spot prices to set military fuel prices in its military fuel contracts.

Corp. v. U.S., 42 Fed. Cl. 128, 131 (Fed. Cl. 1998). The PMM reports all sales. SA2 12 (item III) and 19 (item 23). Avers that, from a pricing and contracting point of view, the use of the PMM was appropriate. Def. Exh. 2-3.

30. Beyond DESC's use of the PMM to set military fuel prices, DESC distorted the market price for fuel in two other ways. First, DESC provided a ten-percent price preference to minority-owned suppliers. Under this price preference, DESC awarded fuel contracts to minority-owned suppliers if their bids were within ten percent of that of the otherwise successful bidder. Def. Supp. App. 6-7; Amended Complaint ¶ 28. In some years, more than twenty percent of the fuel offered (as a percent of that purchased) was subject to DESC's minority price preference. App. 279 (showing volumes offered by minority firms with the designation "SD" and total volume awarded in the procurement); App. 283 (same); Amended Complaint ¶ 28.

Response: The first sentence is an allegation of law to which no response is required. Agrees with the second, third, and fourth sentences.

31. Second, DESC conducted an auction for fuel contracts, whereby DESC offered fuel contracts to suppliers that agreed to match the price, or adjusted price, of other bidders. Under this auction, DESC awarded contracts to small businesses willing to match the price, or adjusted price, offered by the otherwise successful bidder. Def. Supp. App. 10-13; Amended Complaint ¶ 27. More than fifty percent of the fuel DESC procured commonly was set aside for award to small businesses. App. 286; Amended Complaint ¶ 27. Both DESC's minority price preference and its auction, by their very nature, placed downward pressure on bid prices, as non-minority and non-small businesses were forced to compete on an uneven playing field. Amended Complaint ¶ 29.

Response: The first sentence and first clause of the second sentence are allegations of law to which no response is required. Otherwise, agrees with the second and third sentences. La Gloria offers no support for the fourth sentence. Accordingly, we are not required to respond.

32. As Mr. Marple makes clear in his Declaration, La Gloria entered into the contracts with DESC containing DESC's pricing clause, because the pricing clause was non-

negotiable and because La Gloria had no other choice if it wanted to remain a military fuel supplier. App. 639-40. As Mr. Marple confirms:

> DESC maintained that the way it set fuel prices was non-negotiable and that its fuel prices reflected fair market value throughout its contracts. In entering the fuel contracts, La Gloria understood that it could not be a fuel supplier to DESC unless it accepted the way DESC set prices. La Gloria continued to enter fuel contracts with DESC because La Gloria sought to continue to be a supplier to DESC. By continuing to enter fuel contracts with DESC, La Gloria did not . . . intend that it would be paid less than the fair market value of fuel or intend to relinquish the right to payment of fair market value.

App. 639-40 (internal paragraph numbers omitted).

Response: Disagrees with that DESC "set" prices under the fuel contracts. The base price was "set" by the contractors, which alone determined in what quantities and at what prices to offer to sell fuel to DESC. The conclusory affidavit offers no facts upon which the Court might conclude that "DESC maintained that the way it set fuel prices was non-negotiable and that its fuel prices reflected fair market value throughout its contracts." Accordingly, it is insufficient to defeat a motion for summary judgment, and no response is required. Behm v. United States, 68 Fed. Cl. 395, 407 (2005). La Gloria also offers no evidence that it "understood" anything concerning the parties' pricing agreement other than that set forth in the contracts. The allegations concerning La Gloria's business motivations are immaterial and, therefore, require no response. In any event, we lack knowledge to respond concerning La Gloria's intent, other than to note that its repeated offers to enter into these contracts demonstrates that, whatever La Gloria's subjective expectations regarding price might have been, they were met.

33. Moreover, DESC wrongly asserts that La Gloria should have been aware of any defects in the PMM when it bid. As Kalt and Killen point out in their expert report, "[s]uch assertions ignore that a company such as La Gloria, based on the information available at the time that it bid, could not have known that it would receive less than fair market value." App. 628 As Kalt and Killen demonstrate, the PMM's departure from the marketplace was "quite random" and "neither stable nor predictable." App. 628-29.

Response: Disagrees, because the report's assertion that there is a bias depends for its truth upon its unproven assumption that figures found in Platts are the "marketplace," a term it does not define, and the report fails to identify the specific Platts data upon which it relies. Also assumed is that La Gloria had to know the relationship between the PMM and Platts in order to make an offer. In sum, Kalt and Killen's report is speculative regarding the performance and bidding of these contracts, what La Gloria knew, was attempting to learn, or believed concerning the PMM. Moreover, La Gloria could observe the monthly behavior of the PMM, and thus had over 12 "observations" of the PMM. La Gloria continued to bid for contracts with Platts based price adjustment clauses, and never objected to the EPA clauses in its annual contracts, or to the many price changes issued under the contracts. Def. PFF 28.

