# In the United States Court of Federal Claims

No. 02-465 C
(E-filed: August 28, 2006)

_____

LA GLORIA OIL AND GAS COMPANY

        Plaintiff,

   v.

THE UNITED STATES,

        Defendant.

_____

)   Summary Judgment; Motion to
)   Dismiss; Motion to Permit
)   Discovery Pursuant to Rule 56(f)
)   of the Rules of the Court of
)   Federal Claims (RCFC); Legality
)   of Basing Contract Price
)   Adjustment Clauses on Indexes
)   Rather Than the Contractor's Own
)   Prices; Legality of Basing
)   Contract Price Adjustment
)   Clauses on the Petroleum
)   Marketing Monthly and Platts
)   Oilgram Report; Whether Federal
Acquisition Regulation (FAR) §
15.402 Provides a Cause of
Action to Contractors; Whether
the Court of Federal Claims Has
Jurisdiction Over an Equal
Protection Claim in This Non-Bid
Protest Context; Whether the
Court of Federal Claims Has
Jurisdiction Over Implied-in-Fact
Contract Claims of a Successful
Bidder Concerning the Contract
Price; Misrepresentation; Breach
of Contract; Breach of the Implied
Covenant of Good Faith and Fair
Dealing; Failure of Consideration
and Frustration of Purpose;
Mistake; Implied-in-Fact
Contract; Whether a Takings
Claim May Be Maintained When
a Contract Exists; Waiver;
Estoppel

J. Keith Burt, Washington, DC, for plaintiff.  Gary A. Winters, Washington, DC, of counsel.

Peter D. Keisler, with whom were David M. Cohen, Director, and Steven J. Gillingham, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant.  Howard M. Kaufer, Assistant Counsel, Office of Counsel, Defense Energy Support Center, Ft. Belvoir, VA, and Donald S. Tracy, Trial Attorney, Defense Supply Center, Richmond, VA, of counsel.


OPINION

HEWITT, Judge

        This case is one of twenty-three cases dealing with some or all of the issues addressed in the opinion of the Court of Appeals for the Federal Circuit in Tesoro Hawaii Corp. v. United States, 405 F.3d 1339 (Fed. Cir. 2005) (Tesoro II), reh'g denied and reh'g en banc denied, Tesoro Hawaii Corp. v. United States, 2005 U.S. App. LEXIS 19620 (Fed. Cir. Aug. 22, 2005).  Plaintiff, La Gloria Oil and Gas Company (La Gloria or plaintiff), filed its initial complaint in 2002 against defendant, acting through the Defense Energy Support Center (DESC) of the U.S. Department of Defense (DOD).[1]  Plaintiff alleged, inter alia, that defendant's use of economic price adjustment (EPA) clauses that were not tied to plaintiff's own established prices in its fuel supply contracts was illegal. Complaint (Compl.) ¶ 18.  On April 15, 2003, upon consideration of cross-motions for partial summary judgment, this court held that defendant's use of EPA clauses not tied to plaintiff's own established prices violated the Federal Acquisition Regulation (FAR) § 16.203.[2]  La Gloria Oil & Gas Co. v. United States, 56 Fed. Cl. 211, 226 (2003) (La Gloria).  On March 22, 2004, the court stayed the proceedings pending the Federal Circuit's consideration of interlocutory appeals filed in Tesoro Hawaii Corp. v. United

---

[1]DESC is a field activity of the Defense Logistics Agency (DLA) in the DOD.  Def.'s Facts ¶ 2.  Citations for factual background to filings of only one party, unless otherwise noted, do not involve matters in dispute.

[2]Specifically, the court denied defendant's motion for partial summary judgment on the issue of liability and granted plaintiff's motion for partial summary judgment on the issues of entitlement to quantum valebant relief and the invalidity of defendant's requested and approved deviations from the Federal Acquisition Regulation (FAR) § 16.203.  La Gloria Oil & Gas Co. v. United States, 56 Fed. Cl. 211, 226 (2003) (La Gloria).  Those rulings were abrogated by Tesoro Hawaii Corp. v. United States, 405 F.3d 1339 (Fed. Cir. 2005) (Tesoro II).

States, 58 Fed. Cl. 65 (2003) (Tesoro I) and Hermes Consolidated, Inc. v. United States, 58 Fed. Cl. 409 (2003) (Hermes II), which involved legal issues substantially similar to the legal issues in this case. Stay Order of March 22, 2004 at 2. In Tesoro II, the Federal Circuit abrogated this court's decision in La Gloria. Tesoro II, 405 F.3d at 1348 ("The regulations permit use of contracts that include adjustments based on established prices, but do not limit those adjustments to changes only in the specific prices offered by an individual contractor."). After the Tesoro II decision was issued, La Gloria filed a seven-count amended complaint against defendant, alleging illegal award and administration of six fuel supply contracts,[3] Amended Complaint (Am. Compl. or Amended Complaint) ¶¶ 35-44, five related contracts claims, id. at ¶¶ 45-123, and a related takings claim. Id. at ¶¶ 124-132.

On March 31, 2006, defendant filed a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC) or, alternatively, for summary judgment pursuant to RCFC 56(b).[4] Defendant's Motion to Dismiss the Amended Complaint (Def.'s Mot. or defendant's motion) at 1. Defendant's motion was accompanied by a Supplemental Appendix (Def.'s App.). On May 1, 2006, plaintiff filed a motion pursuant to RCFC 56(f), requesting that the court "refuse [defendant's] application for summary judgment or, in the alternative, grant a continuance [to allow plaintiff to] obtain [full] discovery." Plaintiff's Motion Pursuant to RCFC 56(f) to Refuse Defendant's Application for Summary Judgment or, in the Alternative, for a Continuance to Permit Discovery (Pl.'s Mot. or plaintiff's 56(f) motion) at 2. The court heard oral argument on both motions on July 13, 2006. The court now has before it defendant's motion, plaintiff's Rule 56(f) motion, and the following responsive briefing: Plaintiff's Opposition to Defendant's Motion to Dismiss (Pl.'s Resp.); Defendant's Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss the Complaint (Def.'s Reply) and Second Supplemental Appendix (Def.'s Second App.); Defendant's Response to Plaintiff's RCFC 56(f) Motion (Def.'s Resp.); Plaintiff's Reply to Defendant's Response to Plaintiff's Motion Pursuant to RCFC 56(f) To Refuse Defendant's Application for

---

[3]This count contained six sub-parts including two small business complaints and an allegation that defendant awarded and administered plaintiff's contracts in violation of the Due Process Clause of the Fifth Amendment. Amended Complaint (Am. Compl. or Amended Complaint) ¶¶ 39-41.

[4]Defendant's motion specifically requests that paragraphs 40 and 41 of the Amended Complaint (plaintiff's small business and equal protection claims) be dismissed pursuant to RCFC 12(b)(1), and that the remainder of the Amended Complaint be dismissed pursuant to RCFC 56(b) or, in the alternative, pursuant to RCFC 12(b)(6). Defendant's Motion to Dismiss the Amended Complaint (Def.'s Mot.) 1.

Summary Judgment or, in the Alternative, for a Continuance to Permit Discovery (Pl.'s Reply); Defendant's Proposed Findings of Uncontroverted Fact (Def.'s Facts); Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact (Pl.'s Fact Resp.); Plaintiff's Proposed Findings of Fact (Pl.'s Facts); Defendant's Response to Plaintiff's Proposed Findings of Fact (Def.'s Fact Resp.); and the Oral Argument Transcript (Tr.).

I.      Background

From 1993 to 1999, DESC and La Gloria entered six competitively-awarded long-term contracts under which DESC purchased JP-8 jet fuel from La Gloria in Texas.[5] La Gloria, 56 Fed. Cl. at 212; Def.'s Facts ¶ 4; Pl.'s Facts ¶ 2. The contracts "typically last[ed] one year," Def.'s Fact Resp. ¶ 2, and were valued collectively at approximately $157 million, Am. Compl. ¶ 5. The "contracts contained DESC's standard price adjustment [EPA] clause,"[6] Am. Compl. ¶ 6, which allowed for adjustment of the "per-gallon 'base price' offered by fuel suppliers." Def.'s Mot. 4. The 1993 contract adjusted prices based on changes in price indexes published by the Department of Energy in the Petroleum Marketing Monthly (the PMM),[7] La Gloria, 56 Fed. Cl. at 213; Def.'s Mot. 5, while the 1995-1999 contracts adjusted prices based on changes reported in Platts Oilgram Report (Platts), a daily industry publication. La Gloria, 56 Fed. Cl. at 213; Def.'s Mot. 5; Def.'s Facts ¶ 13.

This court first considered the legality under the Federal Acquisition Regulation (FAR) of DESC's EPA clause B19.33 in MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405 (1992) (MAPCO). FAR § 16.203-1 authorizes "[e]conomic price

---

[5]The following contracts are at issue: DLA600-93-D-0559 (1993 contract), SPO600-95-D-0480 (1995 contract), SPO600-96-D-0475 (1996 contract), SPO600-97-D-0464 (1997 contract), SPO600-98-D-0468 (1998 contract), SPO600-99-D-0478 (1999 contract). Am. Compl. ¶ 31; Appendix to Plaintiff's Opposition to Defendant's Motion to Dismiss (Pl.'s App.) 648-77 (1993-1999 contracts). "JP-8 jet fuel is kerosene-based and is similar in composition to commercial jet fuel (which is called 'kerojet' or 'Jet A')." Def.'s Facts ¶ 5; see also Barrett Ref. Corp. v. United States, 42 Fed. Cl. 128, 129 (1998).

[6]The EPA clauses in all of the contracts, denominated B19.33 in each, were substantially similar except that the B19.33 clause in the 1993 contract used the indexes in the Petroleum Marketing Monthly (the PMM) as a price escalator, while the 1995-99 contracts used Platts Oilgram Report (Platts). Pl.'s App. 648-677.

[7]The PMM is published by the Energy Information Administration (EIA) of the Department of Energy's (DOE), and is a compilation of transaction prices that all refiners are required by law to submit monthly to the DOE. Def.'s Mot. 5; see 15 U.S.C. § 772.

4

adjustments . . . of three general types:" (a) "adjustments based on established prices;" (b) "adjustments based on actual costs of labor or material;" (c) "adjustments based on cost indexes of labor or material." 48 C.F.R. § 16.203-1 (FAR § 16.203-1) (2005). The plaintiff-contractor in MAPCO contended that EPA clause B19.33, which used the PMM as an escalator, did not fit within the categories of EPA clauses authorized by the FAR § 16.203-1. MAPCO, 27 Fed. Cl. at 408. More specifically, plaintiff argued that in using the PMM as an escalator, B19.33 did not conform to FAR § 16.203-1(a) because "established prices" in FAR § 16.203-1(a) means the "contractor's own established prices," not "a price index or the average of other refiners' prices," such as the PMM. MAPCO, 27 Fed. Cl. at 408.

Defendant asserted that clause B19.33 satisfied FAR § 16.203-1(a) because the phrase "established prices" encompasses "almost any agreed-upon price adjustment system, especially those that are published, like the PMM Index." MAPCO, 27 Fed. Cl. at 408. Defendant also claimed that clause B19.33 satisfied FAR § 16.203-1(c). MAPCO, 27 Fed. Cl. at 411. The MAPCO court held: (1) that FAR § 16.203(a) does not authorize the use of an EPA clause based on an index such as the PMM, which does not reflect the contractor's established prices, and is not "an established market price," and (2) that the PMM is not a "cost index" within the meaning of FAR § 16.203-1(c). MAPCO, 27 Fed. Cl. at 410-11.

This court revisited DESC's EPA clause B19.33 and the PMM in Barrett Refining Corp. v. United States, 42 Fed. Cl. 128 (1998) (Barrett I). Barrett alleged that DESC's use of clause B19.33, which was based on the PMM, was not authorized by the FAR. Id. at 128-29. In contrast to its position in MAPCO, DESC conceded "that the pricing mechanisms used in the contracts . . . [at issue in Barrett I] were unauthorized," id. at 130, and "agree[d] that the [EPA] clauses [in the contracts were] unenforceable and that the plaintiff [was] entitled to recover on a quantum valebant theory." Id. at 129. The court entered judgment for plaintiff based on the court's calculation of the fair market value of the contracts. Barrett Ref. Corp. v. United States, 45 Fed. Cl. 166, 174 (1999) (Barrett II). On appeal, the Federal Circuit affirmed the Court of Federal Claims' grant of quantum valebant relief. Barrett Ref. Corp. v. United States, 242 F.3d 1055, 1058 (Fed. Cir. 2001) (Barrett III).

After the MAPCO and Barrett III decisions, La Gloria filed suit against DESC, alleging that "the EPA clauses used in its contracts violated the Federal Acquisition Regulation (FAR)," La Gloria, 56 Fed. Cl. at 213 (quoting Compl. ¶¶ 3, 13-17), and claiming that it "is entitled to recover based on the fair market value of the fuel it delivered to DESC . . . by way of reformation, quantum valebant, or rescission and restitution." La Gloria, 56 Fed. Cl. at 213 (quoting Compl. ¶ 33). The parties then cross-

moved for partial summary judgment on the issue of liability.  Id. at 213.  The court, in accord with the decisions in MAPCO and Barrett I, found that "FAR § 16.203-1 does not authorize an [economic price] adjustment based on price indexes."  La Gloria, 56 Fed. Cl. at 214.  The court also held that the individual and class FAR deviations obtained by defendant were invalid, id. at 217-24, and that "there is evidence in this case that supports a finding that defendant promised to pay fair market value for the military fuel it procured [from plaintiff]."  Id. at 224.  Further, based on Barrett III, the court held that "the use of an illegal EPA clause together with an implied-in-fact governmental promise to pay at least fair market value entitles a plaintiff to quantum valebant relief."  Id. at 225.  The court then granted plaintiff's motion for summary judgment on the issues of entitlement to quantum valebant relief and the invalidity of the individual and class deviations from the FAR obtained by defendant.  Id. at 226.  The court denied plaintiff's motion for summary judgment with respect to the applicability of judicial estoppel to the calculation of fair market value, and denied defendant's motion for summary judgment.  Id.

In 2003, plaintiffs in two similar cases, Tesoro I, 58 Fed. Cl. 65, and Hermes II, 58 Fed. Cl. 409, jointly petitioned the United States Court of Appeals for the Federal Circuit for permission to pursue interlocutory appeals "of issues relating to the legality of contract price determinations made by [DESC]."[8]  Tesoro II, 405 F.3d at 1341.  The Federal Circuit granted permission, id., and certified the following questions for interlocutory appeal:  (1) "Did DESC establish the price of fuel in violation of law by employing economic price adjustment clauses indexed to the PMM?"  (2) "Were DESC's individual or class deviations obtained in violation of law?"  (3) "Can DESC assert the defense of waiver to bar Tesoro from pursuing a remedy for DESC's illegal fuel prices?"  (4) "Was DESC's promulgation of the economic price adjustment clauses indexed to the PMM unauthorized?"  (5) "May defendant assert the defense of waiver to bar [plaintiff] from pursuing a remedy for DESC's unauthorized fuel prices?"  Tesoro Haw. Corp. v. United States, 2003 U.S. Claims LEXIS 410, *4 (Oct. 30, 2003) (order certifying questions for interlocutory appeal); Hermes II, 58 Fed. Cl. at 420.  Because the interlocutory appeals in Tesoro I and Hermes II involved "legal issues substantially similar to those presented" in this case, this court stayed proceedings in this case pending the Federal Circuit's consideration of the interlocutory appeals.  Stay Order of March 22, 2004.