34. As Kalt and Killen explain:

> The typical response of a bidder to the uncertainty around the bias introduced by the DESC's use of a PMM-based escalator would be to try to forecast this bias by reference to some set of historical prices. Assuming that the deviation of PMM-based escalators from actual market price escalators was a random walk, bidders might, for example, assume that the bias observed in past periods would be present in future periods. In the absence of any better information, this may be a reasonable assumption; however, this forecasting approach does not necessarily lead to consistent after-the-fact results due to the unstable nature of the bias introduced by the DESC's use of a PMM-based escalator. Using the past relationship between the PMM-based escalator and a market-based escalator to forecast the future relationship will, alternatively, over- or under-predict the bias. For example, when the bias is high in one year, the forecast bias for the next year is likely to be too high given the limited availability of data as to the "true" relationship.

App. 630.

Response: Disagrees, because the report's assertion that there is a bias depends for its truth upon its unproven assumption that figures found in Platts are the "marketplace," a term it does not define, and the report fails to identify the specific Platts data upon which it relies. Also assumed is that La Gloria had to know the relationship between the PMM and Platts in order to make an offer. In sum, Kalt and Killen's report is speculative regarding the performance and bidding of these contracts, what La Gloria knew, was attempting to learn, or believed concerning the PMM. Moreover, La Gloria could observe the monthly behavior of the PMM, and thus had

over 12 "observations" of the PMM. La Gloria continued to bid for contracts with Platts based price adjustment clauses, and never objected to the EPA clauses in its annual contracts, or to the many price changes issued under the contracts. Def. PFF 28. In any event, these are immaterial and unremarkable conclusions if, as explained, they apply to "any otherwise unbiased game," because they would apply to all escalators.

35. Furthermore, given the PMM's random variation with respect to the marketplace, a supplier might well be expected to "alternatively, over- or under-predict the bias," thereby further complicating a supplier's assessment of the PMM's true bias. App. 630. As Kalt and Killen explain:

> The typical response of a bidder to the uncertainty around the bias introduced by the DESC's use of a PMM-based escalator would be to try to forecast this bias by reference to some set of historical prices. Assuming that the deviation of PMM-based escalators from actual market price escalators was a random walk, bidders might, for example, assume that the bias observed in past periods would be present in future periods. In the absence of any better information, this may be a reasonable assumption; however, this forecasting approach does not necessarily lead to consistent after-the-fact results due to the unstable nature of the bias introduced by the DESC's use of a PMM-based escalator. Using the past relationship between the PMM-based escalator and a market-based escalator to forecast the future relationship will, alternatively, over- or under-predict the bias. For example, when the bias is high in one year, the forecast bias for the next year is likely to be too high given the limited availability of data as to the "true" relationship.

App. 630.

Response: Disagrees, because the report's assertion that there is a bias depends for its truth upon its unproven assumption that figures found in Platts are the "marketplace," a term it does not define, and the report fails to identify the specific Platts data upon which it relies. Also assumed is that La Gloria had to know the relationship between the PMM and Platts in order to make an offer. In sum, Kalt and Killen's report is speculative regarding the performance and bidding of these contracts, what La Gloria knew, was attempting to learn, or believed concerning the PMM. Moreover, La Gloria could observe the monthly behavior of the PMM, and thus had over 12 "observations" of the PMM. La Gloria continued to bid for contracts with Platts based

price adjustment clauses, and never objected to the EPA clauses in its annual contracts, or to the many price changes issued under the contracts. Def. PFF 28. In any event, these are immaterial and unremarkable conclusions if, as explained, they apply to "any otherwise unbiased game," because they would apply to all escalators.

36. Accordingly, Kalt and Killen reject DESC's assertion that, through entering a series of contracts with DESC, La Gloria must be deemed to have intended to relinquish payment of fair market value. They state: "Such assertions ignore that a company such as La Gloria, based on the information available at the time that it bid, could not have known that its would receive less than fair market value." App. 628.

Response: This allegation is based upon the legal premise that La Gloria enjoyed the right to the payment of "fair market value," which is a conclusion of law, to which no response is required.

37. La Gloria filed its Complaint soon after the Federal Circuit in *Barrett* put a final end to DESC's public assertions that there were no remedies for its military fuel prices. As explained in the Declaration of Mr. Marple, La Gloria submitted claims under the fuel contracts when it first learned that remedies were available for DESC's pricing. App. 640; *Barrett*, 242 F.3d 1055.

Response: This allegation is based upon the legal premise that La Gloria enjoyed the right to the payment of "fair market value," which is a conclusion of law, to which no response is required. In any event, Barrett is immaterial, as its premise was that the PMM-based EPA clause was illegal. La Gloria continued to bid and never objected to the EPA clauses in the contracts, or to the many price changes issued under the contracts. Def. PFF 28.

38. DESC threatened essentially the entire U.S. refining industry *in writing* with claims of *fraud* should refiners pursue the same claims the Federal Circuit upheld in *Barrett*. App. 563-94.

Response: Agrees that DESC sent the letters cited; disagrees they were a threat, or that were sent to "essentially the entire U.S. refining industry," which did not file post MAPCO claims against DESC arguing that they were entitled to recover money under their contracts.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

HOWARD M. KAUFER
Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

DONALD S. TRACY
Trial Attorney
Defense Supply Center
Richmond, VA

May 26, 2006

CERTIFICATE OF FILING

I hereby certify that on May 26, 2006, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Steven J. Gillingham