The Tesoro II court changed the legal landscape dramatically.  The contractors in

---

[8]In Hermes Consolidated, Inc. v. United States, 58 Fed. Cl. 3, 21-22 (2003) (Hermes I), the court denied the parties' cross-motions for summary judgment and requested supplemental briefing on waiver and the doctrine of laches.  The court then addressed those issues in Hermes Consolidated, Inc. v. United States, 58 Fed. Cl. 409 (2003) (Hermes II).

Tesoro II asserted that the term "established prices" in FAR § 16.203-1(a) should be read as "contractor's established prices." Tesoro II, 405 F.3d at 1343. The contractors also argued that "DESC's use of an EPA clause tied particularly to the PMM does not comport with the express requirements of FAR § 16.203-3" because the PMM is a combination of petroleum sales that do not "reflect the product, the market, or the price for the military fuel [appellants] supplied."[9] Id. at 1348. After examining these issues among others, the Tesoro II court found that established prices under FAR § 16.203-1(a) are not limited to "prices offered by an individual contractor," that "market-based EPA clauses are permitted under the FAR" and, further, that "DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR." Id. The Tesoro II court did not reach the issues of deviations or waiver raised in the certified questions. Id. at 1348-49.

## II.   DISCUSSION

### A.   Standards of Review

#### 1.   Dismissal Under RCFC 12(b)(1)

Rule 12(b)(1) of the Rules of the Court of Federal Claims governs dismissal of a claim for lack of subject matter jurisdiction. RCFC 12(b)(1) (2006). When a defendant challenges jurisdiction, the plaintiff bears the burden of proving that jurisdiction is proper. Toxgon Corp. v. BNFL, Inc., 312 F.3d 1379, 1383 (Fed. Cir. 2002); Reynolds v. Army and Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988); Corrigan v. United States, 68 Fed. Cl. 589, 592 (2005). To establish subject matter jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), the plaintiff must identify "a separate source of substantive law" mandating the payment of money damages by the United States. Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (Fisher II). In deciding a motion to dismiss for lack of subject matter jurisdiction, the court need only decide contested facts relevant to the inquiry into subject matter jurisdiction. Betz v. United States, 40 Fed. Cl. 286, 290 (1998). If the court determines that it lacks subject matter jurisdiction, it must dismiss the claim. RCFC 12(h)(3).

#### 2.   Dismissal Under RCFC 12(b)(6)

Rule 12(b)(6) governs dismissal of a claim for "failure to state a claim upon which

---

[9]FAR § 16.203-3 stipulates that "[a] fixed price contract with economic price adjustment shall not be used" unless necessary "to protect the contractor and the government from significant fluctuations in labor or material costs or to provide for contract price adjustment in the event of changes in the contractor's established prices." FAR § 16.203-3.

relief can be granted." Rule of the Court of Federal Claims (RCFC) 12(b)(6). When evaluating a motion under RCFC 12(b)(6), the court must accept all material facts alleged in the complaint as true, Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 325 (1991) (interpreting substantially identical provisions of the Federal Rules of Civil Procedure), and must draw all reasonable inferences in favor of the non-moving party, Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001). It is inappropriate for a court to grant the motion "when the facts asserted by the plaintiff do not entitle him to a legal remedy." Boyle v. United States, 200 F.3d 1369, 1372 (Fed. Cir. 2000). Under RCFC 12(b)(6), where a motion is filed and "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided by RCFC 56." RCFC 12(b)(6); see also Rotec Indus., Inc. v. Mitsubishi Corp., 215 F.3d 1246, 1250 (Fed. Cir. 2000).

      3.     Summary Judgment

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affadivits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562-63 (Fed. Cir. 1987). A genuine dispute over material facts exists if a reasonable finder of fact could find in favor of the non-moving party. Anderson, 477 U.S. at 248. If the party moving for summary judgment does not bear the burden of proof on an issue, that party need not produce positive evidence in order to demonstrate the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). It is sufficient that the party demonstrate to the court "that there is an absence of evidence to support the non-moving party's case." Id. Once the moving party has demonstrated the absence of genuine issues of material fact, the burden shifts to the non-movant to establish the existence of material facts on which the party will bear the burden of proof at trial. Id. at 324; see also Novartis Corp. v. Ben Venue Labs., Inc., 271 F.3d 1043, 1046 (Fed. Cir. 2001). In order to defeat summary judgment, the non-movant must point to an actual "evidentiary conflict" in the record. SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1116 (Fed. Cir. 1985). Mere "conclusory statements" are insufficient. Id. The evidence is examined in a light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and all justifiable inferences must be drawn in favor of the non-movant, Anderson, 477 U.S. at 255.

     B.     Issues Under FAR § 16.203

Plaintiff argues that defendant violated FAR § 16.203 "by basing price adjustments

on indexes rather than on Plaintiff's own established fuel prices."  Am. Compl. ¶ 36.
Plaintiff's argument contains two prongs:  (1) defendant violated the FAR by basing price
adjustments on indexes and (2) defendant violated the FAR by failing to base price
adjustments on plaintiff's own established fuel prices.  Id. ¶¶ 36-37.  Defendant moves
for summary judgment under RCFC 56(b) or, in the alternative, to dismiss under RCFC
12(b)(6).  Def.'s Mot. 1.  The court evaluates the two prongs of plaintiff's argument in
turn.

      1.      Whether Defendant Violated FAR § 16.203 By Failing to Base EPA
              Clauses on Plaintiff's Own Established Fuel Prices

     The court first addresses whether defendant violated FAR § 16.203 by failing to
"bas[e] price adjustments . . . on Plaintiff's own established fuel prices."  Am. Compl. ¶
36.  Defendant claims that, under FAR § 16.203, EPA clauses "need not be" based on
"the contractor's own prices" and asserts that its position is supported by the Federal
Circuit's decision in Tesoro II.  Def.'s Mot. 13.  The dispute requires the court to
determine whether the issue was addressed and effectively disposed of by the Federal
Circuit in Tesoro II.

     The Tesoro II court described the issue before it as whether "established prices"
under FAR § 16.203-1 "should be read as 'contractor's established prices' in order to be
consistent with the term found in FAR § 16.203-3."  Tesoro II, 405 F.3d at 1343.  The
Tesoro II court explicitly held that "FAR 16.203-3 does not require that adjustments be
tied solely to changes in the prices charged by a particular contractor."  Id. at 1348.
Based on the ruling in Tesoro II that FAR § 16.203 does not require EPA clauses to be
based on a contractor's own prices, Tesoro II, 405 F.3d at 1348, plaintiff's allegation that
defendant violated FAR § 16.203 by failing to base price adjustments on plaintiff's own
established fuel prices fails to state a claim on which relief may be granted.  Cf. Boyle,
200 F.3d at 1372.

      2.      Whether Defendant Violated FAR § 16.203 by Basing EPA Clauses on
              Indexes in General or the PMM in Particular

     The court next considers whether defendant violated FAR § 16.203 "by basing
price adjustments on indexes."  Am. Compl. ¶ 36.  However, the court does not need to
resolve the question of whether, as a general rule, defendant may base price adjustments
on "indexes."  Because plaintiff has raised separately the question of the legality of
basing the adjustment of prices on indexes published in the PMM, the court considers
whether defendant's use of the particular indexes at issue in this case violated FAR §

16.203.[10]

a.     The Parties' Arguments

Plaintiff argues that "[e]ven if FAR § 16.203 permitted DESC to base price adjustments on indexes rather than on Plaintiff's own established fuel prices, DESC knowingly awarded and administered Plaintiff's contracts in violation, inter alia, of FAR § 16.203" by basing its EPA clauses on the PMM which was "not market-based, w[as] not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel." Am. Compl. ¶ 37. Plaintiff further argues that these issues are outside the scope of the Tesoro II opinion because only the issue of the per se illegality of defendant's failure to base price adjustments on the contractors' own established fuel prices was before the Tesoro II court. Pl.'s Resp. 20.[11] Plaintiff supports

---

[10]Assuming arguendo that resolution of the issue of whether the use of indexes generally violates FAR § 16.203 is necessary to a resolution of the case, the court finds that defendant did not violate the FAR by basing adjustments on "indexes." In reaching this conclusion, the court is again guided by the holding in Tesoro II. There, the court held that "DESC's use of market-based adjustments to determine adjustments to established prices was authorized under the law." Tesoro II, 405 F.3d at 1348. Although it is true that Tesoro II does not expressly address whether the use of "indexes" is authorized by the FAR, the court understands "index" to be shorthand for the concept of "economic price adjustment clauses indexed to the PMM" contained in the certified question directly before the Tesoro II court. Id. at 1342. By addressing whether or not "economic price adjustment clauses indexed to the PMM" were authorized by the FAR, id., the court in Tesoro II implicitly addressed the issue of whether or not the use of "indexes" in general is authorized by the FAR. The court's position is supported by the fact that Tesoro II quotes two portions of MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405 (1992) (MAPCO), which refer to the PMM as an "index." MAPCO, 27 Fed. Cl. at 410 (using the term "index" to refer to prices published in the PMM). Therefore, in holding that "DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR," Tesoro II, 405 F.3d at 1348, the Tesoro II court held that the use of "indexes," such as the PMM, is authorized under the FAR. Id. at 1349. Consistent with Tesoro II, the court holds that defendant did not violate FAR § 16.203 by basing price adjustments on indexes.

[11]A claim of per se illegality alleges that the illegal act is "[u]nlawful in and of itself," Black's Law Dictionary 763 (8th ed. 2004), and "stand[s] alone, without reference to additional facts," id. at 1178. The concept of per se illegality does not appear to the court to be a useful analytic tool in this case. Here, the parties both refer to the concept but disagree about what the alleged per se illegality is:  plaintiff's view is that it is the "failure to base price adjustments" on the contractors' own established prices, Am. Compl. ¶ 91, while defendant's view is that it is the "use of market-based indicators," Pl.'s App. 327 (Hearing Transcript, Oral Argument Before the Court of Appeals for the Federal Circuit, Jan. 10, 2005).

its argument by referencing the contractors' principal brief in <u>Tesoro II</u>, which states, "Tesoro's and Hermes' Complaints contain seven counts; however, only the portion of Count I alleging per se illegality was the subject of the parties' cross motions and therefore within the scope of this certified appeal."  Brief of Tesoro Hawaii Corp., Tesoro Alaska Co., & Hermes Consolidated, Inc. (Brief of Plaintiffs-Appellants) at 8 n.5, <u>reprinted</u> <u>in</u> Appendix to Plaintiff's Opposition to Defendant's Motion to Dismiss (Pl.'s App.) 377.  Plaintiff also points to DESC's principal brief and its assertion during oral argument before the Federal Circuit that the issue of whether or not the PMM qualifies a market-based reference was not before the court.  Pl.'s Resp. 21.  In its principal brief in <u>Tesoro II</u>, DESC addressed criticism of the PMM by amicus curiae American Petroleum Institute (API) and further stated, "we do not regard this appeal as a referendum upon the appropriateness or suitability of particular price references."  Brief for the United States at 26.  During oral argument DESC stated:

> This is not a beauty contest about one economist's view of the best marketplace indicator versus another.  Both parties have affidavits either championing or damning the PMM, but the question in this case is whether the government may rely on a market value indicator. . . . The challenge here is a per se challenge to the government's use of market-based indicators.

Pl.'s App. 326-27.  Finally, plaintiff argues that the language of the <u>Tesoro II</u> opinion demonstrates that "[t]he Federal Circuit concurred with both DESC and the Appellants that the claim before it was, in fact, only one of <u>per se</u> illegality and not one challenging the PMM on the ground that it was not a market-based reference."  Pl.'s Resp. 22.  Plaintiff points out that the <u>Tesoro II</u> court held that "DESC's use of market-based references to determine adjustments to established prices was authorized under the law," <u>Tesoro II</u>, 405 F.3d at 1348, but that neither the court nor DESC ever specifically "discuss[ed] whether the PMM was or was not a market-based reference," Pl.'s Resp. 22.  Plaintiff asserts that the <u>Tesoro II</u> court's opinion was narrow, holding only that "DESC's use of the PMM was not <u>per se</u> illegal" because the EPA clause was not based on the contractors' established prices.  <u>Id.</u> at 23.

Plaintiff also asserts that this narrow interpretation of the holding is necessary in order to "comport[] with the limitations on the court's jurisdiction to entertain the appeal."  Pl.'s Resp. 23.  Plaintiff refers to a limitation contained in Section 1292(d)(2) of Title 28 of the United States Code, which permits appeal only of "controlling questions of law" that have been certified by the trial court.  28 U.S.C. § 1292(d)(2).  Plaintiff argues that "[t]he issue of the PMM's relationship to the marketplace (and, therefore, the determination of whether it is a market-based reference) is solely a question of fact" and

therefore not reviewable under 28 U.S.C. § 1292(d)(2).  Pl.'s Resp. 23.  Plaintiff also argues that because neither of the certified orders before the Tesoro II court made factual findings as to whether the PMM reflects the marketplace, the court would have "exceeded its jurisdiction" in deciding "whether the PMM is a market-based reference."  Id.  Finally, plaintiff states that the "plain language" of Tesoro II does not support a finding "that the PMM is a market-based reference."  Id. at 19.

Defendant does not specifically address plaintiff's contention that the only issue before the Tesoro II court was that of per se illegality.  See Def.'s Reply 11-14.  Defendant simply focuses on the Tesoro II court's finding that "DESC's PMM-based EPA clause was an 'established prices clause'" and that the clause was legal.  Id. at 11.  Defendant argues that the Tesoro II court "did not stop with the question of whether, in general, an EPA clause not based upon the contractor's own price would be illegal."  Id.  Instead, defendant states that the Tesoro II court "explicitly considered whether DESC's PMM-based EPA clause was an 'established prices' clause contemplated by FAR § 16.203(1) and held that it was," a holding which, defendant asserts, "foreclos[es] consideration of the question [of whether a PMM-based EPA clause is legal] anew."  Def.'s Mot. 13.  Defendant also points out that the Tesoro II court specifically considered the legality of the PMM itself because one of the certified questions for interlocutory review was, "'Did DESC establish the price of fuel in violation of law by employing economic price adjustment clauses indexed to the PMM?'"  Def.'s Reply 11 (quoting Tesoro II, 405 F.3d at 1342).  Defendant also notes that the Tesoro II court considered various findings in MAPCO including that "the PMM is an 'amalgamation' of petroleum sales that does not reflect . . . the market," Def's Mot. 14 (quoting Tesoro II, 405 F.3d at 1348), before holding that "'DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR.'"  Def.'s Reply 11 (quoting Tesoro II, 405 F.3d at 1348).

b.    Analysis

To resolve the parties' dispute about what the Federal Circuit decided in Tesoro II, the court must determine what was before the Federal Circuit.  The court begins by reviewing the scope of the Federal Circuit's review of questions presented in an interlocutory appeal.  Section 1292(d)(2) of Title 28 of the United States Code provides in pertinent part:

> [W]hen any judge of the United States Court of Federal Claims, in issuing
> an interlocutory order, includes in the order a statement that a controlling
> question of law is involved with respect to which there is a substantial
> ground for difference of opinion and that an immediate appeal from that

order may materially advance the ultimate termination of the litigation, the
United States Court of Appeals for the Federal Circuit may, in its
discretion, permit an appeal to be taken from such order . . . .

28 U.S.C. § 1292(d)(2). Section 1292(c)(1) grants the United States Court of Appeals for
the Federal Circuit "exclusive jurisdiction . . . of an appeal from an interlocutory order or
decree described in subsection (a) or (b) of this section [describing interlocutory appeals
from district judges] in any case over which the court would have jurisdiction of an
appeal under section 1295 of this title . . . ." 28 U.S.C. § 1292(c)(1). Section 1292(d),
applicable to appeals from the United States Court of Federal Claims, is substantially
similar to Section 1292(b), applicable to appeals from the district courts. Compare 28
U.S.C. § 1292(d) with 28 U.S.C. § 1292(b). The Tesoro II court based jurisdiction over
the interlocutory appeal on these sections. Tesoro II, 405 F.3d at 1343 ("We have
jurisdiction pursuant to 28 U.S.C. § 1292(c)(1)."); Tesoro Haw. Corp. v. United States,
89 Fed. Appx. 732, 732 (Fed. Cir. 2004) (citing 28 U.S.C. § 1292(d)).

It is clear that Courts of Appeals decide questions of law before them on
interlocutory appeal. The issue of legality of the PMM under FAR § 16.203, however,
presents a mixed question of law and fact. See Campbell v. Merit Sys. Prot. Bd., 27 F.3d
1560, 1565 (Fed. Cir. 1994) (stating that "the application of a general legal standard to
particular facts" presents a mixed question of law and fact). The reason that this question
presents a mixed question of law and fact is that the court must determine whether a
particular index, about which there is a substantial factual record, fits within a regulatory
definition. See id. The issue, therefore, is to what extent mixed questions of fact and law
are considered to be subject to review for the purposes of deciding an interlocutory
appeal. Although neither the Federal Circuit nor the Supreme Court has addressed the
precise issue, other Courts of Appeals have examined the scope of review in interlocutory
appeals under Section 1292(b), a provision substantially similar to Section 1292(d).
Moreover, the relevant Courts of Appeals decisions appear to the court to be consistent
with closely related Supreme Court precedent.

The Sixth and Ninth circuits have specifically held that mixed questions of fact
and law are treated as questions of law for the purposes of an interlocutory appeal. Flint
v. Ky. Dep't of Corr., 270 F.3d 340, 346 (6th Cir. 2001) (holding that "[m]ixed questions
of fact and law are treated as questions of law for the purposes of an interlocutory appeal"
(citing Williams v. Mehra, 186 F.3d 685, 690 (6th Cir. 1999))); Steering Comm. v. United
States, 6 F.3d 572, 575-77 (9th Cir. 1993) (deciding sua sponte to hear an interlocutory
appeal containing a mixed question of fact and law). The Supreme Court has stated that
once a Court of Appeals permits an appeal, that court can "'exercise jurisdiction over any
question that is included within the order that contains the controlling question of law.'"

13

Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 204 (1996) (quoting order granting certiorari, 514 U.S. 1126 (1995)).   Upon consideration of the appeal, a Court of Appeals also "may address any issue fairly included within the certified order." Yamaha, 516 U.S. at 205.  Further, "all questions material to the order [certified for appeal] are properly before the court of appeals," Nuclear Eng'g Co. v. Scott, 660 F.2d 241, 246 (7th Cir. 1981), because 28 U.S.C. § 1292(b) authorizes appeals from orders involving "'a controlling question of law as to which there is substantial ground for difference of opinion,'" Id. at 245 (quoting 28 U.S.C. 1292(b)), not just the specific question certified. Cf. 28 U.S.C. § 1292(d)(2).  "To view section 1292(b) as allowing review of only the question of law making an order appealable would frustrate the utility of the section 1292(b) appeal process." Nuclear Eng'g Co., 660 F.2d at 246.

   The court finds that persuasive authority favors the view that mixed questions of fact and law are to be treated as questions of law for the purposes of an interlocutory appeal.  The Supreme Court has taken an expansive view of the jurisdiction of a Court of Appeals on interlocutory appeal. Yamaha, 516 U.S. at 204.  This court cannot ignore the Tesoro II court's explicit holding "that DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR." Tesoro II, 405 F.3d at 1348.  The Federal Circuit's holding in Tesoro II is very different from the holding of the United States Court of Federal Claims in Williams Alaska Petroleum, Inc. v. United States, 57 Fed. Cl. 789, 803 (2003) (Williams Alaska).  In Williams Alaska, the court stated that its holding that market-based EPA clauses are authorized under the FAR "does not resolve the case in its entirety." 57 Fed. Cl. at 803.  The court then noted that "[t]here remains to be considered plaintiffs' contention that even if DESC had the authority to use such market-based EPA clauses, these [PMM-based] clauses were nevertheless defective because the price index they incorporated failed to ensure payment of the fair market value of the delivered fuel." Id.  If the Tesoro II court had intended (as did the trial court in Williams Alaska) to limit its opinion to the holding that an EPA clause based on established market prices is not necessarily illegal, the court assumes that it would have so stated.  It did not.

   The court also cannot ignore the circumstances surrounding Tesoro II and the entire content of the opinion.  The trial court in Tesoro I focused solely on the legality of DESC's EPA clauses that were tied to the PMM and declined to rule on EPA clauses that were tied to Platts, or to the Oil Price Information Service, or to the Lundberg Letter. Tesoro I, 58 Fed. Cl. 65 at 69-70.  Had the Tesoro I court and the Tesoro II court been concerned only with the illegality of basing an EPA clause on a source other than the contractor's own prices, as plaintiff urges, Pl.'s Resp. 20, the Tesoro I court could have certified and the Tesoro II court could have addressed a question such as "did DESC establish the price of fuel in violation of law by employing economic price adjustment clauses that were not based on the contractor's established prices?"  However, the Tesoro

14

I court's certified questions included a specific inquiry about the legality of using the PMM. See Tesoro II, 405 F.3d at 1342; Tesoro Haw. Corp., 2003 U.S. Claims LEXIS *4 ("Did DESC establish the price of fuel in violation of law by employing economic price adjustment clauses indexed to the PMM?").

In Hermes Consolidated, Inc. v. United States, 58 Fed. Cl. 3 (2003) (Hermes I), the trial court also specifically considered the PMM and held that "this court adopts the multiple rationales set forth in MAPCO [for finding the use of the PMM unauthorized]." Hermes I, 58 Fed. Cl. 3, 10 (2003). The multiple rationales in MAPCO include the holding that, even if FAR § 16.203-1 encompasses both contractor's established prices and established market prices, "the PMM Index does not reflect an 'established market price'" under FAR § 15.804-3(c)(2) because "the index is an amalgamation of the previous month's petroleum sales data." MAPCO, 27 Fed. Cl. at 410. Furthermore, the question certified by Hermes II also addressed the legality of an EPA clause specifically tied to the PMM, stating, "Was DESC's promulgation of the economic price adjustment clauses indexed to the PMM unauthorized?" Hermes II, 58 Fed. Cl. at 420.

The Tesoro II court, in answering the certified questions, first focused on the meaning of the term "established prices" under FAR § 16.203-1(a). Tesoro II, 405 F.3d at 1342. The court considered the contractors' argument "that the term 'established prices' in FAR § 16.203-1 should be read as 'contractor's established prices' in order to be consistent with the term found in FAR § 16.203-3." Id. at 1343. The court also considered DESC's argument that established prices should be understood to encompass "established market prices" as defined by FAR § 15.804-3(c).[12] Id. at 1345. After examining these arguments as well as prior litigation of the issue in MAPCO and Williams Alaska, among other cases, the Tesoro II court found that "although the term 'established price' is not expressly defined in FAR § 16.203, the definition of the term in FAR § 15.804-3 is incorporated by reference." Tesoro II, 405 F.3d at 1347. The Tesoro II court stated that FAR § 15.804-3 defines "established prices" to include "contractor-specific prices, namely 'established catalog prices,' and industry-based prices, namely 'established market prices.'" Id. The court further stated that the FAR does not limit EPA clauses to "changes only in the specific prices offered by an individual contractor" and that "DESC's use of market-based references to determine adjustments to established prices was authorized under the law." Id. at 1348.

The Tesoro II court went on specifically to examine the PMM and whether "DESC's use of an EPA clause tied particularly to the PMM . . . comport[s] with the express requirements of FAR § 16.203-3." Id. at 1348. As part of this determination, the

---

[12]FAR § 15.804-3(c) was omitted from the FAR on Oct. 10, 1997.

Tesoro II court considered the section of the MAPCO decision that held that the PMM "'is neither the contractor's, nor does it reflect an established price,'" and that the PMM does not reflect an established market price because "'[t]he [PMM] index is an amalgamation of the previous month's petroleum sales data . . . [and] not, as § 15.804-3(c)(2) contemplates, determinitive of any particular corporation's current prices.'" Id. (quoting MAPCO, 27 Fed. Cl. at 410).  The Tesoro II court then held that "it was legal error for the court to reject DESC's use of the PMM on the grounds that it 'does not reflect any specific vendor's current price.'"  Tesoro II, 405 F.3d at 1348.  Nor does the Tesoro II opinion end there.  The Tesoro II court also held that "we conclude that DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR," id., and "the use of the PMM-based EPA clause was authorized under the statute," id. at 1349.

The certified questions before the Tesoro II court specifically asked whether the DESC's use of "economic price adjustment clauses indexed to the PMM" was illegal, id. at 1343, and the Tesoro II court specifically found that "the use of the PMM-based EPA clause was authorized under the [FAR]," id. at 1349.  In order for an EPA clause to be authorized under the FAR, it has to satisfy FAR § 16.203-1, which requires that the EPA clause be one of three types:  "(a) Adjustments based on established prices . . . (b) Adjustments based on actual costs of labor or material . . . (c) Adjustments based on cost indexes of labor or material."  FAR § 16.203-1.  Therefore, in holding "that DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR," Tesoro II, 405 F.3d at 1348, the Tesoro II court necessarily decided that DESC's use of an EPA clause tied to the PMM fit within one of these provisions.  Furthermore, at issue in Tesoro II was whether the PMM was authorized under FAR § 16.203-1(a), "Adjustments based on established prices," which states, "These price adjustments are based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items."  FAR § 16.203-1(a).[13]  The Tesoro II court interpreted "established prices" to encompass both "contractor-specific prices, namely 'established catalog prices,' and industry-based prices, namely 'established market prices.'"  Tesoro II, 405 F.3d at 1347.  The PMM is not a "contractor-specific" price.  In holding "that DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR," id. at 1348, the Tesoro II court necessarily found that the PMM is authorized as an "established price" because it is an "established market price."  Id.

Notwithstanding the foregoing, plaintiff claims that defendant violated FAR §

---

[13]In neither this case nor in Tesoro II did the defendant address whether the PMM should be classified within FAR § 16.203-1(b) or (c).  See generally Tesoro II, 405 F.3d 1339; see also Def.'s Mot. 11-13.

16

16.203 by basing its EPA clauses on the PMM because the PMM is "not market-based, w[as] not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel." Am. Compl. ¶ 37.  It is true that the Tesoro II court held that an "established price" that is not a contractor-specific price must be an industry-based or established market price.  Tesoro II, 405 F.3d at 1348.  However, Tesoro II also held that the PMM was authorized by the FAR, Id. at 1348, and this court concludes that, a fortiori, the PMM must be viewed as either an industry-based price or an established market price.  In addition, neither FAR § 16.203-1(a), "Adjustments based on established prices," nor Tesoro II, in its interpretation of "established prices," requires that an "established price" be "designed or intended to be used to set or adjust prices" or reflective of "at least the fair market value of military fuel" in order to be authorized under the FAR.  Compare Am. Compl. ¶ 37 with FAR § 16.203-1(a) and Tesoro II, 405 F.3d at 1347.

Plaintiff also attempts to bolster its argument that the PMM was not authorized by the FAR by contending that the "PMM suffered from a statistical flaw known as an 'index number problem,' whereby different categories or classes of fuel were used to calculate the value of the index in different months."  Am. Compl. ¶ 15.  Plaintiff claims that this problem "renders use of the PMM essentially meaningless for measuring changes in price levels from month to month as DESC did."  Id.  In making this argument, plaintiff relies on the expert report of Joseph P. Kalt and Peter Killen dated April 28, 2006.  Pl.'s App. 608-38.  Plaintiff states that, according to Kalt and Killen, "this statistical flaw . . . results in the PMM erroneously reporting chang[es] in the volume of fuel sold as changes in the price of fuel."  Pl.'s Facts ¶ 24.  Plaintiff also states that, "unlike DOE [Department of Energy] here, other federal agencies that publish indexes intended to be used as price indexes go to great lengths to ensure that the indexes do not suffer an index number problem."  Id. ¶ 25.

Defendant argues that plaintiff's allegations regarding the PMM's index number problem are "immaterial because [they] do[] not apply the standard for a legal EPA clause that was established in [Tesoro II], which specifically approved DESC's use of the PMM."  Def.'s Fact Resp. ¶ 24.  Defendant also contends that Kalt and Killen's report "depends for its truth upon its unproven assumption that the 'market' is represented only by data published in Platts," even though "Platts publishes spot market price assessments" while "[t]he PMM reports all sales."  Id. ¶ 24.  Defendant also states that Kalt and Killen's report "incorrectly assumes that the PMM is an 'index,' and that it mixes products in its calculations."  Id. ¶ 25.

The expert report of Kalt and Killen specifically addresses the PMM's alleged index number problem.  Pl.'s App. 616.  The report states that the "methodology used in

17

the PMM to calculate average prices reported undermines the usefulness of those data for use as an index of actual product price (and attendant market value) movements." Id. The expert report also states that "the PMM category of kerosene-type jet fuel" used in contract DLA600-93-D-0559 (1993 contract) for JP-8 jet fuel "can encompass several products, including Jet A, JP-5, and JP-8, which are not broken out separately." Id. The expert report further states that "calculating weighted average prices" of these products "can obscure actual price movements of specific products at specific locations because changes in the volume of sales of one product relative to the others or changes in the volume at one location relative to the others affect the weighted average price." Id. The foregoing can lead to an "index number problem," which means that "comparing changes in volume-based average prices across different periods can imply changes in the value of the underlying products when, in fact, none has occurred." Id. at 617.

Kalt and Killen give an example of this problem in a hypothetical. See id. In hypothetical "period 1," 10,000 gallons of Product A are sold at 75 cents per gallon while 10,000 gallons of Product B are sold at 70 cents per gallon. Id. "The volume-weighted PPM reported average price" for period 1 "would be 72.5 cents." Id. In period 2, if the prices for A and B each fall by 1 cent, but the volume of A sold increases to 20,000 gallons while the volume of B sold decreases to 5,000 gallons, "the actual market value of the products has declined . . . by 1 cent" but, "because a greater volume of [A] is now sold relative to [B] . . . the hypothetical weighted average PMM-reported price actually rises by .5 cents, to 73 cents." Id. The expert report states that the hypothetical illustrates a potential problem with DESC's using "PMM-reported kerosene-type commercial jet fuel (known as "Jet A")" as the proxy in the PMM because, if "the relative price of Jet A moved down" while JP-5 and JP-8 stayed constant, "the PMM would reflect a fall in prices, and the DESC's PMM-based escalator would lower the price paid" in contracts involving JP-5 and JP-8, "even though the underlying market value of those fuels had not changed." Id.

By alleging that the PMM has an "index number problem," Am. Compl. ¶ 15, plaintiff appears simply to restate its arguments that PMM is not market-based and does not accurately reflect the market. That more comprehensive allegation has been dealt with in a number of cases including MAPCO. See generally MAPCO, 27 Fed. Cl. 405. Although the so-called "index number problem" was not dealt with in the exact terms addressed in the Kalt and Killen expert report in MAPCO, the MAPCO court did directly examine whether or not the PMM reflected the market. Id. at 410-11. MAPCO found that "the PMM Index does not reflect an 'established market price'" because "the index is an amalgamation of the previous month's petroleum sales data," not "any particular corporation's current prices." Id. at 410. This precise discussion in MAPCO was considered by and cited by the Tesoro II court. See Tesoro II, 405 F.3d at 1348.

18

Furthermore, the so-called "index number problem" was specifically before the Tesoro II court in the form of API's amicus brief.  Brief for American Petroleum Institute as Amicus Curiae at 16-19 (stating that "DESC's use (or misuse) of PMM data presents . . . the "index number problem").  The court concludes that the Tesoro II court was fully aware of the same alleged flaws in the PMM that are alleged by plaintiff here.  That court had before it sufficient facts and argument to decide any subordinate issues necessary to determining the controlling legal question of whether the PMM was authorized under the FAR when it held "that DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR."  Tesoro II, 405 F.3d at 1348.

3.      Whether Defendant Violated FAR § 16.203 by Basing EPA Clauses on Platts

Defendant's Motion requests the court to address an additional issue under FAR § 16.203 that lies just beneath the surface of the parties' dispute about the PMM:  whether defendant violated FAR § 16.203 by basing EPA clauses on Platts.  Def.'s Mot. 15.

a.      The Parties' Arguments

Plaintiff never specifically mentions Platts in its complaint.  Am. Compl. passim. However, five of the six contracts at issue are indexed to Platts rather than the PMM. Pl.'s App. 648-77.  The court therefore assumes that the term "indexes" as used in plaintiff's argument that DESC violated FAR § 16.203 "by basing price adjustments on indexes that were not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel," Am. Compl. ¶ 37, refers not only to the PMM, but also to Platts.[14]  Defendant argues that "La

---

[14]At oral argument, plaintiff's counsel identified the issue as whether Platts, which "meaningfully reflects the spot price for commercial jet fuel" when it is based on the appropriate region, is "an appropriate measure to be used to set the price of military jet fuel, which is a different fuel than commercial jet fuel."  Tr. 48:15-17.  In support of its position, plaintiff's counsel stated, "[M]ilitary jet fuel is not commercial jet fuel.  As we state in our expert report, a more appropriate index to capture what military fuel is would be the use of several indexes, because the military fuel essentially has components of several different fuels."  Id. at 47:20-25. The question posed by FAR § 16.203 is not, however, whether the publication to which the EPA clause is indexed accurately reflects the market for military jet fuel but whether the measure itself is "market-based."  Because the inquiry posed by plaintiff implicates only the question of price fairness, which is not required by FAR § 16.203, and not the question of whether Platts is "market-based," the court does not consider plaintiff's inquiry for the purpose of determining whether indexing an EPA clause to Platts violates FAR § 16.203.

Gloria's Platts-based EPA clauses easily pass muster under <u>Tesoro's</u> 'market sources'/ 'market-based' standard" and points out that "La Gloria's complaint does not assert otherwise."  Def.'s Mot. 15.

      b.     Analysis

      For an EPA clause to be considered authorized under FAR § 16.203-1(a), it must be "based on established prices."  FAR § 16.203-1(a).  "Established prices" can be either "contractor-specific prices, namely 'established catalog prices,'" or "industry-based prices, namely 'established market prices.'"  <u>Tesoro II</u>, 405 F.3d at 1347.  However, neither FAR § 16.203-1(a), "Adjustments based on established prices," nor <u>Tesoro II</u>, in its interpretation of "established prices," requires that an "established price" be "designed or intended to be used to set or adjust prices," and reflective of "at least the fair market value of military fuel" in order to be authorized under the FAR.  <u>Compare</u> Am. Compl. ¶ 37 <u>with</u> FAR § 16.203-1(a) <u>and</u> <u>Tesoro II</u>, 405 F.3d at 1347.  Because the FAR does not require that an established price be "designed or intended to be used to set or adjust prices," and reflective of "at least the fair market value of military fuel" in order to be authorized under the FAR, the court considers only plaintiff's argument that Platts is "not market-based."  Am. Compl. ¶ 37.

      The PMM has been found to be "market-based."  <u>See</u> <u>Tesoro II</u>, 405 F.3d at 1348. In holding "that DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR," <u>id.</u> at 1348, the <u>Tesoro II</u> court necessarily found that the PMM is authorized as an "established price" because it is an "established market price." <u>Id.</u>  "The PMM is published monthly and presents average price and total sales volume data by month, by state and region, and for several classes of trade for a number of petroleum products (motor gasolines, aviation gasoline, kerosene-type jet fuel, kerosene, No. 1 and No. 2 distillate fuels, No. 4 Fuel, residual fuel oil, and propane)."  Pl.'s App. 3 (Biddle Memorandum).  Prices published in the PMM are based on regional averages of refiners' sales.  <u>See id.</u> ("By law, all refiners are required to report their average sales prices to DOE on a monthly basis.").

      While the PMM is a government compilation of transaction prices, Def.'s Mot. 5, Platts is a daily commercial publication, Def.'s Facts ¶ 13.  Platts is widely used by the petroleum industry in commercial contracts to set prices for commercial fuels.  <u>See</u> Tr. 47:10-11 (plaintiff's counsel describing Platts); <u>see also</u> Pl.'s Resp. 7 (referring to Platts and OPIS as "commercial market references").  When arguing that prices published in the PMM fail to reflect the market, plaintiff uses Platts as indicative of the marketplace, as did plaintiff's experts in their expert report.  <u>See, e.g.</u>, Pl.'s Resp. 10 (citing Kalt and Killen's expert report); Pl.'s App. 636 (chart entitled "PMM Adjustment Fails to Track

the Market:  Market-Based JP-4 Escalator and PMM-Based JP-4 Escalator Frequently Move in Different Directions" and using Platts as "the market").  Plaintiff also used Platts as the source in its calculation of the "fair market value" of the disputed contracts in its complaints to the contracting officer.  <u>See</u> Appendix to Defendant's Motion for Partial Summary Judgment Ex. 43-44.  If prices published in the PMM are considered an "established market price" authorized under <u>Tesoro II</u>'s interpretation of FAR § 16.203-1(a), then Platts, a commercial publication widely accepted and used by the petroleum industry in its own contracts, is also an "established market price."  <u>See</u> <u>Tesoro II</u>, 405 F.3d at 1348.

4.      Issues Under FAR § 16.203:  Conclusion

Plaintiff's claims that defendant violated FAR § 16.203 by failing to base EPA clauses on plaintiff's own established prices and by basing EPA clauses on the PMM do not state claims upon which relief may be granted.  <u>See</u> RCFC 12(b)(6).  Plaintiff's claim that defendant violated FAR § 16.203 by basing EPA clauses on Platts does not involve a genuine dispute of material fact and defendant is entitled to summary judgment on that claim.

C.      Whether Defendant Violated FAR § 15.802(b) (1993), Currently Codified at FAR § 15.402(a) (2005), by Allegedly Failing to Establish Prices That Were "Fair" and "Reasonable" to the Contractor

Plaintiff argues that DESC violated former FAR § 15.802(b), currently codified at FAR § 15.402(a), "by using PMM and other indexes to establish prices for military fuel that were not fair and reasonable."  Am. Compl. ¶ 38.  Specifically, plaintiff argues that the requirement contained in FAR § 15.402(a) that "contracting officers . . . purchase supplies and services . . . at fair and reasonable prices" requires the contracting officer to establish a contract price that is "fair and reasonable" both to the contractor and to the government and that, to the extent that the parties agree on a price that is not "reasonable" and "fair," FAR § 15.402(a) provides a cause of action to contractors.  Pl.'s Resp. 28.  Plaintiff argues both that the plain meaning of the word "fair" and the context of the regulatory section as a whole compel this result.  <u>Id.</u> at 28-30.

Defendant argues that plaintiff fails to state a claim upon which relief may be granted because FAR § 15.402 does not create a right enforceable by contractors.  Def.'s Mot. 18; Def.'s Reply 14.  Defendant reasons that the regulation does not create an enforceable right because the purpose of the regulation is to protect the Government from prices that are higher than warranted.  Def.'s Mot. 18-19; Def.'s Reply 14 ("[The regulation at issue] was found in that part of the regulation that was concerned with

21

obtaining adequate price competition, so that the <u>Government</u> was assured of paying a reasonable price.").  Defendant further argues that the regulation does not apply in the context presented by this case because the regulation applies only to "bid and award" prices and not to "adjusted prices," which are the prices at issue here.  Def.'s Reply 15.

The Federal Circuit has stated:  "In order for a private contractor to bring suit against the Government for violation of a regulation, that regulation must exist for the benefit of the private contractor.  If, however, the regulation exists for the benefit of the Government, then the private contractor does not have a cause of action against the Government in the event that a contracting officer fails to comply with the regulation." <u>Freightliner Corp. v. Caldera</u>, 225 F.3d 1361, 1365 (Fed. Cir. 2000).  In order to determine whether a regulation "confers a cause of action upon the private contractor," the court analyzes each regulation separately.  <u>Id.</u>  Where the regulation "serves as an internal operating procedure," <u>id.</u>, or is cautionary rather than prohibitive, and provides guidance to the contracting officer, <u>see</u> <u>AT&T v. United States</u>, 307 F.3d 1374, 1380 (Fed. Cir. 2002), the regulation does not create a cause of action.  <u>AT&T</u>, 307 F.3d at 1380; <u>Freightliner</u>, 225 F.3d at 1365; <u>Short Bros. v. United States</u>, 65 Fed. Cl. 695, 765 (2005).

FAR § 15.802 (1993) provides:

(b)  Contracting officers shall –
(1)  Purchase supplies and services from responsible sources
at fair and reasonable prices . . . .

FAR § 15.802(b)(1).  The regulation goes on to describe the procedures for ensuring that the contracting officer obtains a reasonable price.  <u>See</u> FAR § 15.402.  The procedures include not obtaining more information than is necessary and not requiring the submission of cost or pricing data where it is unnecessary because such a requirement leads to increased proposal preparation costs and consumes additional contractor and government resources.  FAR § 15.402(a), (a)(3).  Although the Federal Circuit has never decided whether FAR § 15.402 or its predecessor creates a cause of action for contractors, this court has held that the regulation at issue "does not afford a judicial remedy" because it "do[es] no more than to provide internal government direction" and guidance to the contracting officer.  <u>Short Bros.</u>, 65 Fed. Cl. at 764-65.

This conclusion is consistent with decisions of the Comptroller General which, although not binding on this court, <u>Thompson v. Cherokee Nation</u>, 334 F.3d 1075, 1084 (2003), provide valuable guidance.  <u>Info. Tech. & Applications Corp. v. United States</u>, 51 Fed. Cl. 340, 352 n.20 (2001).  The Comptroller General has stated, in the context of a

bid protest, that the contracting officer's evaluation for price reasonableness under FAR §
15.402(a) of an offer provided by a bidder "focuses primarily on whether the offered
prices are higher than warranted . . . below-cost pricing is not prohibited." All Phase
Envtl., Inc., Nos. B-292919.2 - B-292919.7, 2004 WL 437450, at *7 (Comp. Gen. Feb. 4,
2004); accord CSE Constr., No. B-291268.2, 2002 WL 31835783 (Comp. Gen. Dec. 16,
2002), at *4; see also Rodgers Travel, Inc., No. B-291785, 2003 WL 1088876 (Comp.
Gen. Mar. 12, 2003), at *2 n.1 (stating that the purpose of a price reasonableness
determination is to ensure that the prices offered are not higher, as opposed to lower, than
warranted); Ralph C. Nash & John Cibinic, Price Reasonableness: a Much
Misunderstood Term, 17 Nash & Cibinic Rep. ¶ 22 (Apr. 2003) (construing the phrase
"focuses primarily" in the decisions of the Comptroller General to mean that the
regulation is not focused on whether prices are "too low" except to the extent of the
government's interest).  The contracting officer evaluates whether prices are too low only
to the extent that the contracting officer is concerned that the contractor will not be able
to perform the contract at that price.  See, e.g., CSE Constr., No. B-291268.2, 2002 WL
31835783 (Comp. Gen. Dec. 16, 2002), at *4.  Decisions of the Comptroller General lead
to the conclusion that the purpose of the contracting officer's price reasonableness
determination under FAR § 15.402(a) is to determine that the price is reasonable based on
the interests of the government and that the contracting officer is not concerned with
evaluating the offer for price reasonableness to the bidder.  See All Phase Envtl., 2004
WL 437450, at *7.

        The regulation at issue prescribes a procedure for the contracting officer's
determination that a contractor's proffered price is reasonable.  The court recognizes that
the plain meaning of the word "fair" can encompass the concept of fairness to both
parties.  The American Heritage Dictionary 635 (4th ed. 2000) (including, as one
definition of "fair," "just to all parties").  The meaning of the words "fair" and
"reasonable," however, must be taken in context.  See Freightliner, 225 F.3d at 1365.
The context is the contracting officer's evaluation of a bid submitted in response to a
solicitation.  See FAR § 15.402(a).  In that context, the underlying assumption is that a
bidder would not submit a bid unless the bidder had already determined the bid to be
reasonable, fair, and even desirable to itself.  For that reason, FAR § 15.402(a) could not
require the government to evaluate potential contractors' bids for reasonableness to the
contractor.  Rather, the regulation serves as an instruction to the contracting officer to
evaluate the proffered bid for fairness and reasonableness to the government.  See First
Enter. v. United States, 61 Fed. Cl. 109, 118 (2004) (stating that "[p]rior to awarding a
contract, contracting officers must ensure that the price to the government is fair" (citing,
inter alia, FAR § 15.402(a)) (emphasis added)).

        Furthermore, it is not clear that FAR § 15.402(a) applies beyond the limited

context of evaluating bids submitted in response to a solicitation.  The evaluation for fairness of a price adjustment clause, rather than bids submitted by prospective contractors in response to a solicitation, appears to the court to present a very different question.  Even assuming that the regulation applies to a challenge to a price adjustment clause, rather than to fixed prices, and a determination whether the price <u>adjustment</u> is fair, the rationale applies with equal force to the context of two contracting parties.  In an arms-length transaction, as here, the assumption is that a contractor would not enter a contract with the government unless the contractor determined the overall contract, of which the price term is a part, to be beneficial to the contractor.  Even in this context, then, the purpose of the regulation, which serves as an instruction to the contracting officer, is to protect the government, not contractors.

The court concludes that the principal purpose of the regulation is the protection of the government, not contractors.  The regulation appears to the court to "serve[] as an internal operating procedure," <u>Freightliner</u>, 225 F.3d at 1365, and to provide cautionary guidance.  <u>See</u> <u>AT&T</u>, 307 F.3d at 1380.  The regulation therefore fails to provide plaintiff with a cause of action.  <u>See id.</u>  The court DISMISSES plaintiff's FAR § 15.802(b) claim for failure to state a claim upon which relief may be granted.

D.      Claims of Illegality Based on DESC's Minority Price Preferences and Small Business Program

Plaintiff argues that DESC violated the equal protection component of the Fifth Amendment Due Process Clause[15] "by extending to minority-owned businesses bidding preferences that were not narrowly tailored to further a compelling governmental interest."  Am. Compl. ¶ 41.  Plaintiff also argues that DESC's administration of its small business program violated various sections of the FAR, the Office of Federal Procurement Policy Act, and Part 219 of the Department of Defense Federal Acquisition Regulation by using prohibited auction techniques and by awarding portions of the procurements set aside for small businesses together with large businesses.  Am. Compl. ¶¶ 39-40.  Plaintiff argues that both the minority price preference and the "auction" depressed bid prices with the result that plaintiff received less than fair market value for the fuel it sold pursuant to its contracts with DESC.  Pl.'s Resp. 16, 55.  Defendant moves to dismiss for lack of jurisdiction.  Def's Mot. 1.  Alternatively, defendant moves for summary judgment.  <u>Id.</u>  The court considers each claim in turn.

---

[15]The Fifth Amendment does not contain an equal protection clause.  However, the Supreme Court has read an equal protection component into the Due Process Clause.  <u>See</u> <u>Schneider v. Rusk</u>, 377 U.S. 163, 168 (1964).

1.     Whether This Court Lacks Jurisdiction Over Plaintiff's Equal Protection
       Claim

Plaintiff alleges that "DESC knowingly awarded and administered [p]laintiff's contracts in violation, inter alia, of the equal protection component of the [F]ifth [A]mendment's [D]ue [P]rocess [C]lause by extending to minority-owned businesses bidding preferences that were not narrowly tailored to further a compelling governmental interest." Am. Compl. ¶ 41. Defendant moves to dismiss plaintiff's equal protection claim for lack of subject matter jurisdiction. Def.'s Mot. 30-32. In support of its motion, defendant argues that plaintiff has not identified a money-mandating source of law. Id. at 31 ("The [E]qual [P]rotection [C]lause of the Fifth Amendment . . . does not provide the requisite substantive right of recovery.") (citing Mullenberg v. United States, 857 F.2d 770, 773 (Fed. Cir. 1988); LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995)). Defendant argues that La Gloria's contracts also do not constitute a money-mandating source conferring jurisdiction on this court as to this particular claim because "La Gloria's [equal protection] complaint is nothing more than a facial attack upon the constitutionality of DESC's fuel acquisition program – and does not concern the award or administration of La Gloria's contracts." Id. Defendant explains that plaintiff's equal protection claim "has nothing to do with the contract claims before this [c]ourt, because those claims are based upon contracts actually awarded to La Gloria – not contracts diverted to minority-owned businesses, rightly or wrongly." Id.

In response, plaintiff states that it does not seek redress under the equal protection component of the Fifth Amendment's Due Process Clause; rather, it brings its claim pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601-13.[16] Pl.'s Resp. 53. La Gloria bases its claim both on its "express contracts with DESC" and on an "implied contract of fair dealing between DESC and La Gloria." Pl.'s Resp. 54. La Gloria clarifies that its express contract claim is that its "contracts with DESC were illegal because a clause in the agreements is unconstitutional" and asserts Tucker Act jurisdiction on that basis. Id. at 53. La Gloria argues that the "illegal term [in its contracts with DESC] . . . resulted in it receiving less than fair market value for the fuel it sold to DESC." Id. at 54-55. As to its implied contract claim, La Gloria asserts that this court has jurisdiction because "Federal Circuit decisions . . . have consistently recognized that there is CDA jurisdiction

_____

[16]Elsewhere, however, plaintiff states, "La Gloria alleges that DESC knowingly awarded and administered La Gloria's contracts in violation of the equal protection component of the Fifth Amendment's due process clause." Pl.'s Resp. 54. Plaintiff cites Rothe Development Corp. v. U.S. Department of Defense, 262 F.3d 1306 (Fed. Cir. 2001), in support of its claim that this court has jurisdiction to consider a plaintiff's equal protection challenge to bidding preferences. Pl.'s Resp. 54; see also Rothe, 262 F.3d at 1316.

to consider contract illegality claims . . . without regard to whether the provision of law violated mandated the payment of money." Id. at 55. La Gloria explains the basis for the harm it allegedly sustained: "[I]f minority-owned firms are given a ten percent price preference, all else being equal, non-minority firms must bid ten percent lower to be competitive." Id. at 55 n.62.

In its reply, defendant restates its assertion that the equal protection component of the Fifth Amendment's Due Process Clause does not provide a basis for this court's jurisdiction. Def.'s Reply 21. Defendant reiterates its position that the contracts cannot provide a basis for jurisdiction because "the contract[s] [are], at best, incidental to [La Gloria's] claim." Id. In further support of its position, defendant states, "La Gloria has failed to identify any of its contract terms that were written in violation of any statute or regulation." Id. at 22; see also id. at 23 ("La Gloria identifies no term of its contract[s] that violates the Fifth Amendment. That is not surprising, because the preference clause is inoperative in a contract awarded to a contractor . . . that does not obtain the evaluation preference."). As to plaintiff's implied contract claims, defendant argues that this court lacks jurisdiction on the basis of an implied contract of fair dealing because plaintiff, not being a disappointed bidder, lacks standing to invoke this court's bid protest jurisdiction. See id. at 22 ("[T]his is not a Rothe claim. Rothe was a disappointed bidder. It did not seek damages arising from a contract, nor did the court assert its jurisdiction on that basis. Rothe alleged that the application of a 10 percent evaluation preference to a small disadvantaged business bid deprived Rothe of obtaining a contract. Thus, it was upon its bid protest jurisdiction . . . that the court entertained the appeal. . . . Rothe provides no grounds for this [c]ourt's jurisdiction.").

It is firmly settled that the equal protection component of the Due Process Clause of the Fifth Amendment does not obligate the United States to pay money damages and therefore does not confer jurisdiction under the Tucker Act. Mullenberg v. United States, 857 F.2d 770, 773 (Fed. Cir. 1988). To state a claim on the basis of an express contract, the claim must arise from some part of the contract. See 28 U.S.C. § 1491(a)(1) (conferring jurisdiction over "any claim against the United States founded . . . upon any express or implied contract"); Trauma Serv. Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("To show jurisdiction in the Court of Federal Claims, [a plaintiff] must show that either an express or implied-in-fact contract underlies its claims."). It is axiomatic that a successful bidder does not have standing to sue under the court's bid protest jurisdiction. Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (AFGE).

The court lacks jurisdiction over plaintiff's equal protection claim. Plaintiff's claim is properly characterized as one for violation of the equal protection component of

the Fifth Amendment Due Process Clause.  The reason for this characterization is that, despite plaintiff's allegations, plaintiff does not identify the contract as the source of its complaint.  Rather, plaintiff identifies a problem with the bidding process.  Plaintiff, however, was the successful bidder.  Accordingly, it lacks standing to bring a bid protest. Id.  Plaintiff does not provide authority to support – nor does the court know of any authority to support – the proposition that the court has jurisdiction over an equal protection claim in this non-bid protest context.  Cf. Rothe Dev. Corp. V. U.S. Dep't of Def., 262 F. 3d 1306, 1316 (Fed. Cir. 2001) (conferring jurisdiction over an equal protection claim in a bid protest context).  Because the court lacks jurisdiction, it cannot entertain plaintiff's claim.

Rothe is not to the contrary.  Unlike La Gloria, the plaintiff in Rothe did not proceed on contract; instead, Rothe was an unsuccessful bidder invoking the court's bid protest jurisdiction.  Id.  Accordingly, review of an equal protection claim was available to the plaintiff in Rothe, but it is not available to La Gloria.

The court accordingly DISMISSES plaintiff's equal protection claim for lack of jurisdiction.

2.      Small Business Claims

Plaintiff argues that the small business program, as administered by DESC, violates FAR §§ 15.610, 19.502-3(c)(1), 19.507(a), and 52.219.7, the Office of Federal Procurement Policy Act, 41 U.S.C. § 423 (1989) (OFPPA), and Department of Defense Federal Acquisition Regulation (DFAR) part 219 by using prohibited auction techniques and by soliciting and awarding portions of procurements set aside for small businesses together with large businesses. Am. Compl. ¶¶ 39-40; Pl.'s Resp. 56-57.  Plaintiff alleges that DESC "discloses competitors' bid or pricing information to small businesses" and awards the contracts to small businesses "if they agree to match the price, or adjusted price, DESC discloses," thereby engaging in a prohibited auction technique. Pl.'s Resp. 58; see also id. at 59.  Plaintiff argues that, under the FAR, DESC may release competitors' bid or pricing information only after the portion of the procurement not set aside for small businesses is completed.  Id. at 59 (citing FAR § 19.502-3(c)(1)).  Plaintiff argues that, as a consequence, DESC artificially deflated the base price that La Gloria was required to bid to prevent a small business from matching its bid.  Id. at 16 ("Both DESC's minority price preference and its auction, by their very nature, placed downward pressure on bid prices, as non-minority and non-small businesses were forced to compete on an uneven playing field."); see also id. at 63-64 ("The impact of DESC's violation of the OFPPA and the FAR is that DESC pays lower prices for fuel to both large businesses and small businesses.").  As a consequence, plaintiff argues, the contract did not reflect

27

the fair market value of military fuel.  Id.

Defendant moves to dismiss for lack of jurisdiction because, it argues, "the complaint presents nothing more than a facial attack upon DESC's small business program."  Def.'s Mot. 34.  As defendant explains, "[T]he complaint does nothing to link any particular action taken under [DESC's small business set-aside] program to any contract La Gloria was awarded."  Id.; see also Def.'s Reply 25 ("La Gloria has not shown how it might ground its generalized complaint concerning the conduct of procurements generally in a cause of action arising out of one of its contracts.").  In fact, defendant argues, if a small business offeror had agreed to match the price La Gloria had offered, La Gloria would have been awarded no contract for that amount.  Def.'s Reply 24.  The necessary implication of defendant's argument is that La Gloria could not have a post-award claim under the small business set-aside program without being a disappointed bidder.  See id.  Defendant further argues that DESC's small business program does not violate the FAR because the "match price method" does not constitute an auction.  Def.'s Mot. 32; Def.'s Reply 23-24 (arguing that the "match price method" does not constitute an auction because "the small business offeror is given the opportunity to match the price the Government would otherwise pay" and "[t]he offeror agrees to match or not" so that "there is no back and forth between one offeror and another"), and because DESC's authorized deviation from the FAR permits it to give small businesses the opportunity to match the price the government would otherwise pay to large businesses.  See Def.'s Reply 24 ("As we explained, the Government's match price method of conducting partial small business set-aside negotiations follows authorized agency procedures and the FAR itself.").  Defendant explains the rationale behind the deviation:  "This procedure [, which] avoids the delay that would take place in re-soliciting set[-]aside failure quantities under the standard FAR and DFARS procedures, has been used since the 1960's pursuant to authorized deviations, and has been approved by the GAO on several occasions."  Def.'s Mot. 34.  Defendant states, "DESC's procedures are consistent with applicable law and regulation" according to findings of the Comptroller General.  Def.'s Reply 25-26 (citing B-230556, March 23, 1989).

Plaintiff responds that, despite defendant's assertion that it has an authorized deviation from the FAR "and somehow its violation of OFPPA," Pl.'s Resp. 62, "DESC has not proffered its alleged deviation" and "has not established that" it followed other procedures required to authorize the deviation.  Id. at 63.  In further support of its argument that no deviation exists to authorize DESC's administration of its small business program, plaintiff asserts, "a FAR deviation cannot authorize the very conduct OFPPA prohibits."  Id. at 62.

The Tucker Act confers on this court jurisdiction over "any claim against the

28

United States founded . . . upon any express or implied contract." 28 U.S.C. § 1491(a)(1). To establish jurisdiction based on an express contract, a plaintiff must identify at least one term of the contract or contractual duty that the defendant breached.  See Trauma Serv. Group, 104 F.3d at 1325 (stating the rule that a plaintiff must identify a contractual duty and allege a breach of that duty to establish breach of contract); see also Fisher II, 402 F.3d  at 1172 (holding that failure to plead facts that identify a source actually mandating the payment of money to plaintiff deprives the court of subject matter jurisdiction).  To establish jurisdiction based on the breach of an implied contract, a plaintiff must establish the existence of a contract implied-in-fact that the government breached.  See Skillo v. U.S., 68 Fed. Cl. 734, 742-43 (2005).  An implied-in-fact contract that all bids will be honestly and fairly considered by the government exists between the government and responsive bidders.  Keco Indus., Inc. v. United States, 428 F.2d 1233, 1237 (Ct. Cl. 1970).

The court lacks jurisdiction over plaintiff's small business claims.  Even though plaintiff has express contracts with the government, it does not identify the contracts as the source of its complaint.  Rather, its claim is for breach of an implied contract concerning the bidding process.  If plaintiff had been displaced by DESC's allegedly "prohibited auction techniques," Am. Compl. ¶ 39, the court may have had jurisdiction to entertain plaintiff's claims.  Under these circumstances, however, where plaintiff does not allege that the small business program prevented plaintiff from obtaining the contract, the court lacks jurisdiction over plaintiff's claims because plaintiff was the successful bidder. See Transcountry Packing Co. v. United States, 568 F.2d 1333, 1337 (Ct. Cl. 1978) (declining to extend implied contract theory to case of successful bidder who sued on the ground that he should not have been awarded the contract); see also AFGE, 258 F.3d at 1302 (holding that standing under 28 U.S.C. § 1491(b)(1) is limited to "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract," parties whom the court describes elsewhere as "disappointed bidders"); cf. Wetsel-Oviatt Lumber Co. v. United States, 40 Fed. Cl. 557, 570 (1998) (successful bidder had standing to sue in context of cancellation of sale).

The court DISMISSES plaintiff's small business claims for lack of jurisdiction.

E.      Contract Claims (Whether La Gloria May Recover Under a Contract Theory for Defendant's Alleged Failure to Set Prices That Reflected Fair Market Value)

Plaintiff argues that, because the prices defendant paid for fuel under the six fuel contracts did not reflect fair market value, it is entitled to recover under various theories

of contract law.  Plaintiff argues (1) misrepresentation; (2) breach of contract; (3) failure of consideration and frustration of purpose; and (4) mutual and unilateral mistake.[17]  See Pl.'s Resp. passim.  The court considers each claim below.

1.      Misrepresentation

Plaintiff alleges that "DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose," Am. Compl. ¶ 52, the following facts: (1) that the indexes on which defendant based its price adjustments "were not adequate to accomplish the stated purpose . . . to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value," id.; (2) that the "PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value," id. ¶ 53; and (3) "that the contracts did not provide for payment of at least fair market value for military fuel and did not provide for fair and reasonable prices," id. ¶ 54.  In support of its allegations, plaintiff asserts that, "[i]n basing price adjustments on PMM, DESC represented and warranted that PMM accurately reflected at least the fair market value for fuel and that prices for military fuel were fair and reasonable."  Am. Compl. ¶ 12.  Plaintiff also cites two of DESC's internal assessments and one of DESC's internal memoranda.  Id. ¶¶ 8, 16-17.  The 1986 assessment stated, "the movement of PMM as compared to other [market] references . . . indicates that PMM may have move[d] as much as one or two cents per gallon out of step with such . . . references."  Def.'s App. 18.  The 1987 assessment concluded that DESC should "[m]odify the current two-step escalation method so that offerors can establish their bid prices as effective with the month of the most recent PMM."[18]  Def.'s App. 25. The DESC internal memorandum stated,

The use of product index escalators ensures that the sale will be at the market price, which is a fair and reasonable price.  Not only is the

_____

[17]Plaintiff also relies on a theory of "implied-in-fact" contract.  See Am. Compl. ¶¶ 73-78. Plaintiff argues that DESC's violation of the law in administering the contract invalidated at least the price terms, so that the price terms were replaced by an implied-in-fact contract to pay the fair market value.  Id.  Because a theory of implied-in-fact contract is a means to provide a remedy to defendant's alleged violation of law, and because the court determined in Parts II.B-C that defendant's actions did not violate the law, the theory of implied-in-fact contract is unavailable to plaintiff.

[18]Despite plaintiff's assertion to the contrary, Pl.'s Facts ¶ 10, the 1987 assessment did not support using commercial price references to make adjustments, Def.'s App. 25.  This fact, however, is not material to the court's disposition of the case.

30

Government protected, but the contractor is protected by knowing that its price will always be related to the price it could obtain in the commercial marketplace.

Pl.'s App. 4 (Memorandum from Edward J. Biddle, Deputy Director, Directorate, Contracting and Production, Defense Logistics Agency (DLA) to Executive Director, Contracting, DLA (Jan. 5, 1993)); see Am. Compl. ¶ 8; Pl.'s Facts ¶ 5.  In a final allegation under this cause of action, plaintiff alleges that DESC "misrepresented and otherwise failed to disclose that DESC worked with DOE to determine how PMM was published and to 'see that our needs are satisfied as . . . one of the primary users of PMM.'" Am. Compl. ¶ 55 (quoting Pl.'s App. 100 (Internal Memorandum from Christopher Lee, Director, Office of Market Research and Analysis to DESC (Mar. 23, 1989))).

Defendant moves to dismiss – or, in the alternative, for summary judgment of – plaintiff's claims of misrepresentation on the basis that "La Gloria's brief does not suggest . . . that the Government actually misrepresented anything." Def.'s Reply 16. "La Gloria has yet to put a fact in evidence that amounts to a misrepresentation . . . ." Id. n.13.  Defendant also argues that "La Gloria has not identified a fact that DESC had a duty to disclose or one that was material to its bargain." Def.'s Mot. 22.  "[A]bsent any material fact pertaining to an actual misrepresentation," defendant argues, "th[e] count [of misrepresentation] must be dismissed." Def.'s Reply 16.  In addition, defendant points out that, as to the 1993 internal memorandum, "La Gloria cites no evidence that:  it was aware of the document at the time it entered into its contracts with DESC; the document was incorporated into the contracts; or the parties' intent was the subject of discussions at the time the contracts were negotiated and awarded." Def.'s Fact Resp. ¶ 5.

In its response, plaintiff realleges that "DESC misrepresented that the PMM was designed to measure fair market value, misrepresented that the PMM was intended to be used to set prices, and misrepresented that the PMM and the prices set using it reflected fair market value." Pl.'s Resp. 34.  Plaintiff does not reassert its allegation of misrepresentation as to indexes generally.  See id.  Plaintiff argues that its "allegations must be deemed true for purposes of DESC's motion to dismiss." Id.  Plaintiff asserts that price is a material term, id. at 35, that DESC had a duty to disclose material facts known to it, id., and that, therefore, DESC did have a duty to disclose "the truth about its prices," id. at 34; see also id. at 35 ("Indeed, a representation that a party will pay fair market value, when it knows it will not, could not be more material.").

"In order for a contractor to prevail on a claim of misrepresentation, the contractor must show that the Government made an erroneous representation of a material fact that

31

the contractor honestly and reasonably relied on to the contractor's detriment," T. Brown Constructors, Inc. v. Pena, 132 F.3d 724, 729 (Fed. Cir. 1997), or that the government "withh[e]ld[] information when it ha[d] superior knowledge of that information and a duty to disclose it to the contractor," AT&T Commc'ns, Inc. v. Perry, 296 F.3d 1307 (Fed. Cir. 2002).  The government has a duty to disclose "superior knowledge . . . which is unknown and reasonably is not available to the contractor." John Massman Contracting Co. v. United States, 23 Cl. Ct. 24, 32 (1991) (Massman) (citing Utility Contractors, Inc. v. United States, 8 Cl. Ct. 42, 52 (1985), aff'd, 790 F.2d 90 (Fed. Cir. 1986) (Table)).  The government has a duty to disclose, under the superior knowledge doctrine, if (1) the information constitutes "vital knowledge of a fact that affects performance costs or direction, (2) the government [i]s aware the contractor had no knowledge of and had no reason to obtain such information, [and] (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire." GAF Corp. v. United States, 932 F.2d 947, 949 (Fed. Cir. 1991).  The government does not, however, have a duty to disclose information that is reasonably available, Massman, 23 Cl. Ct. at 32 (citing L.G. Everist, Inc. v. United States, 231 Ct. Cl. 1013, 1018 (1982)); see also Vann v. United States, 420 F.2d 968, 982 (Ct. Cl. 1970), or that the contractor has an opportunity to learn on its own, see Vann, 420 F.2d at 982 (stating that a contractor who knows or has the opportunity to learn the facts cannot show that it was misled by the contract).

Plaintiff does not plead facts sufficient to state a claim for affirmative misrepresentation.  As noted at oral argument, Tr. 25:20-26:26-21, it is not clear whether plaintiff alleges fraud rather than misrepresentation, see Am. Compl. ¶ 56 (alleging that "[p]laintiff reasonably relied upon DESC's material and/or fraudulent misrepresentations as an inducement to enter the contracts").  In order for a claim of fraud to be sufficiently pleaded, a plaintiff must state the circumstances constituting fraud with particularity. RCFC 9(b) ("In all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity.").  Plaintiff recites facts that, plaintiff argues, tend to show defendant's knowledge that the PMM was inadequate to accomplish the purposes of protecting against market fluctuations and ensuring that the prices paid reflected "the market price."  Am. Compl. ¶¶ 8, 16-17 (describing 1993 DESC internal memorandum and 1986 and 1987 DESC internal assessments).[19]  Plaintiff simply fails to identify any particular document or oral representation on which it relied which stated that the prices

---

[19]The court observes, but does not rely on for its decision under RCFC 12, that, despite plaintiff's assertion of the "stated purpose" of the EPA clause, Am. Compl. ¶ 52, neither the contract nor the FAR states that the purpose of the EPA clause is to protect against market fluctuations and to ensure that the prices paid reflect "the market price."  See Pl.'s App. 671-87 (1993 contract).

the defendant paid on the contract would reflect at least fair market value.  See Am. Compl. ¶¶ 45-56.  Although plaintiff mentions a January 5, 1993 memorandum from DLA's Deputy Director, Directorate Contracting and Production, which states that "[t]he use of product index escalators ensures that the contract price will be awarded and remain at the market price, which is a fair and reasonable price," Pl.'s App. 4, as defendant correctly points out, plaintiff does not state that it relied on this representation, see Def.'s Fact Resp. ¶ 5.

Plaintiff also alleges that defendant "misrepresented" the fact that the "PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value," Am. Compl. ¶ 53, and that "the contracts did not provide for payment of at least fair market value" or "for fair and reasonable prices," id. ¶ 54.  Because plaintiff does not allege the affirmative – that defendant affirmatively stated these propositions rather than failed to disclose them – plaintiff fails to state a claim for affirmative misrepresentation.

In addition, to the extent that plaintiff argues that the government failed to disclose its knowledge about the way in which the PMM operated, plaintiff also fails to state a claim.  Although plaintiff alleges a duty on the part of defendant to disclose because price is a material term, the court finds that information about both the PMM and Platts were reasonably available to plaintiff.  The 1993 contract plainly states, "the [PMM] publication for a given month represents actual sales prices during that month."  Pl.'s App. 676.  Even if the 1993 contract did not put plaintiff on notice of the way in which the PMM operated, plaintiff, as a seller in the industry, knew or had the opportunity to discover the way the PMM worked because all industry sellers were required to report prices to it.  Plaintiff must be assumed to have read the PMM-based contract at issue, which states, "Contract prices for each month's deliveries will be based on the specified references listed by the [PMM] under the Sales Prices of Petroleum Products Tables for the month dated during the month of delivery."  Id.  On the following page, the contract lists "KEROSENE-TYPE JET FUEL SALES TO END-USERS[,]  PAD DISTRICT I AVERAGE[,] PAD DISTRICT III AVERAGE" as the "[h]eading under which reference price is published and name of product."  Id. at 677.  The contract also identifies "EAST/GULF/JP-8" as the "Economic Price Adjustment Region and Item No. Listed (items)."  Id.  Plaintiff was on notice of the products and region on which the adjustment would be based.  See id.  In addition, once the contracts began basing the price adjustment on Platts, a commercial publication widely used in the industry, plaintiff knew, or had the opportunity to learn, about the operation of Platts.  Because information about the operation of the PMM and Platts was "reasonably available" to plaintiff, the court finds that, as a matter of law, defendant could not have had a duty to disclose the inner workings of the indexes to plaintiff.

33

Plaintiff's claim that defendant failed to disclose the fact "that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value," Am. Compl. ¶ 53, also fails to state a claim. The plain language of the contract describes the way in which the PMM operates, and information about the PMM and Platts, a commercial publication widely used in the industry, was reasonably available to plaintiff. In addition, where, as here, plaintiff is an experienced seller of fuel, it cannot be said that the information about the PMM "misled the contractor, or did not put it on notice to inquire." GAF Corp., 932 F.2d at 949. Accordingly, defendant did not have any duty to disclose the alleged fact that the PMM was "not designed or intended to be used to set or adjust prices." Am. Compl. ¶ 53.

Plaintiff's allegation that defendant "failed to disclose that the contracts did not provide for payment of at least fair market value" or "for fair and reasonable prices" also fails to state a claim. Defendant did not have a duty to disclose the extent to which prices listed in the PMM deviated from prices listed in commercial publications such as Platts. Although price is a material term, see Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 666 (Fed. Cir. 1992), the government did not have a duty to disclose everything it knew about the price. See GAF Corp., 932 F.2d at 949 (stating that the government has a duty to disclose, under the superior knowledge doctrine, if (1) the information constitutes "vital knowledge of a fact that affects performance costs or direction, (2) the government [i]s aware the contractor had no knowledge of and had no reason to obtain such information, [and] (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire").

In this case, therefore, without first having made affirmative misrepresentations on which plaintiff relied, defendant did not have a duty to disclose that the PMM might not yield the price available in the commercial market reported in Platts or other commercial publications. Although plaintiff recites facts which, plaintiff argues, tend to show that defendant intended to utilize EPA clauses that would yield the "market price," see Am. Compl. ¶ 8 (1993 memorandum stating that the use of DESC's standard price adjustment clause would "ensure[] that the contract price will be awarded and remain at the market price" and "ensure[] that the sale will be at the market price"); see also id. ¶¶ 16-18 ("an internal assessment . . . indicates that [prices reported in] PMM may . . . move[] one or two cents per gallon out of step with . . . commercial references"), plaintiff fails to allege that it relied on any such facts. Plaintiff does not argue that it relied on a misrepresentation by defendant that defendant would pay "at least fair market value." Plaintiff fails to state a claim for misrepresentation on that ground.

Finally, plaintiff alleges that DESC "misrepresented and otherwise failed to disclose that DESC worked with DOE to determine how PMM was published." Am.

34

Compl. ¶ 55.  Plaintiff appears to be alleging that DESC was involved in establishing prices as reported in the PMM, and that, based on its conflict of interest, DESC should not have used prices reported in the PMM as the basis of its price adjustment.  To evaluate plaintiff's claim, the court reviews the documentation provided by plaintiff to support its claim and accordingly reviews plaintiff's claim under RCFC 56.  It is uncontested that the PMM reported prices as an average of prices it obtained from suppliers.  Plaintiff does not allege that DESC had any effect on the prices reported by PMM.  It is clear from plaintiff's own filings that the contact between DESC and DOE was for the purpose of assuring that the PMM continued to report mid-grade and regular unleaded gasoline together to facilitate administration of existing contracts, in the same way that the PMM had reported these fuels when the existing contracts were negotiated.  Pl.'s App. 101 ("[DOE's proposed alteration in price reporting] will separate mid-grade unleaded gasoline prices from regular unleaded prices.  Currently these two grades are combined for reporting purposes.  [DESC] currently uses the [unleaded gasoline table (Table 31)] as a prime component in its contract economic price adjustment scheme for JP-4, the major Air Force jet fuel. . . .  Any change in the reporting format of PMM Table 31 . . . would necessitate the renegotiation of all existing JP-4 line items on active contracts.").  As the Federal Circuit has determined, "use of a market-based EPA clause tied to the PMM was authorized under the FAR."  <u>Tesoro II</u>, 405 F.3d at 1348.  Plaintiff has failed to raise a genuine issue of material fact that would support a claim for conflict of interest in defendant's use of the PMM.  The court therefore GRANTS defendant's motion for summary judgment on plaintiff's conflict of interest claim.

> 2.    Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

Plaintiff argues that DESC is in breach of its contracts with plaintiff for failing to pay fair market value for the fuel plaintiff delivered.  Am. Compl. ¶¶ 61-63, 68; Pl.'s Resp. 36.  Plaintiff states, "In contravention of DESC's contractual obligation, DESC based price adjustments on the PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and ensure that the prices DESC paid for military fuel reflected at least fair market value," Am. Compl. ¶ 66, and "were not designed or intended to be used to set or adjust prices and which did not reflect at least the fair market value of fuel," <u>id.</u> ¶ 67.  Plaintiff bases its claim on the alleged purpose of the EPA clause, Pl.'s Resp. 36-37, on the plain language of the EPA clause, <u>id.</u> at 37-40, and on the <u>Spearin</u> doctrine, under which plaintiff argues that the government impliedly warranted the accuracy of the PMM and other indexes it used to adjust prices in reflecting the market.  <u>Id.</u> at 39-40 (citing <u>United States v. Spearin</u>, 248 U.S. 132, 136 (1918)).  Plaintiff also alleges that "DESC did not negotiate and administer the contracts in good faith," claiming that defendant

"used a non-negotiable illegal price adjustment clause that based price adjustments on PMM and other indexes, and worked with DOE to determine how PMM was published and to 'see that our needs are satisfied as . . . one of the primary users of PMM.'"  Am. Compl. ¶ 69 (quoting Pl.'s App. 100); see also Pl.'s Resp. 40 n.47 ("La Gloria alleges that DESC breached its obligation of good faith and fair dealing. . . .  La Gloria alleges that DESC imposed a non-negotiable price clause that it knew would not reflect the fair market value of fuel and, without disclosure to La Gloria, worked with DOE to 'see that our needs are satisfied' in the way the PMM was published.") (quoting Pl.'s App. 100).

Defendant moves to dismiss this claim of breach of contract because, defendant contends, basing price adjustments on indexes adequate to protect against market fluctuations and ensure that the prices paid would reflect at least fair market value were not material conditions of the contracts.  Def.'s Mot. 23.  Defendant states, "there is nothing in the contract that recites any such condition."  Id.  In addition, "La Gloria cites no language to contradict the unambiguous language of the contract's pricing clause."  Def.'s Reply 17.  "Accordingly," defendant states, "there is no basis for concluding . . . that the contracts were breached, even assuming that these conditions never materialized."  Def.'s Mot. 23.

Interpretation of a contract begins with an examination of the plain language of the written agreement between the parties.  Hercules Inc. v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002) (internal citations omitted); Giove v. Dep't of Transp., 230 F.3d 1333, 1340 (Fed. Cir. 2000).  A contract must be taken as a whole to give meaning to all provisions.  Forman v. United States, 329 F.3d 837, 842 (Fed. Cir. 2003) (citing McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (McAbee)).  If the plain meaning is clear, then the court need not consider extrinsic evidence.  HRE, Inc. v. United States, 142 F.3d 1274, 1276 (Fed. Cir. 1998) (citing McAbee, 97 F.3d at 1435).

Plaintiff first claims that the plain language of the contract and the title of the EPA Clause, B19.33, demonstrate an agreement on the part of the government to pay "fair market value."  Pl.'s Resp. 36.  The title of the provision is "Economic Price Adjustment – Published Market Price."  Pl.'s App. 673.  To the extent that this title is ambiguous as to whether the government agreed to pay fair market value, the court need only look to the remainder of the provision.  Part A, the definitions section, states that "[t]he reference price is the average or weighted average sales price of the specified product(s) in the specified PAD District or State of the Petroleum Marketing Monthly published by the Energy Information Administration."  Id.  Part D describes the PMM:  "In accordance with the Petroleum Marketing Monthly practice, the Petroleum Marketing Monthly publication for a given month represents actual sales prices during that month."  Id. at 676.  It is clear from the plain language of the contract that prices will be adjusted

36

according to the PMM.  Taking the provision as a whole, the court finds that the government did not warrant, through the title section or any other part of the provision, that it would pay "fair market value" for fuel.  Cf. Spearin, 248 U.S. at 137 (holding that, by inserting in the contract specifications "prescribing the character, dimensions and location of the sewer," the government "imported a warranty that, if the specifications were complied with, the sewer would be adequate"); see also GAF Corp., 932 F.2d at 950 (distinguishing a "'mere supply contract,'" such as the one at issue in GAF Corp., from a "'construction contract with its massive detail all prescribed by the owner'" and holding that a mere supply contract does not imply a warranty of specifications (quoting Lopez v. A.C. & S., Inc, 858 F.2d 712, 715 (Fed. Cir. 1988)).

In addition, the court finds that plaintiff has failed to state a claim for a breach of the duty of good faith and fair dealing.  A breach of the covenant of good faith and fair dealing by one party prevents the other party from enjoying the fruits of the bargain.  See Centex Corp. v. United States, 395 F.3d 1283, 1305 (Fed. Cir. 2005) (stating that the trial court found that a breach of the covenant of good faith and fair dealing occurs when one party "deprive[s] [the party's] contracting partner[ ] of a substantial measure of the fruits of the contract [by] appropriate those fruits, pro tanto, to itself"); Agredano v. United States, 70 Fed. Cl. 564, 574 (2006) ("[T]he object of the contract is presumed to be subject to the covenant of good faith and fair dealing . . . ." (citing Centex, 395 F.3d at 1306)).  "The duty applies to the government just as it does to private parties."  Centex, 395 F.3d at 1304 (citing Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1330 (Fed. Cir. 2003); Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000); Malone v. United States, 849 F.2d 1441, 1445, modified, 857 F.2d 787 (Fed. Cir. 1988)).  Plaintiff does not plead facts which, if proven, show that it was denied the benefit of its bargain.  Plaintiff sold defendant fuel and collected payment for its sales.  Plaintiff was on notice of the mechanism that would be used to adjust prices.  Defendant did not deprive plaintiff of the benefits of its bargain.  Accordingly, defendant's motion to dismiss plaintiff's claim for breach of the covenant of good faith and fair dealing is GRANTED.

3.      Failure of Consideration and Frustration of Purpose

Plaintiff also restates its claim that defendant failed to pay fair market value as a claim for failure of consideration and frustration of purpose.  Plaintiff states, "the illegality of [defendant's] prices and its failure to pay fair market value for fuel caused consideration to fail and frustrated the purpose of the contracts."  Pl.'s Resp. 41; see also id. at 44 ("DESC's use of the PMM and failure to pay fair market value . . . render[] the fuel contracts commercially impractical, if not commercially 'worthless.'").  In support of its position, plaintiff argues that both causes of action provide remedies by way of restitution in addition to excuse of performance.  Id. at 41-42.  Plaintiff adds that it alleges

37

frustration of purpose "both at [the time the contract was made] and based on intervening events." Pl.'s Resp. 43 (citing Restatement (Second) of Contracts § 266 (1981)). Plaintiff identifies two intervening events:  defendant's alleged violation of law and defendant's alleged misrepresentation, of which "DESC's use of the PMM and failure to pay fair market value" is alleged to be a product.  Id. at 44.

Defendant argues that the facts plaintiff alleges do not state a claim for failure of consideration or frustration of purpose.  Def.'s Mot. 24-25.  Furthermore, defendant states, "these theories are bases for avoiding performance, and [are] not applicable here, because performance already has occurred."  Id. at 24.

Failure of consideration, a defense which excuses performance, occurs when the party against whom the defense is asserted fails to perform or substantially fails to perform.  See Restatement (Second) of Contracts § 237 cmt. a (1981) ("What is sometimes referred to as 'failure of consideration' by courts and statutes . . . is referred to in this Restatement as 'failure of performance' to avoid confusion with the absence of consideration."); accord Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp., 270 F.3d 1117, 1126 (7th Cir. 2001) ("[F]ailure of consideration . . . relates to a party's performance of its contractual promises.  When a party does not perform at all, the case resolves itself; there is a failure of consideration, and the party cannot enforce the contract.  When an individual does perform some of its contractual obligations, a more complicated situation arises.").  Failure of consideration also occurs when the party asserting the defense fails to receive that for which he specifically bargained.  FDIC v. Meo, 505 F.2d 790, 793 n.5 (9th Cir. 1974).  In determining whether consideration has failed, a court looks to the contract to determine the consideration that was bargained for.  Bailey v. United States, 54 Fed. Cl. 459, 499 (2002).  The court does not evaluate the adequacy of consideration.  Id. ("The court . . . does not evaluate the adequacy of consideration, only the existence of consideration. . . .  It is a long established rule that the court will inquire only into whether there has been a bargained for exchange, and not into the adequacy of consideration."); see also Fifth Third Bank of W. Ohio v. United States, 52 Fed. Cl. 264, 270 n.9 (2002) ("If such a bargain is established, the fact that the Government miscalculated the benefit of these transactions does not amount to a failure of consideration").

Plaintiff does not state a claim for failure of consideration because plaintiff does not allege that it did not receive payment for the fuel it provided to defendant, or that defendant "substantially failed" to pay plaintiff the price agreed upon.  See, e.g. Meo, 505 F.2d at 793 n.5; see also Far W. Fed. Bank v. Director, Office of Thrift Supervision, 930 F.2d 883, 887 (Fed. Cir. 1991) (allegation by plaintiff-investors that the Financial Institutions Reform, Recovery and Enforcement Act deprived plaintiffs of the consideration for which they bargained by depriving them of both their investment and

the profit they would have made otherwise).  Furthermore, because courts do not evaluate the adequacy of consideration, the court declines to consider whether plaintiff did or did not receive a "good deal."  See Bailey, 54 Fed. Cl. at 499.  Because plaintiff fails to state a claim for failure of consideration, see RCFC 12(b)(6), the court DISMISSES plaintiff's claim.

Plaintiff also argues that affirmative relief is available upon a showing of frustration of purpose.  Plaintiff cites no authority that has recognized an affirmative remedy for frustration of purpose and the court is aware of none.  Frustration of purpose is a defense to excuse performance on the basis of "changed conditions [that] have rendered the performance . . . worthless [to one of the parties]."  Everett Plywood Corp. v. United States, 651 F.2d 723, 729 (Ct. Cl. 1981).  The classic example is that of Krell v. Henry, 2 K.B. 740 (1903), where the plaintiff had contracted to permit the defendant to occupy the plaintiff's flat on Pall Mall during the two days of King Edward's coronation parades.  King Edward's illness, however, led to the cancellation of the events.  Id. Because performance of the contract would have been useless to one of the parties – that is, because the purpose of the contract was frustrated – performance was excused.  Id. The purpose must be understood by both parties at the time of the formation of the contract.  Id.  The party asserting the defense of frustration of purpose "must show that (1) a supervening event occurred that should excuse performance, (2) it did not bear the risk of the event, and (3) the event rendered the value of the performance worthless to [it]."  Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1296 (Fed. Cir. 2002).

Plaintiff does not allege a supervening event that frustrated the purpose of the contracts.  The only events plaintiff alleges are (1) defendant's alleged violation of law in basing price adjustments on the PMM and (2) defendant's alleged misrepresentation that DESC would pay fair market value.  Pl.'s Resp. 43-44.  For the reasons stated in Parts II.A-E, supra, defendant's use of the PMM to adjust prices did not violate the law.  And for the reasons stated in Part II.G.1, supra, plaintiff failed to state a claim for misrepresentation.  Plaintiff cites the Restatement in support of its assertion that defendant's "violations of law . . . , its use of the PMM, and its failure to pay fair market value frustrated the principal purpose of the contracts."  Pl.'s Resp. 43.  Section 266 of the Restatement (Second) of Contracts provides that frustration of purpose exists "[w]here, at the time a contract is made, a party's principal purpose is substantially frustrated without his fault by a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made."  Restatement (Second) of Contracts § 266 (2).  This rule, however, does not describe plaintiff's situation.  Cf., e.g., Restatement § 266, illust. 1 (excusing performance where, at the time the contract is made, the object of the contract has been destroyed by fire without the buyer's knowledge).  The court has found that, as a matter of law, plaintiff's alleged

"assumptions" fail to state a claim on which relief may be granted.  Nor do these "assumptions" state a claim when joined together and renamed "Frustration of Purpose." The court accordingly DISMISSES plaintiff's claim for frustration of purpose.

      4.    Mistake

      Plaintiff also restates its claims for illegality and failure to pay fair market value as a claim for mutual, or, in the alternative, unilateral, mistake.  Its claim for mutual mistake is that both parties entered and performed the contracts with the intent that DESC pay fair and reasonable prices and at least fair market value (and that DESC use indexes adequate to accomplish that purpose and indexes "designed or intended to be used to set or adjust prices") and with the intent that the contracts be administered in accordance with law and regulation.  Am. Compl. ¶¶ 99-100, 106-109.  Plaintiff argues that it was harmed by these mutual mistakes and is entitled to recover by way of reformation or rescission and restitution.  Id. ¶¶ 122-23.  Plaintiff's pleading in the alternative for unilateral mistake is that, if DESC was not mistaken, then "DESC knew or should have known of [p]laintiff's mistake and failed to meet its duty timely to disclose th[e]s[e] mistake[s] to [p]laintiff." Id. ¶¶ 118-21.

      Defendant moves to dismiss La Gloria's claim for failure to state a claim upon which relief may be granted.  Defendant argues that La Gloria fails to state a claim for mutual mistake because La Gloria does not "offer[] . . . evidence concerning the elements of a mistake claim, including that both parties held an unrealized belief concerning a basic assumption underlying their bargain." Def.'s Mot. 26.  Defendant also argues that La Gloria fails to state a claim for mutual mistake because it not provided evidence to support a claim "that the parties believed that the PMM or Platts were anything other than what they are:  publications of certain price data." Id. at 28.  In addition, defendant argues that plaintiff does not state a claim for mutual mistake because plaintiff has alleged a mistaken belief as to how the indexes would operate in the future rather than a fact in existence at the time the agreement was formed.  Id.

      Defendant argues that La Gloria fails to state a claim for unilateral mistake because La Gloria's "vague allegations concerning the inappropriateness of the EPA clauses are, at best, legal characterizations of the clauses or of payment eventualities that postdated La Gloria's offers (the payment, or not, of 'fair market value') – and not true mistakes concerning what La Gloria intended to bid." Id. at 27.  Defendant also argues that La Gloria does not state a claim for unilateral mistake because it does not plead facts concerning the state of mind of its pricing teams or the factual circumstances surrounding La Gloria's offers.  Id. at 28.  In addition, defendant argues that plaintiff fails to state a claim for unilateral mistake because neither the award nor the administration of the

contracts was unconscionable.  Id.

Plaintiff responds that its claim does not concern "a mistaken prediction about the future," but rather facts in existence at the time of contracting:  specifically, the parties' "then-existing belief about what the PMM was, how it was designed, and for what it was intended to be used," and the PMM's "index number problem."  Pl.'s Resp. 44-45.  Plaintiff cites Beta Systems, Inc. v. United States, a case in which the Federal Circuit found that the "inclusion of an 'inappropriate and inadequate . . . price index in the escalation clause' constitute[s] mutual mistake of material fact," 838 F.2d 1179, 1184-85 (Fed. Cir. 1988), to support its assertion that "the parties' erroneous assumptions about the index" may support a claim for mistake, Pl.'s Resp. 45-46.  As to its claim of unilateral mistake, plaintiff asserts that "DESC knew or had reason to know of [plaintiff's] mistake about the PMM," citing defendant's own alleged "misrepresent[ation of] the underlying facts," and argues that "permitting DESC to retain the benefits of its prices in the face of La Gloria's mistake, when DESC knew the PMM did not reflect market value and nonetheless used it to set prices, would be unconscionable."  Id. at 46 n.51.

In its reply, defendant again argues that plaintiff's claim of mistake "lacks a factual premise."  Def.'s Reply 19.  Defendant argues that "La Gloria failed to meet the basic elements of proof of a mistake claim, including that, at the time of their agreement, the parties shared a mistaken belief 'regarding a fact' concerning a 'basic assumption underlying the contract.'"  Id. at 18 (quoting Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994)).  Despite La Gloria's claim that "the Complaint's focus in this Count is the purpose of the PMM and what it is intended to measure," Def.'s Reply 18, defendant argues that "La Gloria's reply fails to identify any belief that it held concerning the PMM – let alone one held by DESC," id.  In addition, defendant argues that "La Gloria has failed to show why the purpose of the PMM or why [the Energy Information Administration (EIA) within DOE] collects PMM data is material to an unambiguous contract provision that was never alleged to operate or be administered or interpreted improperly."  Id. at 18-19.

"Where there has been a mutual mistake of material fact, resulting in a contract which does not faithfully embody the parties' actual intent, reformation, rescission, and restitution may be available to the adversely affected party."  Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 665 (Fed. Cir. 1992).  The Federal Circuit has stated:

Reformation of a written agreement on the ground of mutual mistake is an extraordinary remedy, and is available only upon presentation of satisfactory proof of four elements:

41

> (1) the parties to the contract were mistaken in their belief
> regarding a fact;
> (2) that mistaken belief constituted a basic assumption
> underlying the contract;
> (3) the mistake had a material effect on the bargain; and
> (4) the contract did not put the risk of the mistake on the
> party seeking reformation.

Nat'l Austl. Bank v. United States, 452 F.3d 1321, 1329 (Fed. Cir. 2006) (quoting Atlas Corp. v. United States, 895 F.2d 745, 750 (Fed. Cir. 1990)).  To prove unilateral mistake, a plaintiff must show (1) that the alleged mistake concerns a basic assumption on which the contract was made; (2) that the plaintiff does not bear the risk of the mistake; and either (a) the effect of the mistake is such that enforcement of the contract would be unconscionable or (b) the other party had reason to know of the mistake or his fault caused the mistake.  Johnson Mgmt. Group CFC, Inc. v. Martinez, 308 F.3d 1245, 1260 (Fed. Cir. 2002) (citing Restatement (Second) of Contracts § 153).  A party bears the risk of mistake when, among other things, it is reasonable in the circumstances to allocate the risk to that party.  Restatement (Second) of Contracts § 154(c); see id. § 154 ("A party bears the risk of the mistake when (a) the risk is allocated to him by agreement of the parties, or (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.").  "A prediction or judgment regarding an event to occur in the future, if erroneous, does not constitute a 'mistake,' as the term is contemplated within the doctrine of mutual mistake of fact."  ECC Int'l Corp. v. United States, 43 Fed. Cl. 359, 371 (1999); see also Dairyland, 16 F.3d at 1203 ("To establish a mutual mistake of fact . . . , the party seeking reformation must show that the parties to the contract held an erroneous belief as to an existing fact. . . . 'A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined [under the doctrine of mutual mistake of fact]'" (emphasis added) (quoting Restatement (Second) of Contracts § 151 cmt. a (1981)).  Mistakes of judgment do not qualify the complaining party for reformation or rescission of the contract.  Liebherr Crane Corp. v. United States, 810 F.2d 1153, 1157 (Fed. Cir. 1987).

   Because the court has already determined that the premise of plaintiff's first claim – that the contracts were not awarded and administered in accordance with law and regulation – is incorrect, see supra Parts II.B-D, defendant's motion to dismiss for failure

to state a claim of mistake on the basis of illegality is GRANTED.[20]

Plaintiff's second claim concerning a mistaken belief that the parties intended that DESC would pay at least fair market value also fails to state a claim. The reason is that the plain language of the contract demonstrates that the intent of the parties was to base price adjustments on the measure identified by the EPA clause – PMM and later Platts. See Pl.'s App. 671-87 (1993 contract). When sophisticated parties chose a mechanism on which to base price adjustments, the parties each assume the risk that the measure will not reflect exactly what they hoped it would. In this case, each party understood what the PMM measured, and each party was responsible for determining the issues that were important to it with regard to the way in which the indexes worked. To the extent that the parties did not understand what the PMM measured – and to the extent that plaintiff thought the PMM would be adequate "to protect against market fluctuations and to ensure that the prices DESC paid for military fuel [would] reflect[] at least fair market value," Am. Compl. ¶ 52 – that was an error of judgment, see United Int'l, 56 Fed. Cl. at 628, or a case of a party treating its limited knowledge as sufficient, see Restatement (Second) of Contracts § 154(b), as to which the party proceeded at its own risk. If plaintiff was concerned about the extent to which the PMM reflected prices reported in commercial publications, plaintiff bore the responsibility to make that determination. It is far from clear that plaintiff alleges that it expected at the time of contracting that the PMM would closely track commercial publications. Even if plaintiff can be understood so to allege, however, defendant could not have known – and plaintiff does not allege that defendant knew – that plaintiff would expect the PMM to track commercial publications. Accordingly, the fact that PMM either would or would not closely track commercial publications or the extent of the deviation was not a basic assumption on which the contract was made. Furthermore, to the extent that either plaintiff or defendant was mistaken about the way the indexes worked – including mistakes concerning an alleged "index number problem" or the extent to which the PMM tracked the commercial publications – each of the parties bore the risk.

---

[20]In Gold Line Refining, Ltd. v. United States, this court held that plaintiff Gold Line's similar claim for mutual mistake on the basis of illegality was a claim on which relief could be granted. 43 Fed. Cl. 291, 297 (1999) (Gold Line). The court stated, "[I]f a fixed price contract containing an economic price adjustment clause is in violation of the procurement regulations and does not meet the requirement that the selected indexes approximately tracks the economic changes affecting the contract, reformation is appropriate." Id. The court based its reasoning on MAPCO and the illegality of the indexes employed by defendant to adjust prices. See id. at 296. Tesoro II abrogated the finding in MAPCO that the EPA clause at issue was illegal under the FAR. See Tesoro II, 405 F.3d at 1348. MAPCO was the legal underpinning for the Gold Line holding. See Gold Line, 43 Fed. Cl. at 296.

As to the alleged "index number problem" specifically, that problem constitutes an error in judgment and not a mistake at law. See United Int'l, 56 Fed. Cl. at 628. To the extent that the parties could have known at the time the contract was made that the index contained an "index number problem," the parties "treat[ed] their limited knowledge as sufficient" – an error in judgment – and assumed the risk. See Restatement §154(b); United Int'l, 56 Fed. Cl. at 628. To the extent that the parties could not have known about the alleged index number problem, the alleged mistake constituted an erroneous "prediction or judgment regarding an event to occur in the future," ECC Int'l, 43 Fed. Cl. at 371, and is not recognized by the law as a mistake.

Beta Systems, relied on by plaintiff, Pl.'s Resp. 45-46, is not to the contrary. See generally Beta Systems, Inc. v. United States, 838 F.2d 1179 (Fed. Cir. 1988). In that case, the plaintiff claimed that the index used to adjust prices failed to measure the inflationary or deflationary changes in the cost of labor and materials because it did not track the price of aluminum, which constituted at least 40% of the materials. Id. at 1184. This alleged failure was contrary to Defense Acquisition Regulation (DAR) 3-404.3(c)(3)c.5 (1981), which provided:

> An index should be structured to encompass a large sample of the relevant items yet bear a logical relationship to the type of contract costs being measured. The basis of the index should not be so large and diverse that it is significantly affected by fluctuations not relevant to the contract performance, yet must be significantly broad so as to assure the minimal effect of any single company, including anticipated contractors.

DAR 3-404.3(c)(3)c.5 (1981). Here, however, plaintiff does not identify a regulation which the alleged index number problem could be found to have violated. See supra Parts II.B-C (finding that the EPA clause did not violate the FAR). La Gloria does not even allege that the index failed to account for the price of fuel or measured fluctuations in prices of an entirely different material. Similarly, plaintiff's allegation that the indexes used to adjust prices did not account for the right kinds of fuel does not state a claim. In addition to not rising to the level of failure to account for a material which constitutes 40% of the product supplied, see Beta Systems, 838 F.2d at 1184, it does not state a claim because plaintiff was on notice of exactly which types of fuel would be taken into account in the adjustment of prices. The contracts explicitly listed the specific types of fuel whose fluctuations the EPA clause would follow. See, e.g., Pl.'s App. 675 (identifying JP-8 fuel as the product on whose fluctuations in price the EPA clause would be based). La Gloria fails to state a claim for mistake.

Plaintiff's claim that it held a mistaken belief as to the fact that the PMM and other

44

indexes were not intended to be used to set or adjust prices also fails to state a claim. Whether the PMM and Platts were or were not intended to be used to set or adjust prices did not constitute a basic assumption on which the contracts were made.  This is so because plaintiff, an experienced supplier of fuel, knew what the PMM measured and generally how it operated.  Furthermore, to the extent that the PMM and other indexes did not operate as plaintiff hoped they would, plaintiff, in a position to learn about the operation of the indexes, bore the risk.  Any failure in this regard constituted a mistake of judgment for which there is no legal remedy under the doctrine of mistake.  See United Int'l, 56 Fed. Cl. at 628.

Defendant's motion to dismiss plaintiff's claims for mistake for failure to state a claim is GRANTED.

F.    Takings

Plaintiff also alleges that defendant's establishment and payment of allegedly unfair fuel prices pursuant to its contracts with plaintiff effected a taking of plaintiff's property.  Am. Compl. ¶¶ 125-30.  Defendant moves to dismiss for failure of plaintiff to state a claim upon which relief may be granted on the basis that a takings claim generally cannot lie where the government has purchased the property pursuant to a contract. Def.'s Mot. 29-30 (citing Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 703 n.27 (1949); Hughes Commc'ns Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001); Sun Oil Co. v. United States, 572 F.2d 786, 818 (Ct. Cl. 1978)).

The Fifth Amendment of the U.S. Constitution provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. am. V. Where a contract between the plaintiff and the government covers the property that the plaintiff asserts has been "taken," the court must look to the contract to determine whether the plaintiff is entitled to damages.  See Castle v. United States, 301 F.3d 1328, 1342 (Fed. Cir. 2002); Pac. Gas & Elec. Co. v. United States, 70 Fed. Cl. 766, 777 (2006) ("Where a plaintiff retains a range of remedies associated with any contractual property right it possesses, the plaintiff's claim is said to be one of damages for breach of contract, not just compensation for taking of property.").  The Federal Circuit has explained:

> This court's predecessor has cautioned against commingling takings compensation and contract damages.  Indeed, "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach of contract claim not a taking claim."

Hughes Commc'ns Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001) (quoting Sun Oil Co. v. United States, 572 F.2d 786, 818 (1978)).  Where, however, the rights that a plaintiff asserts exist independent of the contract, the fact that there is a contract between the plaintiff and the government will not preclude the court from evaluating whether the plaintiff is entitled to compensation.  Integrated Logistics Support Sys. Int'l, Inc. v. United States, 42 Fed. Cl. 30, 34-35 (1998).

Here, plaintiff argues that the price it received as established by the contract was unfair.  Because the very term about which plaintiff complains was established by a contract, the court cannot evaluate plaintiff's claim as a takings claim.  Plaintiff cannot recover under a takings theory.  Defendant's motion to dismiss plaintiff's takings claim under RCFC 12(b)(6) is GRANTED.

G.      Waiver and Estoppel

Defendant asserts the defenses of waiver and estoppel and moves to dismiss plaintiff's claims on those bases.  Def.'s Mot. 35-38.  Because the court has DISMISSED all of plaintiff's claims on other grounds, the court declines to reach the issue of whether plaintiff's delay in bringing its claims prevents it from bringing these claims now under the doctrines of waiver and estoppel.

H.      Plaintiff's Request for Discovery Pursuant to RCFC 56(f)

By separate motion, plaintiff moves for discovery to prove the facts it alleges.  Pl.'s Mot. passim.  Plaintiff argues that discovery is needed to allow La Gloria to "present facts essential to justify its opposition."  Pl.'s Mot. 2.  Plaintiff states, "La Gloria requires complete discovery with respect to each of the enumerated proposed findings of fact and with respect to each of the enumerated allegations in the Amended Complaint."  Pl.'s Mot. 6.  Plaintiff concedes that "to the extent that the [c]ourt were to find that any of DESC's proposed findings of fact enumerated below are not material to resolving DESC's motion, discovery with respect to those findings of fact would not be required to resolve the motion."  Id. at 7.  While plaintiff enumerates many findings of fact that require discovery, id. at 8-23, plaintiff at no point explains why the establishment of any particular fact would preclude entry of summary judgment on behalf of defendant.

Defendant argues that the court should deny plaintiff's motion for discovery because plaintiff failed to plead sufficient facts to invoke the various causes of action alleged and fails to state with sufficient specificity how discovery will enable it to rebut defendant's showing of the absence of a genuine issue of fact.  Defendant argues that the

court should not allow discovery to proceed because "La Gloria's 56(f) motion and affidavit simply fail to explain why La Gloria cannot obtain relevant evidence and how discovery will enable it to raise a genuine issue of material fact[], in light of our <u>legal</u> arguments." Def.'s Resp. 14.  Further, defendant argues that, to the extent that plaintiff suggests that DESC was aware that there was something improper in its use of the PMM, <u>id.</u> at 16 (citing Am. Compl. ¶¶ 17-20), the court may decide the question on the basis of documents defendant provided which are sufficient to demonstrate that "in addition to there being no materiality to this innuendo, there also was no factual basis" for it, <u>id.</u>

RCFC 56(e) states in pertinent part,

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or otherwise provided by this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

RCFC 56(e); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325-26 (1986) (stating that the quoted language was added to Rule 56(e) "to disapprove a line of cases allowing a party opposing summary judgment to resist a properly made motion by reference only to its pleadings" and that the purpose of the "amendment to Rule 56(e) [was] . . . to <u>facilitate</u> the granting of motions for summary judgment").  Under RCFC 56(f), a court may refuse summary judgment or may order a continuance to permit additional discovery if the non-movant submits an affidavit explaining why it is unable to fulfill the requirements of RCFC 56(e) of setting forth "specific facts" showing that genuine issues of material fact exist.  RCFC 56(f); <u>Jade Trading, LLC v. United States</u>, 60 Fed. Cl. 558, 565 (2004); <u>see</u> <u>Simmons Oil Corp. v. Tesoro Petroleum Corp.</u>, 86 F.3d 1138, 1144 (Fed. Cir. 1996) ("In moving for relief under Rule 56(f), a party must demonstrate specifically 'how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'" (quoting <u>Willmar Poultry Co. v. Morton-Norwich Prods., Inc.</u>, 520 F.2d 289, 297 (8th Cir. 1975)).

RCFC 56(f), which is identical to Rule 56(f) of the Federal Rules of Civil Procedure, provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot <u>for reasons stated</u> present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a

continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

RCFC 56(f) (emphasis added).  Discovery is permitted, and summary judgment denied, when the non-movant has shown that further discovery is reasonably calculated to lead to facts necessary to prove the non-movant's opposition to summary judgment.  "The party 'may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts.'"  Simmons Oil, 86 F.3d at 1144 (quoting Sec. & Exch. Comm'n v. Spence & Green Chem. Co., 612 F.2d 896, 901 (5th Cir. 1980)).  Rather, "the movant is 'required to state with some precision the materials he hopes to obtain with further discovery, and exactly how he expects those materials would help him in opposing summary judgment.'"  Simmons Oil, 86 F.3d at 1144 (quoting Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1443 (5th Cir. 1993)); Opryland USA, Inc. v. Great Am. Music Show, 970 F.2d 847, 852 (Fed. Cir. 1992).  "It is not enough simply to assert . . . that 'something will turn up.'"  Simmons Oil, 86 F.3d at 1144.

A motion for discovery pursuant to RCFC 56(f) is only appropriate to prevent resolution of a case on summary judgment.  Where a case is resolved on a motion to dismiss, additional discovery will not save it.

Because, with the exception of plaintiff's claims that defendant violated FAR § 16.203 by basing price adjustments on Platts and plaintiff's claim for conflict of interest with respect to the use of the PMM, the court decides every claim as a matter of law on the basis of either RCFC 12(b)(1) or 12(b)(6), the court DENIES plaintiff's Rule 56(f) motion as to those claims.

The court DENIES plaintiff's 56(f) motion as to plaintiff's remaining claims because plaintiff fails to state with specificity what it expects to find.  See RCFC 56(e) (requiring the non-moving party to "set forth specific facts showing that there is a genuine issue for trial"); RCFC 56(f) (requiring the non-movant to state reasons why it cannot present facts essential to justify its opposition to a motion for summary judgment). Plaintiff's claim for misrepresentation, in which plaintiff's claim for a conflict of interest is encompassed, states a general claim that more discovery is needed to prove fraud and/or misrepresentation on the part of the defendant.  However, plaintiff's claim does not identify the specific incident of misrepresentation beyond the statement identified in the internal DESC memorandum provided, see Pl.'s App. 100, which, the court has determined, does not demonstrate a conflict of interest.  Plaintiff also does not identify anything else that it expects to find.  Plaintiff's claim that defendant violated FAR § 16.203 by using Platts to adjust prices also does not specify anything that it expects to find that would create a genuine issue of material fact that would bar summary judgment.

Plaintiff simply does not provide a basis on which to grant its motion.  Because the court declines to authorize what, in the absence of specifically pleaded facts, appears to the court to amount to a fishing expedition, the court DENIES plaintiff's motion.

III.    Conclusion

The court GRANTS defendant's Motion to Dismiss plaintiff's claims of illegality under FAR § 16.203 for failing to base EPA clauses on plaintiff's own established prices and basing EPA clauses on the PMM for failure to state a claim upon which relief may be granted.  The court GRANTS defendant's Motion for Summary Judgment of plaintiff's claim of illegality under FAR § 16.203 for basing EPA clauses on Platts.  The court GRANTS defendant's Motion to Dismiss plaintiff's claim of illegality under FAR § 15.402 for failure to state a claim upon which relief may be granted.  The court GRANTS defendant's Motion to Dismiss plaintiff's equal protection and small business claims for lack of jurisdiction.  The court GRANTS defendant's Motion to Dismiss plaintiff's common law contract claims and takings claim for failure to state a claim upon which relief may be granted.  The court GRANTS defendant's Motion for Summary Judgment of plaintiff's conflict of interest claim.  The court DENIES plaintiff's RCFC 56(f) motion.  The Clerk of the Court shall DISMISS the Amended Complaint and ENTER JUDGMENT for defendant.

IT IS SO ORDERED.

s/Emily C. Hewitt
EMILY C. HEWITT
Judge